**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

Demetrius Jones                          :
1053 E. Cheltenham Ave                    :
Philadelphia, PA 19124                   :     TRIAL BY JURY DEMAND
                                         :
            Plaintiff.                    :     CIVIL ACTION NO.
                                         :
            v.                           :
                                         :
City of Philadelphia                     :
1515 Arch Street                         :
Philadelphia, PA 19102                   :
                                         :
Blanche Carney                           :
Commissioner of the                      :
Philadelphia Prisons Department          :
1515 Arch Street                         :
Philadelphia, PA 19102                   :
                                         :
Karen Butler                             :
Deputy Warden CFCF                       :
1515 Arch Street                         :
Philadelphia, PA 19102                   :
                                         :
Robert Rose                              :
Deputy Warden CFCF                       :
1515 Arch Street                         :
Philadelphia, PA 19102                   :
                                         :
Ivory Cousins                            :
1515 Arch Street                         :
Philadelphia, PA 19102                   :
                                         :
John Doe                                 :
1515 Arch Street                         :
Philadelphia, PA 19102                   :
                                         :
            Defendants.                   :

**COMPLAINT**

Plaintiff, by and through his attorney, Brian J. Zeiger, Esquire, hereby alleges the following:

**JURISDICTION & VENUE**

1.     Plaintiff alleges civil rights violations under 42 U.S.C. § 1983 and this Court has jurisdiction pursuant to 28 U.S.C. § 1343 and 28 U.S.C. § 1331.

2.     Defendants reside in the Eastern District of Pennsylvania and venue is proper pursuant to 28 U.S.C. § 1391(b).

**PARTIES**

3.     At all times relevant hereto, Plaintiff Demetrius Jones is an adult resident of Pennsylvania who lives at 1053 E. Cheltenham Ave, Philadelphia, PA 19124.

4.     Defendant City of Philadelphia, doing business at 1515 Arch Street, Philadelphia, PA 19102, is a municipality, duly organized and existing under the laws of the Commonwealth of Pennsylvania.

5.     Defendants Carney, Butler, and Rose are believed to be an adult citizens of Pennsylvania conducting business at One Parkway, 15th Floor, 1515 Arch Street, Philadelphia, PA 19102. Defendants Carney, Butler, and Rose are being sued in their official capacity only.

6.     Defendant Ivory Cousins is believed to be an adult citizen of Pennsylvania conducting business at 1515 Arch Street, Philadelphia, PA 19102. Defendant Cousins is believed to be a corrections officer and is being sued in her individual capacity.

7.     Defendant Doe is believed to be an adult citizen of Pennsylvania conducting business at 1515 Arch Street, Philadelphia, PA 19102. Defendant Cousins is believed to be a corrections officer and is being sued in their individual capacity.

LEVIN & ZEIGER LLP
1500 JFK BLVD, SUITE 620
PHILADELPHIA, PENNSYLVANIA  191029
215.546.0340

8.    At all times material hereto, the individual defendants acted under color of law and within the course and scope of their employment, pursuant to the customs, policies, practices, ordinances, regulations, and directives of the City of Philadelphia.

## FACTUAL BACKGROUND

### A. Specific Facts Related to Plaintiff's Beating

9.    On or about August 29, 2019, Plaintiff was an inmate at the Curran Fromhold Correctional Facility ("CFCF"), when he was attacked and stabbed by the inmates at the behest of Defendant Cousins.

10.    After the attack, Defendant Cousins locked Plaintiff in his cell, where he was seated in a pool of his own blood and denied medical care.

11.    Several hours later, Defendant Cousins's co-workers attempted to get Plaintiff medical help, but Cousins prevented her co-workers from getting Plaintiff help.

12.    Defendant Cousins entered Plaintiff's cell and pepper-sprayed him, causing aggravation and irritation to open wounds on his face from the earlier beating instigated by Defendant Cousins.

13.    Defendant Cousins was untruthful in paperwork filed with the Philadelphia Prison System ("PPS").

14.    Sometime shortly thereafter, other corrections officers were finally able to get Plaintiff medical attention.

15.    Plaintiff learned he suffered from a fractured eye socket and various other injuries as a result of the beating.

16.    Plaintiff filed multiple grievances, but no action was taken because Defendant Cousins covered up her actions and was untruthful on paperwork.

LEVIN & ZEIGER LLP
1500 JFK BLVD, SUITE 620
PHILADELPHIA, PENNSYLVANIA 191029
215.546.0340

17.    In April 2025, Defendant Cousins was convicted in federal court on Docket Number 2:24-cr-00279-JS-1 of 18 U.S.C. § 242 - Deprivation Of Rights Under Color Of Law, and 18 U.S.C. § 1519 - Falsification Of Records.

18.    Defendant Doe was present during all times relevant to the instant matter, working as a corrections officer at the CFCF, and failed to stop Defendant Cousins actions, and failed to render aid to Plaintiff.

**B. Supervisory Liability and Municipal Liability**

19.    Defendants Carney, Butler, and Rose knew of the risk to Plaintiff's safety because of their knowledge that the CFCF was grossly understaffed at the time of the attack.

20.    Defendants Carney, Butler, and Rose were responsible for hiring corrections officers or otherwise working to recruit or retain corrections officers.

21.    Defendants Carney, Butler, and Rose were responsible for the safety of inmates at the CFCF at all times relevant to the instant complaint.

22.    Defendants Carney, Butler, and Rose were aware the CFCF was grossly understaffed at the time of the assault on Plaintiff.

23.    The City of Philadelphia has a history of understaffing and failing to protect inmates like Plaintiff from known, dangerous inmates, failing to monitor inmates for inmate safety, and failing to ensure that security protocols are being followed to ensure inmate safety.

24.    Due to the understaffing by Carney, Butler, and Rose, Defendant Cousins was not adequately supervised, during all time relevant to the instant complaint.

25.    Defendants Carney, Butler, and Rose were all personally involved in policies and procedures at the CFCF regarding staffing levels and supervising staff, during all times relevant to

the instant complaint.

26. On April 20, 2020, in *Remick v. City of Philadelphia*, 20-cv-1959, the City of Philadelphia was sued based on a theory of Unconstitutional Conditions of Confinement in Violation of the Eighth and Fourteenth Amendments to the U.S. Constitution related to inadequate protection from COVID-19, inadequate medical care, failure to protect inmates from violence in the PPS, and inadequate staffing generally at the PPS. (Exhibit A; 2:20-cv-1959, ECF# 1).

 a. On June 22, 2021, the City of Philadelphia settled the matter and agreed to a monitor to observe the terms and conditions of the settlement. Exhibit B. On July 12, 2022, the settlement was authorized by the Court. (Exhibit C; 2:20-cv-1959, ECF# 175).

 b. The City failed to live up to its end of the settlement and was held in contempt on July 12, 2024, due to inadequate staffing at the PPS. (Exhibit D; 2:20-cv-1959, ECF# 220).

 c. On August 16, 2024, the City of Philadelphia was forced to place $25,000,000 in escrow due to the Contempt Order. (Exhibit E, 2:20-cv-1959, ECF# 222).

 d. The City has failed to correct the inherent dangers of understaffing at the PPS.

 e. Further, on May 25, 2022, a monitor was appointed by the Court to track staffing levels at the PPS. (*See* 2:20-cv-1959, ECF# 169):

  i. The monitor has written various reports regarding the continued lack of staffing at the PPS since the settlement in *Remick*. *See* 2:20-cv-1959;

- Exhibit F, Monitor's First Report, ECF# 181, November 4, 2022;
- Exhibit G, Monitor's Second Report, ECF# 185, March 3, 2023;
- Exhibit H, Monitor's Third Report, ECF# 193, October 12, 2023;
- Exhibit I, Monitor's Fourth Report, ECF# 204, March 29, 2024;
- Exhibit J, Monitor's Fifth Report, ECF# 224, September 20, 2024.

LEVIN & ZEIGER LLP
1500 JFK BLVD, SUITE 620
PHILADELPHIA, PENNSYLVANIA 191029
215.546.0340

ii. During the time period from the settlement to the observer's reports, Defendant City of Philadelphia spent *less* on staffing; *i.e.*, their costs of staff went down during the period of observation.

iii. Further, in September 2023, the observer began to chart the deficient staffing levels at PPS, which clearly shows a pattern and practice of inadequate staffing. *See* Exhibit J, Monitor's Fifth Report, 2:20-cv-1959; ECF# 224, p. 17:

**Table 7: Percentage of Posts Left Vacant Due to Staffing Shortage**
**September – December 2023**

| Date | September | October | November | December | Average |
|------|-----------|---------|----------|----------|---------|
| Average | 43% | 43% | 33% | 40% | 40% |

**Table 8: Percentage of Posts Filled with Overtime Staff**
**September – December 2023**

| Date | September | October | November | December | Average |
|------|-----------|---------|----------|----------|---------|
| Average | 26% | 24% | 24% | 26% | 25% |

• Indeed, based on information and belief, in April 2023, the PPS was short-staffed with vacant posts.

27. At the time of the incident, Defendants Carney, Butler, and Rose were directly involved in creating and enforcing policy at the CFCF regarding inmate discipline, movement, classification, safety, and search of the person.

28. At the time of the incident, Defendants Carney, Butler, and Rose, were responsible for training and supervising Defendant Cousins regarding prisoner discipline, movement, classification, safety, and searches of the person; yet, they failed to properly train and supervise Defendant Cousins.

**C. Examples of Inmate Assaults at the CFCF**

29. Defendant City of Philadelphia has been sued on a myriad of occasions for corrections

LEVIN & ZEIGER LLP
1500 JFK BLVD, SUITE 620
PHILADELPHIA, PENNSYLVANIA 191029
215.546.0340

officers beating inmates, yet Defendant City of Philadelphia still does not properly train and supervise corrections officers regarding the use of force against inmates.

a. In September of 2014, CFCF corrections officer Tyrone Glover beat inmate Marcellus Temple in plain view of prison visitors, but was neither terminated nor disciplined. The next year, in October 2015, Glover was once again captured on CFCF's security cameras striking inmate John Steckley in the face several times with a closed fist following a verbal altercation. Glover was not immediately terminated, but he resigned so he would not be criminally charged.

b. In October of 2014, CFCF corrections officer James Weisback repeatedly punched an inmate, Jonathan Akubu, in the face fifteen times with a closed fist while Akubu was handcuffed. The matter was captured on video. Officer Weisback received a brief suspension for using excessive force and was transferred to different unit.

c. In May of 2015, CFCF corrections officer Larry Levy struck inmate Victor Henderson in the back of the head nine times, kicking him in the back of the leg, throwing him to the ground, stepping on his head, punching him while he was on the ground, and pepper-spraying him in the face. The matter was captured on video. Levy was convicted of simple assault.

d. In June of 2016, corrections officers Milton Gibbs and Terrance Bailey took PPS inmate Brandon Kulb out of his cell, handcuffed him, walked him the exit, and then struck Kulb in the back of the head, knocking him to the ground. Officers Gibbs and Bailey proceeded to drag Kulb to the central control area and began to stomp on him. Officer Shaun Lowe then arrived and joined the assault. The assault was

captured on video and lasted nearly 10 minutes, with Kulb losing consciousness at least twice. Gibbs and Bailey submitted a fake mental health referral for Kulb, alleging that he intentionally harmed himself in an effort to cover up their wrongdoings. Officer Lowe transported Kulb to a receiving room where Officer Gibbs attempted to coerce him not to report the assault in exchange for food. All three officers submitted written reports that omitted the assault. The guards were arrested for their conduct. Officer Gibbs was sentenced to a jail term between 45 days and 23 months, plus 4 years of probation, and was required to attend anger management counseling and provide community service. Officer Bailey accepted a guilty plea and was sentenced to 3 years of probation. Officer Lowe kept his job and was sent to a diversion program for his role in obstructing the investigation. It turned out that Gibbs had previously beat inmates on multiple occasions: he was arrested in 1989 for choking a juvenile in custody in Bucks County, participated in the 2004 assault of an inmate in a Philadelphia men's jail, and was the subject of other disciplinary complaints, including a 2012 allegation that he grabbed a female inmate by the hair and dragged her down a hall.

e.  In December of 2016, a transgender inmate was pepper-sprayed in the face 4 times by Officer Monique Jones at the direction of Sergeant Nakia Anderson at Riverside Correctional Facility while the inmate was handcuffed in his cell. None of the officers involved in this incident were terminated.

f.  In July of 2018, in *Simmons v. Philadelphia*, 22-cv-1644, inmate Simmons was assigned to a cell in the Philadelphia Prison System with a paranoid schizophrenic,

LEVIN & ZEIGER LLP
1500 JFK BLVD, SUITE 620
PHILADELPHIA, PENNSYLVANIA 191029
215.546.0340

Jessie Wilson, who had a history of physically and verbally abusing Simmons. Simmons reported the abuse, but of course, the claim fell upon deaf ears. Simmons remained in a cell with Wilson, who brutally assaulted and raped Simmons throughout the night after his complaints. Wilson should have been placed in segregation at the time of the assault on Simmons. He was not.

g. On October 25, 2018, Michael Battersby was an inmate at the Philadelphia Prison System. Battersby was in a special unit for inmates in recovery who were very frail. In the unit, every morning after breakfast, every inmate was given a protein shake to help them stay hydrated and put on weight. At that time, corrections officer Rynell Hovington was handing out the shakes and had an argument with Battersby. Hovington beat Battersby with his fist and shattered Battersby's jaw in two places. Hovington walked off the job immediately after the beatdown, feigning a headache. Battersby was transported to a nearby hospital, where his jaw was wired shut. Hovington returned to work the next day and was never disciplined for the incident.

h. On December 17, 2018, David Overton was an inmate in the Philadelphia Prison System when he was beaten by corrections officer Bruce. After the beating, Plaintiff was transferred to a nearby hospital, treated for a broken jaw, and had his jaw wired shut. Sergeant Q. Thomas was present during the altercation, reprimanded Bruce in front of Overton, but did not discipline Bruce with any further punishment.

i. In May of 2019, two CFCF corrections officers, Robert Berger and Nathanial Morris, were arrested by the FBI for attacking inmate Lamar Rozier; they punched

9

and kicked him multiple times even though he was compliant, posed no physical threat, and did not even attempt to fight back. The two corrections officers were also charged with filing false statements after excluding details of their assault from their incident reports. While both were found not guilty in criminal court, the City of Philadelphia still has not terminated Berger or Morris.

j.  On August 26, 2019, Jose Lopez was an inmate at the CFCF who suffered from severe mental health problems. After Lopez urinated on the floor in his cell, he was removed from his cell, transported to a private area at the CFCF, and placed naked into a restrictive smock so he could not use his hands. Corrections officers Reese, Fitzroy Williams, Anthony Shorts, Aisha Ryans, Grogan George, and Tyrone Rodriguez beat him. As a result of the beating, Lopez was transported to a nearby hospital, where he was treated for a fractured orbital socket and fractured jaw. One of the abovementioned guards was disciplined for the being the lookout during the beatdown, which was described as "leaving their post." None of the other guards were disciplined.

k.  In August of 2019, PPS inmate Frankie Diaz, Jr. died of injuries after being beaten by another prisoner. https://www.prisonlegalnews.org/news/2022/aug/1/filth-fury-philly-jails-descend- murderous-chaos/. The inmate who beat Diaz to death had a violent history while incarcerated. That inmate was involved in a significant fight and/or altercation with Diaz and, as a result, should have been placed in segregation at the time of the assault on Diaz. He was not.

l.  On or about October 6, 2020, Victor Hernandez was attacked by five corrections officers at the CFCF. The guards took Hernandez to an area of the prison they believed to be out of the purview of the camera system; there, they beat him, including stomping on his testicles, causing a major injury to Hernandez. One of the corrections officers was indicted and convicted in this court on criminal charges related to the incident.

m.  On December 20, 2020, inmate Randall Todd was violently attacked by two corrections officers at the Philadelphia Industrial Correction Center ("PICC"). Todd was knocked unconscious, rushed to a local hospital, intubated, and later revived. Todd also suffered a fractured hand.

n.  In January of 2021, Dale Curbeam was found dead face down in his cell at Curran Fromhold Correctional Facility ("CFCF"), a prison within the Philadelphia Prison System. His cellmate was arrested for the murder. According to *The Philadelphia Inquirer*, only one correctional officer was stationed in the Pod at the time of the homicide.    https://www.inquirer.com/news/homicide-philadelphia-jails-violence-covid-pandemic- lockdowns-20210120.html.

o.  In March of 2021, Armani Faison was incarcerated at CFCF. He was assigned to a cell with known, dangerous inmate Kevin Massey. Massey had sexually assaulted another inmate earlier that day. In response to the sexual assault, Massey was not placed in administrative or disciplinary segregation. That other inmate was moved out of the cell with Massey. Faison was moved into the cell with Massey mere hours after Massey sexually assaulted the other inmate. Massey repeatedly raped, beat,

LEVIN & ZEIGER LLP
1500 JFK BLVD, SUITE 620
PHILADELPHIA, PENNSYLVANIA  191029
215.546.0340

and choked Faison. Faison's body was found the next morning, naked, bloodied, and floating in six inches of water. He was transported to Nazareth Hospital and pronounced dead that morning. As a result of his prior conduct, Massey should have been placed in segregation at the time of the assault on Faison. He was not.

p.   On July 16, 2021, corrections officers Jean Castor and Terrel Felts beat, violently punched, and kicked an inmate at the CFCF. After the beating, Castor used a handheld radio issued by the prison system to beat the inmate in the face. Video of the incident shows other corrections officers attempting to pull Castor and Felts off the inmate while the inmate lay prone and motionless on the ground. *See McClennan v. City of Philadelphia*, et al., 2:21-cv-04948-KSM.

q.   On or about April 15, 2022, Juan Ayala Rivera was an inmate in the Philadelphia prison system when he had an argument with a female corrections officer Harris. After the argument was completed, Rivera went back to his cell. Moments later a male corrections officer Harris removed Rivera from his cell and slapped and punched him in the face. The male Harris moved Rivera to a private area, where he punched and kicked Rivera. As a result of the beating, Rivera was transported to the hospital because blood was running from his ear. Rivera is now deaf in that ear.

r.   In April of 2022, Christopher Hinkle was incarcerated at CFCF when another inmate attacked him, resulting in a broken neck and other blunt-force injuries. The guards did not find Hinkle until at least four hours later. Once found, it was too late; he was put on life support, but eventually succumbed to his injuries. Hinkle was a nonviolent offender. Hinkle's cellmate had a long record of random assaults and

LEVIN & ZEIGER LLP
1500 JFK BLVD, SUITE 620
PHILADELPHIA, PENNSYLVANIA 191029
215.546.0340

violent criminal offenses and, as a result, should have been placed in segregation at the time of the assault on Hinkle. He was not.

s.  On or about August 11, 2022, Anthony Autry was attacked at PICC by other inmates. The corrections officers working that day knew of other inmates on the block who were not properly categorized for housing and who had a propensity for using weapons and assaulting other inmates. As a result of the attack, Autry was severely injured. *See Autry v. City of Philadelphia,* 2:23-cv-01501-PD.

t.  In April of 2023, in a matter similar to the instant case, Charles Parks was an inmate at the CFCF when a corrections officer sent other inmates into his cell to beat him as she stood by and watched. Mr. Parks suffered a fractured orbital socket.

30.  Defendants Carney, Butler, and Rose were the policymakers for the Defendant City of Philadelphia, and were aware of all of the constitutional violations against the City's inmate population as set forth above; nonetheless, Defendants Carney, Butler, Rose, and the City of Philadelphia still maintain an inadequate screening policy of corrections officers.

31.  Defendants Carney, Butler, Rose, and the City of Philadelphia have a long and distinguished history of inadequate screening policies that amount to deliberate indifference and are directly related to the deprivation of Plaintiff's constitutional rights.

**D.  Equitable Tolling**

32.  In the Third Circuit, "[e]quitable tolling is appropriate in three general scenarios: (1) where a defendant actively misleads a plaintiff with respect to her cause of action; (2) where the plaintiff has been prevented from asserting her claim as a result of other extraordinary circumstances; or (3) where the plaintiff asserts her claims in a timely manner but has done so in the wrong forum."

LEVIN & ZEIGER LLP
1500 JFK BLVD, SUITE 620
PHILADELPHIA, PENNSYLVANIA 191029
215.546.0340

*Lake v. Arnold*, 232 F.3d 360, 370–71, n.9 (3d Cir. 2000). Additionally, a litigant must demonstrate that "she exercised due diligence in pursuing and preserving her claim." *D.J.S.-W. ex rel. Stewart v. United States*, 962 F.3d 745, 750 (3d Cir. 2020).

33.    In the instant matter, Defendant Cousins misled the Plaintiff by falsifying her reports regarding how Plaintiff was injured. Her conviction regarding her misconduct is extraordinary because the Plaintiff had no way to know the depth of Defendant Cousins' misconduct and the complete lack of supervision of Cousins in her role as a corrections officer by Defendants Philadelphia, Carey, Butler, and Rose.[1] Plaintiff did not know the depth of Cousins misconduct and the lack of supervision by Defendant City of Philadelphia until she was convicted.

34.    Here, once Defendant Cousins was convicted, the plaintiff comes now filing the instant matter within days of the conviction.

## COUNT I: EXCESSIVE FORCE
## EIGHTH AMENDMENT PURSUANT TO 42 U.S.C. § 1983
## PLAINTIFF V. DEFENDANT COUSINS

---

[1] The application of equitable tolling to *Monell* claims has been addressed in several cases. In *Hernandez v. Montoya*, 636 F.Supp.3d 511 (2022), the plaintiff argued for equitable tolling due to his learning disability, limited education, incarceration, and inability to speak or read English. The court noted that while these factors might justify equitable tolling, the absence of prejudice to the defendant is not an independent basis for invoking the doctrine. *Hernandez v. Montoya*, 636 F.Supp.3d 511 (2022). The court ultimately found that Hernandez did not identify a factor that would justify equitable tolling. *Hernandez v. Montoya*, 636 F.Supp.3d 511 (2022). In *Poole v. Marks*, the Third Circuit held that equitable tolling did not apply to save the plaintiff's § 1983 claims against police officers from a limitations bar. The plaintiff argued that a state magistrate judge precluded her from filing charges against the officers, but the court found that this did not prevent her from timely filing her claims in federal court. *Poole v. Marks*, 441 Fed. App'x 854 (3d Cir. 2011). In *Lake v. Arnold*, the Third Circuit recognized that equitable tolling might be appropriate "where a guardian conspires to deprive a mentally incompetent person of her constitutional and civil rights." *Lake v. Arnold*, 232 F.3d 360, 370–71 (3d Cir. 2000).

LEVIN & ZEIGER LLP
1500 JFK BLVD, SUITE 620
PHILADELPHIA, PENNSYLVANIA 191029
215.546.0340

35.    Plaintiff alleges each and every allegation contained in the foregoing paragraphs of this Complaint and incorporates them herein by reference as if the same were set forth at length.

36.    Plaintiff believes and therefore avers that the force used upon him was unnecessary and was more force than was reasonable under the circumstances.

37.    Alternatively, Plaintiff believes Defendant Cousins instigated an attack on Plaintiff, tantamount to attacking him herself.

38.    Further, after the initial attack by other inmates, Defendant Cousins pepper-sprayed Plaintiff while he had open wounds.

39.    Plaintiff believes and therefore avers that Defendant Cousins has, by the aforementioned actions, deprived Plaintiff of his constitutional and statutory rights.

40.    Defendant Cousins's actions were a factual and/or proximate cause of Plaintiff's substantial damages and harm.

WHEREFORE, Plaintiff demands judgment against Defendant for such sums as would reasonably and properly compensate him for injuries in an amount in excess of two hundred fifty thousand dollars ($250,000.00), together with delay damages, interest, costs and attorneys' fees, and punitive damages.

### COUNT II: FAILURE TO PROTECT
### EIGHTH AMENDMENT PURSUANT TO 42 U.S.C. § 1983
### PLAINTIFF V. DEFENDANT COUSINS AND DOE

41.    Plaintiff alleges each and every allegation contained in the foregoing paragraphs of this Complaint and incorporates them herein by reference as if the same were set forth at length.

42.    Prison officials have a duty to take reasonable measures to protect inmates from other inmates.

LEVIN & ZEIGER LLP
1500 JFK BLVD, SUITE 620
PHILADELPHIA, PENNSYLVANIA 191029
215.546.0340

43.    Defendant Cousins was acting as a correctional officer at or near the time of Plaintiff's injuries, on duty in Plaintiff's block at the CFCF.

44.    Defendant Cousins had a duty to protect Plaintiff from violence at the hands of other inmates in the CFCF.

45.    Defendant Cousins instigated the attack against Plaintiff.

46.    Defendant Cousins knew or had reason to know other inmates posed a danger to Plaintiff because she encouraged them to attack him.

47.    Defendant Cousins failed to take reasonable measures to guarantee Plaintiff's safety.

48.    Defendant Cousins permitted conditions in CFCF that posed a substantial risk of serious harm to Plaintiff.

49.    Defendant Cousins was deliberately indifferent to the substantial risk to Plaintiff's health and safety.

50.    Defendant Cousins's deliberate indifference caused Plaintiff harm.

51.    Defendant Cousins knowingly and unreasonably disregarded an objectively intolerable risk of harm.

52.    As a direct and proximate cause of Defendants Cousins's actions and omissions, Plaintiff suffered and underwent great pain and continues to do so.

53.    As a direct and proximate result of Defendants Cousins's actions and omissions, Plaintiff suffered serious physical injuries, the full extent of which are not yet known.

54.    As a direct and proximate result of Defendants Cousins's actions and omissions, Plaintiff suffered serious mental and psychological injuries, including, but not limited to, anxiety, trauma, and depression.

LEVIN & ZEIGER LLP
1500 JFK BLVD, SUITE 620
PHILADELPHIA, PENNSYLVANIA  191029
215.546.0340

55.    Plaintiff also makes a claim for such injuries, damages, and consequences resulting from the incident of which he has no present knowledge.

56.    Further, Defendant Doe was present and failed to stop Defendant Cousins's actions, and failed to render medical aid to Plaintiff.

WHEREFORE, Plaintiff claims of Defendant a sum in excess of one hundred and fifty thousand dollars ($150,000) in compensatory damages, punitive damages, delay damages, interest, and allowable costs of suit and brings this action to recover same.

### COUNT III: FAILURE TO INTERVENE
### EIGHTH AMENDMENT PURSUANT TO 42 U.S.C § 1983
### PLAINTIFF V. DEFENDANT COUSINS AND DOE

57.    Plaintiff alleges each and every allegation contained in the foregoing paragraphs of this Complaint and incorporates them herein by reference as if the same were set forth at length.

58.    Defendant Cousins was acting as a correctional officers at or in proximity to the time of Plaintiff's injuries.

59.    Defendant Cousins had a duty to intervene in order to protect Plaintiff from the dangerous inmates who attacked him.

60.    Defendant Cousins had a reasonable opportunity to intervene to protect Plaintiff against force by other inmates, in that she:

a.   knew of threats against Plaintiff made by other inmates;

b.   was physically present at the scene of the attack and could have prevented it;

c.   could have timely prevented the attack;

d.   had the ability to request assistance on behalf of Plaintiff;

e.   had the ability to immediately stop the attack before or once it began;

LEVIN & ZEIGER LLP
1500 JFK BLVD, SUITE 620
PHILADELPHIA, PENNSYLVANIA  191029
215.546.0340

  f. had the ability to immediately stop the attack before once it began; and

  g. could have acted to protect Plaintiff in other ways not yet known to Plaintiff.

61. Defendant Cousins violated her duty to intervene in that she:

  a. was actually aware of the danger and did not intervene;

  b. was physically present at the scene of the attack and could have prevented the

   attack from occurring;

  c. did not stop the attack prior to Plaintiff becoming injured;

  d. did not immediately request assistance on behalf of Plaintiff;

  e. did not immediately restrain the inmates attacking Plaintiff; and

  f. did not act in other ways not yet known to Plaintiff.

62. Further, Defendant Doe failed to intervene in Cousins's conduct, failed to stop the attack on Plaintiff, and failed to render medical care to Plaintiff.

63. Defendant Cousins's actions and omissions were a direct and proximate cause of Plaintiff's injuries and damages.

64. Defendant Cousins acted intentionally, maliciously and wantonly, by failing to intervene when she was otherwise able.

65. As a direct and proximate cause of Defendant Cousins's actions and omissions, Plaintiff suffered great pain and continues to do so.

66. As a direct and proximate result of Defendant Cousins's actions and omissions, Plaintiff suffered serious physical injuries, the full extent of which are not yet known.

LEVIN & ZEIGER LLP
1500 JFK BLVD, SUITE 620
PHILADELPHIA, PENNSYLVANIA  191029
215.546.0340

67.    As a direct and proximate result of Defendant Cousins's actions and omissions, Plaintiff suffered serious mental and psychological injuries, including, but not limited to, anxiety, trauma, and depression.

68.    Plaintiff also makes a claim for such injuries, damages, and consequences resulting from the incident of which he has no present knowledge.

WHEREFORE, Plaintiff claims of Defendant a sum in excess of one hundred and fifty thousand dollars ($150,000) in compensatory damages, punitive damages, delay damages, interest, and allowable costs of suit and brings this action to recover same.

### COUNT IV: CONSPIRACY
### EIGHTH AMENDMENT PURSUANT TO 42 U.S.C. § 1983
### PLAINTIFF V. DEFENDANT COUSINS AND DOE

69.    Plaintiffs alleges each and every allegation contained in the foregoing paragraphs of this Complaint and incorporates them herein by reference as if the same were set forth at length.

70.    Defendant Cousins conspired with Doe to deprive the Plaintiff of his constitutional rights.

71.    Defendant Cousins with Doe and other inmates, i.e. she took overt steps in furtherance of the conspiracy to have other inmates housed on Plaintiff's block attack Plaintiff.

WHEREFORE, the Plaintiffs demands judgment against Defendants for such sums as would reasonably and properly compensate him for injuries in an amount in excess of one hundred fifty thousand dollars ($150,000.00) together with compensatory damages, delay damages, interest, costs and attorneys' fees, and punitive damages.

### COUNT V: *MONELL* CLAIM
### MUNICIPAL LIABILITY PURSUANT TO 42 U.S.C. § 1983
### PLAINTIFF V. DEFENDANT CITY OF PHILADELPHIA

LEVIN & ZEIGER LLP
1500 JFK BLVD, SUITE 620
PHILADELPHIA, PENNSYLVANIA  191029
215.546.0340

72.    Plaintiff alleges each and every allegation contained in the foregoing paragraphs of this Complaint and incorporates them herein by reference as if the same were set forth at length.

73.    Defendant City of Philadelphia, through its prisons department, established, knew of, and acquiesced to policies, procedures, and customs that Defendants knew or should have known would lead to violations of citizens' constitutional rights.

74.    The decisionmakers of the City of Philadelphia made, enforced, or turned a blind eye to the defective policies, procedures, and customs that led to Plaintiff's injuries on the night in question.

75.    Defendant City of Philadelphia, through its prisons department, acted with deliberate indifference to the consequences when establishing and enforcing inadequate policies, procedures, and customs.

76.    Plaintiff believes and therefore avers that Defendant City of Philadelphia has adopted and maintained for many years a recognized and accepted policy, custom, and/or practice of systematically failing to properly train, investigate, supervise, and discipline its employees, including the Defendant Cousins, regarding individuals' rights under the Fourth Amendment, Eighth Amendment, and Fourteenth Amendment to the Constitution of the United States.

77.    Defendant City of Philadelphia knew or should have known that its employees engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like Plaintiff; Defendant deliberately, knowingly, and intentionally failed to take measures to stop or limit the policy, custom, and practice, and therefore acquiesced in, and were deliberately indifferent to, the aforementioned unconstitutional conduct and policy.

78.    By failing to take action to stop or limit the policy and/or custom and/or practice, Defendant City of Philadelphia remained deliberately indifferent to the systematic abuse that

LEVIN & ZEIGER LLP
1500 JFK BLVD, SUITE 620
PHILADELPHIA, PENNSYLVANIA  191029
215.546.0340

occurred in accordance with and as a direct and proximate result of the policy; Defendant City of Philadelphia condoned, acquiesced in, participated in, and perpetrated the policy in violation of Plaintiff's rights under the Fourth, Eighth, and Fourteenth Amendments to the Constitution of the United States, the laws of the United States, and of the Commonwealth of Pennsylvania.

79.    The conduct of Defendant City of Philadelphia and/or its policymaker, and/or the conduct of Defendant's employees or agents, were a factual cause of the cause of the harm and damages sustained by Plaintiff.

80.    The City hired Defendant Cousins as corrections officers without first adequately screening her background as a proximate result of its inadequate screening policies.

81.    The City's inadequate screening policies amount to deliberate indifference and led directly to the deprivation of Plaintiff's constitutional rights, rendering these policies the proximate cause of Plaintiff's injuries.

WHEREFORE, Plaintiff demands he be compensated for injuries in an amount in excess of one hundred fifty thousand dollars ($150,000.00), together with delay damages, interest, costs, attorneys' fees, and declaratory and injunctive relief.

### COUNT VI: FAILURE TO TRAIN AND SUPERVISE
### SUPERVISORY LIABLITY PURSUANT TO 42 U.S.C. § 1983
### PLAINTIFF V. DEFENDANTS CARNEY, BUTLER, AND ROSE

82.    Plaintiff incorporates the preceding paragraphs as though fully set forth herein at length.

83.    Defendants Carney, Butler, and Rose failed to properly train their officers in the use of force at the prisons and failed to properly supervise Defendant Cousins, before and during the aforementioned excessive use of force, thereby violating Plaintiff's rights under the Eighth Amendment the Constitution of the United States of America and 42 U.S.C. §1983.

LEVIN & ZEIGER LLP
1500 JFK BLVD, SUITE 620
PHILADELPHIA, PENNSYLVANIA 191029
215.546.0340

84.     Defendants Carney, Butler, and Rose, acting with deliberate indifference, created a dangerous situation, thereby directly causing serious injury to Plaintiff, in violation of his rights under the Eighth Amendment to the Constitution of United States of America and 42 U.C.S. §1983.

85.     As a direct and proximate result of the aforesaid acts of Defendants Carney, Butler, and Rose, which were committed under color of their authority for the City of Philadelphia, Plaintiff suffered serious bodily injury, in violation of his rights under the Eighth Amendment to the United States Constitution and 42 U.S.C. §1983.

86.     The acts committed by Defendants Carney, Butler, and Rose, with deliberate indifference and constituting a state-created danger, caused Plaintiff's previously described injuries in violation of his constitutional rights as previously set forth in the aforementioned paragraphs.

87.     Defendants Carney, Butler, and Rose, in their supervisory capacity over Defendant Cousins, as set forth above and based upon their knowledge of other prior misconduct of Defendant Cousins pertaining to her use of force against inmates at the Philadelphia Prison System, and their failure to discipline or properly train Defendant Cousins prior to the instant matter, is an acquiescence to Defendant Cousins's violation of Plaintiff's rights.

88.     Defendants Carney, Butler, and Rose, in their roles as policymakers for the City of Philadelphia Prison System, with deliberate indifference to the consequences, established, implemented and maintained a policy or custom of inadequate training and therefore caused Defendant Cousins to use excessive force against Plaintiff, which directly caused the constitutional harm to Plaintiff.

WHEREFORE, Plaintiff demands judgment for compensatory damages against Defendants for such sums as would reasonably and properly compensate him for injuries in an amount in excess

LEVIN & ZEIGER LLP
1500 JFK BLVD, SUITE 620
PHILADELPHIA, PENNSYLVANIA  191029
215.546.0340

of one million dollars ($1,000,000.00) together with delay damages, interest, costs, attorneys' fees, and declaratory and injunctive relief.

Respectfully submitted,

/s/ Brian J. Zeiger
BRIAN J. ZEIGER, ESQUIRE
ID No. 87063
zeiger@levinzeiger.com

/s/ Laura Zippin
LAURA ZIPPIN, ESQUIRE
ID No. 324914
zippin@levinzeiger.com
Levin & Zeiger, LLP
1500 JFK Blvd, Suite 620
Philadelphia, Pennsylvania 19102
215.546.0340

Date: April 25, 2025

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THOMAS REMICK, NADIYAH WALKER,
JAY DIAZ, MICHAEL ALEJANDRO,
MICHAEL DANTZLER, ROBERT
HINTON, JOSEPH WEISS, JOSEPH
SKINNER, SADDAM ABDULLAH, and
JAMES BETHEA, on behalf of themselves
and all others similarly situated,

     Plaintiffs-Petitioners,

          v.

CITY OF PHILADELPHIA; and BLANCHE
CARNEY, in her official capacity as
Commissioner of Prisons,

     Defendants-Respondents.

Case No.

ELECTRONICALLY FILED

IMMEDIATE RELIEF SOUGHT

## CLASS ACTION COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF AND PETITION FOR WRITS OF HABEAS CORPUS

### INTRODUCTION

1.      Plaintiffs-Petitioners ("Plaintiffs") are ten individuals held at the Philadelphia Department of Prisons ("PDP") who, as a result of the policies, practices, and actions adopted and undertaken by Defendants-Respondents ("Defendants"), are at significant risk of contracting COVID-19 (also known as the Coronavirus) and suffering from severe disease and possible death. The current conditions of confinement at PDP's facilities create a heightened and unreasonable risk of COVID-19 for any confined person, and a substantial risk of severe illness or death for those who are elderly and/or medically vulnerable to COVID-19.  The named Plaintiffs, on their own behalf and on behalf of all others similarly situated, seek immediate changes in the conditions

of their confinement to protect them from this clear and present danger of disease and death, and to ensure humane living conditions, as required by the United States Constitution. Plaintiffs seek injunctive relief that would require, among other things, Defendants to comply with recognized public health and safety measures, as adopted by the Centers for Disease Control and Prevention ("CDC"), to prevent the spread of the virus for those confined at jails and prisons.

2. Absent the implementation of and strict adherence to emergency measures that comply with these recommended public health and safety measures, Plaintiffs seek the release of individuals 55 and older and those with medical conditions that place them at heightened risk of severe illness or death from COVID-19, as these individuals face heightened risks of life-threatening conditions, and their removal from PDP would facilitate the quarantine and social distancing measures recommended by the CDC and other public health officials.

3. Prisons and jails have become epicenters of COVID-19 in cities throughout the country. In the PDP, on April 16, the city reported that a cumulative total of 100 incarcerated people had tested positive for the virus.[1] The next day, Philadelphia Commissioner of Public Health Dr. Thomas Farley reported an additional thirteen new cases within the PDP.[2] By Sunday, April 19, the number of total reported cases rose to over 120.[3] These numbers will continue to rise

---

[1] On Thursday, April 16, 2020, Philadelphia Managing Director Brian Abernathy provided this information during an April 16th, 2020 press conference. *See* Philadelphia Department of Public Health, *Update on COVID-19 Coronavirus Response in Philadelphia*, Facebook (April 16, 2020), https://www.facebook.com/phillyhealth/videos/175556743555021 (Managing Director Abernathy noting that 100 incarcerated individual tested positive at approximately the 26 minute mark).

[2] *See* Philadelphia Department of Public Health, *Update on COVID-19 Coronavirus Response in Philadelphia,* Facebook (April 17, 2020), https://www.facebook.com/phillyhealth/videos/2975919772519206/ (Dr. Farley noting the increase at approximately the 12 minute mark).

[3] *See* Max Marin & Aaron Moselle, *'Scared for Their Lives': Inside the Coronavirus Outbreak in Philadelphia's Jails,* WHYY (April 19, 2020), https://whyy.org/articles/scared-for-their-lives-inside-the-coronavirus-outbreak-in-philadelphias-jails/.

exponentially. The population within PDP is uniquely vulnerable to the spread of COVID-19 due to the congregate nature of jails, exacerbated by unnecessary crowding, inadequate sanitation, denial of hygiene products, and inadequate quarantine procedures. The current conditions within PDP's facilities create an extreme risk for the rapid, uncontrollable spread of COVID-19 among the incarcerated population, correctional officers, health care workers, and beyond jail walls to the larger Philadelphia community.

4. To comply with basic Constitutional guarantees against cruel and unusual punishment and due process of law, conditions must be substantially improved to adhere to CDC guidelines for social distancing and enhanced sanitation and hygiene practices. Defendants must implement adequate quarantine and social distancing protocols; provide adequate hygiene supplies; ensure that sanitation practices conform to CDC standards; conduct recreation and meal service in a manner that allows for appropriate social distancing; and require the use of Personal Protective Equipment ("PPE") for staff and those incarcerated.

## I. JURISDICTION AND VENUE

5. Plaintiffs bring this putative class action pursuant to 22 U.S.C. § 2241, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202, and the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA"), for relief from both detention and conditions of confinement that violate their Fourteenth Amendment and/or Eighth Amendment rights under the U.S. Constitution.

6. This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. § 1343(a) (civil rights jurisdiction), and 28 U.S.C. § 1331 (federal question jurisdiction).

7. This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in the Eastern District of Pennsylvania.

## II.   PARTIES

8.   Thomas Remick, Nadiyah Walker, Jay Diaz, Michael Alejandro, Michael Dantzler, Robert Hinton, Joseph Weiss, Joseph Skinner, Saddam Abdullah and James Bethea are all adult individuals currently incarcerated at a PDP facility and are at a heightened risk for more severe symptoms and potential death from COVID-19 due to their age and/or underlying medical conditions.  They sue for injunctive and declaratory relief on behalf of themselves and on behalf of those who currently are or will in the future be subject to these unconstitutional conditions of confinement within the PDP.

9.   Defendant City of Philadelphia is a political subdivision organized and existing under the laws of the Commonwealth of Pennsylvania.  The City of Philadelphia funds, controls, and operates the Philadelphia Department of Prisons.  The City of Philadelphia currently has immediate custody over Plaintiffs and all other putative class members.

10.   Defendant Blanche Carney is the Commissioner of PDP.  Defendant Carney currently has immediate custody over Plaintiffs and all other putative class members.  Defendant Carney is a policymaker for the City of Philadelphia, and she is sued in her official capacity.

11.   Defendant City of Philadelphia and Carney have at all relevant times acted under color of state law.

4

## III.     FACTUAL ALLEGATIONS

**A.     COVID-19 Poses a Significant Risk of Illness, Injury, and Death.**

12.     We are in the midst of the most significant pandemic in generations. As of April 20, 2020, there were 32,284 confirmed cases of COVID-19 in Pennsylvania and 1,112 deaths.[4,5] In the City of Philadelphia, there have been 8,764 cases and 240 deaths as of April 20.[6] These numbers likely underestimate the impact and spread of the virus, given the lack of testing.[7]

13.     The virus spreads from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.[8] There is no vaccine against COVID-19, and there is no known medication to prevent or treat infection.[9] Social distancing (deliberately keeping at least six feet of space between persons[10]) and a vigilant hygiene regimen, including washing hands frequently with soap and water, are the only known measures

---

[4] *See* Exhibit A, Expert Declaration of Dr. Joseph Amon, Ph.D. MSPH, ¶ 5 ("Amon Decl."). Dr. Amon is an infectious disease epidemiologist, Director of Global Health and Clinical Professor in the department of Community Health and Prevention at the Drexel Dornsife School of Public Health with past experience as an epidemiologist in the Epidemic Intelligence Service of the U.S. Center for Disease Control and Prevention.

[5] COVID-19 Data for Pennsylvania, Philadelphia Department of Health (April 2020), https://cutt.ly/Tt1J66h.

[6] *Id.*

[7] *See* Exhibit B, Expert Declaration of Robert L. Cohen, M.D., ¶ 24(i) ("Cohen Decl."). Dr. Cohen, an internist with more than 30 years of experience, is an expert in correctional health care and correctional health system management. He has been appointed as a federal court monitor of healthcare delivery in jails and prisons around the country and for decades has provided expert consulting on conditions within the PDP.

[8] Amon Decl. ¶ 21; Cohen Decl. ¶ 11.

[9] Amon Decl. ¶ 6; Cohen Decl. ¶ 2.

[10] Amon Decl. ¶ 22-24; Cohen Decl. ¶ 21.

for protecting against transmission of COVID-19.[11]   Because the coronavirus spreads among

people who do not show symptoms, *everyone* has to act as if *everyone* has the disease.[12]

      14.    The older a person is, the greater their risk of serious illness or death from COVID-

19.[13]   A February 29, 2020 preliminary report found that individuals age 50-59 had an overall

mortality rate of 1.3%; 60-69-year-olds had an overall 3.6% mortality rate, and those 70-79 years

old had an 8% mortality rate.[14]

      15.    People of any age are also at an elevated risk if they suffer from certain underlying

medical conditions, including lung disease, heart disease, chronic liver or kidney disease

(including hepatitis and dialysis patients), diabetes, epilepsy, hypertension, compromised immune

systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell

disease), inherited metabolic disorders, stroke, developmental delay, or asthma.[15]   An early report

from the World Health Organization ("WHO") estimated the mortality rate of 13.2% for COVID-

19 patients with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic

respiratory disease, and 7.6% for cancer.[16]

---

[11] Amon Decl. ¶ 22-24; Cohen Decl. ¶ 9.

[12] Cohen Decl. ¶ 12.

[13] Amon Decl. ¶ 9 (observing that "those ≥54 years could be considered high risk for severe disease and death."); Cohen Decl. ¶ 36.

[14] *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths* Chart, https://cutt.ly/ytEimUQ (data analysis based on WHO China Joint Mission Report).

[15] Amon Decl. ¶ 8; Cohen Decl. ¶ 43.

[16] *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization (Feb. 28, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf

16.     The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 infection than from influenza.[17]  According to recent estimates, the fatality rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems.[18]  For people in the highest risk populations, the fatality rate of COVID-19 infection can be greater than 13 percent.[19]  Patients who do not die from serious cases of COVID-19 may face prolonged recovery periods, including extensive rehabilitation from neurological damage, loss of digits, and loss of respiratory capacity.[20]

### B.     COVID-19 Poses an Increased Risk of Serious Harm or Death in Correctional Settings, Including the PDP.

17.     People in congregate environments—places where people live, eat, and sleep in close proximity—face increased danger of coronavirus infection and COVID-19, as already evidenced by the rapid spread of the virus in cruise ships and nursing homes.[21]  It is extremely difficult, and at times impossible, for people who are confined in prisons, jails, and detention centers to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission of the disease.[22]

---

[17] *House Oversight and Reform Committee Hearing on Coronavirus Response, Day 1*, C-SPAN (March 11, 2020), https://www.c-span.org/video/?470224-1/dr-fauci-warns-congress-coronavirus-outbreak-worse.

[18] *How the Novel Coronavirus and the Flu are Alike...and Different*, NPR (March 20, 2020), https://www.npr.org/sections/goatsandsoda/2020/03/20/815408287/how-the-novel-coronavirus-and-the-flu-are-alike-and-different.

[19] Cohen Decl. ¶ 44.

[20] Y. Wu et al., *Nervous System Involvement After Infection with COVID-19 and Other Coronaviruses* (March 30, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7146689/.

[21] Amon Decl. ¶ 29; Cohen Decl. ¶ 5.

[22] *Id.*

18.     Correctional settings further increase the risk of contracting COVID-19 because of the concentration of people with chronic, often untreated, illnesses in a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, presence of many high-contact surfaces, and no possibility of staying at a distance from others.[23]

19.     Incarcerated people are dying, including a recent death of an incarcerated person at the Riverside Correctional Facility ("RCF"), the women's prison within the PDP.[24] At the Chicago Cook County Jail and at New York City Rikers Island, the transmission rates for COVID-19 are estimated to be the highest in the world.[25]

20.     Numerous public health experts, including Dr. Joseph Amon,[26] Dr. Robert L. Cohen,[27] Dr. Gregg Gonsalves,[28] Ross MacDonald,[29] Dr. Marc Stern,[30] Dr. Oluwadamilola T.

---

[23] Amon Decl. ¶¶ 28-29, 33-35, 38, 43, 45; Cohen Decl. ¶¶ 4-5, 36.

[24] Jeremy Roebuck, Laura McCrystal, Chris Palmer and Dylan Purcell, *Philly Reports First Inmate Death From Coronavirus In Its Jails*, Philadelphia Inquirer (April 14, 2020) https://www.inquirer.com/news/philly-jail-coronavirus-death-inmate-first-blanche-carney-20200414.html; *see also He Died In Prison From The Coronavirus — Three Days Before A Breakthrough In His 30-Year Fight To Clear His Name*, Philadelphia Inquirer (April 15, 2020), https://www.inquirer.com/news/sci-phoenix-coronavirus-death-rudolph-sutton-pennsylvania-innocence-project-20200415.html (detailing first death from COVID-19 in the Pennsylvania Department of Corrections).

[25] Amon Decl. ¶ 38; Cohen Decl. ¶ 17-18, 39.

[26] Amon Decl. ¶ 63.

[27] Cohen Decl. ¶ 4-6.

[28] Kelan Lyons, *Elderly Prison Population Vulnerable to Potential Coronavirus Outbreak*, Connecticut Mirror (March 11, 2020), https://cutt.ly/BtRSxCF.

[29] Craig McCarthy and Natalie Musumeci, *Top Rikers Doctor: Coronavirus 'Storm is Coming*,' New York Post (March 19, 2020), https://cutt.ly/ptRSnVo.

[30] Marc F. Stern, MD, MPH, *Washington State Jails Coronavirus Management Suggestions in 3 "Buckets*," Washington Assoc. of Sheriffs & Police Chiefs (March 5, 2020), https://cutt.ly/EtRSm4R.

Oladeru and Adam Beckman,[31] Dr. Anne Spaulding,[32] Homer Venters,[33] the faculty at Johns Hopkins schools of nursing, medicine, and public health,[34] and Josiah Rich[35] have all strongly cautioned that people booked into and held in jails are likely to face serious, even grave, harm due to the COVID-19 pandemic.

21. Each day of the past week, between 1 and 13 new people have tested positive for the virus within PDP with greater than 120 cases reported within the facilities.[36] On April 17, 2020, at the City's daily Update on COVID-19 Response in Philadelphia, Dr. Thomas Farley, Commissioner of Public Health, announced that there were 13 new cases in PDP in one day alone.[37]

22. Two weeks ago, within PDP, the infection rate was more than double the rate of infection of the City as a whole.[38]

---

[31] Oluwadamilola T. Oladeru, et al., *What COVID-19 Means for America's Incarcerated Population – and How to Ensure It's Not Left Behind*, (March 10, 2020), https://cutt.ly/QtRSYNA.

[32] Anne C. Spaulding, MD MPDH, *Coronavirus COVID-19 and the Correctional Jail,* Emory Center for the Health of Incarcerated Persons (March 9, 2020).

[33] Madison Pauly, *To Arrest the Spread of Coronavirus, Arrest Fewer People*, Mother Jones (March 12, 2020), https://cutt.ly/jtRSPnk.

[34] Letter from Faculty at Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Larry Hogan, Gov. of Maryland, March 25, 2020, https://cutt.ly/stERiXk.

[35] Amanda Holpuch, *Calls Mount to Free Low-risk US Inmates to Curb Coronavirus Impact on Prisons*, The Guardian (March 13, 2020 3:00 p.m.), https://cutt.ly/itRSDNH.

[36] *See supra* notes 1-2.

[37] *See supra* note 2.

[38] *See* The Defender Association of Philadelphia, *Covid-19 in Philly Jails*, https://www.philadefender.org/wp-content/uploads/2020/04/Jail-Infection-Jurisdictions-and-Zip_Landing-Page_4.8.20.pdf; Cohen Decl. ¶ 7.

23.     The higher rate of COVID-19 infections in the PDP exacerbates the disproportionate impact the virus has had on people of color, both nationally and in Philadelphia.[39] In Philadelphia, Black people make up 44 percent of the City's total population, yet as of February, over 69 percent of the incarcerated people in the PDP were Black, and almost 19 percent were Latinx, with racial minorities totaling over 88 percent of the incarcerated population.[40]

24.     Staff as well as incarcerated people are being infected with COVID-19. Defendants have adopted a policy of not disclosing the number of correctional officers who have tested positive, but as of April 16, 2020, 43 officers self-reported positive tests.[41]

25.     Risk mitigation is the only viable strategy to combat the spread of COVID-19 and prevent serious harm or death to class members.[42] This requires creating and implementing a comprehensive plan to address the spread of COVID-19 in PDP. Given the current population numbers and the housing structures within PDP, risk mitigation also requires the release of individuals who are at high risk of severe disease if infected with COVID-19.[43] Release of the medically vulnerable population protects them from transmission of COVID-19, limits the burden

---

[39] Ryan Briggs, Nina Feldman, *African Americans Lead Coronavirus Deaths In Philadelphia,* WHYY (April 8, 2020), https://whyy.org/articles/african-americans-lead-coronavirus-deaths-in-philadelphia/; *see also* CBS News, *Philadelphia's Black Communities Disproportionately Hit By City's Coronavirus Pandemic* (April 10, 2020), https://www.cbsnews.com/news/coronavirus-pandemic-philadelphia-black-communities-disproportionately-hit/.

[40] Philadelphia Jail Report: July 2016 – February 2020, https://www.phila.gov/media/20200320153910/Full-Public-Jail-Report-February-2020-1.pdf.

[41] Prisoners Being Released from City, State Prisons Are Not Being Tested for COVID-19, NBC Philadelphia (April 16, 2020), https://www.nbcphiladelphia.com/investigators/prisoners-being-released-from-city-state-prisons-are-not-being-tested-for-covid-19/2365885/.

[42] *See* Amon Decl. ¶ 60; Cohen Decl. ¶ 9.

[43] Amon Decl. ¶ 60; Cohen Decl. ¶ 43.

on the region's health care infrastructure by reducing the number of people who will become seriously ill from COVID-19, and facilitates other risk mitigation measures.[44]

26.     Defendants have failed to respond to and manage the continued risk of harm posed by the COVID-19 outbreak by not following public health guidance from the CDC for correctional facilities.  The guidelines require: (a) providing all incarcerated persons a six-foot radius or more of distance from any other persons, including during meals, transportation, court sessions, recreation, counts, and all other activities; (b) instituting a safety plan to prevent a COVID-19 outbreak in PDP's facilities in accordance with CDC guidelines; (c) making sanitation solutions readily and freely available for the purposes of cleaning cells, dormitories, laundry, and eating areas, including sufficient antibacterial soap, and lifting any ban on alcohol-based hygiene supplies (e.g. hand sanitizer, cleaning wipes); (d) providing adequate and appropriate COVID-19 testing for incarcerated persons, jail staff, and visitors; (e) waiving all medical co-pays for those experiencing COVID-19 like symptoms; and (f) providing sufficient personal protective equipment, particularly masks, and to all staff and incarcerated people.[45]

---

[44] Amon Decl. ¶ 51, 60; Cohen Decl. ¶ 10, 43.

[45] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

### C. The Current Conditions of Confinement at PDP's Facilities Fail to Comply with CDC Guidelines and Exacerbate the Extreme and Imminent Danger Faced by Class Members of Contracting and Possibly Dying from COVID-19.

27. Defendants have failed to implement the necessary safeguards outlined above, thus creating extreme risk to all incarcerated individuals in the PDP, and imminent danger to Plaintiffs.[46]

28. Defendants fail to allow for adequate social distancing consistent with all public health guidelines.

    a. The Detention Center ("DC") contains both dormitory-style housing ("dorms") as well as several cellblocks. Individuals housed in dorms sleep in bunk beds less than 6 feet apart. The dorms, in some circumstances, house more than 30 individuals in a unit. One block is comprised of multiple dorm units, each a cage-like structure, with only metal fencing separating each unit such that air flows between each block, allowing the transmission of COVID-19 between units. Social distancing is not possible in this setting.

    b. Many people incarcerated in PDP are double-celled. In Curran-Fromhold Correctional Facility ("CFCF"), up to four people may be housed in a quarantine cell. Due to the size of the typical PDP cell, which contains bunk beds, a toilet, a sink, and sometimes a desk, it is difficult or impossible for cellmates to remain six feet apart at all times.

    c. Phone usage is vital during the pandemic for people to contact their attorneys as well as friends and family who are not permitted to visit. Because of the way phones

---

[46] The named Plaintiffs have provided Declarations outlining their experiences in PDP's facilities. *See* Exhibit C. Plaintiffs' experts' Declarations review the concerning patterns and trends identified in those Declarations. *See* Amon Decl. ¶ 33; Cohen Decl. ¶ 24.

are positioned, using phones requires standing within two feet of other people for extended periods of time.

29.     Defendants have failed to adequately and consistently provide necessary hygiene products for incarcerated people in PDP.

　　　　a.     Soap is not available for all incarcerated people at all times, especially for those who cannot buy soap from the commissary.  Some who have requested soap from correctional officers were told that no free soap is available.

　　　　b.     At least one named Plaintiff went without soap for four days.

　　　　c.     Plaintiffs are unable to consistently wash their hands.

　　　　d.     PDP does not provide any hand sanitizer to those incarcerated within their facilities.

30.     Defendants have failed to provide for adequate cleaning, sanitizing and disinfecting of all spaces.

　　　　a.     Cleaning and disinfectant supplies are inadequate for regular and necessary cleaning of living areas, including cells.  PDP failed to provide plaintiffs with the bleach and disinfectant necessary to clean their cells on a regular basis.  Some Plaintiffs have gone for a month without being able to clean and disinfect their cells.

　　　　b.     People at all PDP facilities must share phones that are not disinfected between uses.

　　　　c.     People at all PDP facilities must share showers, sinks, and toilets that are not cleaned or disinfected between each use.

　　　　d.     No toilets in PDP facilities have lids.  Many toilets fail to adequately flush, allowing waste matter to remain.

31.     Defendants have failed to provide and mandate the use of adequate personal protective equipment.

      a.     Correctional officers, and even prison medical staff, inconsistently use masks and often interact with people without wearing masks.  These same correctional officers move between different areas of PDP's facilities.

      b.     Although PDP has distributed cloth face masks to incarcerated people, PDP does not clean or exchange these cloth face masks on an adequate basis, and Plaintiffs have been required to wear the same mask for multiple days or weeks.  Nor does PDP instruct people how to wear the masks.

32.      Defendants have failed to provide for adequate isolation or quarantine measures.

      a.     Upon entry to the PDP, incarcerated people are placed into a "quarantine" unit.  This is a standard prison practice for new admissions to jail facilities at all times.  Due to the COVID-19 pandemic, the need for a quarantine unit is enhanced—and requires placement for a minimum of 14 days.  In PDP facilities, however, people newly admitted are not always held in quarantine for a full 14 days before transfer to general population.

      b.     When an incarcerated person displays symptoms of COVID-19, he or she is frequently neither isolated nor tested for COVID-19.

      c.     Even if someone has tested positive for COVID-19 and is taken to another location, he or she is often returned to general population without testing to ensure that COVID-19 is no longer present or contagious.

33.     PDP relies on near 24-hour lockdowns.

      a.     People are let out of their cells for a mere 15 minutes, occasionally once a day, but many PDP facilities do not let people out for days on end.

14

b.      In these circumstances, people are unable to bathe or shower for multiple days.

c.      For those in single or double cells, these conditions constitute solitary confinement, causing and exacerbating mental illness and mental distress.

d.      People detained in these conditions suffer serious physical harms without the ability to exercise for prolonged periods of times.

e.      With people locked in their cells for prolonged periods, access to medical care for chronic conditions and acute illnesses unrelated to COVID-19 has been severely limited.

34.     PDP's measures have improperly interfered with the right to counsel.

a.      Given the PDP's failure to take adequate risk mitigation measures, in-person legal visits pose an unreasonable medical risk to all involved.

**b.**      Further, PDP administrators have not undertaken efforts to arrange legal calls between counsel and incarcerated clients, and any such efforts have resulted in a laborious and time-consuming process.

**D.      The Named Plaintiffs are at Heightened Risk due to the Unsafe and Inhumane Conditions of Confinement at PDP's Facilities.**

35.     Plaintiffs are at a heightened risk for serious illness and death due to medical vulnerabilities and/or age.  These risks are exacerbated—thus further increasing the risk of serious illness or death—because Plaintiffs are incarcerated under the conditions described above.

36.     Thomas Remick is a 30-year-old individual held at DC, who was diagnosed with sarcoma and requires regular chest x-rays.  He also lives in a dorm setting.

37.     Jay Diaz is a 30-year-old individual housed at RCF who suffers from asthma.  He requires breathing treatments, which have not been provided despite his requests.  He has stage 3 cervical and ovarian cancer.

38.   Nadiyah Walker is a 43-year-old individual housed at RCF who suffers from seizure-causing epilepsy, diabetes, asthma, and anemia.

39.   Michael Alejandro is a 27-year-old individual held at DC who suffers from asthma. He lives in a dorm setting.

40.   Michael Dantzler is a 45-year-old individual incarcerated in the medical unit at DC. He has vascular disease that makes him prone to blood clots, and in February 2020, had emergency surgery to remove a pulmonary embolism.  Even in the medical unit, Mr. Dantzler has not had his cell cleaned nor has he had access to cleaning products to clean the cell himself.  A doctor comes to his cell every week, but the doctor does not always wear a mask.

41.   Robert Hinton is a 63-year-old individual held at CFCF, who has Hepatitis C that has caused damage and scarring to his liver.  He is currently experiencing pain on the side of his abdomen.

42.   Joseph Weiss is a 57-year-old Army Veteran held at CFCF.  Due to being wounded in combat, he has a metal rod and pins in his femur and walks with a cane.

43.   Joseph Skinner is a 38-year-old individual held at CFCF with severe asthma currently incarcerated at CFCF.  He must use an inhaler daily, has been hospitalized 4 or 5 times, and was previously intubated due to his asthma.

44.   James Bethea is a 53-year-old individual housed at the Philadelphia Industrial Correctional Center ("PICC"), and suffers from asthma, Hepatitis C, arthritis, and diabetes.

45.   Saddam Abdullah is a 29-year-old individual incarcerated at PICC.  He has asthma and had 4 recent acute asthma attacks.  His inhaler is not working, and after his most recent asthma attack, medical staff refused to provide a breathing treatment.  He has experienced chills, loss of

taste and smell, and difficulty breathing.  Because he did not have a fever, he was not tested for COVID-19 and was not medically isolated.

## IV.     CLASS ACTION ALLEGATIONS

46.     Plaintiffs Remick, Walker, Diaz, Alejandro, Dantzler, Hinton, Weiss, Skinner, Abdullah, and Bethea bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situated individuals.

47.     Plaintiffs Remick, Walker, Diaz, Alejandro, Dantzler, Hinton, Weiss, Skinner, Abdullah, and Bethea seek to represent a class of all current and future detainees held in custody at PDP's facilities ("Class"), including two subclasses: (1) persons who, by reason of age or medical condition, are particularly vulnerable to injury or death if they were to contract COVID-19 ("Medically-Vulnerable Subclass"), and (2) persons who, by reason of their disability, are particularly vulnerable to injury or death if they were to contract COVID-19 ("Disability Subclass").

48.     The "Medically Vulnerable Subclass" is defined as all current and future persons in the custody of the Philadelphia Department of Prisons who are 55 or older,[47] as well as all current and future persons held of any age who have a medical condition that places them at increased risk of COVID-19 illness, injury, or death, including but not limited to: (a) lung disease, including asthma, chronic obstructive pulmonary disease (*e.g.* bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure, or coronary artery disease; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) epilepsy; (f) hypertension; (g) compromised immune systems (such as from cancer, HIV, receipt

---

[47] Amon Decl. ¶ 9; Cohen Decl. ¶ 43.

of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders (including sickle cell disease); (i) inherited metabolic disorders; (j) history of stroke; (k) a developmental disability; and/or (l) a current or recent (last two weeks) pregnancy.  All Plaintiffs represent the Medically Vulnerable Subclass.

49.     The "Disability Subclass" is defined as all current and future persons in the custody of the Philadelphia Department of Prisons who have an impairment that substantially limits one or more of their major life activities and who are at increased risk of COVID-19 illness, injury, or death due to their disability or any medical treatment necessary to treat their disability, including but not limited to those who have: (a) lung disease, including asthma, chronic obstructive pulmonary disease (*e.g.* bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure, or coronary artery disease; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) epilepsy; (f) hypertension; (g) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders and/or (i) developmental disability.[48]  All Plaintiffs represent the Disability Subclass.

50.     This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

51.     Joinder is impracticable because (1) the class members are numerous; (2) the classes include unidentifiable future members; and (3) the class members are incarcerated,

---

[48] The disability subclass is separate and apart from the medically vulnerable class as age, and some conditions within the medically vulnerable class, such as pregnancy, are not factors that place a person under the ambit of the ADA's protections.

rendering their ability to institute individual lawsuits limited, particularly in light of the court closures in the City of Philadelphia.

52.     Common questions of law and fact exist as to all members of the proposed classes: All have the right to receive adequate COVID-19 prevention, testing, and treatment.

53.     Plaintiffs' claims are typical of the members of the class because Plaintiffs and all class members are injured by the same wrongful acts, omissions, policies, and practices of Defendants-Respondents as described in this Complaint.  Plaintiffs' claims arise from the same practices, policies, and conduct that gives rise to the claims of the class members, and are based on the same legal theories.

54.     Plaintiffs Remick, Walker, Diaz, Alejandro, Dantzler, Hinton, Weiss, Skinner, Abdullah, and Bethea have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class.  They have no interests adverse to the interests of the proposed class.  They retained *pro bono* counsel with experience and success in the prosecution of civil rights litigation.  Counsel for Plaintiffs know of no conflicts among proposed class members or between counsel and proposed class members.

55.     Defendants have acted on grounds generally applicable to all proposed class members, and this action seeks declaratory and injunctive relief.  Plaintiffs therefore seek class certification under Rule 23(b)(2).

56.     In the alternative, the requirements of Rule 23(b)(1) are satisfied, because prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of contact for the party opposing the proposed classes.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Unconstitutional Conditions of Confinement in Violation of the**
**Eighth and Fourteenth Amendment to the U.S. Constitution**
42 U.S.C. § 1983/28 U.S.C. § 2241

*Class & Medically Vulnerable Subclass versus All Defendants*

57.     Under the Eighth and Fourteenth Amendments, corrections officials are required to provide for the reasonable health and safety of persons, whether sentenced or in pretrial detention, and they must provide humane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Youngberg v. Romeo*, 457 U.S. 307, 315–16, 324 (1982). Correctional officials have an affirmative obligation to protect persons in their custody from infectious disease. Correctional officials also have an obligation not to place persons in their custody in oppressive conditions involving prolonged lockdowns and solitary confinement. Officials violate the rights of incarcerated individuals when they are either deliberately indifferent to conditions of confinement that are likely to cause them serious illness and that pose an unreasonable risk of serious damage to their future health, *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993), or if their acts are objectively unreasonable. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2470 (2015).

58.     PDP's facilities, as currently operated, are unable to comply with public health guidelines to prevent an outbreak of COVID-19, and Defendants have not and cannot provide for the safety of the Class, nor have they been providing humane conditions of confinement. Defendants have not taken appropriate steps to test for, treat, or prevent COVID-19 outbreaks, and Defendants are unable to protect the Medically Vulnerable Subclass from serious harm caused by COVID-19, in violation of their constitutional obligation to provide humane conditions of confinement for the Class and Medically Vulnerable Subclass.

59. Absent the immediate implementation of the CDC-mandated health and safety measures, further relief in the form of releases of highly vulnerable inmates will be necessary.

60. Defendants have violated the rights of the Class under the Eighth and Fourteenth Amendments.

## SECOND CLAIM FOR RELIEF

### Violation of the Americans with Disabilities Act
42 U.S.C. §§ 12101 et seq
*Disability Subclass versus Defendant City of Philadelphia*

61. Title II of the ADA requires public entities, such as PDP, to reasonably accommodate people with disabilities in all programs and services for which people with disabilities are otherwise qualified.

62. Plaintiffs, and other members of the Class, are qualified individuals with a disability under the meaning of the ADA.

63. Access to medical treatment and safe conditions of confinement are programs or services that PDP's facilities must provide to incarcerated people for purposes of the ADA.

64. Defendants intentionally discriminate against people with disabilities by intentionally denying them reasonable accommodations in accordance with CDC guidelines and necessary to protect themselves from COVID-19.

65. If the population is reduced to allow for adequate social distancing, reasonable accommodations in accordance with CDC guidelines are necessary to protect people with disabilities including, but not limited to: single celling, provision of cleaning supplies, access to soap to facilitate handwashing, and staggered dining and recreation times in numbers that permit social distancing.

21

66. Failing to provide these reasonable accommodations is illegal discrimination under the ADA entitling Plaintiffs and members of the Disability Subclass to injunctive and declaratory relief.

## VI.     REQUEST FOR RELIEF

67. Plaintiffs Thomas Remick, Nadiyah Walker, Jay Diaz, Michael Alejandro, Michael Dantzler, Robert Hinton, Joseph Weiss, Joseph Skinner, Saddam Abdullah, and James Bethea and Class Members respectfully request that the Court order the following:

a. Certification of this case as a Class Action under Fed. R. Civ. P. 23(b)(2);

b. Injunctive relief ordering Defendants to immediately mitigate the serious risk of illness, death, and harm from COVID-19 and to provide humane conditions of confinement to those who are incarcerated or detained in the PDP;

c. A preliminary injunction directing Defendants to submit a plan to the Court within five days, to be overseen by a qualified public health expert pursuant to Fed. R. Evid. 706, which outlines specific mitigation efforts, in line with CDC guidelines, to significantly reduce the risk of contraction of COVID-19 by all Class Members;

d. In the absence of immediate and effective compliance with paragraphs b and c, injunctive relief and/or writs of habeas corpus requiring Defendants to:

(i.)     Release the Medically Vulnerable Subclass Members;

(ii.)    Provide these individuals with educational resources on COVID-19, including instructions that they should self-isolate for the CDC-recommended period of time (currently 14 days) following release;

22

(iii.)   A housing and/or public support plan for any released Class or Subclass Members with  exposure to or infection with COVID-19 confirmed by testing, and who do not readily have a place to self-isolate for the CDC-recommended period of time (currently 14 days).

e.   A declaration that Defendants' policies and practices violate the Eighth and Fourteenth Amendments and that Defendants' policies and practices violate the Americans with Disabilities Act with respect to the Disability Subclass.

f.   An award of Plaintiffs' attorneys' fees and costs; and

g.   Any further relief this Court deems just and appropriate.

Respectfully submitted,

/s/ Su Ming Yeh
Su Ming Yeh (PA 95111)
/s/ Matthew A. Feldman
Matthew A. Feldman (PA 326273)
PENNSYLVANIA INSTITUTIONAL
LAW PROJECT
718 Arch St., Suite 304S
Philadelphia, PA 19106
(215)-925-2966
smyeh@pailp.org
mfeldman@pailp.org

/s/ David Rudovsky
David Rudovsky (PA 15168)
/s/ Jonathan H. Feinberg
Jonathan H. Feinberg (PA 88227)
/s/ Susan M. Lin
Susan Lin (PA 94184)
KAIRYS, RUDOVSKY, MESSING,
FEINBERG, & LIN, LLP
718 Arch Street, Suite 501S
Philadelphia, PA 19106
(215) 925-4400
drudovsky@krlawphila.com
jfeinberg@krlawphila.com
slin@krlawphila.com

/s/ Nyssa Taylor
Nyssa Taylor (PA 200885)*
/s/ Witold J. Walczak
Witold J. Walczak (PA 62976)
/s/ Hayden Nelson-Major
Hayden Nelson-Major (PA 320024)
/s/ Ali Szemanski
Ali Szemanski (PA 327769)*
AMERICAN CIVIL LIBERTIES UNION
OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
(215) 592-1513
ntaylor@aclupa.org
vwalczak@aclupa.org
HNelson-Major@aclupa.org
aszemanski@aclupa.org

/s/ Will W. Sachse
Will W. Sachse (PA 84097)
/s/ Benjamin R. Barnett
Benjamin R. Barnett (PA 90752)
/s/ Mary H. Kim
Mary H. Kim*
/s/ Nicolas A. Novy
Nicolas A. Novy (PA 319499)
/s/ Theeya Musitief
Theeya Musitief (PA 327295)*
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-2496
Will.Sachse@dechert.com
Ben.Barnett@dechert.com
Mary.Kim@dechert.com
Nicolas.Novy@dechert.com
Theeya.Musitief@dechert.com

* indicates counsel who will seek
admission or *pro hac vice* admission

*Attorneys for Petitioners/Plaintiffs*

DATE: April 20, 2020

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THOMAS REMICK, et al., on behalf of themselves and all others similarly situated, | : | No. 2:20-cv-01959-BMS |
| | : | |
| Plaintiffs-Petitioners, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA; and BLANCHE CARNEY, in her official capacity as Commissioner of Prisons, | : | |
| | : | |
| Defendants-Respondents. | | |

**SETTLEMENT AGREEMENT**

The parties, by and through their undersigned counsel, hereby enter into this Settlement Agreement ("Agreement") as a negotiated resolution of the pending Plaintiffs' Motion for Contempt and Sanctions (ECF No. 71). The parties agree to the terms outlined in this Agreement and to the entry of a Court Order approving this Agreement, as follows:

1. The Plaintiffs hereby withdraw the pending Plaintiffs' Motion for Contempt and Sanctions (ECF No. 71).

2. The Defendants hereby agree to make a one-time payment of $125,000, in equal amounts of $62,500 to the Philadelphia Bail Fund and the Philadelphia Community Bail Fund, as a non-contempt sanction for the violations of the Court's Orders on out-of-cell time.

3. For the period of time between the date of a Court Order approving this Agreement and July 12, 2021, the Defendants shall make all reasonable efforts to increase out-of-cell times beyond those required by current Court Orders, with the ultimate goal of a new schedule that would provide out-of-cell time: (a) for all vaccinated units, in the

range of 4.5-5.0 hours/day; (b) for other general housing units, 3.5 hours/day; (c) for quarantined housing units, 3 hours/day; and (d) for segregation units, 1 hour/day. By July 6, 2021, the Defendants shall provide to Plaintiffs a report detailing all efforts made to increase out-of-cell time.

4. By July 12, 2021, the parties will report to the Court whether there is an agreement on a new schedule for out-of-cell time. Any new schedule would be subject to the "operational" exceptions provided by current Court Orders and to Court-approved modifications based on changes in infection rates.

5. If the parties do not reach an agreement on a new schedule for out-of-cell time by July 12, 2021, the Court, on motion by the Plaintiffs, and after considering the relevant factors, may enter an updated Order on out-of-cell time. In the meantime, the Defendants shall continue to provide to the Court and the Plaintiffs reports on infection and vaccination rates and the reports of the Deputy Wardens on out-of-cell time required under current Court Orders and Plaintiffs reserve the right to move for contempt of court and sanctions if there is not full compliance with current Court Orders.

6. By July 20, 2021, the Defendants shall prepare a report setting forth plans for a graduated return to pre-pandemic operations based on projected infection and vaccination rates. Thereafter, the parties shall discuss further court orders on out-of-cell time, family visitation policies, and related COVID-19 policies and practices.

**IT IS SO AGREED:**

/s/ David Rudovsky
David Rudovsky (PA 15168)
Kairys, Rudovsky, Messing, Feinberg & Lin,
LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106


/s/ Su Ming Yeh
Su Ming Yeh (PA 95111)
Pennsylvania Institutional Law Project
The Cast Iron Building
718 Arch Street, Suite 304 South
Philadelphia, PA 19106


/s/ Nyssa Taylor
Nyssa Taylor (PA 200885)
American Civil Liberties Union of
Pennsylvania
P.O. Box 60173
Philadelphia, PA 19102


/s/ Benjamin R. Barnett
Benjamin R. Barnett (PA 90752)
Dechert LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104


*Counsel for Plaintiffs*

/s/ Craig M. Straw
Craig M. Straw
First Deputy City Solicitor
City of Philadelphia Department of Law

/s/ Anne B. Taylor
Anne B. Taylor
Chief Deputy City Solicitor
Civil Rights Unit, Law Department
City of Philadelphia
1515 Arch Street, 14th Floor
Philadelphia, PA 19102-1595


*Counsel for Defendants*

DATE: June 22, 2021

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS REMICK, et al., on behalf of themselves and all others similarly situated, | : | No. 2:20-cv-01959-BMS |
| | : | |
| Plaintiffs-Petitioners, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA; and BLANCHE CARNEY, in her official capacity as Commissioner of Prisons, | : | |
| | : | |
| Defendants-Respondents. | : | |

## ORDER

**AND NOW**, this 23rd day of June, 2021, upon consideration of Plaintiffs' Motion for Contempt and Sanctions (ECF No. 71), Defendants' Response in Opposition to Plaintiffs' Motion for Contempt and Sanctions (ECF No. 73), and a Settlement Agreement signed by the parties on June 22, 2021, it is **HEREBY ORDERED**:

1. The Court approves the Settlement Agreement that is attached to this Order.

2. The parties shall comply with the terms of the June 22, 2021 Settlement Agreement.

3. Plaintiffs' Motion for Contempt and Sanctions, having been withdrawn, is denied without prejudice to their right to seek additional relief from the Court, including a motion for contempt and sanctions should the Defendants fail to comply with the Court's Orders and/or a motion to enforce the Settlement Agreement.

BY THE COURT:

_____

Berle M. Schiller, J.

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THOMAS REMICK, et al., on behalf of themselves and all others similarly situated, | : : : | CIVIL ACTION |
| Plaintiffs-Petitioners, | : : : | |
| v. | : : | |
| CITY OF PHILADELPHIA; and BLANCHE CARNEY, in her official capacity as Commissioner of Prisons, | : : : : | |
| Defendants-Respondents. | : : | No. 20-1959 |

**MEMORANDUM**

Schiller, J.                                                                July 12, 2022

Before the Court is the parties' Joint Motion for Final Approval of Class Action Settlement (the "Joint Motion"). (ECF No. 173.) Following more than two years of litigation, Plaintiffs—a class of persons who are currently or will in the future be confined in the Philadelphia Department of Prisons ("PDP")—and Defendants—the City of Philadelphia ("City") and Commissioner of Prisons Blanche Carney—entered into arm's length settlement negotiations that resulted in the execution of a global settlement agreement (the "Settlement Agreement"). The Court previously granted preliminary approval of the Settlement Agreement on April 13, 2022. (ECF No. 166.) After providing notice of the Settlement Agreement to class members, only one legitimate objection was submitted. A fairness hearing was held on July 6, 2022, at which counsel for both parties appeared and no further objections were made. For the reasons that follow, the Joint Motion is granted and the Settlement Agreement is approved.

**I.       BACKGROUND**

The Court previously recounted the facts of this case in considerable detail and therefore

will not repeat them here. *See Remick v. City of Phila.*, Civ. A. No. 20-1959, 2022 WL 742707, at *1-3 (E.D. Pa. Mar. 11, 2022). In brief, on April 20, 2020, Plaintiffs filed suit against Defendants to compel them "to protect individuals incarcerated in the PDP from the risks of serious harm they face from the twin dangers of COVID-19 and prolonged isolation in their cells." (ECF No. 132 at 6 (citing ECF No. 1).) Over the ensuing two years, *inter alia*, the Court issued numerous orders relating to the PDP's COVID-19 protocols and jail conditions, (*see, e.g.*, ECF Nos. 35, 55, 58, 59, 62, 63, 70, 74, 92, 93); Plaintiffs filed two contested motions for contempt, (ECF Nos. 71, 73, 113, 119, 124), both of which were resolved via settlement; and Defendants filed a contested motion to vacate one of the Court's orders, (ECF Nos. 118, 127), which was also resolved via settlement. All the while, the Court and the parties held biweekly status conferences, and the parties regularly submitted status reports, declarations from incarcerated persons, certifications from prison staff, and information relating to COVID-19 infection and vaccination rates at PDP facilities.

More recently, on January 7, 2022, Plaintiffs filed their Motion for Preliminary Injunction. (ECF No. 128.) Plaintiffs thereafter filed their Third Amended Motion to Certify Class on January 28, 2022, (ECF No. 132), and Third Amended Complaint on February 22, 2022. (ECF No. 147.) Defendants moved to dismiss the Third Amended Complaint on February 25, 2022. (ECF No. 148.) On March 11, 2022, the Court certified a 23(b)(2) class. (ECF Nos. 152-53.) The class comprises "[a]ll persons who are currently or will be in the future confined in the [PDP], and are or will be subjected to illegal or unconstitutional conditions of confinement as a result of policies and restrictions implemented in response to the COVID-19 pandemic, and the PDP's staffing shortage." *Remick*, 2022 WL 742707, at *5. The Court scheduled a hearing on Plaintiffs' preliminary injunction motion for March 29, 2022.

While these motions were pending, the parties entered into arm's length settlement

negotiations. On March 28, 2022, the Court rescheduled the preliminary injunction hearing for April 25 after the parties informed the Court of their initial successes. (ECF No. 164.) Two weeks later, on April 12, 2022, the parties submitted a joint motion for the preliminary approval of the Settlement Agreement. (ECF No. 165.) The Court preliminarily approved the Settlement Agreement on April 13, 2022 and scheduled a fairness hearing for July 6, 2022. (ECF No. 166.) During the fairness hearing, counsel for both Plaintiffs and Defendants further voiced their approval of the Settlement Agreement.

Under the terms of the Settlement Agreement, the City will: (1) implement measures to enhance the hiring and retention of correctional officers, including by issuing signing and retention bonuses; (2) provide incarcerated persons with greater amounts of out-of-cell time on a schedule with graduated increases; (3) increase capacity for in-person visits and develop a plan for return to pre-pandemic programming; (4) continue to ensure adequate and timely medical and mental health treatment, including by expanding mental health programming and reducing backlogs for medical appointments; (5) ensure compliance with individuals' due process rights during disciplinary proceedings; (6) expand phone and tablet access; (7) continue the implementation of a lock replacement program and implement refresher training on the emergency call button system; (8) continue to follow COVID-19-related protocols to ensure incarcerated persons are available for court and meetings with attorneys, including by testing incarcerated persons before court appearances; and (9) provide refresher training on the PDP's use of force policy. (ECF No. 173 Ex. A.) Defendants also agreed to withdraw their Petition for Permission to Appeal this Court's Class Certification Order, which is currently pending in the Third Circuit Court of Appeals. (*Id.*)

The Settlement Agreement further provides for the Court's appointment of a monitor (the "Monitor") to assist the Court and the parties in implementing the Settlement Agreement for a

period of two years. (*Id.*) The parties recommended, and the Court approved and appointed, Cathleen Beltz as the Monitor on May 25, 2022. (ECF No. 169.)

## II.       LEGAL STANDARD

The law encourages the settlement of civil actions—particularly class actions—in federal courts. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004); *see also In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("[T]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."). Nevertheless, the decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court. *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975). "Under [Fed. R. Civ. P. 23(e)] the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members." *Gen. Motors*, 55 F.3d at 785. "The claims, issues, or defenses of a certified class . . . may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). A court may only issue its approval upon a finding that the settlement agreement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

To guide district courts considering approval of class action settlements, the Third Circuit has adopted a nine-factor test, referred to as the *Girsh* test. Under the *Girsh* test, the Court considers: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater settlement; (8) the range of reasonableness of the settlement in light of the best possible recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of litigation.

*Girsh*, 521 F.2d at 157.

The Third Circuit subsequently expanded upon the *Girsh* factors to enumerate several permissive factors, known as the *Prudential* factors, including: (1) the maturity of the underlying substantive issues; (2) the existence and probable outcome of claims by other classes and subclasses; (3) the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; (4) whether class or subclass members are accorded the right to opt out of the settlement; (5) whether any provisions for attorneys' fees are reasonable; and (6) whether the procedure for processing individual claims under the settlement is fair and reasonable. *In re Prudential Ins. Co.*, 148 F.3d 283, 323 (3d Cir. 1998).

## III.        DISCUSSION

Here, the Court finds that the Settlement Agreement is fair, reasonable, and adequate. It addresses the relevant *Girsh* and *Prudential* factors in turn.

### A.        Presumption of Fairness

At the outset, the Court will afford the Settlement Agreement a presumption of fairness. The Third Circuit applies "an initial presumption of fairness in reviewing a class settlement when: (1) the negotiations occurred at arms [sic] length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 436 (3d Cir. 2016). The Settlement Agreement fulfills all four factors.

First, the parties engaged in arm's length negotiations. The Court was apprised of the parties' settlement progress during several of its biweekly conference calls with the parties. Informal settlement discussions occurred between the parties throughout the course of the

litigation. Progress accelerated in February and March 2022 as the preliminary injunction hearing approached. Between then and mid-April 2022, the parties partook in frequent meetings, reaching 95% completion of a settlement agreement by the end of March and hammering out the remaining details over the ensuing weeks.

Second, there was sufficient discovery. The parties have engaged in significant informal and formal discovery, including: Defendants providing Plaintiffs and the Court with weekly reports concerning, *e.g.*, staff absenteeism, out-of-cell time, incarcerated persons' access to court hearings, COVID-19 positivity rates among both staff and incarcerated persons, and vaccination rates among both staff and incarcerated persons; the parties engaging in document production; and Plaintiffs deposing the PDP's Chief of Medical Operations.

Third, both parties are represented by reasonable counsel possessing significant experience in prisoner rights litigation and class actions. Class counsel in particular consists of two non-profit organizations, the Pennsylvania Institutional Law Project and the Abolitionist Law Center, in addition to the law firm Kairys, Rudovsky, Messing, Feinberg & Lin LLP, all of which are regularly on the forefront of the most pressing civil rights issues in both our state and nation. The class is also represented by Dechert LLP, a highly revered global law firm based in Philadelphia with extensive complex litigation experience.

Fourth, and as discussed further below, counsel only received one objection to the Settlement Agreement.

The Court therefore concludes that a presumption of fairness is warranted here.

## B.    The *Girsh* Factors

The Court finds that the relevant *Girsh* factors, taken together, weigh in favor of approval of the Settlement Agreement.

### 1.    The complexity, expense, and likely duration of the litigation

The Court finds that the first *Girsh* factor weighs in favor of settlement approval. The first *Girsh* factor "captures the probable costs, in both time and money, of continued litigation." *Warfarin*, 391 F.3d at 535-36. Here, the litigation has already spanned more than two years; were the claims in this case to proceed (notwithstanding the Court's decision on Defendants' pending motion to dismiss), the parties would be required to conduct full-scale, exhaustive, and costly merits discovery. Further, the size of the class, the underlying claims addressing complex issues such as medical care—necessitating expert witnesses—and the extent of the injunctive relief sought all contribute to the complexity of this case. Courts in this Circuit have historically found comparable litigation addressing prison policies and procedures to be sufficiently complex to weigh in favor of settlement approval. *See, e.g.*, *Woods v. Marler*, Civ. A. No. 17-4443, 2018 WL 11355449, at *2 n.3 (E.D. Pa. Sept. 24, 2018); *Williams v. City of Phila.*, Civ. A. No. 08-1979, 2011 WL 3471261, at *3 (E.D. Pa. Aug. 8, 2011); *Inmates of Northumberland Cnty. Prison v. Reish*, Civ. A. No. 08-345, 2011 WL 1627951, at *3 (M.D. Pa. Apr. 29, 2011).

Thus, the first factor weighs in favor of settlement approval.

### 2.    The reaction of the class to the settlement

The Court finds that the second *Girsh* factor weighs in favor of settlement approval. The second *Girsh* factor calls for the Court to "attempt[] to gauge whether members of the class support the settlement by considering the number of objectors . . . and the substance of any objection." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 321 (3d Cir. 2011) (quoting *Prudential*, 148 F.3d at 318) (quotation marks omitted). Here, counsel for the parties received letters regarding the Settlement Agreement from fifty-six of the approximately 4,100 persons incarcerated at PDP facilities. Following a review of the letters, the Court has determined that only one constitutes an actual

objection to the Settlement Agreement. The author of this letter felt as though litigation might achieve longer-lasting change at PDP than settlement. The author, however, justified this contention by citing to issues that are already addressed by the Settlement Agreement.

The remainder of the letters discussed what the authors asserted is the ongoing state of disrepair and unlivable conditions at PDP facilities, which the Settlement Agreement is designed to ameliorate. Some of those letters also expressed disappointment at not receiving monetary damages, but a Rule 23(b)(2) class is not the appropriate vehicle to pursue those damages. A low number of objectors compared to the potential number of class members creates a strong presumption in favor of approving a settlement. *See Inmates of Northumberland Cnty. Prison*, 2011 WL 1627951, at *3 (approving settlement agreement where four comments were received out of 200 class members and where none of the four objected to the terms of the settlement); *Boone v. City of Phila.*, 668 F. Supp. 2d 693, 712 (E.D. Pa. 2009) (approving settlement agreement where three objections were received from a potential class of 37,000 members).

Thus, the second factor weighs in favor of settlement approval.

### 3.    The stage of the proceedings and the amount of discovery completed

The Court finds that the third *Girsh* factor weighs in favor of settlement approval. The third *Girsh* factor "captures the degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *Gen. Motors*, 55 F.3d at 813.

Here, the extensiveness of discovery and motion practice, coupled with the protracted pretrial stage of these proceedings, demonstrates a well-informed decision to settle this action. This case has developed considerably over the past two years. The parties engaged in significant discovery, both in connection with Plaintiffs' motion for preliminary injunction and Court orders

mandating the weekly exchange of data and reports on PDP conditions. The parties have also engaged in extensive motion practice, filing and responding to multiple motions for preliminary injunctions, motions for class certification, and motions for contempt, as well as a motion to dismiss and a motion to compel. *See Pack v. Beyer*, Civ. A. No. 91-3709, 1995 WL 775360, at *4 (D.N.J. Dec. 22, 1995) (finding that the "substantial discovery and motion practice . . . conducted" signifies that "the parties have a clear understanding of the facts underlying this case, as well as the strengths and weaknesses of the arguments" and "that the settlement has been fully and fairly negotiated").

Thus, the third factor weighs in favor of settlement approval.

### 4. The risks of establishing liability

The Court finds that the fourth *Girsh* factor weighs slightly in favor of settlement approval. In examining this factor, the Court "give[s] credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action." *Lachance v. Harrington*, 965 F. Supp. 630, 638 (E.D. Pa. 1997). "By evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." *Gen. Motors*, 55 F.3d at 814.

Here, the Court finds that Settlement Agreement's comprehensiveness in providing relief to class members does away with many of the risks inherent in a complex prison civil rights litigation of this sort. Although, in weighing acceptance of the Settlement Agreement with the prospect of litigation, "there is no assurance that the relief would be greater or different than the relief provided by [the proposed agreement]," *Harris v. Reeves*, 761 F. Supp. 382, 401 (E.D. Pa. 1991), the Court joins the general sentiment of Judge Surrick, who expressed that "[i]f one were

to look at the 40-year history of prison litigation involving conditions in the [Philadelphia prison system], one could conclude that Plaintiffs face no risk in establishing liability." *Williams*, 2011 WL 3471261, at *4. In any event, the Settlement Agreement provides relief for all of the issues discussed by the parties and the Court over the long course of this litigation.[1]

Thus, the fourth factor weighs slightly in favor of settlement approval.

### 5.    The risk of establishing damages

The Court finds that the fifth *Girsh* factor weighs in favor of settlement approval. Pursuant this factor, the Court balances "the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *Prudential*, 148 F.3d at 319. Although this class does not seek monetary damages, courts considering this *Girsh* factor in connection with proposed settlements for 23(b)(2) classes have noted that "the risks inherent in seeking injunctive relief are always significant." *Williams*, 2011 WL 3471261, at *4; *see also Inmates of Northumberland Cnty. Prison*, 2011 WL 1627951, at *3 ("With respect to the fifth factor, the risks of establishing damages, we note that the parties do not seek damages but rather seek declaratory and injunctive relief. The risks of demonstrating the propriety of an injunction—especially an injunction of such a grand scale as would be necessary here (and is reflected in the Proposed Settlement)—are great.").

Thus, the fifth factor weighs in favor of settlement approval.

### 6.    The risks of maintaining the class action through trial

The Court finds that the sixth *Girsh* factor is neutral with respect to settlement approval.

---

[1] The Court also acknowledges that Defendants have reason to avoid the uncertainties of litigation: if Plaintiffs succeeded in establishing liability, the Court would have significant discretion in fashioning injunctive relief. The Settlement Agreement affords Defendants greater control in determining what terms they feel are most appropriate to manage PDP facilities.

The sixth *Girsh* factor considers the risks of maintaining a class action throughout the litigation. Fed. R. Civ. P. 23 allows district courts to "decertify or modify a class at any time during the litigation if it proves to be unmanageable." *Prudential*, 148 F.3d at 321. Thus, "[t]here will always be a 'risk' or possibility of decertification." *Id.* But beyond the invariable risk of decertification, and absent a decision by the Third Circuit on Defendants' petition appealing this Court's certification decision, neither party points to any specific reason that decertification is likely to occur here. To the extent individuals continuously enter and leave PDP custody, the fluidity of the class weighs in favor of settlement approval. Overall, however, the Court agrees with the parties that this factor is neutral.

7.    The seventh, eighth, and ninth *Girsh* factors

This action was certified pursuant to Fed. R. Civ. P. 23(b)(2) for injunctive relief only. The seventh, eighth, and ninth *Girsh* factors involve monetary judgments and settlement funds. They therefore do not apply here. *See Inmates of Northumberland Cnty. Prison*, 2011 WL 1627951, at *3.

Thus, the totality of the *Girsh* factors weigh in favor of the Court's approval of the Settlement Agreement.

C.    The ***Prudential*** Factors

The Court finds that the applicable *Prudential* factors weigh in favor of settlement approval. The factors "identified in *Prudential* are illustrative of additional inquiries that in many instances will be useful for a thoroughgoing analysis of a settlement's terms." *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010). Since this class does not seek monetary damages, only two factors are relevant here: the maturity of the underlying substantive issues, and whether any provisions for attorneys' fees are reasonable. First, at the time the Settlement

Agreement was executed, and as discussed above, extensive discovery and motion practice had been completed, meaning that the "underlying substantive issues" were "matur[e]" and class counsel had a strong "ability to assess the probable outcome of a trial on the merits." *See Prudential*, 148 F.3d at 323.

Second, the attorneys' fees and costs provided for in the Settlement Agreement are fair and reasonable. The parties have settled their claim for attorneys' fees and costs for $340,000.00. The Civil Rights Attorneys' Fees Awards Act of 1976 ("Fees Act") provides that prevailing plaintiffs are entitled to claim reasonable attorneys' fees in civil rights cases, and "strong federal policy embodied in the Fees Act normally requires an award of fees to prevailing plaintiffs in civil rights actions, including those who have prevailed through settlement." *Evans v. Jeff D.*, 475 U.S. 717, 724-25 (1986); *see also* 42 U.S.C. § 1988. "The initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Blanchard v. Bergeron*, 489 U.S. 87, 94 (1989) (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)) (quotation marks omitted). The parties both represent that, "[e]ven with attorney rates limited by the Prison Litigation Reform Act, the agreed-upon figure is a significant reduction in attorneys' fees compared to the fees that could be assessed through a fee petition due to the significant number of hours expended in the litigation." (ECF No. 173 at 17.) Further, the attorneys' fees here are comparable to attorneys' fees agreed upon and approved in other analogous class action suits. *See Inmates of Northumberland Cnty. Prison*, 2011 WL 1627951, at *3 (finding attorneys' fees of $300,000 to be fair and reasonable).

Therefore, the totality of the relevant *Prudential* factors weighs in favor of the Court's approval of the Settlement Agreement.

### D. Notice to Class Members

Finally, the Court finds that notice of the Settlement Agreement provided to class members was adequate. Fed. R. Civ. P. 23(e) requires that notice of settlement be afforded to class members. The court has broad discretion in determining the timing and manner of the notice. *Harris*, 761 F. Supp. at 393. Here, notice was provided to class members by posting information regarding the Settlement Agreement in all PDP housing areas, at the law libraries, and on PDP tablets. (*See* ECF No. 173 Exs. B-C.) Plaintiffs' counsel also provided class members with copies of the Settlement Agreement upon request. This method of providing notice comports with that approved by courts in analogous litigations. The Court acknowledges the impractical nature of providing individual notice to class members, since the class comprises many thousands of members, as well as many unidentifiable members, *i.e.*, individuals who will be incarcerated at PDP facilities in the future. *See Harris*, 761 F. Supp. at 393. Accordingly, courts in this Circuit have widely recognized that posting notices at prison facilities is the best way to inform class members of a pending settlement agreement. *See, e.g., id.*; *Woods v. Marler*, Civ. A. No. 17-4443, 2018 WL 11355449, at *1-2 (E.D. Pa. Sept. 24, 2018); *Inmates of Northumberland Cnty. Prison*, 2011 WL 1627951, at *2. That was done here.

Therefore, adequate notice was provided to class members pursuant to Fed. R. Civ. P. 23(e).

## IV. CONCLUSION

In sum, the Court finds that a balancing of the relevant *Girsh* and *Prudential* factors weighs heavily in favor of approval of the Settlement Agreement. It is a vast understatement to say that this litigation was toilsome and trying—both in terms of workload and emotional taxation, given the gravity of the issues facing class members—forcing counsel to navigate through uncharted and

unprecedented times as the COVID-19 pandemic gripped the PDP. While it is certainly too soon to declare the COVID-19 pandemic "over," the Court genuinely applauds counsel and their dexterous work at bringing the formal components of this litigation to a close. It is apparent that the parties have a plan in place to confront the, at times, unfathomably harrowing conditions at the PDP. The Court is further comforted by the appointment of Ms. Beltz—as skillful and experienced as they come—as the Monitor, and the Court looks forward to working with her to implement the Settlement Agreement and actively keep tabs on the PDP over the next few years. The Settlement Agreement also provides an avenue for Plaintiffs to return to this Court should conditions at PDP stagnate or deteriorate.

For the reasons stated above, the Court is satisfied that the Settlement Agreement is fair, reasonable, and adequate. The Court therefore grants the Joint Motion and approves the Settlement Agreement. An Order consistent with this Memorandum will be docketed separately.

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THOMAS REMICK, ET AL., | : | |
| | : | **CIVIL ACTION NO. 20-1959** |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, ET AL. | : | |

## **ORDER**

This 12th day of July, 2024, for the reasons that follow, it is hereby **ORDERED** that Plaintiffs' Motion for Contempt (ECF 205) is **GRANTED**.

The Court finds Defendants in **CONTEMPT** of its Order of July 12, 2022 (ECF 176), approving the parties' joint Settlement Agreement (ECF 173). Following two formal hearings, as set forth on the record in open court, there is clear and convincing evidence that Defendants City of Philadelphia and Commissioner of Prisons[1] are not in compliance with respect to at least two core issues addressed by the Settlement Agreement – staffing levels and out-of-cell time. Although the Court does not consider the Defendants' non-compliance willful, or deem them to be acting in bad faith, neither are required for a finding of civil contempt. *F.T.C. v. Lane Labs-USA, Inc.*, 624 F.3d 575, 582 (3d Cir. 2010) ("Although courts should hesitate to adjudge a defendant in contempt when there is ground to doubt the wrongfulness of the conduct, an alleged contemnor's behavior need not be willful in order to contravene the applicable decree.")

As to the defense of substantial compliance, Defendants have taken partial steps to ameliorate the crisis in the Philadelphia Department of Prisons, but they have not taken "all reasonable steps" as required to prevail on that defense. *Lane Labs*, 624 F.3d at 591.

The Court is holding the issue of appropriate sanctions under advisement.

　　　　　　　　　　　　　　　　/s/ Gerald Austin McHugh
　　　　　　　　　　　　　　　United States District Judge

---

[1] Current Commissioner Michael Resnick, Esquire did not assume his position until April 22, 2024.

# EXHIBIT E

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THOMAS REMICK, ET AL.      :
                                  :       CIVIL ACTION NO. 20-1959
           v.                  :
                                  :
CITY OF PHILADELPHIA, ET AL.   :

## ORDER

This 16th day of August, 2024, after finding Defendants City of Philadelphia and the Commissioner of Prisons in Contempt (ECF 220),[1] and following in-depth consultation with this Court's team of Monitors, the following equitable remedy[2] is hereby **ORDERED:**

1. **RECRUITMENT, STAFFING, AND HIRING** [3]

    a. The City of Philadelphia (City) shall, within **30** days of the date of this Order, identify and provide to the Monitor outside recruitment firms with a proven track record of hiring for law enforcement agencies for consideration by the Court. Within **90** days of Court approval of a firm, the City shall hire that firm to manage and increase recruitment and hiring efforts for the Philadelphia Department of Prisons (PDP) and related jobs.

    b. The City shall maintain an internet portal to accept applications for employment to the PDP, and that portal shall remain open and continuously available to accept applications at all times.

---

[1] Defendants were found in contempt of this Court's July 12, 2022 Order (ECF 176), which approved and incorporated a Settlement Agreement (ECF 173-2).

[2] The Court will entertain additional argument as to whether any form of coercive or compensatory sanction is separately warranted.

[3] The requirements described in this section primarily seek to remedy non-compliance with section II, paragraphs (1) through (5), (10), (13), (14), (17), and (18) of the Settlement Agreement. ECF 173-2.

c.   The City shall complete an evaluation of departments within the PDP, including but not limited to: Classification, Movement, and Registration; Management Information Systems; Booking; and external gate security, to determine if these departments could be served in full or in part by civilian employees. This evaluation should include a review of possible barriers to reclassification of these positions. The City shall complete this evaluation and report its findings to the Monitor within **30** days of the date of this Order.

d.   Within **30** days of the date of this Order, the City shall identify for the Court companies that are capable of providing medical guarding of PDP's open ward patient population after the first 24 hours following admission and transportation of patients to offsite medical appointments. Within **90** days of the date by which the Court approves a selected company, the City shall commence negotiating a contract with the selected service provider. To the extent the hiring of services contemplated by the provision of this Order is a mandatory subject of bargaining, the contract with the company capable of the services contemplated by this paragraph shall remain in place consistent with any terms negotiated through bargaining, subject to final approval by the Court.

e.   The City shall immediately authorize PDP to offer additional double-time pay for any day of the week as necessary to staff all vacant shifts.

f.   To assist with employee retention, the City shall, within **150** days of the date of this Order, fund an adequate employee wellness program. Within **90** days of the date of this Order, the PDP shall appoint a Wellness Coordinator to oversee the PDP's employee wellness program.

2

g. Within **60** days of the date of this Order, the City shall compare wages and non-wage benefits available to PDP employees and other City of Philadelphia employees and submit a description of any differences identified to the Monitor. The comparison shall include uniformed public safety personnel and all other PDP job classifications for which vacancy rates exceed ten percent.

h. Within **30** days of the date of this order, the City shall initiate any necessary action to expand the timeframe for eligibility to rehire former employees contained within Civil Service Regulation 15-031 from one year to five years after resignation.

i. Pursuant to the waiver of the Residency Requirement in the June 12, 2024 Act 195 Interest Arbitration Supplemental Award, *see* ECF 216-8, the City shall expand the category of eligible applicants to qualified individuals who reside outside the Commonwealth of Pennsylvania.

2. **HEALTHCARE ACCESS** [4]

a. The City shall increase the budget for YesCare to provide additional healthcare staffing to serve as liaisons between security personnel and healthcare providers, to expand healthcare services to meet the current and future needs of the patient population, and to provide routine rounding in all housing units due to limited out-of-cell time.

   i. Rounding shall occur at least three times per week in all units until the PDP comes into substantial compliance with required out-of-cell time.

   ii. The budget increase shall be sufficient to allow YesCare to provide additional staff members as necessary to ensure substantial compliance with

---

[4] The requirements described in this section primarily seek to remedy non-compliance with section II, paragraphs (4) through (6) of the Settlement Agreement. ECF 173-2.

substantive provisions 4 ("Return to Normal Operations"), 5 ("Healthcare") and 6 ("Behavioral Health in Segregation") of the Settlement Agreement. *See* ECF 173-2, ¶¶ II(4)-(6).

b. The City shall fund an Access to Care team, to be housed within the Commissioner's Office, and to include, at minimum, one Deputy Commissioner, one Access to Care Manager at a correctional peace officer management rank, one secretary, one analyst, and at least five Health Care facilitators assigned to PDP facilities.  The Access to Care team shall be fully operational within **180** days of the date of this Order.

c. Where medical care can properly be rendered using telehealth services, the City shall take all reasonable and necessary steps to employ such services to reduce the number of staff assigned to transport duties, even if the marginal cost of telehealth services is higher than that of in-person visits.

3. **PROGRAMMING AND SERVICES FOR CLASS MEMBERS** [5]

   a. Within **60** days of the date of this Order, the City shall identify and provide to the Monitor competent outside consultant(s) to conduct an objective evaluation of the Restorative and Transitional Services (RTS) Unit's functions and effectiveness. Within **60** days of approval by the Court, the City shall engage the identified consultant(s). The evaluation shall include, at a minimum, a comparative analysis of programs proven effective in other comparable detention/correctional facilities, and a recommendation for performance metrics against which to assess the performance of PDP employees working in RTS.

   b. The City shall install law library terminals in each unit in each facility for class members to use during their recreation time. The law library terminals shall be fully installed within **1 year** of the date of this Order.

4. **FACILITY MAINTENANCE** [6]

   a. The City shall authorize the PDP to expand services contractually provided by U.S. Facilities, Inc., and fund such expanded scope of services until necessary maintenance is performed at all PDP facilities. To the extent any maintenance needs are not included in the scope of work of the RFP that resulted in the contract, the City shall initiate bargaining on the subject or issue a request for proposals in accordance with the applicable collective bargaining agreements.

---

[5] The requirements described in this section primarily seek to remedy non-compliance with section II, paragraphs (4), (5), and (7) of the Settlement Agreement. ECF 173-2.

[6] The requirements described in this section primarily seek to remedy non-compliance with section II, paragraphs (4) and (17) of the Settlement Agreement. ECF 173-2.

b. The City shall complete an analysis of the state of the physical plant and long-term capital needs at each PDP facility housing class members, identifying deficits that impact the conditions of confinement. This analysis should also provide the Commissioner of Prisons with detailed recommendations for a target number of staff employees needed to maintain each facility. The City shall complete the analysis and report its findings to the Monitor within **270** days of the date of this Order.

5. **FACILITY SECURITY** [7]

a. The PDP shall confer with the Philadelphia Police Department to implement a system to report criminal offenses remotely that occur at PDP facilities, to include a video capability that would allow police personnel to interview complainants and witnesses remotely. The PDP shall report the outcome of these discussions to the Monitor within **60** days of the date of this Order.

b. The City shall fund PDP's K9 detection program. Funding for the program shall be at a level sufficient to conduct routine and consistent sweeps for contraband at each institution and to ensure adequate facilities to house K9s and all necessary equipment.

c. The City shall complete the purchase of technology that allows for prompt and efficient scanning, without violating any attorney-client privilege, of incoming legal mail for contraband within **60** days of the date of this Order.

---

[7] The requirements described in this section primarily seek to remedy non-compliance with section II, paragraph (4) of the Settlement Agreement. ECF 173-2.

6. **POPULATION MANAGEMENT** [8]

    a.  Within **120** days of the date of this Order, the Commissioner is directed to explore realistic, suitable options for relocation of class members to another secure facility, and report in writing to the Monitor any such options identified for assessment by the Court.

    b.  The Prison Population Manager, or designee, in the Managing Director's Office, shall, on a monthly basis, evaluate data from the Tableau Prison Population Dashboard to identify individual members of the prison population being held on a charge other than murder, with no detainers, because of a failure to post bail. A report shall be issued and provided to the Monitor, the PDP Commissioner, the District Attorney and Office of the Public Defender, with a copy to the Administrative Judges and Supervising Judges for criminal matters in both the Court of Common Pleas and Municipal Court. This report shall include the person identifier (PPN), admission date, length of stay, total bail amounts, facility, lead charges, lead grades, and docket numbers, as well as the following:

        i.  persons held on bail up to $100,000;

        ii.  persons with significant medical needs such as cancer treatment and dialysis requiring frequent off-site medical appointments;

        iii.  persons over the age of 60;

        iv.  persons who are in PDP's minimum or community security categories, have only misdemeanor and F3 charges, and who have no more than a minor history of misconduct within the PDP; and

---

[8] The requirements described in this section primarily seek to remedy non-compliance with section II, paragraphs (2) and (3) of the Settlement Agreement. ECF 173-2.

v.  persons who are housed in protective custody.

Any data not obtainable through the Tableau Prison Population Dashboard, including the docket numbers, lead charges, and lead grades shall be compiled by the Prison Population Manager, or designee, in the Managing Director's Office.

7. **REMEDY**

a.  As an equitable remedy imposed under this Court's contempt power, the City of Philadelphia is ordered to pay the sum of 25 million dollars[9] into the Registry of this Court.  These funds will be held by the Court solely as the prerequisite for a further order directing the Clerk of Court to disburse said funds to the City of Philadelphia Grants Fund.  The funds are to be designated for use exclusively to comply with the terms of this Order, with the City required to submit periodic reports to the Court as to all disbursements.  Upon further notice from the Court, the appropriate City representative shall execute Form AO-213P, with an original, non-electronic signature, to facilitate the disbursement via an electronic funds transfer.  The City is prohibited from reducing funds currently budgeted or projected for future fiscal years for the operation of the PDP because of its obligation to comply with this or any other provision of this Order.

8. **COMPLIANCE WITH THIS ORDER AND THE SETTLEMENT AGREEMENT**

a.  To the extent the expansion or hiring of services or civilianization of positions contemplated by the provisions of this Order are mandatory subjects of bargaining,

---

[9] The spreadsheets submitted by the City, in a sworn declaration by the PDP Commissioner, show that from fiscal years 2020 to 2023 (July 1, 2019 to June 30, 2023), the City of Philadelphia saved $19,304,126 by underspending its PDP budget, largely due to understaffing.  *See* ECF 216, Exs. A-C.  This action was commenced in April 2020, and the spreadsheets from which this total was extracted date back several months before.  It should be noted, however, that if fiscal year 2020 were excluded from the calculations, the shortfall in City spending on the prisons is even greater, totaling $25,119,265.

including but not limited to the positions recommended by the Monitor for civilization pursuant to provision 1.c, the City shall initiate bargaining and/or provide notice to the applicable union of its intention to expand or hire services or civilianize any positions within **45** days from the date of this Order.

b. The City shall, as required to comply with the mandates of this Order and the Settlement Agreement, hire or contract with a permanent full-time internal Compliance Coordinator within **120** days of the date of this Order with sufficient support staff to facilitate implementation of this Order and the Settlement Agreement. In the meantime, the City shall remain responsible for compliance with all provisions of this Order and the Settlement Agreement.

  i. Within **60** days of appointment, the Compliance Coordinator shall submit a staffing plan to the Court via the Monitor for approval. Remaining team members shall be appointed within **90** days following Court approval of the staffing plan.

  ii. Within **180** days of the date of this Order, Defendants shall submit a written status report on their progress toward implementation of this Order. Subsequent status reports shall be submitted on the first day of each quarter until otherwise directed by the Court.

c. The Monitor shall continue to provide the Court with biannual status reports.

The Court retains jurisdiction over any matter which may arise in connection with the administration of this Order and may revise or order additional equitable relief or sanctions against the Defendants pending information provided to the Court in conjunction with this Order.

 /s/ Gerald Austin McHugh
United States District Judge

# EXHIBIT F

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS REMICK, et al., on behalf of Themselves and all others similarly situated, | : : : | No.: 2:20-cv-01959-BMS |
| Plaintiffs, | : : | |
| v. | : : | |
| CITY OF PHILADELPHIA; and BLANCHE CARNEY, in her official capacity as Commissioner of Prisons, | : : : : | |
| Defendants. | : : | |

## MONITOR'S FIRST REPORT

Pursuant to Section 19 of the Settlement Agreement (Agreement) and Section 7 of the Monitoring Agreement and Protocol, the Monitor appointed by this Court submits the attached Monitor's First Report evaluating Defendants' compliance with the terms of the Agreement through August 31, 2022. The Monitor prepared this report as the first of regular reports to be filed of record with this Court every four months. Subsequent reports will be filed according to the following schedule:

| | |
|---|---|
| Monitor's Second Report | March 3, 2023 |
| Monitor's Third Report | July 7, 2023 |
| Monitor's Fourth Report | November 3, 2023 |
| Monitor's Final Report | March 29, 2024 |

I am available to answer any questions the Court may have regarding this report and Defendants' compliance with the Agreement at such times as are convenient for the Court.

DATED: November 4, 2022                    Respectfully submitted,


                                           By: /s/ Cathleen Beltz
                                               Monitor

The Agreement between Plaintiffs Thomas Remick, et al., (Plaintiffs), on behalf of themselves and all others similarly situated, and the City of Philadelphia (City) and Blanche Carney, in her official capacity as Commissioner of Prisons (Defendants), in *Thomas Remick et al., v. City of Philadelphia,* Case No. CV 01959-BMS (Action), requires system-wide reform of the Philadelphia Department of Prisons (PDP) as prescribed in 18 substantive provisions.

The Agreement further provides that the Monitor issue "regular reports to counsel and the Court" that assess Defendants' compliance with each substantive provision of the Agreement. The Monitor will address Defendants' implementation progress and issue "Substantial Compliance," "Partial Compliance," or "Non-compliance" findings for each substantive provision. Where necessary, the Monitor will make specific recommendations to improve Defendants' compliance with the Agreement. A "Substantial Compliance" finding means that Defendants "have and are reasonably expected to continue to substantially satisfy" the requirements of an Agreement provision. A "Partial Compliance" finding means that PDP has successfully completed some of the discrete tasks outlined in a substantive provision and continues to demonstrate progress toward substantial compliance. A "Non-compliance" finding means that Defendants have "not substantially satisfied" Agreement requirements by failing to complete discrete tasks outlined in a substantive provision. Defendants will not be found in non-compliance based on "isolated or minor instances of failure [to substantially comply]" or "omissions of a technical or trivial nature."

Where substantial compliance requires the revision of existing policies or promulgation of new ones, Defendants' compliance will be assessed based on policy language and substance, notification and training of personnel, and policy implementation and adherence. Finally, the Monitor and Parties agree that successful reform is ultimately measured by sustained improvements to living conditions for Class Members. As such, in issuing compliance findings, the Monitor will consider whether reforms implemented pursuant to the Agreement are durable and their benefits are expected to outlive the Agreement's April 12, 2024, termination date.

The Monitor has retained subject matter experts (SME) to assist in evaluating Defendants' compliance with the Agreement and in making compliance determinations. Terri McDonald has more than 34 years of experience in complex jail and prison operations, and implementation and monitoring of conditions of confinement-related class action settlement agreements. Tim Belavich, PhD, has more than 20 of experience in correctional healthcare administration, including implementation of jail and prison healthcare related class action settlement agreements and subject matter expert and expert witness experience. This report incorporates the SMEs' analysis and opinions.

The Agreement requires the Monitor to conduct site inspections "at least once every three months," during which the Monitor has access to conduct confidential interviews with personnel and incarcerated persons. The Monitor also has access to all records, files, electronic files, videos, and other materials, including personnel records and patient protected health information, as necessary to measure Defendants' compliance with the Agreement. In addition to at least one quarterly site visit, the Monitor will conduct periodic site visits with little advance notice to PDP.

1

Since the Monitor's appointment on May 25, 2022, the Monitor has completed two site visits to PDP facilities, including Curran-Fromhold Correctional Facility (CFCF), The Detention Center (DC) and the Prison Health Services Wing (PHSW), Philadelphia Industrial Correctional Center (PICC), the Alternative and Special Detention Central Unit (ASD-CU and MOD 3), and Riverside Correctional Facility (RCF).[1] The SMEs accompanied the Monitor on the second site visit, during which the Monitoring Team inspected housing units in every populated PDP facility with class members in each type of housing category and at each security classification level.[2] The SMEs alone conducted a third site visit and completed subject area-focused site visits and meetings with relevant PDP personnel. During each site visit, the Monitoring Team spoke with Class Members and personnel in every area visited regarding Agreement requirements and conditions inside PDP facilities. The Monitoring Team also met with PDP Commissioner Blanche Carney (Commissioner) and her executive team as well as facility leadership and managers at every site.

Thus far, the Monitoring Team has been granted access to facilities, documentation, personnel, and Class Members. The Commissioner and her staff have been generous with their time, attentive to any requests made by the Monitoring Team, and agreeable to all preliminary recommendations. They have been transparent with the Monitoring Team regarding challenges in PDP's daily operations and anticipated barriers to compliance and have communicated an understanding of the need for broad systemic reform and a commitment to achieving it. The Monitoring Team thanks the Commissioner and her PDP staff for their service and their collaboration in the monitoring process.

The Monitor has held regular meetings with counsel for the parties, the Commissioner, and PDP executive management. Initial meetings have been effective in refining monitoring protocols and establishing compliance expectations. The Monitor has also begun to meet with representatives from key stakeholder organizations including the Defender Association of Philadelphia, the Pennsylvania Prison Society, the Public Defender Association of Pennsylvania, the American Federation of State County Municipal Employees, District Council 33, Local 159 (Labor), Philadelphia Bail Fund, and Healing Communities. Information shared by stakeholders in initial meetings provides stark illustrations of current PDP conditions experienced by PDP Class Members and invaluable context that will assist the Monitoring Team in its analysis and compliance assessment. The Monitoring Team thanks them for their time and advocacy.

The Monitoring Team has issued initial requests for data and documentation necessary to make compliance determinations for each substantive provision. Information provided as proof of compliance is being placed into a separate shared drive on the PDP server, which is accessible by the Monitoring Team via a virtual private network. The Monitoring Team has met extensively

---

[1] Site visits to all populated PDP facilities were completed July 18-22, August 17-19, and October 3-6, 2022.
[2] Housing units inspected included female and male intake, general population at minimum, medium, and maximum-security classification levels, protective custody, administrative and punitive segregation, "special handle" classification, behavioral health, quarantine and isolation, and medical and behavioral health licensed bed/hospital housing. The Monitoring Team also inspected food preparation areas, attorney and family visiting areas, intake records and holding areas, safety/crisis cells and medical waiting areas, cleaning supply storage locations and laundry facilities, facility medical offices and treatment spaces, and facility and PDP command locations and administrative offices.

with PDP executives and support personnel to ensure that the request is narrowly tailored to include only data and documentation that is necessary for thorough and accurate implementation monitoring.  The requests are voluminous and the burden on PDP personnel in generating and providing requested information is substantial.  PDP has nonetheless fulfilled a significant portion of the requests and continues to provide information as it becomes available.  Much of the information requested is already being tracked by PDP and is readily available.  Some information necessary for implementation monitoring and internal quality improvement is neither readily available nor producible with PDP's current data management systems.  PDP reports that it is in the process of reconfiguring and updating systems and protocols that will benefit PDP operations and facilitate compliance monitoring.

The Agreement requires the Monitor to "provide to the parties those documents and reports that are secured by her office which, in her judgment, should be shared to effectuate the terms and conditions of the agreement."  In consultation with the parties, and in the interest of sound monitoring methods and supporting PDP's commitment to transparency, the Monitor has determined that documentation provided by Defendants and utilized by the Monitoring Team in making compliance determinations will generally be shared with Plaintiffs' co-counsel.  The specific terms of the process by which documentation will be shared, any limitations on documents provided, and protections against improper disclosure of documents or information are still being finalized.  Documents utilized by the Monitoring Team in issuing the below compliance determinations have therefore not yet been shared with Plaintiffs' co-counsel.

# Table of Provisions

Compliance Findings .................................................................................................. 5

Substantive Provision 1—Staffing.............................................................................. 6

Substantive Provision 2—Out-of-Cell Time ............................................................ 10

Substantive Provision 3—Out-of-Cell/Segregation................................................. 10

Substantive Provision 4—Resume Normal Operations ........................................... 15

Substantive Provision 5—Healthcare ...................................................................... 16

Substantive Provision 6—Behavioral Health in Segregation .................................. 20

Substantive Provision 7—Law Library Access ....................................................... 24

Substantive Provision 8—Discipline ....................................................................... 24

Substantive Provision 9—Tablets ........................................................................... 25

Substantive Provision 10—Phone Calls .................................................................. 26

Substantive Provision 11—PICC Emergency Call Systems .................................... 27

Substantive Provision 12—Locks............................................................................ 28

Substantive Provision 13—Visiting......................................................................... 29

Substantive Provision 14—Attorney Visiting ......................................................... 30

Substantive Provision 15—COVID-19 Testing....................................................... 30

Substantive Provision 16—Quarantine ................................................................... 31

Substantive Provision 17—Sanitation .................................................................... 33

Substantive Provision 18—Use-of-Force ............................................................... 35

**Compliance Findings**

Most substantive provisions contain deadlines or implementation benchmarks that PDP must meet to achieve substantial compliance with the Agreement.  PDP is in the process of developing an internal implementation plan that divides each substantive provision into discrete tasks with specific corresponding action items that must be completed by PDP to achieve compliance.  The Monitoring Team is continuing to review documentation provided and awaits the provision of additional documentation, some of which is necessary for the Monitoring Team to make compliance findings for some provisions.  This report includes compliance findings for substantive provisions for which the Monitoring Team has sufficient proof of implementation to measure progress and issue findings.  This report also highlights several issues that emerged during initial site visits, which the Monitoring Team believed require immediate action.

The following table depicts the Agreement's 18 substantive provisions, a short-form "Designation" for each, and compliance status where appropriate (compliance status is "Deferred" where additional information or analysis is needed for a definitive compliance determination):

| Substantive Provision | Designation | Compliance Status |
|---|---|---|
| 1 | Staffing | PC |
| 2 | Out-of-Cell Time | PC |
| 3 | Out-of-Cell/Segregation | PC |
| 4 | Resume Normal Operations | Deferred |
| 5 | Healthcare | PC |
| 6 | Behavioral Health/Segregation | PC |
| 7 | Law Library Access | PC |
| 8 | Discipline | PC |
| 9 | Tablets | PC |
| 10 | Phone Calls | PC |
| 11 | PICC Emergency Call Systems | PC |
| 12 | Locks | PC |
| 13 | Visiting | PC |
| 14 | Attorney Visiting | PC |
| 15 | COVID-19 Testing | PC |
| 16 | Quarantine | PC |
| 17 | Sanitation | Deferred |
| 18 | Use-of-Force | Deferred |

*Substantive Provision 1—Staffing*

*No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the hiring and retention of correctional officers to ensure that there are a sufficient number of correctional officers to cover all posts, according to PDP post-plans, on each shift at each facility. These measures shall continue until this goal is achieved and thereafter to maintain the proper number of correctional officers.*

### Compliance Rating: Partial Compliance

On August 12, 2022, an arbitration award was issued that provides for the hiring and retention bonuses discussed in this substantive provision.[3]  Though the decision was issued and measures will be implemented after the Agreement deadline of April 20, 2022, bonuses will be awarded to all eligible employees hired as of that date.  Other measures ordered include regular pay increases as well as longevity and quarterly attendance bonuses, and the implementation of a 12-hour shift program.  The decision also temporarily lifts the City's requirement that civil service employees reside within City limits for one year prior to employment.[4]  The Monitoring Team will continue to track Defendants' staffing progress pursuant to the arbitration decision, and considering factors discussed below, determine whether it meets Agreement requirements.

In assessing the adequacy of PDP's staffing, the Monitoring Team evaluates three factors:  (1) the number of required and filled positions; (2) the number of required and filled posts; and (3) hiring and retention outcomes.  Determinations about how many positions PDP is funded for, and at which specific job classifications, are made by the City via its annual budget process.  PDP then allocates budgeted positions to create posts in designated work locations and assigns personnel to fill them.  A single post may require more than one employee position to fill when accounting for vacations and employee sick leave, and if, for example, a post requires staffing seven days per week.  When regularly assigned personnel are unavailable, posts are filled by redirecting personnel from other posts, requiring staff to work overtime, or by leaving budgeted posts vacant.

---

[3] In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia (decision date, August 12, 2022) Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia
[4] Bill no. 200363, Section 20-101 of The Philadelphia Code (passed June 25, 2020), available at https://phila.legistar.com/View.ashx?M=F&ID=8611128&GUID=2216D7C4-6DD5-4235-A23B-88C7F3C3A25E

PDP reports and documentation provided reflects critically low vacancies across several position classifications.  The below table reflects select vacancies as of September 18, 2022:

**Philadelphia Department of Prisons Vacancy Report**
September 18, 2022

| | Position Classification | Budgeted | Filled | Vacant | Vacancy Rate |
|---|---|---|---|---|---|
| Sworn Staff | Officers | 1719 | 994 | 725 | 42% |
| | Sergeants | 129 | 88 | 41 | 32% |
| | Lieutenants | 56 | 39 | 17 | 30% |
| | Captains | 31 | 24 | 7 | 23% |
| | **Custody Total** | **1935** | **1145** | **790** | **41%** |
| Maintenance Staff | Trades Worker I | 8 | 5 | 3 | 38% |
| | Trades Worker II | 23 | 10 | 13 | 57% |
| | HVAC Mechanic | 3 | 2 | 1 | 33% |
| | Building Engineer | 1 | 0 | 1 | 100% |
| | Maintenance Group Leader | 1 | 0 | 1 | 100% |
| | **Total Maintenance** | **36** | **17** | **19** | **53%** |
| Human Resources (HR) Staff | HR Professional | 2 | 0 | 2 | 100% |
| | HR Associate | 2 | 2 | 0 | 0% |
| | HR Manager 3 | 1 | 1 | 0 | 0% |
| | **HR Total** | **5** | **3** | **2** | **40%** |
| **PDP TOTAL** | **All Positions** | **2186** | **1346** | **842** | **39%** |

Current vacancy rates of 39% for all PDP positions, 41% for custody positions, and 53% and 40% for maintenance and HR positions respectively are deeply concerning.

Post vacancy information provides more detail about whether personnel report to assigned work locations throughout PDP within specific timeframes (per shift, daily, weekly, etc.).  PDP maintains three separate reports on post vacancies, each of which provides some useful information, but none of which provide synthesized daily and monthly accounts with sufficient detail for management to monitor problems, quickly reallocate limited personnel resources, and strategize integrated solutions.[5]  Current post vacancy reports do not provide the Monitoring Team with sufficient vacancy data necessary for accurate compliance determinations.  The

---

[5] The "Workforce TeleStaff Roster Report" (TeleStaff Report) includes a daily attendance roster for each post and is PDP's most effective management tool of the three systems for tracking which staff are assigned and report to each post in a 24-hour period.  The "Attendance Report" includes summaries of the reasons for employee absences (sick, vacation, etc.), and the "Deputy Warden Reports" summarize fillable posts and the number of posts left vacant in PDP facilities.

Monitoring Team has recommended updates to tracking systems that will provide for more accuracy, improve transparency in public reporting, and allow PDP to better analyze trends.[6] Though the Monitoring Team is unable to establish a precise baseline of post vacancies due to data limitations, all available information reflects critical post vacancies with up to 40% of total posts routinely remaining unfilled on daily bases.  With nearly 25% of filled posts reportedly being staffed with overtime, PDP does not likely have sufficient staff working in PDP facilities.  PDP's dependence upon overtime damages morale and renders even the most committed workforce exhausted, which exacerbates existing safety, security, and operational concerns that the Agreement was negotiated to resolve.

PDP data suggests that voluntary resignations are among the largest contributing factors to the current vacancy rate.  Retention data reflects significant increases in voluntary resignations, particularly among personnel at the ranks of correctional officer, sergeant, lieutenant, and captain.  The following table depicts voluntary resignation rates for fiscal years 2019/2020, 2020/2021, and 2021/2022:

**Voluntary Resignations by Fiscal Year**
19/20, 20/21, 21/22

| Fiscal Year (FY) | FY 19/20 | FY 20/21 | | FY 21/22 | |
|---|---|---|---|---|---|
| | Staff | Staff | FY Increase | Staff | FY Increase |
| Total Resignations | 191 | 244 | 28% | 372 | 52% |
| **Sworn Staff Resignations (Percent of Total) and Increase from Previous FY** | **56 (29%)** | **87 (36%)** | **55%** | **180 (48%)** | **107%** |

PDP's increases in sworn staff resignations from FY 19/20 and 20/21 by 55% and 107% respectively for an overall 221% increase over the two-year period reflect debilitating personnel losses.

The PDP has been hiring sworn staff and its efforts are commendable given existing recruitment barriers.  A total of 155 PDP cadets graduated from seven academies since January 2021, and an academy class of 17 more trainees commenced on August 1, 2022.  PDP also reports that it held

---

[6] Current reporting systems that measure and track post assignments are not standardized between facilities and lack clarity for external monitoring.  The Monitoring Team has recommended coding updates to the TeleStaff system, or development of a new system that generates the following information: (1) vacant posts not permitted to fill due to budget reductions; (2) vacant posts not permitted to fill pursuant to a formal institutional vacancy plan due to critical position vacancies; (3) vacant posts due to employees not reporting for work and notations indicating when posts are left unfilled due to lack of available staff; (4) vacant posts due to the redirection of staff to other critical functions (i.e., suicide watch, medical guarding/transportation) that are not backfilled; and (5) all temporary posts created during a shift to meet institutional needs.

8

orientations on August 27, 2022, and September 17, 2022, and that 106 of 245 invited candidates attended.  During site visits, the Monitoring Team regularly spoke with new staff whose presence is noticeable throughout PDP facilities.  However, the relatively small size and current frequency of academy classes are insufficient to compensate for PDP's extraordinarily high resignation rates.

Properly functioning systems should be able to project vacancy rates based on factors known to increase personnel retention and decrease attrition.  These projections should be used in developing strategies to meet staffing needs.  The Monitoring Team has not analyzed data prior to FY 19/20, nor has it formed an opinion on the effectiveness of PDP's vacancy projection methodology.  It is certain, however, that the COVID-19 pandemic presented or exacerbated challenges in ways that were unpredictable to Defendants and unprecedented for PDP.

The voluntary resignation and post vacancy rates that PDP is experiencing constitute a dire personnel crisis, which is increasing in magnitude and cannot be corrected by the efforts and resources at the disposal of PDP alone.  Effective remediation necessitates that Defendants engage a full-scale effort with commensurate resources, innovative strategy, and close, committed collaboration between the City, PDP, Labor, and other critical stakeholders.  Because Defendants have a duty to meet basic human needs and protect the constitutional rights of those confined in its facilities, correcting PDP's personnel crisis should be prioritized among the most critical City initiatives and over other City departments not bound by the same constitutional mandates and federal court intervention.  PDP will be unable to correct systemic deficiencies and achieve substantial compliance with the Agreement while the crisis persists.

Defendants should immediately consider the following recommendations:

1. Expand existing contracts to correct maintenance vacancies that severely impact conditions of confinement at ASD-CU and MOD 3, DC, and PICC.[7]
2. Determine whether the current salary and benefits structures pursuant to the arbitration award and other efforts by Defendants are sufficiently competitive with other jurisdictions and agencies to attract applicants, and if not, supplement benefits accordingly.
3. Retain a qualified recruitment firm to assist in guiding the city's efforts, which should include salary surveys in support of the previous recommendation, and other validated recruitment and retention strategies.
4. Engage an independent staffing analysis to determine true staffing needs for each facility.  The analysis should be completed by someone with specific expertise in jail staffing studies.[8]

---

[7] CFCF and RCF are serviced by a contracted maintenance provider, while remaining facilities are maintained by the City of Philadelphia.  On each site visit, the Monitoring Team observed a stark contrast between the physical plant conditions in the facilities maintained by the contractor and those maintained by the city.  PDP confirms reports of Class Members that work orders for CFCF and RCF are typically filled the same day while other facilities can take weeks or months, even for highest priority repairs.  PDP's maintenance issues are discussed in more detail under Substantive Provision 17—Sanitation below.

[8] The August 12, 2022, arbitration award directs the convening of an internal committee to develop staffing plans for each facility (*at* p.5, 7(a)(i-vii)).  PDP reports that the staffing plans will be developed, in part, by a consultant hired by Defendants to assist with compliance.  PDP reports that the consultant will be considering, among other factors, population size and needs when analyzing total necessary budgeted positions and post plans.

5. Evaluate which PDP functions currently performed by sworn personnel can be performed by civilians (information technology, records, intake and release, cashier, etc.) and identify or expand civilian employees or contracted services accordingly.[9]
6. Simplify the City's lengthy hiring and onboarding processes that reportedly create delays in recruits reporting to PDP academies.
7. Establish continuous-fill civil service hiring lists during the staffing crisis.
8. Assess the impact of Philadelphia's employee residency requirements on PDP's hiring outcomes and consider whether permanent exemptions or modifications are appropriate.

***Substantive Provision 2—Out-of-Cell Time***

*Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than August 1, 2022, no less than five hours of out-of-cell time each day. The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases of out-of-cell time should continue to be made beyond the August 1, 2022 standard, with a presumptive expected increase to six hours by October 15, 2022. The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, infra, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis. See also para. 4, infra.*

**Compliance Rating:  Partial Compliance**

***Substantive Provision 3—Out-of-Cell/Segregation***

*Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day. Defendants further agree that they will continue their practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units.*

**Compliance Rating:  Partial Compliance**

PDP acknowledges that the COVID-19 pandemic, combined with its staffing crisis, resulted in incarcerated persons being confined to their cells with limited opportunities to recreate, shower, make phone calls, attend family or legal visits, and other activities for extended periods of time, resulting in prolonged isolation.  PDP reports that it is making progress in complying with the terms of the Agreement regarding out-of-cell time in both general population and punitive and

---

[9] The August 12, 2022, arbitration award provides for the reallocation of some tasks currently being performed by sworn staff to civilian personnel (*at* p.8, 13).

administrative segregation (segregation) as well as in ensuring that incarcerated persons are not housed in segregation for space or staffing reasons.

Based on available documentation, the Monitor's initial site visits, and discussions with Class Members and PDP personnel, Class Members are receiving more opportunities to come out of their cells than during the height of the pandemic and subsequent spikes. Most staff and Class Members reported that Class Members on most housing units receive some out-of-cell time most weeks. However, PDP has not met the out-of-cell benchmarks by prescribed deadlines and PDP executives report that staffing shortages continue to pose significant barriers to offering Class Members additional opportunities for out-of-cell time.

In April 2020, PDP began to require incarcerated persons to acknowledge via manual signature any opportunities they receive to come out of their cells. These signatures are deemed validation of the specific timeframes each incarcerated person is reportedly offered. Validated out-of-cell timeframes are compiled by unit staff and submitted to facility leadership who reports the information in weekly "Deputy Warden Certifications" that are submitted to PDP executives.

Despite the complexity and significant burden of current out-of-cell tracking and reporting processes, the Monitoring Team is confident that they were designed and implemented with the goals of improving accuracy and accountability in measuring out-of-cell time. However, PDP's Deputy Warden Certifications and all currently available out-of-cell time information and documentation are inadequate for compliance monitoring. The Monitoring Team is therefore unable to: (1) establish an accurate baseline of current out-of-cell opportunities for Class Members; (2) determine the extent to which Agreement deadlines and benchmarks have been met; and (3) make recommendations for future out-of-cell benchmarks or deadlines. Current tracking systems pose the following methodological barriers:

- Methods for collecting Class Member signatures and documenting out-of-cell-time are not consistent across PDP facilities, units, and personnel shifts.[10]
- In some units, signatures are collected before out-of-cell start and end times are documented, so incarcerated persons are being required to attest to the accuracy of information they do not have, rendering those signatures invalid.[11]
- Most logs and Deputy Warden Certifications document out-of-cell times as starting and finishing on the hour or half-hour, which is unlikely to occur naturally with the frequency reported and raises questions about data collection methods and accuracy of out-of-cell times and durations reported.

---

[10] In one unit visited, the Monitor observed incarcerated persons (specifically, "block representatives" designated to communicate with staff on behalf of other incarcerated persons housed together in a given unit) distributing logs and collecting signatures. On another unit in the same facility, this task was observed being performed by staff. In another facility, manual signature sheets were placed on tables in the unit recreation areas and incarcerated persons were allowed to come out of their cells contingent upon their agreement to sign the sheets thereafter. There are benefits and drawbacks to each method observed, and to others that personnel and incarcerated persons reported to the Monitor, but internal inconsistencies necessarily impact the accuracy of out-of-cell times reported.

[11] The Monitor observed sheets that appeared to be filled with Class Member signatures, but which did not contain out-of-cell durations or start and end times.

- Some Deputy Warden Certifications reflect anomalies in out-of-cell time Class Members received but do not provide sufficient corresponding staffing, vacancy, and other detail to contextualize them and suggest potential reporting errors.[12]
- Some Deputy Warden Certifications provide explanations for why no out-of-cell time was offered on some units in given timeframes and others do not.
- Some information reported is neither replicable nor verifiable.  In the coming months, the Monitoring Team may attempt to validate a small sample of out-of-cell information contained in the Deputy Warden Certifications by comparing available CCTV recordings to unit logs and signature sheets, though the process would be methodologically flawed, statistically unreliable, and unsustainable long-term.
- Some Class Members have reported to PDP and the Monitoring Team that some logs are inaccurate and do not reflect actual out-of-cell time offered or received, and some have reported that they have, at times, been required to sign sheets attesting to inaccurate information or to out-of-cell time that they did not receive.  Current tracking systems prevent PDP from thoroughly investigating these allegations because much of the information is either unavailable or too labor intensive to extract given PDP's existing staffing deficits.

The process of requiring manual signatures from each Class Member is lengthy, staffing resource intensive, and shortens the duration of daily out-of-cell time.  The issues with PDP's current practice described above can also lead to confusion among Class Members and have reportedly increased tension between Class Members and personnel.  Finally, the current system does not provide for the tracking of some information, such as which Class Members routinely refuse to come out of their cells.  This information is particularly important in segregation units where isolation can spur or exacerbate behavioral health symptoms or serious mental illness.

Jails and prisons are replacing paper tracking systems that rely on manual signatures or staff logs with more technologically advanced systems, such as radio-frequency identification (RFID), that track out-of-cell and other important operations electronically.  PDP reports that in early 2022, it initiated the process of procuring an RFID or similar system that will allow it to track and report out-of-cell information more accurately and reliably.  A new system that tracks information electronically will reduce errors resulting from manual information entry, assist with investigating Class Member grievances alleging lack of access, and allow PDP managers to better monitor real-time operations.  It will also allow them to better identify which facilities, units, and personnel require additional attention.  Finally, a new system will be critical to measuring compliance with out-of-cell and other Agreement requirements such as access to the

---

[12] For example, CFCF's Deputy Warden Certification for the week of April 29 through May 5, 2022, shows that Unit A1, P4, upper tier (cells 17-32) received 12 hours out-of-cell and A1, P4 lower tier (cells 1-16) only received 2 hours.  It may be that staffing or Class Member count on that administrative segregation unit or other factors explain why the lower tier received one-fifth of the out-of-cell time as the upper tier on the same housing unit on the same day.  Without additional detail explaining the anomaly, it is more likely that the 12 hours noted in the Deputy Warden Certification is an entry error.  Errors are expected whether data is entered manually or electronically, but multiple reporting layers and points of data entry from unit logs, to staff, to supervisors, to facility leadership, to PDP executives, combined with other methodological issues discussed in this report make errors more likely and impact the accuracy of information reported.

law library and educational and therapeutic programming.  The Monitoring Team recommends that PDP continue to expedite the procurement and implementation of an electronic tracking system.

During site visits, multiple officers reported that they feel unsafe following current out-of-cell requirements, particularly when they are alone on housing units without additional staff or "rover" personnel assigned to assist with transporting Class Members or during emergencies.  As a result, some report regrettably that they leave units altogether and monitor Class Members from adjacent control booths for the duration of out-of-cell time.  Monitoring recreation from the control booth is inconsistent with PDP's direct supervision model based on physical plant design and current policy and poses significant safety risks for Class Members and staff.

The current ratios of staff to Class Members during out-of-cell time may be appropriate but determining the optimal ratios for each PDP housing unit requires the independent staffing analysis recommended under substantive Provision 1—Staffing above.  In the meantime, PDP executives astutely observe that PDP staff are attempting to follow policies that cause some to fear for their safety and that PDP executives are expected to hold staff accountable for failures to comply when existing conditions may render compliance infeasible.

Any recommendations by the Monitoring Team for incremental increases in out-of-cell time pursuant to this agreement must be safe to implement, accurately measurable, and based on sound methods that consider such factors as staffing, COVID-19 and other communicable disease mitigation, population levels and security classification, behavioral health, and other programming needs.  At a minimum, they require a firm baseline of current out-of-cell opportunities that is supported by sound tracking and data mechanisms.  For the reasons detailed above, particularly those involving compromised institutional safety, the Monitor makes no specific recommendation for the next increase in out-of-cell time in this reporting period.

In addition to requiring daily out-of-cell opportunities for Class Members in administrative segregation, Substantive Provision 3—Out-of-Cell/Segregation requires that PDP not place Class Members in segregation units due to lack of available housing or inadequate staffing in other units.  PDP prohibits placing Class Members in administrative segregation for any reason other than those necessary to maintain institutional safety, and placements must be based on documented case-by-case analyses.

Administrative segregation documentation that the Monitoring Team has reviewed does not expressly identify housing space or staffing as stated rationales for placement of individual Class Members into administrative segregation.  However, PDP reports that reevaluations for retention on administrative segregation are not occurring within required timeframes and that Class Members are serving disciplinary sentences that exceed allowable policy timeframes.  Both of these conditions are likely caused or exacerbated by housing and staffing issues.[13]  Current

---

[13] PDP's Administrative Segregation Monitoring Reports indicate that a high percentage of Class Members on administrative segregation are not being reviewed for retention in administrative segregation (and consideration for release to lower security housing) within 60 and 90-day timeframes, resulting in Class Members being exposed to extended periods of isolation.

policy and PDP documentation also suggest that the overall thresholds for both placement and retention in administrative segregation may be too low.[14]  Finally, it appears that because PDP Transition Unit housing for those on the behavioral health caseload was reduced, some class members have been placed in segregation due to lack of appropriate alternative housing for those experiencing mental illness, in violation of the Agreement.  This is discussed in more detail below under Substantive Provision 6—Behavioral Health in Segregation.

Current PDP policy generally prohibits the confinement of incarcerated persons in punitive segregation (discipline) for more than 30 days without additional documented misconduct while in discipline and approval of the facility's warden.[15]  PDP's documentation reflects that many disciplinary sentences exceed policy timeframes and some records lack appropriate documentation, including any reasons for any extensions.  Current facility management vacancies likely impact the timeliness and quality of disciplinary hearings and adjudications and result in extended use of segregation.

The table below depicts total Class Members in discipline and durations of retention on disciplinary status for three facilities as of September 11, 2022:

### Lengths of Stay in Discipline
Week of September 11, 2022

| Facility | Total in Discipline | Average Time in Discipline | Total in Discipline >30 Days | Total in Discipline >60 Days |
|---|---|---|---|---|
| CFCF | 83 | 67 | 42 (51%) | 31 (37%) |
| PICC | 50 | 81 | 48 (96%) | 20 (40%) |
| RCF | 58 | 39 | 21 (36%) | 14 (24%) |
| ASD-MOD3 | 13 | 24 | 4 (31%) | 2 (15%) |
| **Total** | **204** | **60** | **115 (56%)** | **67 (33%)** |

PDP executives are aware of the harm that extended isolation may inflict on incarcerated persons as well as the operational challenges and safety issues it raises for staff and are committed to reducing PDP's reliance on segregation.  The Monitoring Team will conduct additional analysis of PDP's segregation practices and make specific recommendations in subsequent monitoring reports to reserve PDP's use of segregation only for those whose behavior necessitates it, and to limit durations of segregation placements to the shortest possible timeframes required to maintain institutional stability.

---

[14] Placement in administrative segregation must be based on a combination of factors that should include serious institutional misconduct on the part of incarcerated persons.  PDP currently allows the administrative segregation of incarcerated persons with high security classification needs (such as "Change in Custody Level," "Escape Risk," "High Bail/No Bail," "High Profile Case," "State Sentenced," and "Life Sentence") but who may not have engaged in accompanying institutional misconduct.

[15] The Monitoring Team is reviewing all current PDP policies related to segregation and discipline and will make recommendations for improvement.

*Substantive Provision 4—Resume Normal Operations*

*By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services). During the period that precedes a return to normal operations, if the Monitor determines that the Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor. The parties and the Monitor shall then engage in discussions to resolve the issues in dispute. If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions.*

**Compliance Rating:  Deferred**

PDP reports that it has established an internal committee pursuant to the August 12, 2022, arbitration award to, among other tasks, analyze staffing needs and develop a plan to return to normal operations pursuant to this Agreement.  The arbitration award requires the plan to be finalized by October 1, 2022, and any disputes to be resolved by the Arbitration Panel by October 15, 2022.[16]  PDP reports that it is not currently able to safely resume normal operations and has not yet finalized a plan to do so.  The Monitoring Team has made recommendations regarding the staffing crisis and will continue to monitor and report on steps taken and any progress made.

Though the Agreement does not specifically address population reduction, given that staffing shortages are afflicting jails and prisons nation-wide and meaningful progress in reforming PDP is likely going to continue to be delayed, Defendants should continue to engage with local justice partners to develop and improve programs aimed at reducing the number of people incarcerated in PDP.  The PDP Commissioner does not possess unilateral authority to reduce the PDP population by early parole of incarcerated persons serving PDP sentences, or by release of those awaiting trial on low-level offenses who are being held on bail they cannot pay.

PDP reports that more than 90% of its current population is pretrial and that speedier adjudication of their cases would result in lower population levels.  Delays in access to the criminal courts caused largely by COVID-19 mitigation protocols have been significantly reduced.[17]  Although PDP's COVID-19 protocols continue to delay court appearances for some incarcerated persons, any delays in preliminary hearings, bail and detainer reviews, and trials and sentencing of defendants are not within PDP's control.

---

[16] In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia (decision date, August 12, 2022, *at* p.5, 7(a)(i-vii)) Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia

[17] For example, PDP reports that prior to February 2022, when PDP implemented the CDC's modified testing protocols, higher numbers of Class Members each day were not being medically cleared for court.  This delayed access to, among other proceedings, preliminary hearings.  Because there are dispositions of many cases at preliminary hearings, repeated continuances likely prevented the release of some Class Members from PDP.

The Monitoring Team will continue to report on PDP's efforts to ensure timely access to courts and counsel. It would be useful for all criminal justice stakeholders, including the Courts, Philadelphia District Attorney's Office, Defender Association of Philadelphia, and the Probation Department to discuss the possible expansion and expediting of bail reviews, detainers, and early listings for misdemeanor and non-violent felony case dispositions where possible. Over the years, cooperation on these issues has successfully reduced PDP's population and justice partners should explore whether additional programs or modification of current practices could further reduce the population without endangering public safety.[18]

### *Substantive Provision 5—Healthcare*

*The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons. The Defendants agree to institute the programs and measures (referred to as "the Backlog Plan") set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022, to address the existing backlog. The "Backlog Plan" is a new, three-month effort to see backlogged patients as soon as possible. The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs. Four agencies are contracted to provide staff towards this end. Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort. Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures. Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog.*

### Compliance Rating: Partial Compliance

The COVID-19 pandemic placed extraordinary pressure and a dramatically increased workload on PDP healthcare providers. PDP was guided to restrict population movement and shelter-in-place to limit the spread of infection among incarcerated patients while instituting aggressive testing, vaccination, and sanitation protocols. These pressures, combined with personnel losses and ongoing testing, quarantine, and isolation contributed to significant lapses in the provision of medical and mental health care. By March 2022, more than 900 patients at CFCF were awaiting general medical, specialty and behavioral health appointments (Herdman Dep. 65).

This substantive provision provides that, by August 1, 2022, PDP must have reduced its appointment backlog to no more than 15% of its April 2022, numbers. The 900-appointment backlog identified in March included CFCF patients only who were waiting for general medical, behavioral health and all specialty appointments (Herdman Dep. 70). In July 2022, PDP began tracking backlogged appointments in all facilities and made other changes to its tracking methodology to achieve greater specificity. The July 2022 backlog data for all facilities,

---

[18] The Criminal Justice Advisory Board (CJAB) Subcommittee on Prison Population Management (Subcommittee) reportedly convenes regularly to strategize population reduction. CJAB should consider whether a review of and potential modifications to the Subcommittee's current mandates could improve population reduction outcomes.

including all appointment types, was 1,587.[19] Because 1,587 is the most accurate backlog count currently available, it will be used to measure compliance pursuant to this substantive provision. In order to achieve substantial compliance, PDP must: (1) reduce its backlog to no more than 238, or 15% of 1,587; (2) continue efforts to reduce any remaining backlog; and (3) ensure that any solutions are designed and implemented to continue to address the remaining backlog and to sustain any reductions achieved.

PDP's initial backlog plan was to utilize overtime staff and extra personnel from healthcare registries to offer Class Member patients additional appointment slots on nights and weekends. PDP reports that additional appointment slots pursuant to this plan were offered on four occasions between April and August 2022.  The table below compares total backlogged on-site medical appointments, by type of appointment, on July 22, 2022, and seven weeks later on September 11, 2022:

**On-Site Appointment Backlogs for General Medical and Behavioral Healthcare**
July 22, 2022 and September 9, 2022

| Backlog Report Date | 7/22/22 | Percent of Total Backlog | 9/11/22 | Percent of Total Backlog | Percent Change (+/-) |
|---|---|---|---|---|---|
| **Total Backlog** | **1242** | | **1111** | | **-12%** |
| BH Initial Psychiatric Eval. | 164 | 13% | 123 | 11% | -25% |
| BH Social Work Sick Call | 76 | 6% | 34 | 3% | -45% |
| BH SW SCTR | 1 | 0% | 9 | 0% | * |
| Chronic Care Follow-up | 200 | 16% | 180 | 16% | -10% |
| Chronic Care Initial | 190 | 15% | 126 | 11% | -33% |
| MAT | 59 | 5% | 168 | 15% | 285% |
| MAT Follow-up | 0 | 0% | 0 | 0% | * |
| Provider Sick Call | 22 | 2% | 2 | 0% | * |
| RN Sick Call | 105 | 8% | 157 | 14% | 50% |
| Re-Entry Planning | 425 | 34% | 312 | 28% | -27% |

*Percent change not calculated for categories with total backlogged appointments <50.

The data reflects a 12% reduction in the total backlog over the seven-week period, with the greatest reductions in behavioral health and chronic care appointments and the greatest increases in Medication Assisted Treatment (MAT) and Nursing Sick Call appointments.  Additional PDP documentation suggests that for some appointment types, backlogs have seen periods of significant reductions with current backlogs being newly accumulated rather than long-standing. For example, the 123 backlogged Behavioral Health Initial Psychiatric Evaluation appointments for September 11, 2022, reflect a reduction from the July 22, 2022, total, and additional PDP

---

[19] This total includes 1,242 on-site general medical and behavioral health appointments (July 22, 2022), 104 on-site specialty appointments (July 22, 2022), and 241 off-site specialty appointments (July 18, 2022).

documentation shows that 95% of the September backlog accumulated over the previous 21 days. This is also true for Behavioral Health Social Worker Sick Calls, with 100% of the September backlog accumulating within the previous two weeks, and for Nursing Sick Call, with 96% of the September backlog occurring within the preceding three weeks. Although appointment backlogs persist, that some appear to be addressed within weeks suggests that additional focus in these areas has been beneficial.

Both Chronic Care Follow-ups and Chronic Care Initial Appointment backlogs were also reduced between July and September, however, both appointment types have longer accumulating backlogs of up to seven weeks. Although MAT Follow-up appointments are not backlogged, the backlog of MAT initial appointments increased from 59 in July to 168 in September with backlogs accumulating over seven weeks.

Specialty appointment backlogs also remain an issue. Data from August 2022, indicates that PDP offered on-site specialty services in optometry, orthopedics, pap testing, podiatry, physical therapy, ultrasound, and x-ray.[20] Data shows that optometry services pose the biggest challenge, representing 76 of 121 backlogged appointments reported on August 4, 2022.

Some types of specialty appointments are only offered off site and require transportation to providers outside of PDP. PDP reports that off-site specialty appointments during the height of the COVID-19 pandemic were negatively impacted for various reasons, including: (1) off-site specialists were frequently not seeing patients in person or cancelling appointments altogether; (2) increasing security staffing deficits prevented Class Member patients from being transported off site; (3) Class Member patients were frequently quarantined or medically isolated and unable to be transported off-site; and (4) telehealth options were limited. Data shows that from March to September 2022, PDP made progress in reducing the off-site specialty appointment backlog by 33% from 276 to 187.

Although PDP is making progress in reducing off-site backlogs, it struggles to get Class Member patients to scheduled appointments, requiring rescheduling, which further impacts the off-site backlog. PDP data indicates that in July 2022, Class Member patients only made it to 56%, or 147 of 262 scheduled off-site specialty appointments. Documented reasons for the missed appointments vary with the most frequent reasons being Class Member patient refusals, security staffing shortages, quarantine, and provider cancellations. Ensuring that off-site appointments are completed requires security and medical staff coordination to ensure that appointments are scheduled and confirmed with specialty providers and that Class Member patients are notified and transported in a timely way.

PDP also reports ongoing challenges with meeting its goal of completing Class Member patient intake screenings within four hours of their arrival at PDP. PDP reports that pre-COVID-19, timely intake screenings were rarely an issue, but by March 2022, PDP was reportedly meeting its four-hour goal only 31% of the time. Data for the week ending August 6, 2022, shows that the four-hour timeframe was being met 60% of the time, reflecting an improvement.

---

[20] PDP reports that it no longer offers on-site orthopedic services.

PDP reports that its most significant barrier to reducing the backlog and providing adequate care remains security and healthcare staffing deficits. In January 2022, medical and behavioral health care, previously managed by two different correctional healthcare service providers, were consolidated under Corizon, a single provider. Corizon was then renamed "YesCare." In March 2022, PDP experienced a healthcare staff vacancy rate of approximately 20%, which reflected a substantial increase from the 3% vacancy rate that PDP was reportedly accustomed to historically (Herdman Dep. 47).

Correctional healthcare staff vacancy rates are analyzed based on the number of vacant and filled positions for a "staff vacancy" rate and a "functional vacancy" rate, which accounts for shifts filled by overtime staff or temporary agency hires. Documentation for August 2022 indicates that PDP had a staff vacancy rate of 33%, or 109 of 328 positions, and a total functional vacancy rate of 14%. The functional vacancy rate for Behavioral Health clinicians (psychiatrists, psychiatric nurse practitioners, and social workers) was 50% and 31% for physicians and mid-level practitioners. PDP reports that these vacancy rates continue to prevent PDP from providing care that meets its internal quality standards, which is demoralizing for committed but exhausted providers and ultimately compounds attrition issues.

The table below reflects data on personnel hires and separations, by healthcare position classification, for the combined months of June, July, and August 2022:

**Healthcare Personnel New Hires and Separations by Job Classification**
June, July, and August 2022

| Job Classification | New Hires | Separations | Net (+/-) |
|---|---|---|---|
| Behavioral Health Nurse Practitioner | 6 | 0 | +6 |
| Licensed Clinical Social Worker | 4 | 3 | +1 |
| Behavioral Health Registered Nurse | 2 | 2 | 0 |
| Psychiatrist | 0 | 1 | -1 |
| Behavioral Health Counselor | 2 | 0 | +2 |
| Regional Director of Behavioral Health | 1 | 0 | +1 |
| Behavioral Health Licensed Practical Nurse | 1 | 2 | -1 |
| Re-Entry Director | 1 | 0 | +1 |
| Nurse Practitioner | 2 | 0 | +2 |
| Registered Nurse | 7 | 6 | +1 |
| Licensed Practical Nurse | 3 | 6 | -3 |
| Medical Assistant | 2 | 6 | -4 |
| Director of Nursing | 0 | 1 | -1 |
| Site Medical Director II | 0 | 1 | -1 |
| Certified Nursing Assistant | 1 | 0 | +1 |
| Assistant Health Services Administrator | 1 | 0 | +1 |
| X-ray Technician | 0 | 1 | -1 |
| Quality Improvement Coordinator | 0 | 1 | -1 |
| Medical Records Clerk | 1 | 0 | +1 |
| Scheduler | 0 | 2 | -2 |
| Administrative Assistant | 1 | 1 | 0 |
| **Total** | **35** | **33** | **+2** |

PDP has successfully recruited and hired 35 additional staff in a three-month period. Unfortunately, the struggle to retain staff resulted in nearly as many separations for a net gain of two employees, reflecting minimal overall headway in increasing PDP's permanent healthcare workforce.  The hiring of six behavioral health nurse practitioners is positive and the new hires should be able to assist in decreasing the backlog and wait times for patients to be evaluated and prescribed psychiatric medications.  Overall nursing classification vacancies have increased, however, with additional departures of licensed practical nurses and medical assistants.

Dr. Belavich observes that PDP's staffing deficits and attrition challenges are also occurring in jail and prison systems nationwide, and that systems must now compete with community hospitals, private practices, and healthcare staffing agencies for the same small pool of full-time and agency candidates.  Some are offering significant pay increases, recruitment bonuses, retention bonuses, preferred schedules, and other incentives to attract candidates.  Extended reliance on temporary agency staff and overtime can be problematic when regular staff experience burnout and agency staff are difficult to obtain or lack the same degree of investment as full-time personnel.

Data shows that most of the backlogged and missed appointments, intake screening delays, and other healthcare deficiencies are largely the result of the medical and security staffing deficits described above as this is the most significant change the organization has experienced during COVID-19.  PDP executives also recognize, however, that better communication and coordination between healthcare and security personnel would reduce the effects of these deficits and contribute to long-term reductions in back-logged appointments on and off site.  As a result, PDP is convening an internal working group to identify solutions for any internal inefficiencies within PDP's control despite the current healthcare and security staffing crisis.  The Monitoring Team also makes the following recommendations for immediate action:

1) Defendants should engage an independent salary survey to assist PDP in identifying salaries and benefits that are sufficiently competitive to attract and retain full-time healthcare staff.
2) Continue to explore options to provide both on and off-site appointment services via telehealth.
3) Create an internal interdisciplinary workgroup to evaluate reasons for missed off-site appointments and develop procedures to increase efficiency in arranging and ensuring that scheduled appointments occur.

### Substantive Provision 6—Behavioral Health in Segregation

*By September 30, 2022, the PDP and Corizon shall re-establish a mental health program for persons who are in segregation status.*

**Compliance Rating:  Partial Compliance**

In order to achieve substantial compliance with this substantive provision, PDP must, at a minimum: (1) resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status; (2) ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on administrative or punitive segregation (segregation) status; (3) resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating serious mental illness (SMI); (4) resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation status; (5) establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units; (6) safely discontinue the use of segregation for Class Member patients due to lack of sufficient Transition Unit housing; and (7) significantly reduce the use of segregation for Class Member patients who require placement on the behavioral health caseload.

PDP policy requires physical health clearances for all Class Members who are placed on segregation status and additional behavioral health clearances for those on the behavioral health caseload or designated as seriously mentally ill (SMI). Class Member patients who present with SMI must receive a behavioral health clearance within four hours. Those who are on the behavioral health caseload but not designated SMI must be cleared within 24 hours.

Behavioral health clearance data shows some fluctuations in compliance with this policy requirement.[21] It appears that one challenge in achieving full compliance with the behavioral health clearance policy is that some Class Members are being segregated in place. That is, they are sometimes placed on segregation status, with commensurate removal of privileges, but without being moved to a designated segregation unit or informing healthcare staff. This is reportedly occurring due to lack of segregation housing space. Because current practice typically limits physical and behavioral health clearances to those in segregation housing, unless behavioral health clinicians are made aware of Class Members who are segregating in place, those Class Members are unlikely to be evaluated. As part of PDP's quality improvement protocols, healthcare completed a review of 50 Class Member patient charts and determined that 42% of Class Member patients on segregation status were not housed in a segregation unit. PDP reports that it is currently implementing a system to ensure proper tracking of this vulnerable population and improve policy compliance.

In addition to clearance requirements, PDP policy includes extensive discussion of ensuring protections for those who are navigating SMI from the potential harms associated with segregation. Specifically, policy prohibits the punishment of incarcerated persons for experiencing SMI symptoms and requires the suspension of disciplinary hearings for those who

---

[21] In February 2022, PICC and RCF were reported at 100% compliance and CFCF at 76% compliance. Data from July 2022 reflects improved compliance at CFCF at 92%, however, PICC and RCF dropped to 83%. July 2022 data for ASD reflects 100% compliance. The Monitoring Team has not reviewed work papers or raw data utilized in these audits but notes that the sample sizes are small, so slight variations appear more significant when reported as percentages only. The Monitoring Team will review PDP's audit and reporting methods and make any appropriate recommendations.

are unable to participate due to SMI. PDP has reported challenges in ensuring that policies are consistently followed and that Class Member patients are protected.

During initial site visits, the Monitoring Team observed Class Member patients with SMI in segregation housing who appeared to be in states of acute psychiatric distress and required higher levels of care than they were receiving. Dr. Belavich noted that some patients were simply too acute to be in segregation. At the times of the site visits, the patients visited by the Monitoring Team had reportedly been in segregation housing for various durations, from some hours to weeks or months. For those who appeared to be in psychiatric distress having only been in segregation for some hours, it raises concerns about the quality of initial behavioral health clearances. It also raises concerns about PDP's adherence to the prohibitions against holding hearings for those who are unable to participate and imposing punishment for SMI symptoms. For those who had been in segregation for longer periods when visited by the Monitoring Team and observed in acute distress, it raises concerns about the overall quality of care in PDP segregation units.

Security and clinical personnel assigned to the segregation units were knowledgeable about which patients were identified as or displaying symptoms of SMI. They indicated that patients at similar levels of acuity are regularly placed and retained on segregation status and that conditions on the segregation units during the Monitoring Team's initial site visits were typical. These and other factors discussed below suggest that segregation is being overutilized for the SMI population and that some Class Member patients are not being adequately cared for.

The provision of frequent physical and behavioral healthcare rounds for those on segregation status is also critical to adequate care, and PDP policy requires healthcare personnel to make daily physical health rounds and weekly behavioral health rounds for those on segregation status. PDP audits reflect fluctuating compliance with both physical and behavioral health rounds from one audit period to the next as well as between facilities.[22] Daily healthcare rounds are critical for Class Member patients to seek necessary services and for providers to monitor the health and behavioral health status of isolated populations on daily and weekly bases. Behavioral health providers must frequently assess patients for signs of decompensation, and they must request the removal of anyone who may be harmed as a result of placement in segregation. Vigilance in consistent healthcare rounding is the best mechanism for this to occur. PDP reports that lapses in segregation rounding are largely due to staffing shortages and the inability to track those serving

---

[22] February and July 2022 audit data for daily physical health rounds in segregation show that RCF achieved 100% compliance in February and 78% compliance in July, PICC achieved 70% compliance in February and 0% compliance in July, and CFCF achieved 13% compliance in February and 15% compliance in July. ASD was audited in July 2022 only and achieved 0% compliance with this policy requirement. Behavioral health round audit data show that CFCF achieved 13% compliance in February and 26% compliance in July. PICC and RCF had each achieved 100% compliance in February and 91% and 89% percent respectively in July. ASD's July results showed 0% compliance. Again, it appears that PDP's audit methods involve small sample sizes, which may be inadvertently misleading when reported as percentages only.

segregation time in non-segregation units, among other systemic deficiencies. PDP reports that immediate solutions are being explored by PDP's Quality Improvement Committee.

PDP has made progress in developing Positive Change, Positive Outcomes, a new behavioral health group treatment program that will be offered to Class Member patients in segregation units. The program includes two hours of structured group treatment five days per week for a total of 10 possible treatment hours per patient per week. PDP reports that the program commenced in July and the behavioral health staffing matrix reflects nine dedicated full-time personnel for the provision of services. PDP executives anticipate that the program will be fully operational and serving all Class Members on segregation status by the end of October 2022.

Dr. Belavich indicates that the placement of individuals who are navigating SMI into segregation housing, or the imposition of restrictions regardless of where an individual is housed, should only occur as a last resort when no alternatives exist. The conditions of confinement in segregated housing can lead to exacerbation of symptoms, and services are often not delivered or are inadequate compared to those offered in non-segregated housing. Limiting, or excluding altogether, those with behavioral health concerns and SMI from segregation and isolation is no longer merely best practice but is rapidly becoming standard practice in jail and prison systems.

PDP documentation indicates that on August 8, 2022, there were 331 Class Members on segregation status, not including those in protective custody. Of the 331 Class Members, 47% are on the behavioral health caseload and 12% are documented SMI. PDP executives estimate that 40% of the PDP population is on the behavioral health caseload and that 13% are designated SMI. If the combined behavioral health and SMI populations are overrepresented in segregation when compared to the total PDP population, PDP must reexamine its use of segregation for this population.

PDP has three "Transition Units" for Class Member patients on the behavioral health caseload who do not require inpatient hospitalization but are too fragile to be in the general population. PDP reports that due to COVID-19, the size of the Transition Units decreased. By August 2022, Transition Unit housing had decreased by 83% for females, from 64 cells to 11 cells, and by 44% for males, from 100 cells to 56 cells. It is likely that lack of Transition Unit housing is increasing PDP's reliance on segregation for some Class Member patients.

The Monitoring Team observed the Transition Unit at PICC during both initial site visits. The program is well run and relationships between regularly assigned security personnel and the Class Member patients on the unit are positive. One security officer in particular was described by Class Members as "amazing" in his attentiveness to Class Member patients' needs and well-being. Class Member patients also described him as consistently de-escalating situations in which patients experience crises or severe symptoms. Indeed, the unit officer described for members of the Monitoring Team each patient's behavioral patterns and how he endeavors to support clinicians in supplementing patients' mental health needs. The officer knows every patient by name and the Monitoring Team observed the officer utilize sound technique and behavior incentives to encourage patients to clean their cells, participate in structured programming, or come out for recreation time. While the success of PICC's Transition Unit is currently dependent upon the skill set and compassion of this officer, the unit's stability and

success should be measured for positive outcomes and replicated system-wide to accommodate everyone on the behavioral health caseload in need of this level of care. Expanding Transition Unit housing will also be necessary to comply with Substantive Provision 3—Out of Cell/Segregation above, which prohibits the use of segregation due to lack of available alternative housing.

PDP executives have committed to exploring the idea of redirecting acute patients who engage in institutional misconduct to a separate Transition Unit therapeutic housing environment in lieu of placement in segregation. The Monitoring Team is encouraged by PDP's efforts in this area and will continue to report on PDP's progress.

### Substantive Provision 7—Law Library Access

*PDP will continue to provide law library access for all incarcerated individuals. The Monitor and the parties will discuss access and scheduling matters and the Monitor shall make any recommendations on these matters by August 1, 2022.*

**Compliance Rating: Deferred**

Personnel and Class Members report that law library access has resumed in some locations, but that access to legal research is hindered by equipment failures. Access is also only provided as out-of-cell time and staffing permit. The Monitoring Team requires sound out-of-cell data and additional information about the locations and functionality of law library computers in order to make compliance determinations and any additional recommendations.

### Substantive Provision 8—Discipline

*All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding. See Wolff v. McDonnell, 418 U.S. 539, 563–66 (1974); Kanu v. Lindsey, 739 F. App'x 111, 116 (3d Cir. 2018); Stevenson v. Carroll, 495 F.3d 62, 70–71 (3d Cir. 2007). The PDP shall: (a) expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date; (b) release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing; (c) cancel sanctions that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms. Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation. Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline. Defendants shall provide to counsel for plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022.*

24

**Compliance Rating:  Partial Compliance**

During the COVID-19 pandemic, PDP began conducting disciplinary hearings without affording charged Class Members opportunities to be present at the hearings, make statements, or present evidence, among other violations of PDP policy.  In order to achieve substantial compliance with this substantive provision, PDP must prove that: (1) PDP disciplinary policies, procedures, and practices comply with established due process rights; (2) disciplinary dispositions for all Class Members who were not afforded an opportunity to be present at their disciplinary hearings between the dates of March 2020 and April 12, 2022 were expunged; (3) all Class Members who were not present at their disciplinary hearings between March 2020 and April 12, 2022 but were still serving disciplinary sentences on April 12, 2022 were released from segregation; (4) all Class Members who remained in administrative segregation on April 12, 2022, following a disciplinary sentence that was imposed without a hearing were released from segregation; and (5) sanctions that required payments for damage to property or other restitution based on hearings conducted between March 2020 and April 12, 2022, in violation of PDP policy, were canceled; and (6) payments made by Class Members who were required to pay for damage to property or other harms based on hearings conducted between March 2020 and April 12, 2022, in violation of PDP policy, were returned.

Internal audit documentation dated June 7, 2022, reflects that 100%, or 4217 of 4217 total disciplinary records, were expunged through that date.  PDP also reports that it conducted an internal audit of 250 Class Member files and confirmed that 100% of the reported expungements were documented therein.  PDP also reports that all Class Members who were eligible for release from segregation pursuant to this substantive provision were released.  The Monitoring Team is in the process of verifying this information.  PDP reports that as of October 4, 2022, 279 of 4217 total disciplinary cases were identified as requiring reimbursement of a total $27,082 pursuant to this substantive provision.  PDP provided documentation reflecting that 238 of 279 reimbursements have been made, and PDP anticipates that remaining reimbursements will be issued by the next reporting period.  The Monitoring Team will verify that the 279 reimbursements constitute a complete list of disciplinary actions that were eligible for reimbursement pursuant to this substantive provision.

This substantive provision also permitted PDP to hold hearings of some Class Members who remained in segregation on April 12, 2022, contingent on PDP first providing notice to Plaintiffs' co-counsel.  PDP reports that it did not re-adjudicate any of the cases for the small number of Class Members still in segregation on April 12, 2022.

PDP reports that it is also revising its disciplinary policy and staff training curriculum to ensure future compliance with Agreement requirements.  The Monitoring Team will conduct additional document review and complete sample replication of PDP's audit findings based on the above-referenced compliance timeframe.

***Substantive Provision 9—Tablets***

*PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational*

*capabilities and housing designs. The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets; and, at RCF, expanding from six (6) to eight (8) tablets on the 2nd and 3rd floor (4 housing units) and expanding from eight (8) to twelve (12) tablets on the 1st floor of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF. This expansion process will be completed by May 1, 2022. The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices.*

### Compliance Rating:  Partial Compliance

The PDP maintains documentation of its tablet expansion efforts pursuant to the Agreement. The PDP reports that CFCF has expanded from four (4) tablets to six (6) tablets on all housing units, for a total of one hundred eighty (180) tablets at CFCF.  The tablet expansion was completed in July 2022**.**  The only unit at CFCF that did not appear to have at least six tablets assigned is Unit B1, with only five tablets assigned.  Regarding RCF, PDP reports that it has ordered tablets for the larger and smaller units consistent with Agreement requirements and is awaiting additional docking stations.  PDP anticipates that all tablets will be installed by the next reporting period.

During initial site visits, some units did not have all required tablets available for use by Class Members.  Some tablets were reportedly out for repairs or charging, which is consistent with inventory reports provided.  During initial tours, Class Members were observed utilizing tablets, though the Monitoring Team received complaints from Class Members that confirmed inventory reports that some tablets were unavailable.  It was also clear during site visits that some units did not have the required numbers of tablets available for use by Class Members.  PDP has committed to evaluate current practices and make appropriate adjustments to ensure that the required numbers of tablets are maintained and consistently available for Class Members.  The Monitoring Team will also confirm the presence of tablet docking stations and commensurate numbers of available tablets on each unit during subsequent site visits.

The Monitoring Team is certain that PDP and Class Members can benefit from the installation of additional tablets and is assessing current directives and practices to ensure that they are being durably implemented and that Class members have equitable access.  This assessment will inform future recommendations pursuant to this substantive provision.

### *Substantive Provision 10—Phone Calls*

*PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices. Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls.*

### Compliance Rating:  Partial Compliance

PDP's current policy regarding phone access has not been updated to reflect Agreement requirements.  It does, however, require unit personnel to monitor and ensure equitable phone access, and the Monitoring Team has confirmed that 15-minute free phone calls for Class Members has been implemented.  During initial site visits, Class Members reported, and personnel confirmed, that Class Members receive 15-minute free phone calls.  Like other programs and services addressed in the Agreement, access to free daily calls is contingent upon Class Members' access to unit dayrooms, which remains a challenge as reported above under Substantive Provision 2—Out-of-Cell Time and Substantive Provision 3—Out-of-Cell/Segregation.  Class Members' access to 15-minute free calls is further impacted when phones are in disrepair.  The Monitoring Team will conduct additional review to verify reports of Class Members and staff during site visits that phone repairs are not being completed efficiently.  In the interim, PDP has agreed to more vigilant internal monitoring and documentation to identify issues and ensure that timely phone repairs occur.

### *Substantive Provision 11—PICC Emergency Call Systems*

*The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to tablets and/or phones and determine whether any policies and practices are necessary to address these matters considering all relevant factors, including operational feasibility and physical capacity.*

### Compliance Rating:  Deferred

In initial discussions with PDP about emergency call systems, PDP reports that installation of call buttons at PICC was one option considered, but that PICC's physical plant cannot accommodate the installation of call buttons.  The Monitoring Team requires additional information to verify PDP's statements but recommends against the expansion of the call button system as currently designed, irrespective of physical plant capacity.

The current call button system is largely ineffective as a mechanism for Class Members to communicate needs or to seek assistance in emergencies and is entirely ineffective as a means for managers and executives to monitor personnel responses to Class Members' requests for assistance.  The call button system is not connected to any of PDP's tracking databases, which means that there is no available information or data regarding who presses call buttons, why, how often, or whether or when anyone responds.  PDP executives note that because call button use is not tracked, there is similarly no way to generate single point-in-time snapshots to compile call button information or aggregate any data.  Any surmising about frequencies or locations of and responses to call button requests would be based solely on direct observation and anecdotal information, which is inadequate for executive management to identify and address issues.

During site visits, the Monitoring Team observed working call buttons and active call button notifications on most units.  Call buttons are not connected to intercoms, so unit personnel are expected to physically respond to each cell upon notification, which is challenging for staff who must juggle multiple required tasks at once.  Some personnel are likely responsive to call button

27

requests for assistance if units are sufficiently staffed, though PDP executives report significant challenges with call button responses given current staffing deficits. Manual tracking of call requests and responses is wholly infeasible.

Because call buttons are one of few means by which Class Members can communicate with personnel when locked inside their cells, the call button requirements pursuant to this provision are consistent with an underlying spirit of the Agreement to ensure that Class Members' needs are met. In theory, if even some call button requests are responded to and Class Members' needs are attended to, the system serves a purpose consistent with the Agreement. However, the stress experienced by Class Members when call button requests are left unanswered, or by staff when they believe that call buttons are pressed for non-emergent reasons, breeds tension between Class Members and staff.

In evaluating call button issues for compliance with the Agreement, the Monitoring Team will focus *only* on call button operability, repairs, and training pursuant to Substantive Provision 12-- Locks.

Regarding alternative emergency call systems at PICC as well as solutions to any current issues with access to tablets and phones, the Monitoring Team will work with PDP to identify solutions and make recommendations in subsequent reports.

### *Substantive Provision 12—Locks*

*PDP initiated the lock replacement program for PICC and RCF, which will be completed by June 30, 2022. For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022. Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner. PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system.*

### Compliance Rating: Partial Compliance

PDP documentation reflects that PDP initiated facility-wide lock replacements at PICC and RCF beginning in December 2021 and completed RCF in May 2022, in advance of the June 30, 2022, Agreement deadline. PDP reports that it has completed 95% of lock replacements at PICC with 27 locks remaining for a total of 957 locks replaced system-wide to date. PDP also implemented a twice daily lock inspection protocol at both facilities. Copies of those inspections at RCF for the months of April through July have been provided for review. Documentation reflects that staff were trained in lock-related expectations in September 2021, April 2022, and again in July 2022. PDP has a policy governing facility captains' responsibilities in overseeing the lock and key protocols, however, housing officer post orders reviewed do not specifically direct lock inspections with the completion of the lock inspection inventory sheet.

Documentation also reflects that staff are submitting work orders when locks break or when they suspect tampering with new locking mechanisms. Completion of repairs appears to be ranging from approximately 24 hours to as many as 20 days. Work orders do not reflect whether cells

are decommissioned for use pending repair but available information and site visit observations suggest that they are. Unit personnel reported to the Monitoring Team that, aside from periodic tampering, new locking mechanisms largely resolved lock-related safety issues.

The Agreement also requires that a one-time test and repair of all call button devices in existing facilities occur by August 1, 2022, and that, going forward, any complaints regarding necessary repairs are handled through the work order process. PDP was also required to provide refresher training on call button operations and responses by June 1, 2022.

PDP reports that all call buttons were tested and repaired prior to the June 2, 2022, Agreement deadline. Documentation provided reflects that RCF conducted a review and repair of all call buttons from March 17, 2022, through April 21, 2022, and that work orders have been submitted for call button repairs at that facility consistent with Agreement requirements. PDP provided proof that in April 2022, staff at CFCF and RCF were re-briefed on staff responsibilities regarding operability of call buttons and their responsibility to notify supervisors when call buttons are not working.

The Monitoring Team is awaiting additional documentation regarding testing and repairs of remaining call buttons, as well as policies or post orders and accompanying training that guide personnel in the proper handling of nonoperational call buttons. If additional documentation shows that call buttons were repaired, complaints are being properly handled and addressed, and training has occurred, PDP will achieve substantial compliance with this substantive provision.

### Substantive Provision 13—Visiting

*As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members. PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule. At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots. Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues. PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated outside of PDP.*

#### Compliance Rating:  Partial Compliance

PDP reports that it initially resumed in-person visiting in November 2021, but that it was suspended due to a COVID-19 surge from January 2022 through March 2022. PDP weekly documentation for April through July 2022 from various facilities reflects an average of 208 visits for weeks reported. To establish an appropriate baseline of initial and additional time slots as the basis for recommendations and compliance findings, the Monitoring Team will analyze more detailed information about scheduled, cancelled, attended, and refused visits, in-person versus tablet-facilitated visits, and visitors' vaccination information. PDP is updating its current visiting policy consistent with Agreement requirements and is in the process of providing

additional required documentation. For documentation that is not currently available, PDP is exploring its tracking and documentation capabilities to support proof of compliance with this substantive provision.

### *Substantive Provision 14—Attorney Visiting*

*PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit. For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment. For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay.*

**Compliance Rating:  Partial Compliance**

Initial conversations with Defender Association of Philadelphia attorneys and private counsel for Class Members suggest that PDP has made significant improvements in ensuring access to attorney visits.  This is reportedly true both in providing more space and opportunities for virtual and in-person visiting as well as shortened wait times for Class Member clients.  PDP weekly documentation from April through July 2022, reflects an average of 324 attorney visits per week reported and reflects the total timeframes for each visit.  Initial documentation provided does not identify the times of scheduled visits and Class Member clients' arrivals, nor does it identify visits that were delayed or cancelled, or corresponding reasons.  The existing tracking system may be able to generate this information, which will be necessary to supplement generally positive feedback from counsel and Class Members during site visits.  PDP reports that it is both developing new policy and revising existing policy and post orders regarding attorney visits consistent with Agreement requirements.

### *Substantive Provision 15—COVID-19 Testing*

*The PDP shall continue the present policy regarding testing of persons who are scheduled for court. Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID-19. They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results. Those housed on a "yellow block" may have been exposed to a COVID-19-positive individual, and they will be rapid-tested twice, the night before court and the morning of court. They will be transported to court if both tests are negative. Those housed on a "red block" are COVID-19 positive and will be isolated for ten days and not brought to court during that time frame. These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia Department of Public Health. Provided, however, that the Defendants shall not unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols.*

**Compliance Rating:  Partial Compliance**

In a memo dated February 7, 2022, the PDP Commissioner states that PDP will continue to adhere to Centers for Disease Control guidelines for jail and prison prevention and treatment of COVID-19, including screening and testing of all incarcerated persons entering PDP, testing of unvaccinated staff, provision of masks for staff and incarcerated persons, testing in housing units where exposure to COVID-19 is suspected, and offering vaccinations and boosters at intake and ensuring their ongoing availability throughout incarceration.  The memo also outlines a tiered approach to Class Member movement and testing due to COVID-19 in consultation with the Philadelphia Department of Public Health.

Consistent with the policy described in this substantive provision, PDP housing units are classified as either, "green," "yellow," or "red," each prescribing unique protocols for testing and movement.  Green housing units have no movement constraints, are not undergoing regular COVID-19 testing, and are not subject to COVID-19-related restrictions.  PDP staff report that Class Members from green housing units are tested for COVID-19 on the day prior to any scheduled court hearings.  Yellow housing units are on COVID-19 quarantine and receive COVID-19 tests every five days.  Movement on yellow units is restricted outside the housing areas except for scheduled court hearings.  In order to receive clearance to attend court while housed on a yellow unit, Class Members must be asymptomatic and test negative both on the day prior to the scheduled hearing and again on the morning of the hearing.  Red units are reserved for COVID-19-positive Class Members who require medical isolation.  Class Members remain in isolation for 10 days and are restricted from attending in-person court hearings.

PDP has provided documentation of COVID-19 testing frequency and results for Class Members with scheduled court hearings.  From September 27, 2021, through July 29, 2022, PDP reportedly administered 21,702 COVID-19 tests for those going to court.  Of these, 21,593 were reported negative, 109 were positive, and there were 270 recorded test "refusals." Additionally, PDP provided an example of a database query with Class Members' identifying information and corresponding test results.  The Monitoring Team will attempt to validate the information reported and documented by PDP by cross-referencing available database information with housing unit documentation to determine whether the testing protocol is being followed pursuant to the Agreement.

### *Substantive Provision 16—Quarantine*

*If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19. Under current policy, see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021, for persons who are vaccinated and are exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative.*

**Compliance Rating:  Partial Compliance**

PDP reports that its quarantine protocol was developed and evolves based on guidance from the Centers for Disease Control (CDC) consistent with Agreement requirements.  As more is learned about COVID-19 prevention and treatment, CDC guidance is updated and PDP reports that it modifies its protocols accordingly, in consultation with the Philadelphia Department of Public Health (PDPH).  On the April 12, 2022, Agreement date, PDP was required to follow CDC's June 9, 2021, *Interim Guidance on Management for Correctional and Detention Centers.*[23]  The June guidance allowed for vaccinated individuals who were exposed to someone with COVID-19 to avoid quarantine as long as they tested negative following the exposure.[24]  Unvaccinated individuals who tested negative were quarantined for a period of ten days, tested every five days, and released from quarantine if the entire housing unit tested negative at the end of that period.

The most recent CDC *Guidance on Prevention and Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* was updated on May 3, 2022.[25]  The new guidance created two sets of prevention strategies, one for everyday operations and one for enhanced prevention.  Strategies for everyday operations establish a baseline for regular disease prevention that should be consistently followed.  A variety of enhanced prevention strategies are recommended when risk increases based on several factors, including community transmission levels, jail or prison physical plant design, population turnover, and institutional vaccination rates.  CDC guidance acknowledges that every jail and prison is not likely to be able to implement every enhanced strategy and offers flexibility in choosing which to implement.  As of September 25, 2022, Philadelphia County qualifies as "medium" risk based on CDC guidelines and should follow everyday *and* enhanced prevention strategies.

CDC continues to require isolation for those infected with COVID-19 and quarantine for those exposed as part of everyday operations.  As an everyday operation in its strictest interpretation, CDC requires quarantine of *all* exposed persons, either individually or in cohorts, regardless of vaccination status.  Accordingly, PDP quarantines Class Members in cohorts for periods of 10 days with additional testing of everyone in each cohort at least every 5 days.  If new cases are discovered, the quarantine period resets, which results in extended periods of quarantine.  As of August 8, 2022, PDP reported 7 symptomatic positive cases of COVID-19 and 44 asymptomatic positive cases, with 34 units either on quarantine or in medical isolation.  The longest quarantine as of August 8, 2022, was initiated on May 25, 2022, more than 10 weeks earlier. In addition, there are 7 intake quarantine units not included in this count.  CDC's guidance acknowledges that its current baseline strategy, with accompanying restrictions in movement and access to programs and services, increases stress and potential mental health risks.  Guidance permits some variation in quarantine protocols to better balance mental health and programmatic needs,

---

[23] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (June 9, 2021)

[24] *Id.*

[25] Centers for Disease Control and Prevention, *Guidance on Prevention and Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (May 3, 2022), available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

such as allowing for movement to court and off-site medical appointments, both of which PDP protocol provides for.  PDP also has a separate testing and quarantine protocol for all Class Members entering its facilities during intake.  This requires a COVID-19 test upon entry followed by a 10-day quarantine.  The Monitoring Team will conduct additional review to determine if PDP's current strategy is adequate given the reported low vaccination rate among the PDP population.

PDP reports that it has challenges maintaining quarantines due to limited housing space.  As a result, newly arriving Class Members are sometimes placed into housing units that are already under quarantine, which undermines the purpose of strict quarantine protocols and exposes Class Members to risk.  The Monitoring Team will continue to report on PDP's quarantine protocols and document any changes for the duration of the settlement term.

***Substantive Provision 17—Sanitation***

*Defendants agree to continue conducting the weekly General Inspection ("GI") cleaning days with supplies provided by officers to clean cells and housing area, and to provide regular laundry services under current PDP policies.*

### Compliance Rating:  Deferred

PDP has provided the Monitoring Team with extensive documentation, including 10 policies and post orders, internal audit findings, inspection logs, and Deputy Warden Certifications in support of PDP's compliance with this provision.  The Monitoring Team toured laundry facilities and sanitation and linen storage locations, confirmed the presence of ample supplies, and housing unit personnel offered consistent reports on sanitation protocols and distribution of supplies.

Officers are required to document sanitation and laundry issuance in unit logbooks, samples of which PDP has provided for review.  The PDP Audit Division conducts audits for compliance with COVID-19 mandates and documents overall sanitation on housing units.  PDP has provided the results of these audits for review.  Deputy Warden Certifications contain documentation confirming Class Members' access to cell and housing unit cleaning supplies on daily bases.  PDP executives communicate a strong desire for sanitary and well-maintained facilities and have ensured the presence of appropriate policies and documentation of adherence to them.[26]  Despite these efforts, PDP executives report ongoing challenges with ensuring that Class Members consistently receive sanitation supplies, timely linen exchanges, and scheduled laundry access.

These challenges were confirmed during site visits when the Monitoring Team received regular complaints from Class Members in most housing units about insufficient quantity, frequency and methods of distribution of cleaning and other supplies.  Concerns about insufficient sanitation-related supplies and protocols are not uncommon among incarcerated persons in jail and prison systems nationwide, even with adequate policies and procedures in place.  However, when incarcerated persons from different units and different facilities throughout a system reiterate

---

[26] Some of the distribution and documentation protocols require revisions in order to prove PDP's compliance with this substantive provision, and the Monitoring Team will work with PDP to ensure that they are effective and efficient.

identical issues, and when cleaning supplies and bed linens become high-value currency within incarcerated populations as is the case in PDP facilities, it suggests larger issues with scarcity or distribution that require additional attention. PDP executives should take immediate steps to ensure more consistent distribution of supplies, including facility-wide spot checks and standardized unit inspections.

The purpose of this substantive provision is to ensure that PDP maintains clean, habitable conditions for Class Members confined in its facilities. Reports of unsanitary conditions are exacerbated by insect and rodent infestations in some facilities. The Monitoring Team observed significant evidence of infestations in PICC and DC that require immediate enhanced vector control efforts. PDP provided documentation of recent efforts in those facilities and took additional action following the site visits. Given infrastructure and facility maintenance issues campus wide, some insect and rodent issues will likely persist outside of PDP's immediate control. However, PDP must remain vigilant in identifying issues and ensuring that the frequency and quality of inspections and treatments in all facilities are sufficient to maintain safe working conditions for personnel and safe and habitable conditions for Class Members.

The Monitoring Team also observed serious lapses in building maintenance in some areas of ASD-CU and MOD 3, DC, and PICC, including rust, erosion, broken toilet and sink units, no lighting in occupied cells, and inoperable drinking fountains and air conditioning units in the hottest summer months. The Monitoring Team has recommended under Substantive Provision 1—Staffing above that Defendants address maintenance staffing deficits by expanding PDP's current maintenance contract to include all PDP facilities. The two facilities that currently receive contracted services for work orders and preventive maintenance have adequately maintained physical plants. However, the 50% vacancy rate in the PDP plant operations staff are resulting in delayed or unaddressed repairs in remaining facilities as described here.

PDP documentation for August 10, 2022, reflects no overdue work orders for CFCF or RCF, while PICC reported 110 unusable cells due to unresolved maintenance issues and work orders, many of which existed on or before the April 12, 2022, Agreement date.[27] SME McDonald notes that if PDP/City maintenance is unable to maintain repairs sufficient to repopulate unusable cells, it is also likely unable to ensure routine maintenance necessary to avert debilitating and costly system breakdowns. The living conditions for Class Members who occupy poorly maintained or rodent and insect-infested cells, units, and facilities are unacceptable, and Defendants must take additional action to improve them.

Security staffing shortages also contribute to unsanitary and unsafe conditions. As previously reported, sergeant and lieutenant posts are routinely left vacant, which likely results in supervisors being forced to prioritize other operational needs or crises over cleanliness and maintenance inspections. Dozens of vacant correctional officer posts limit available personnel to issue supplies and supervise work details for routine deep cleaning.

---

[27] Among reported issues at PICC that resulted in cells being unusable were 14 broken locks, 3 broken lights, 12 toilet/sink units, 4 cell door windows, and 2 with exposed wires.

In monitoring PDP's compliance with this substantive provision, the Monitoring Team will complete unannounced visual inspections of facilities to track PDP's progress in improving and maintaining sanitation. It will continue to meet with Class Members and staff and monitor Class Member grievances regarding access to cleaning supplies, bed linens, and laundry. It will also work with PDP in refining its policies, documentation, tracking, and auditing methods for greater efficiency, and to allow PDP executives to more closely monitor living conditions and address problems. In the interim, PDP has committed to improving internal monitoring and auditing of all sanitation, maintenance, and vector control issues.

### *Substantive Provision 18—Use-of-Force*

*PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands. The parties agree that correctional officers should follow de-escalation measures provided in PDP policies. The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors. In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states: "Force is only used when necessary and only to the degree required to control the inmate(s) or restore order…The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated…. Staff will not use pepper spray as a means of punishment, personal abuse, or harassment."*

#### Compliance Rating:  Deferred

Assessment of PDP's use of force practices pursuant to this substantive provision requires qualitative and data analyses of PDP's:  (1) current use of force policies and procedures; (2) use of force training curriculum and instruction on law, policy, tactics, prevention, de-escalation, reporting, investigation, use of specialized equipment, and guidelines for planned versus emergency use of force; (3) current reporting and investigation practices based on specific and aggregate use of force investigations; (4) systems for commending personnel who utilize effective use of force, prevention, and de-escalation tactics; (5) disciplinary thresholds and dispositions for inappropriate or excessive uses of force; (6) mechanisms for review of use of force incidents at supervisory, management, and executive levels; and (7) processes for identifying, implementing, and monitoring any use of force-related corrective action or other quality improvement measures.  Once an assessment is completed, the Monitoring Team will prescribe the specific requirements necessary for PDP to achieve substantial compliance with this substantive provision.

PDP was required to provide refresher training on use of force policy III.A.8 – *Use of Force and Restraints*.  PDP has provided documentation reflecting that retraining commenced in May 2022 and has been completed for 1065 of 1169 security staff.  Documentation reflects that a total of 91% of PDP staff members have been retrained pursuant to this substantive provision.  Of 104 remaining staff who have not yet received the retraining, 94 are on extended leave and 10 have

35

not been retrained due to other delays.  PDP anticipates that the 10 staff members whose training was delayed for various reasons and any staff members who return from extended leave will be trained by the next reporting period.

The Monitoring Team has requested completed use of force packages for 30 of 130 total reported incidents for the second quarter of 2022.  Cases were selected using a semi-random method to ensure representation of cases from each facility reported.  The initial case review will establish a baseline from which to analyze PDP's use of force practices, develop recommendations, and measure results of any changes implemented.  PDP's current policies and tracking systems, including detailed monthly trend reports and Crisis Intervention Team training provide a sound foundation for PDP to improve current use of force systems.  The Monitoring Team will provide additional analysis with compliance requirements and findings in future reports.

# EXHIBIT G

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS REMICK, et al., on behalf of Themselves and all others similarly situated, | : | No.: 2:20-cv-01959-BMS |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA; and BLANCHE CARNEY, in her official capacity as Commissioner of Prisons, | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

## MONITOR'S SECOND REPORT

Pursuant to Section 19 of the Settlement Agreement (Agreement) and Section 7 of the Monitoring Agreement and Protocols, the Monitor appointed by this Court submits the attached Monitor's Second Report evaluating Defendants' compliance with the terms of the Agreement through December 31, 2022. The Monitor prepared this report as the second of regular reports to be filed of record. The Monitor also hereby confirms that by authorization of this Court, and in consultation with the *Remick* parties, regular reports will now be filed semiannually, according to the following schedule:

| Monitor's Third Report | September 15, 2023 |
|---|---|
| Monitor's Final Report | March 29, 2024 |

I am available to answer any questions the Court may have regarding this report and Defendants' compliance with the Agreement at such times as are convenient for the Court.

DATED: March 3, 2023

Respectfully submitted,

By: /s/ Cathleen Beltz
    Monitor

The Agreement between Plaintiffs Thomas Remick, et al., (Plaintiffs), on behalf of themselves and all others similarly situated, and the City of Philadelphia (City) and Blanche Carney, in her official capacity as Commissioner of Prisons (Defendants), in *Thomas Remick et al., v. City of Philadelphia,* Case No. CV 01959-BMS (Action), requires system-wide reform of the Philadelphia Department of Prisons (PDP) as prescribed in 18 substantive provisions.

The Agreement further provides that the Monitor issue "regular reports to counsel and the Court" that assess Defendants' compliance with each substantive provision of the Agreement. The Monitor will address Defendants' implementation progress and issue "Substantial Compliance," "Partial Compliance," or "Non-compliance" findings for each substantive provision. Where necessary, the Monitor will make specific recommendations to improve Defendants' compliance with the Agreement. A "Substantial Compliance" finding means that Defendants "have and are reasonably expected to continue to substantially satisfy" the requirements of an Agreement provision. A "Partial Compliance" finding means that PDP has successfully completed some of the discrete tasks outlined in a substantive provision and continues to demonstrate progress toward substantial compliance. A "Non-compliance" finding means that Defendants have "not substantially satisfied" Agreement requirements by failing to complete discrete tasks outlined in a substantive provision. Defendants will not be found in non-compliance based on "isolated or minor instances of failure [to substantially comply]" or "omissions of a technical or trivial nature."

Where substantial compliance requires the revision of existing policies or promulgation of new ones, Defendants' compliance will be assessed based on policy language and substance, notification and training of personnel, and policy implementation and adherence. Finally, the Monitor and Parties agree that successful reform is ultimately measured by sustained improvements to living conditions for Class Members. As such, in issuing compliance findings, the Monitor will consider whether reforms implemented pursuant to the Agreement are durable and their benefits are expected to outlive the Agreement's April 12, 2024, termination date. In this reporting period, the Monitoring Team utilized data and information tracked through December 31, 2022.

The Agreement requires the Monitor to conduct site inspections "at least once every three months," during which the Monitor has access to conduct confidential interviews with personnel and Class Members. The Monitor also has access to all records, files, electronic files, videos, and other materials, including personnel records and patient protected health information, as necessary to measure Defendants' compliance with the Agreement. In addition to at least one quarterly site visit, the Monitor will conduct periodic site visits with little advance notice to PDP.

The *Remick* Monitoring Agreement and Protocol requires the Monitor to "establish means of communication to enable Class Members, their families, and advocates to provide information related to implementation of and compliance with the Agreement."[1] The Monitor has retained a

---

[1] Monitoring Agreement and Protocol, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 169 at 4 (E.D. Pa. May 25, 2022)

deputy monitor who, in consultation with the Parties, has established a mechanism to receive information pursuant to this requirement. Deputy Monitor Ryan Grosso is an advocate committed to public policy and carceral reform. He has more than six years of experience as a practicing attorney in Philadelphia, including five years of criminal defense work with the Defender Association of Philadelphia where he represented many incarcerated clients.

The Deputy Monitor conducts monthly site visits to speak with Class Members on PDP housing units. Following site visits, the Deputy Monitor schedules weekly confidential tablet meetings with Class Members who desire more privacy than can be achieved during housing unit discussions alone.[2] PDP has posted the Agreement on all housing units along with a memorandum to Class Members describing the Monitoring Team's role and inviting communication with the team.

The Monitoring Team also receives memoranda from Plaintiffs' co-counsel detailing specific allegations and systemic issues communicated by Plaintiffs to co-counsel. With prior authorization from Class Members, co-counsel provides the Deputy Monitor with Class Members' identifying information, and the Deputy Monitor, or others on the Monitoring Team, follow-up with individual Class Members as necessary. With prior authorization from Class Members, select complaints and systemic issues are forwarded to PDP for response or investigation, which the Monitoring Team tracks and reviews. Thus far, the information received via this protocol confirms both improvements and deficiencies detailed in *Remick* filings and reports by PDP staff and others who work in or inspect PDP facilities.

Information that the Monitor obtains via reports and communications with oversight agencies, reform advocates, Plaintiffs' co-counsel, and others independent of PDP provides valuable historical and factual context for PDP's current conditions. It augments the Monitoring Team's direct observations and shapes recommendations that the Monitoring Team hopes will produce the most durable reforms. The Monitoring Team thanks these oversight partners for their contributions and commitment.

In assessing PDP's implementation of the Agreement, the Monitoring Team attempts to identify any Class Member grievances related to each substantive provision. Grievances are a rich supplement to information the Monitoring Team receives through site visits, data, documentation, and interviews. They add nuance to compliance analysis, inform determinations, and are critical in the identification of emerging systemic deficiencies. PDP's grievance system is not useful for compliance monitoring. An alarming lack of grievances about well-established deficiencies outlined in the Agreement that greatly impact Class Members' basic human needs suggests PDP's grievance system is overwhelmed and ineffective.

Class Members regularly report to the Monitoring Team during site visits that grievance forms are unavailable on housing units, not provided in triplicate form so that Class Members have records of their filings, and that their submitted grievances are ignored. On one housing unit in this reporting period, a Class Member indicated that he could not submit a grievance because the

---

[2] Monthly site visits commenced in October 2022, and weekly two-hour tablet meetings commenced December 6, 2022.

housing unit grievance box was full.  Indeed, the Monitoring Team observed the grievance receptacle so compacted with completed grievance forms that it could not accommodate more.

PDP personnel report that they attempt to ensure that grievance forms are retrieved at regular intervals, properly logged, prioritized, investigated, and responded to.  Living unit staff and facility managers communicate a clear understanding of their responsibilities, that grievances protect the legal rights of Class Members, and that they are one of few means by which Class Members can document their needs and seek to have them met.  Unit personnel do not appear indifferent to the ineffective grievance system, but they are clearly challenged in fixing it.  One option currently being considered is the filing of grievances via tablet in addition to paper forms, which should aid in grievance tracking and accountability.

Under intense scrutiny, PDP executives are attempting comprehensive systemic reform with greater challenges and fewer tools than ever before.  For reasons previously reported, achieving compliance with the Agreement will likely require years.  The Monitoring Team has therefore recommended that PDP establish implementation priorities with an eye toward changes that are most likely to improve the daily lives of those confined and working in its facilities.  Though the grievance system itself is not subject to Agreement monitoring, it is certainly part of normal jail operations addressed in Substantive Provision 4, and PDP executives understand that repairing it is one such priority.

Another significant challenge for PDP and the Monitoring Team is the fidelity of PDP's data.  PDP does not currently have adequate tracking systems for individual access to several services such as law library, visiting, and out-of-cell time.  Far too many reports are generated by manual data entry, which leads to inaccuracies.  Additionally, the Jail Management System (JMS) database is not integrated with health care data systems, which requires cross-referencing of manually generated lists for important basic information.  For example, PDP must compare separate healthcare and security lists to identify which Class Members in segregation are also seriously mentally ill (SMI), but because data points used to compile the lists are different, they are not wholly compatible and comparisons are not always accurate.

Reports based on methodologically flawed data collection are necessarily flawed, and neither PDP executives nor the Monitoring Team can validate them with certainty.  In making compliance determinations, the Monitoring Team is unable to rely on single reports and must typically compare several types of data and reports to generate the tables and other information reported to the Court.  Nevertheless, data is critically important for systems this size to measure trends and identify necessary improvements.  Internal monitoring of systemic issues is key to sustaining reform successes and data analysis will become PDP's most effective tool once systems are improved.  If properly analyzed, cross-referenced, contextualized, and supplemented with qualitative information, PDP's data remains useful despite current inadequacies.  PDP is also in the process of replacing its antiquated JMS database.  PDP is working with the developer of the replacement system to refine, computerize, and aggregate information that is currently only contained in dozens of standalone, manually generated reports.  The Monitoring Team is hopeful that the new system will improve data fidelity and is providing recommendations for how the updated system can aid in proving compliance.

In this reporting period, members of the Monitoring Team completed three site visits to all PDP facilities, including Curran-Fromhold Correctional Facility (CFCF), The Detention Center (DC) and the Prison Health Services Wing (PHSW), Philadelphia Industrial Correctional Center (PICC), the Alternative and Special Detention Central Unit (ASD-CU and MOD 3), and Riverside.[3]  During each site visit, the Monitoring Team spoke with Class Members and personnel in every area visited regarding Agreement requirements and conditions inside PDP facilities.

The Monitoring Team continues to meet regularly with PDP Commissioner Blanche Carney (Commissioner) and her staff and receives full access to facilities, documentation, personnel, and Class Members.  PDP remains transparent in providing information and collaborative in identifying solutions to deficiencies that impede compliance with the Agreement.  The Monitoring Team thanks the Commissioner and PDP staff for their contribution to the drafting of this report.  The Monitor also continues to meet with counsel for the parties and representatives from key stakeholder, advocacy, and oversight organizations and thanks them for their time and contribution to the Monitor's reports and findings.

The Agreement requires the Monitor to "provide to the parties those documents and reports that are secured by her office which, in her judgment, should be shared to effectuate the terms and conditions of the Agreement."  The Monitor has determined that documentation provided by Defendants and utilized by the Monitoring Team in making compliance determinations will generally be shared with Plaintiffs' co-counsel.  The specific terms of the process by which documentation is shared were agreed upon by the Parties, approved by this Court on January 17, 2023, and the first set of documents were produced on January 25, 2023.[4]

---

[3] Site visits were conducted October 3-6, 2022, November 7-10, 2022, and December 1, 2022.  Additional site visits conducted January 6, 2023, and February 20-24, 2023, will be discussed in the Monitor's Third Report.

[4] Confidentiality Agreement, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 183 (E.D. Pa. Jan. 17, 2023).

# Table of Provisions

Compliance Findings .................................................................................. 7

***Substantive Provision 1—Staffing*** ........................................................ 11

*Sub-provision 1.1* ...................................................................................... 11

*Sub-provision 1.2* ...................................................................................... 14

*Sub-provision 1.3* ...................................................................................... 14

*Sub-provision 1.4* ...................................................................................... 16

***Substantive Provision 2—Out-of-Cell Time*** ....................................... 18

*Sub-provision 2.1* ...................................................................................... 18

*Sub-provision 2.2* ...................................................................................... 19

***Substantive Provision 3—Out-of-Cell/Segregation*** ........................... 19

*Sub-provision 3.1* ...................................................................................... 19

*Sub-provision 3.2* ...................................................................................... 20

***Substantive Provision 4—Resume Normal Operations*** ....................... 23

***Substantive Provision 5—Healthcare*** .................................................. 25

***Substantive Provision 6—Behavioral Health in Segregation*** .............. 33

***Substantive Provision 7—Law Library Access*** .................................... 38

***Substantive Provision 8—Discipline*** ................................................... 39

*Sub-provision 8.1* ...................................................................................... 39

*Sub-provision 8.2* ...................................................................................... 41

*Sub-provision 8.3* ...................................................................................... 41

*Sub-provision 8.4* ...................................................................................... 42

***Substantive Provision 9—Tablets*** ....................................................... 43

*Sub-provision 9.1* ...................................................................................... 43

*Sub-provision 9.2* ...................................................................................... 46

***Substantive Provision 10—Phone Calls*** ............................................... 47

*Sub-provision 10.1* .................................................................................... 47

*Sub-provision 10.2* .................................................................................... 47

***Substantive Provision 11—PICC Emergency Call Systems*** ................. 47

***Substantive Provision 12—Locks*** ....................................................... 48

*Sub-provision 12.1* .................................................................................... 48

Sub-provision 12.2 .................................................................................................... 49

Sub-provision 12.3 .................................................................................................... 49

Sub-provision 12.4 .................................................................................................... 49

Sub-provision 12.5 .................................................................................................... 50

**Substantive Provision 13—Visiting** ................................................................ **50**

Sub-provision 13.1 .................................................................................................... 50

Sub-provision 13.2 .................................................................................................... 50

Sub-provision 13.3 .................................................................................................... 52

**Substantive Provision 14—Attorney Visiting** ................................................ **52**

Sub-provision 14.1 .................................................................................................... 52

Sub-provision 14.2 .................................................................................................... 53

Sub-provision 14.3 .................................................................................................... 53

**Substantive Provision 15—COVID-19 Testing** .............................................. **54**

**Substantive Provision 16—Quarantine** .......................................................... **55**

**Substantive Provision 17—Sanitation** ............................................................ **57**

Sub-provision 17.1 .................................................................................................... 57

Sub-provision 17.2 .................................................................................................... 59

**Substantive Provision 18—Use-of-Force** ....................................................... **60**

## Compliance Findings

Some of the Agreement's 18 substantive provisions contain related but discrete action items that must be completed for PDP to achieve substantial compliance with each provision. In this reporting period, the Monitoring Team has created sub-provisions for some of the 18 substantive provisions based on these discrete action items and will be analyzing and issuing separate compliance findings for each enumerated sub-provision. This will provide additional clarity for Defendants as they work to implement required changes and greater specificity for the Court and Parties in distinguishing between action items that are being successfully implemented and those that require additional attention. To achieve substantial compliance with each substantive provision, PDP must first achieve substantial compliance with every sub-provision. The table below reflects all provisions and current compliance ratings for each:

| Provision | | Requirements | Compliance Status |
|---|---|---|---|
| **1** | | **Staffing** | **PC** |
| | 1.1 | No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the *hiring* of correctional officers. | PC |
| | 1.2 | No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the retention of correctional officers. . . | PC |
| | 1.3 | Ensure that there are sufficient number of correctional officers to cover all posts, according to PDP post plans on each shift at each facility. | NC |
| | 1.4 | These measures will continue until achieved and thereafter to maintain the proper number of correctional officers. | NC |
| **2** | | **Out-of-Cell Time** | **PC** |
| | 2.1 | Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than August 1, 2022, no less than five hours of out-of-cell time each day. | PC |
| | 2.2 | The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases of out-of-cell time should continue to be made beyond the August 1, 2022 standard, with a presumptive expected increase to six hours by October 15, 2022. The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, *infra*, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis. *See also* para. 4, *infra*. | NC |
| **3** | | **Out-of-Cell/Segregation** | **PC** |
| | 3.1 | Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day. | PC |

| Provision | Requirements | Compliance Status |
|---|---|---|
| 3.2 | Defendants further agree that they will continue their practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units. | PC |
| **4** | **Resume Normal Operations** | **NC** |
| | By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services). During the period that precedes a return to normal operations, if the Monitor determines that the Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor. The parties and the Monitor shall then engage in discussions to resolve the issues in dispute. If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions. | |
| **5** | **Healthcare** | **PC** |
| | The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons. The Defendants agree to institute the programs and measures (referred to as "the Backlog Plan") set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022, to address the existing backlog. The "Backlog Plan" is a new, three-month effort to see backlogged patients as soon as possible. The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs. Four agencies are contracted to provide staff towards this end. Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort. Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures. Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog. | |
| **6** | **Behavioral Health in Segregation** | **PC** |
| | By September 30, 2022, the PDP and [YesCare] shall re-establish a mental health program for persons who are in segregation units. | |
| **7** | **Law Library Access** | **PC** |
| | PDP will continue to provide law library access for all incarcerated individuals. The Monitor and the parties will discuss access and scheduling matters and the Monitor shall make any recommendations on these matters by August 1, 2022. | |
| **8** | **Discipline** | **PC** |
| 8.1 | All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding. *See Wolff v. McDonnell*, 418 U.S. 539, 563–66 (1974); *Kanu v. Lindsey*, 739 F. App'x 111, 116 (3d Cir. 2018); *Stevenson v. Carroll*, 495 F.3d 62, 70–71 (3d Cir. 2007). | PC |
| 8.2 | The PDP shall expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date [April 12, 2022]. . . | SC |

| Provision | Requirements | Compliance Status |
|---|---|---|
| 8.3 | [PDP shall] release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are [on April 12, 2022] still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing. . . | PC |
| 8.4 | [PDP shall] cancel sanctions [imposed in hearing held between March 2020 and April 12, 2022] that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms. Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation. Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline. Defendants shall provide to counsel for plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022. | SC |
| **9** | **Tablets** | **PC** |
| 9.1 | PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational capabilities and housing designs. The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets; and, at RCF, expanding from six (6) to eight (8) tablets on the [first floor] (4 housing units) and expanding from eight (8) to twelve (12) tablets on the [2nd and 3rd floors] of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF. This expansion process will be completed by May 1, 2022. | PC |
| 9.2 | The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices. | PC |
| **10** | **Phone Calls** | **PC** |
| 10.1 | PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices. | PC |
| 10.2 | Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls. | NC |
| **11** | **PICC Emergency Call Systems** | **PC** |
| | The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to phones and/or tablets and determine whether any policies and practices are necessary to address this matter considering all relevant factors, including operational feasibility and physical capacity. | PC |
| **12** | **Locks** | **PC** |
| 12.1 | PDP initiated the lock replacement program for PICC. . . which will be completed by June 30, 2022. | PC |

| Provision | Requirements | Compliance Status |
|---|---|---|
| 12.2 | PDP initiated the lock replacement program for. . .RCF, which will be completed by June 30, 2022. | PC |
| 12.3 | For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022. | SC |
| 12.4 | Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner. | PC |
| 12.5 | PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system. | SC |
| **13** | **Visiting** | **PC** |
| 13.1 | As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members. PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule.  At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots. | SC |
| 13.2 | Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues. | PC |
| 13.3 | PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated. | NC |
| **14** | **Attorney Visiting** | **PC** |
| 14.1 | PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit. | PC |
| 14.2 | For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment. | PC |
| 14.3 | For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay. | NC |
| **15** | **COVID-19 Testing** | **PC** |
|  | The PDP shall continue the present policy regarding testing of persons who are scheduled for court.  Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID-19.  They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results.  Those housed on a "yellow block" may have been exposed to a COVID-19-positive individual, and they will be rapid-tested twice, the night before court and the morning of court.  They will be transported to court if both tests are negative.  Those housed on a "red block" are COVID-19 positive and will be isolated for ten days and not brought to court during that time frame.  These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia Department of Public Health.  Provided, however, that the Defendants shall not unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols. |  |

| Provision | Requirements | Compliance Status |
|---|---|---|
| **16** | **Quarantine** | **PC** |
| | If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19. Under current policy, *see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021*, for persons who are vaccinated and are exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative. | |
| **17** | **Sanitation** | **PC** |
| 17.1 | Defendants agree to continue conducting the weekly General Inspection ("GI") cleaning days with supplies provided by officers to clean cells and housing areas. | PC |
| 17.2 | [Defendants agree] to provide regular laundry services under current PDP policies. | PC |
| **18** | **Use-of-Force** | **PC** |
| | PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands. The parties agree that correctional officers should follow de-escalation measures provided in PDP policies. The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors. In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states: "Force is only used when necessary and only to the degree required to control the inmate(s) or restore order...The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated.... Staff will not use pepper spray as a means of punishment, personal abuse, or harassment." | |

**Substantive Provision 1—Staffing**

*Sub-provision 1.1--No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the hiring of correctional officers.*

   **Compliance Rating: Partial Compliance**

As previously reported, PDP will be unable to achieve substantial compliance with the Agreement until it can hire and retain sufficient personnel to cover all posts necessary to meet the needs of Class Members.[5] To date, the City has not engaged the full-scale hiring effort recommended by the Monitoring Team. The following table reflects PDP's reported changes in security and maintenance vacancies since the last reporting period:

---

[5] Monitor's First Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 181 at 8 (Nov. 4, 2022).

**Philadelphia Department of Prisons Vacancy Report**
September and December 2022

| | Position Classification | Budgeted | September 2022 | | December 2022 | | Vacancies (+/- change) | Vacancy Rate (+/- change) |
|---|---|---|---|---|---|---|---|---|
| | | | Filled | Vacant | Filled | Vacant | | |
| Sworn Staff | Officers | 1719 | 994 | 725 | 973 | 746 | +11 | 43% (+1%) |
| | Sergeants | 129 | 88 | 41 | 77 | 52 | +11 | 40% (+8%) |
| | Lieutenants | 56 | 39 | 17 | 46 | 10 | -8 | 16% (-14%) |
| | Captains | 31 | 24 | 7 | 24 | 7 | +1 | 26% (+3%) |
| | **Security Total** | **1935** | **1145** | **790** | **1130** | **805** | **15** | **42% (+1)** |
| Maintenance Staff | Trades Worker I | 8 | 5 | 3 | 5 | 3 | 0 | 38% |
| | Trades Worker II | 23 | 10 | 13 | 8 | 15 | +2 | 65% (+8) |
| | HVAC Mechanic | 3 | 2 | 1 | 2 | 1 | 0 | 33% |
| | Building Engineer | 1 | 0 | 1 | 0 | 1 | 0 | 100% |
| | Maintenance Group Leader | 1 | 0 | 1 | 0 | 1 | 0 | 100% |
| | **Maintenance Total** | **36** | **17** | **19** | **15** | **21** | **2** | **58% (+5)** |
| Human Resources (HR) Staff | HR Professional | 2 | 0 | 2 | 0 | 2 | +2 | 100% |
| | HR Program Admin | 2 | 2 | 0 | 2 | 0 | 0 | 0% |
| | HR Manager 3 | 1 | 1 | 0 | 1 | 0 | 0 | 0% |
| | **HR Total** | **5** | **3** | **2** | **3** | **2** | **2** | **40%** |
| **PDP TOTAL** | **All Positions** | **2186** | **1346** | **842** | **1321** | **865** | **23** | **40%** |

The August 12, 2022, Arbitration Award provides for the hiring bonuses discussed in this sub-provision.[6]  Among positive hiring strategies in this reporting period, the City approved bonuses pursuant to the award, increased base salaries and longevity pay, provided for an additional day off each year, and increased uniform allowances.[7]  PDP also reports that the City initiated a contract to advertise job openings on billboards throughout the City, which reportedly began in mid-December 2022.

Unfortunately, Defendants' current hiring and academy schedules are insufficient to address PDP's reported 800 vacancies.  PDP reports that the City most recently accepted applications for a two-week period, closing on December 12, 2022.  This is inconsistent with the Monitoring Team's recommendation to allow continuous-fill hiring lists in order to maximize the number of applications received.

---

[6] In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia (decision date, August 12, 2022) Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia

[7] The August 12, 2022, Arbitration Award authorizes a range of compensation increases.  *See Id.* at 3-9.

PDP data reflects that since February 2021, only 225 new staff have entered an academy. Of the total 120 staff hired with academy graduation dates in the 2022 calendar year, 79 were still employed as of December 23, 2022, reflecting a 34 percent attrition rate within the first year of employment in 2022. This rate will be used as a baseline from which to measure any progress in the 2023 calendar year. The table below depicts academy schedules, attendance, and graduation data for 2021 and 2022 and first-year employee retention rates for 2022 academies:

**Philadelphia Department of Prisons Academy Report**

| Class Number | Class Dates | Total Cadets | Total Graduated | Still Employed on 12/23/22 | Retention Rate |
|---|---|---|---|---|---|
| 21-01 | Feb 22, 2021 - May 5, 2021 | 25 | 23 | N/A | N/A |
| 21-02 | June 28, 2021 - September 14, 2021 | 19 | 15 | N/A | N/A |
| 21-03 | August 16, 2021 - November 3, 2021 | 35 | 30 | N/A | N/A |
| 21-04 | November 8, 2021 -January 19, 2022 | 30 | 26 | 21 | 70% |
| 21-05 | December 20, 2021 - March 2, 2022 | 20 | 16 | 11 | 55% |
| 22-01 | March 21, 2022 - June 1, 2022 | 31 | 25 | 18 | 58% |
| 22-02 | May 2, 2022 - July 13, 2022 | 21 | 20 | 15 | 71% |
| 22-03 | August 1, 2022 - October 12, 2022 | 18 | 16 | 14 | 78% |
| 22-04 | October 31, 2022- January 20, 2023 | 26 | 20 | 20 | N/A |
| **Total** | **9 Academies** | **225** | **191** | **--** | **77%** |

Based on information provided, an average of approximately 8 percent of applicants complete the orientation, interview, and background check processes and are ultimately hired as PDP correctional officers. Available data on recruitment yields is depicted in the following table:

**Philadelphia Department of Prisons Average Recruitment Yields**

| Certification List | Total Applicants | Total Hired | Rate (%) |
|---|---|---|---|
| 2020-0210 | 228 | 36 | 15.8 |
| 2021-0906 | 758 | 50 | 7.9 |
| 2022-0221 | 298 | 16 | 5.4 |
| 2022-0516 | 245 | 25 | 10.2 |
| **Total** | **1529** | **127** | **8.31** |

The City's efforts thus far do not reflect the aggressive strategy necessary to resolve PDP's staffing crisis. Assuming 800 vacancies, an 8 percent recruitment yield, and a 34 percent first-year attrition rate, the City may need to attract more than 15,000 applicants to fill current vacancies. Given the administrative burden of processing applications and training and onboarding new staff, any strategy would require some years to implement. Thus far, the City's actions are not responsive to the enormity of PDP's staffing crisis and fail to acknowledge the duty imposed on Defendants by this Court to improve working conditions for more than 1,600 employees and reduce the suffering of more than 4,200 people confined in PDP facilities.

*Sub-provision 1.2--No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the retention of correctional officers. . .*

### Compliance Rating:  Partial Compliance

The August 12, 2022, Arbitration Award also provided for step-based salary increases, retention bonuses, longevity pay, and other positive steps that support employee retention.[8]  Preliminary data suggests that bonuses and other incentives authorized pursuant to the August 12, 2022, Arbitration Award may correlate with a decline in average monthly attrition rates.  PDP's reported monthly average voluntary separations for 2019 through 2022, including job abandonment, are depicted in the following table:

| Average Voluntary Separations by PDP Employees | | | | | |
|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | Pre-Arbitration Award (Jan-Aug 2022) | Post-Arbitration Award (Sep-Dec 2022) |
| Monthly Ave | 10 | 11 | 24.25 | 22.75 | 10.75 |

PDP reports that COVID-19 protocols and staffing shortages have significantly hampered PDP's employee wellness efforts.  PDP personnel have unanimously reported to the Monitoring Team that pre-COVID-19 employee wellness activities and programs were positive for morale and that their absence has been detrimental.  Because employee wellness and personnel retention are critical to resolving the current staffing crisis and because failures to retain staff negate hard-won recruitment gains, the Monitoring Team has recommended that PDP consider employee retention strategies beyond those implemented pursuant to the August 12, 2022, Arbitration Award.  The Monitoring Team is hopeful that attrition rates will continue to decline as a result of new monetary incentives, however, job satisfaction is not driven by compensation alone.  Current attrition rates, particularly of new hires, demand a robust employee wellness initiative and thoughtful evaluation of working conditions to identify any timeframes within which new hires need additional support.[9]

*Sub-provision 1.3--Ensure that there are sufficient numbers of correctional officers to cover all posts, according to PDP post plans on each shift at each facility.*

### Compliance Rating:  Non-compliance

In the first reporting period, the Monitoring Team utilized available data to approximate the reported 40 percent daily post vacancy rate in PDP facilities.[10]  It is unlikely that the rate has changed significantly in this reporting period because:  (1) the security vacancy rate has

---

[8] *Id.* at 4-6.
[9] The Monitoring Team has offered suggestions and the United States Department of Justice—National Institute of Corrections and other entities offer jail executives useful employee wellness resources.  *See Wellness for Corrections and Supervision Professionals,* National Institute of Corrections, *available at* https://nicic.gov/projects/wellness-for-corrections-and-supervision-professionals
[10] Monitor's First Report, *supra* note 5, at 8.

remained virtually unchanged, so there are no additional staff to fill vacant posts; (2) data provided regarding sick leave utilization show no marked improvement; and (3) the incarcerated population has remained static requiring PDP to operate the same number of housing units. To ensure that there are enough staff to fill all posts consistent with this substantive provision, PDP should utilize findings from the Monitoring Team's recommended staffing analysis to determine how many and which types of posts are required. Effective post vacancy tracking is critical in initially assessing and ultimately maintaining sufficient personnel to achieve substantial compliance.

Despite remaining in non-compliance with this requirement, PDP is making progress in the following areas:

- Arbitration and the Twelve-Hour Shift Initiative--the Twelve-Hour Shift Initiative was implemented on a trial basis pursuant to the August 12, 2022, Arbitration Award. Implementation was delayed by one month and began on October 3, 2022.[11] Based on the Monitoring Team's observations on site and discussions with PDP staff and executives, Class Members, and counsel, the initiative's implementation appeared hasty and some expressed frustration with how it was rolled out or with the initiative itself. A supplemental arbitration award issued on January 20, 2023, extends the 12-Hour Shift Initiative trial period through April 30, 2023. The Panel also directed the parties to develop a hybrid staffing model that allows for both 12 and 8-hour shifts as well as other directives attentive to the concerns of both parties.[12] A third supplemental arbitration award, issued January 27, 2023, prescribes significant pay increases for employees assigned to a 12-hour shift.[13] Despite the challenges, twelve-hour shifts are designed to reduce overall staffing needs and the Monitoring Team is hopeful that the initiative and other items awarded will prove successful.

- Staffing Analysis--In this reporting period, the Monitoring Team met with the City's consultants who are completing the staffing analysis discussed in the first report.[14] The consultants anticipate that the analysis will be completed in the next reporting period and PDP reports it should clarify how many positions and posts PDP requires to support a return to normal operations as required by the Agreement. A staffing analysis is

---

[11] The 12-Hour Shift Initiative trial period was ordered to begin by September 4, 2022. *See* In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2 (decision date, December 8, 2022) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia ("Despite the direction by this Panel that the 12-hour Shift Initiative be implemented on September 5, 2022, the implementation of the 12-hour shift at CFCF was delayed until October 03, 2022").

[12] In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 4-5 (decision date, January 20, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia ("the Panel has determined that the PDP shall implement a hybrid work schedule that includes both 12-hour and 8-hour shifts, and that balances the preferences of the workforce with the operational concerns of management, with the intent to stabilize attrition and improve short- and long-term concerns over employee recruitment, retention, attendance, and lateness").

[13] In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2-3 (decision date, January 27, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia.

[14] Monitor's First Report, *supra* note 5, at 9.

consistent with the Monitoring Team's recommendation and the Monitoring Team will opine on any findings and recommendations that support compliance once it is completed.

- Technical Assistance--Further analysis of PDP's current post plans, TeleStaff reports, and other data confirmed previously reported deficiencies and revealed a need for technical support for PDP personnel in tracking post vacancies and improving staffing data collection and analysis. In this reporting period, the Monitor retained an additional subject matter expert to assist PDP staff and executives in maximizing TeleStaff capabilities and improving PDP's internal monitoring of staffing issues. In late December 2022, PDP implemented a pilot program utilizing updated TeleStaff coding and trained its hiring staff in the new coding system. PDP reports that it will expand the pilot to other facilities once training and coding are refined. Monitoring staffing needs is complex, and PDP requires additional internal expertise to oversee its staffing system. The Monitoring Team has recommended that PDP retain its own expert to refine its systems and budgetary processes associated with staffing allocations.

Additional areas that require the City's attention include workers' compensation and PDP's sick leave utilization rates. The City is responsible for engaging return-to-work strategies for staff who are out for extended periods or work-related injuries. Documentation provided indicates that there were nearly 100 employees off duty on long-term leave as of PDP's last count. The City should initiate a return-to-work strategy that is specifically tailored to the needs of PDP personnel.

PDP's high sick leave utilization rates persist and continue to limit its ability to fill current jail posts. The August 12, 2022, Arbitration Award provides for a $500 bonus for staff who do not utilize sick leave in the preceding quarter. The $500 bonus amount may not be sufficient motivation for personnel with high burnout levels to significantly reduce PDP's sick leave utilization rates. This is also true given unlimited opportunities for staff to work overtime shifts, which may offset the loss of a quarterly bonus. However, the January 27, 2023, Arbitration Award provides for an additional attendance bonus for those assigned to a 12-hour shift, which should provide additional incentive to report to work. A bonus structure is progress, and the Monitoring Team will continue to track sick leave utilization.

*Sub-provision 1.4--These measures will continue until achieved and thereafter to maintain the proper number of correctional officers.*

**Compliance Rating: Non-compliance**

A partial or substantial compliance rating first requires PDP to achieve compliance with sub-provision 1.3.

Status of Recommendations, Substantive Provision 1—Staffing, from the Monitor's First Report:

1. Expand existing contracts to correct maintenance vacancies that severely impact conditions of confinement at ASD-CU and MOD 3, DC, and PICC.

*The Monitor met with the Philadelphia City Manager and Deputy Finance Director on February 2, 2023. The City committed to take action on this recommendation, however, as of the filing of this report, contracts have not been expanded and some PDP facilities remain in dangerous disrepair.*

2. Determine whether the current salary and benefits structures pursuant to the arbitration award and other efforts by Defendants are sufficiently competitive with other jurisdictions and agencies to attract applicants, and if not, supplement benefits accordingly.

   *As of the filing of this report, Defendants have taken no action to implement this recommendation.*

3. Retain a qualified recruitment firm to assist in guiding the city's efforts, which should include salary surveys in support of the previous recommendation, and other validated recruitment and retention strategies.

   *As of the filing of this report, Defendants have taken no action to implement this recommendation.*

4. Engage an independent staffing analysis to determine true staffing needs for each facility. The analysis should be completed by someone with specific expertise in jail staffing studies.

   *In this reporting period, the Monitor met with consultants retained by Defendants to, among other tasks, complete the above recommended staffing analysis. The Monitoring Team has reviewed a draft and has requested additional information. The final report is expected to be completed in the next reporting period.*

5. Evaluate which PDP functions currently performed by sworn personnel can be performed by civilians (information technology, records, intake and release, cashier, etc.) and identify or expand civilian employees or contracted services accordingly.

   *PDP reports that it has initiated contact with labor organizations to address this issue. As of the filing of this report, this recommendation has not been implemented.*

6. Assess the impact of Philadelphia's employee residency requirements on PDP's hiring outcomes and consider whether permanent exemptions or modifications are appropriate.

   *As of the filing of this report, the City has taken no action to implement this recommendation. However, the supplemental arbitration award issued December 8, 2022, refines the August 12, 2022, award to, effective January 1, 2023, eliminate the City's residency requirement for AFSCME Local 159B (Union) members/civil service employees with five or more years of service.[15] The City reports that it is implementing the award consistent with Civil Service Commission rules.*

Additional Recommendations regarding Substantive Provision 1—Staffing this reporting period:

7. PDP should implement strategies for employee retention and a robust employee wellness program.
8. The City should implement a return-to-work strategy that is tailored to the needs of PDP employees who are out on long-term leave or work-related illness.

---

[15] Bill no. 200363, Section 20-101 of The Philadelphia Code (passed June 25, 2020), *available at* https://phila.legistar.com/View.ashx?M=F&ID=8611128&GUID=2216D7C4-6DD5-4235-A23B-88C7F3C3A25E

9. Retain an expert to build internal capacity to manage systems, coding, and budgetary processes associated with staffing allocations. The expert should assist PDP in identifying and retaining only the most useful staffing reports and discontinuing the use of non-essential or inaccurate reports.

## Substantive Provision 2—Out-of-Cell Time

*Sub-provision 2.1--Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than August 1, 2022, no less than five hours of out-of-cell time each day.*

### Compliance Rating: Partial Compliance

PDP continues to report deficiencies in ensuring that Class Members receive opportunities to recreate, shower, make phone calls, attend family or legal visits, and other activities outside of their cells for minimum daily timeframes required in the Agreement. The Monitor previously reported that PDP's out-of-cell time tracking mechanisms are methodologically flawed and inadequate and the Monitoring Team remains unable to (1) establish an accurate baseline of current out-of-cell opportunities for Class Members, or (2) to determine the extent to which Agreement deadlines and benchmarks have been met.

PDP acknowledges that despite offering out-of-cell opportunities most weeks, most PDP housing units are not consistently offering the required five hours out-of-cell time daily and none are offering 6 hours out-of-cell time daily.[16] This is consistent with the Monitoring Team's impressions based on discussions with Class Members and PDP personnel during site visits in this reporting period. It is also consistent with reports from civilian oversight and reform advocates who enter PDP facilities or speak with Class Members.

As previously reported, PDP is making efforts to procure a radio frequency identification (RFID) system that tracks information electronically and reduces errors resulting from manual information entry. An RFID system will allow PDP to accurately track how much time Class Members spend outside of their cells and improve accountability for failures to provide out-of-cell opportunities. It will also allow the Monitoring Team to measure compliance with this substantive provision and several others that require movement of Class Members through PDP facilities, such as family and official visiting and access to medical care. RFID will also assist

---

[16] PDP's analysis is based on available out-of-cell time documentation, including Deputy Warden Reports. Although Deputy Warden Reports are unreliable for Agreement compliance determinations, PDP's critical self-assessment and reporting of compliance failures are commendable. PDP acknowledges that it has struggled to maintain public trust and positive working relationships with reform and advocacy partners. PDP reports that is committed to increasing public trust and improving these working relationships. Because transparent self-reporting of systemic deficiencies is critical to reform, the Monitoring Team is encouraged by PDP's commitment to improving in this area and has recommended that efforts continue.

with measuring the provision of structured treatment activity and equitable access to law library and tablets. Most importantly, RFID will reduce current workloads of personnel who must manually track services and increase their ability to focus on providing them.

PDP initially reported that it may be able to enter into a cooperation agreement with another City department that currently uses RFID. A cooperation agreement would allow PDP to avert the City's lengthy procurement process and the Monitoring Team recommended that the City prioritize the processing of the cooperation agreement or new RFID procurement. As of the filing of this report, the City had not implemented this recommendation.

In the interim, the Monitoring Team recommended that PDP replace its current out-of-cell tracking system with a spreadsheet tracker developed in consultation with the Monitoring Team. Though not ideal, a spreadsheet system is more accurate than the current system and can be standardized across all PDP facilities and housing units. Standardization will allow the Monitoring Team and PDP leadership to verify samples of documented out-of-cell times through housing unit CCTV review. It will also improve data reliability and allow the Monitoring Team to begin to identify an out-of-cell compliance baseline. PDP reports that it piloted the spreadsheet tracker in February 2023.

*Sub-provision 2.2--The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases in of out-of-cell time should continue to be made beyond the August 1, 2022 standard, with a presumptive expected increase to six hours by October 15, 2022. The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, infra, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis. See also para. 4, infra.*

### Compliance Rating: Non-compliance

Because PDP is currently unable to achieve the 4- and 5-hour out-of-cell benchmarks consistently, it is necessarily unable to meet 6, 8, or 10-hour benchmarks. The Monitor defers recommendations for future out-of-cell benchmarks or deadlines until PDP establishes a reliable baseline of current out-of-cell practices.

## Substantive Provision 3—Out-of-Cell/Segregation

*Sub-provision 3.1--Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day.*

### Compliance Rating: Partial Compliance

PDP reports that segregation units are not consistently offering the required one-hour out-of-cell time each day. Some segregation units are offering out-of-cell opportunities for longer than one hour on some days and some are offering one hour on most days, but PDP is not

meeting the one-hour daily requirement. PDP also acknowledges that Class Members on some units receive no out-of-cell opportunities for extended periods up to 50 percent of the time. PDP's self-assessment is consistent with the Monitoring Team's impressions based on discussions with Class Members and PDP personnel during site visits in this reporting period. The spreadsheet tracking system that PDP is currently piloting should produce a more reliable baseline of out-of-cell opportunities in segregation units until an RFID system can be implemented.

In the meantime, the Monitoring Team and others who work in or enter PDP facilities have observed first-hand the injury inflicted on Class Members as a result of extended isolation. Class Members have reported experiencing depression, hopelessness, suicidal thoughts, and visual or auditory hallucinations, among other symptoms. The Monitoring Team has observed Class Members displaying behaviors such as pacing, pleading with passers-by to open cell doors, anger, crying, and lashing out, or experiencing symptoms including confusion, despondence, unwillingness or inability to engage, incessant muddled communication or talking to oneself, or psychiatric decompensation requiring hospitalization. Tension on PDP housing units is consistently high, and use of force incidents have resulted when effects of isolation have caused Class Members to attempt to force their way out of cells or refuse to return to them.

Out-of-cell time is key to Class Members' well-being and to maintaining institutional stability. Class Members need a schedule that is shared with them in advance and that they can depend on to plan daily activities and attend to personal needs. Housing unit schedules that are consistently followed, even if they afford fewer than required out-of-cell opportunities, can begin to reduce harm experienced by Class Members and improve the housing unit climates.

As PDP continues to work on a new, more reliable tracking system for out-of-cell time in all PDP housing units, PDP executives and managers should focus on:

1. Providing daily out-of-cell time for all Class Members, even if Agreement requirements cannot be met. PDP should reevaluate the current requirement that three officers must be present to provide out-of-cell time.[17]
2. Ensuring that current out-of-cell schedules are feasible for personnel to implement, that Class Members receive schedules in advance, and that schedules are consistently adhered to.
3. Use currently available information, such as reports from staff, supervisors, and Class Members to identify and attend to housing units that are struggling to offer out-of-cell time.
4. Documenting the reasons for any failures to offer out-of-cell time.

*Sub-provision 3.2--Defendants further agree that they will continue their practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units.*

---

[17] SME Terri McDonald opines that it is typically safe to move most restricted housing unit populations in restraints with two officers, assuming incarcerated persons can be transitioned to the shower, phone, law library, and recreational yard with the area then secured and restraints removed.

**Compliance Rating:  Partial Compliance**

PDP prohibits placing Class Members in administrative segregation for any reason other than those necessary to maintain institutional safety, and placements must be based on documented case-by-case analyses.  As with the previous reporting period, documentation reviewed in this reporting period does not identify a lack of housing space or staffing as stated rationales for placement of individual Class Members into administrative segregation.

In the first reporting period, a high percentage of reevaluations for retention on administrative segregation were not occurring within 60- and 90-day policy timeframes, and punitive segregation placements were exceeding allowable timeframes.[18]  These conditions may be exacerbated by housing or staffing issues, however, PDP documentation reflects improvements in both areas.

The following table depicts reported total numbers of Class Members in administrative segregation, hearings exceeding 60- and 90-day timeframes, and average lengths of stay in administrative segregation for sample dates over six months between July 2022 and December 2022:

**Reviews for Retention on Administrative Segregation Exceeding 60 and 90 Days and Average Lengths of Stay**
July 2022 – December 2022

| | CFCF | | | | | PICC | | | | | RCF* | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Ad-Seg | > 60 Days | > 90 Days | % >60 Days | Average Days in Ad-Seg | Total Ad-Seg | > 60 Days | > 90 Days | % >60 Days | Average Days in Ad-Seg | Total Ad-Seg | Average Days in Ad-Seg | Total | Average Days in Ad-Seg |
| 7-1-22 | 60 | 20 | 27 | 78% | 133 | 76 | 6 | 2 | 11% | 78 | 17 | 71 | 153 | 99 |
| 8-5-22 | 80 | 0 | 8 | 10% | 127 | 60 | 1 | 5 | 10% | 88 | 19 | 89 | 159 | 107 |
| 9-2-22 | 99 | 12 | 4 | 16% | 102 | 73 | 1 | 4 | 7% | 66 | 23 | 55 | 195 | 84 |
| 10-7-22 | 89 | 16 | 7 | 26% | 93 | 102 | 1 | 2 | 3% | 49 | 18 | 75 | 209 | 68 |
| 11-4-22 | 115 | 8 | 16 | 21% | 89 | 89 | 1 | 1 | 2% | 52 | 20 | 58 | 224 | 72 |
| 12-2-22 | 124 | 1 | 8 | 7% | 99 | 67 | 0 | 0 | 0% | 53 | 28 | 50 | 219 | 81 |

*RCF reviews were all completed within policy according to documentation reviewed.

The timeliness of administrative segregation reviews appears to have improved at both CFCF and PICC since the first report.  At CFCF, the percentage of reviews for retention on administrative segregation that failed to occur within policy guidelines reduced from 78 percent in July 2022 to 7 percent in December 2022 and, at PICC, from 11 percent of cases in July to 0 cases in December.  RCF cases in the sample selected were all completed within policy timeframes.  Additionally, the average time Class Members spent in administrative segregation decreased at CFCF from 133 days in July to 99 days in December.  These are positive trends.  Unfortunately, the total number of Class Members placed in administrative segregation increased

---

[18] Monitor's First Report, *supra* note 5, at 13.

by 30 percent from July to December. This increase may be partially explained by a reported reduction over the same period in average lengths of disciplinary sentences reflected in the table below:

**Punitive Segregation: Total Placements and Average Lengths of Stay**
July 2022 – December 2022

| | CFCF | | PICC | | RCF | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation |
| 7-1-22 | 100 | 89 | 24 | 110 | 27 | 34 | 151 | 99 |
| 8-5-22 | 65 | 98 | 34 | 89 | 36 | 44 | 135 | 82 |
| 9-2-22 | 58 | 87 | 56 | 71 | 65 | 34 | 179 | 63 |
| 10-7-22 | 56 | 37 | 50 | 53 | 64 | 32 | 170 | 39 |
| 11-4-22 | 52 | 38 | 71 | 39 | 39 | 59 | 162 | 44 |
| 12-2-22 | 33 | 30 | 59 | 27 | 36 | 18 | 128 | 25 |

PDP data shows on July 1, 2022, Class Members spent an average of 99 days in punitive segregation. Average lengths of stay decreased each month thereafter to an average of 25 days on December 2, 2022, representing a 75 percent decrease in average punitive segregation sentences. CFCF also appears to have made progress in reducing the number of Class Members sentenced to punitive segregation terms, from 100 on July 1, 2022, to 33 on December 2, 2022. These are also positive trends. It may be that after some Class Members complete their punitive segregation terms, they are reclassified to administrative segregation, which may explain the overall increase noted above.

PDP data suggests that it continues to segregate approximately 10 percent of its incarcerated population. SME Terri McDonald opines that, based on national trends, PDP should reduce its use of segregation to no more than 3 to 6 percent of its population on average. Reductions in lengths of stay and segregation placements at some facilities reflect significant progress and the Monitoring Team is encouraged both by PDP's receptivity to recommendations in this area and its efforts thus far to reduce its reliance on segregation.

The Monitoring Team also previously reported that lack of available Transition Unit (TU) housing for Class Members on the behavioral health caseload is likely contributing to some segregation placements in violation of the Agreement. This issue is discussed below under Substantive Provision 6—Behavioral Health in Segregation.

PDP will see additional reductions by narrowing its requirements for placement and retention in segregation. Among other changes, PDP has agreed to review its use of punitive segregation for non-violent infractions, such as possession of contraband, or those that are related to behavioral health diagnoses. PDP is also reviewing its systematic segregation of Class Members who are

sentenced to state prison or have "high profile" cases.[19] These Class Members and others could be more appropriately housed in one of PDP's high-security, non-segregation environments.

Finally, PDP is still working to resolve the issue of identifying any Class Members who may be "segregated in place," meaning they are on segregation status outside of designated segregation housing areas. The Monitoring Team has recommended against this practice, and PDP reports that it has been discontinued. The Monitoring Team requires additional information and further review of PDP's housing unit tracking systems to verify these statements. Ongoing communication issues between security and healthcare also continue to present challenges ensuring that all Class Member patients who are on segregation status receive services pursuant to Provision 6—Behavioral Health in Segregation below.

**Substantive Provision 4—Resume Normal Operations**

*By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services). During the period that precedes a return to normal operations, if the Monitor determines that the Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor. The parties and the Monitor shall then engage in discussions to resolve the issues in dispute. If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions.*

**Compliance Rating:  Non-compliance**

PDP reports that it is not prepared to submit a plan for a return to normal operations that includes additional out-of-cell time and access to other services and programs as required by the Agreement.[20] It reports that it has convened an internal committee pursuant to the August 12, 2022, and December 8, 2022, initial and supplemental arbitration awards and is working on a plan that is intended to address some staffing issues. PDP reports that while it is able to make some operational improvements with existing staffing resources, it cannot provide a date by which it will be able to return to normal operations.

The Monitoring Team has had frequent discussions with PDP regarding barriers to compliance with all substantive provisions of the Agreement. The Monitoring Team has recommended that

---

[19] See additional discussion regarding segregation of state sentenced Class Members below under Substantive Provision 6—Behavioral Health in Segregation.

[20] The Monitoring Team is working with PDP to ensure that "normal operations" is defined according to evidence based best practices at the time PDP is prepared to implement them.

Defendants refrain from unrealistic reform projections, some of which have resulted in patterns of non-compliance. All reform efforts should be designed to ensure durability and effectiveness.

Defendants have acknowledged that they are non-compliant with the requirements of this substantive provision due to PDP's staffing crisis, as discussed under Substantive Provision 1—Staffing.[21] Defendants also acknowledge that they are not in substantial compliance with the requirements for out-of-cell time pursuant to Substantive Provision 2—Out-of-Cell Time, and Substantive Provision 3—Out-of-Cell/Segregation, all due to insufficient staffing.[22]

Accordingly, if the City fails to implement the Monitor's recommendations pursuant to Substantive Provision 1—Staffing and take all appropriate action within its authority to address PDP's staffing vacancies, it will be required to "provide specific reasons for non-compliance to the Plaintiffs and the Monitor" and, failing that process, "Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions."[23]

PDP's staffing crisis will likely require years to resolve. As such, the only other path to compliance with the Agreement is to reduce PDP's population to a level commensurate with staffing resources. PDP estimates that it would need to reduce its population by approximately 800 Class Members to improve manageability and achieve meaningful reform.[24]

The Monitor has continued to discuss population reduction issues with the Parties and Philadelphia's criminal justice partners. There is agreement that reductions in PDP's population can be achieved through greater efficiency and improvements to existing criminal justice processes and population reduction initiatives. Enhancements to the procedures for bail review and consistent review of cases where individuals are detained on minor or technical violations of probation or parole are two such interventions. Removing financial barriers and reevaluating rigid eligibility restrictions for those who might otherwise be safely released on electronic monitoring is another. Expediting processing and transfers to substance abuse treatment programs and other settings as alternatives to incarceration would also be productive.

Justice partners who spoke with the Monitor continue to assert that greater criminal justice reform is necessary to achieve more than a fraction of the 800 Class Member reductions cited by PDP. Justice partners also correctly note, however, that even nominal reductions may ease operational burdens and improve conditions for some Class Members. The Monitor will continue to report on population reduction issues as they impact Defendants' compliance with the Agreement.

---

[21] *See also* Monitor's First Report, *supra* note 5, at 9.

[22] The Monitor accepts PDP's "partial compliance" self-assessment pending PDP's implementation of a reliable out-of-cell tracking system.

[23] Settlement Agreement, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 165 at 2 (April 12, 2022).

[24] PDP's projection is based on cursory analysis of current staffing and population numbers. The formula for identifying a precise population reduction goal requires complex population and staffing projections, and will vary depending on the success of Defendants efforts to improve recruitment and retention rates, among other variables.

**Substantive Provision 5—Healthcare**

*The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons. The Defendants agree to institute the programs and measures (referred to as "the Backlog Plan") set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022, to address the existing backlog. The "Backlog Plan" is a new, three-month effort to see backlogged patients as soon as possible. The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs. Four agencies are contracted to provide staff towards this end. Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort. Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures. Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog.*

**Compliance Rating: Partial Compliance**

To achieve substantial compliance with the substantive provision, PDP must: (1) reduce its backlog to no more than 238, or 15 percent of 1,587; (2) continue efforts to reduce any remaining backlog; and (3) ensure that any solutions are designed and implemented to continue to address the remaining backlog and to sustain any reductions achieved.[25] In this reporting period, PDP security and healthcare staff continued their efforts to reduce backlogs and have begun to implement some of the Monitoring Team's recommended improvements, however, staffing shortages and on-going COVID-19 protocols continue to impact compliance. The current backlog remains significant and is not yet approaching the required 15 percent of the originally estimated backlog of 900 from March 2021, or the 1,587 backlog that will be used for compliance determinations.

PDP endeavors to keep reliable healthcare data and has been receptive to recommended improvements. However, current healthcare staffing shortages can result in large week-to-week fluctuations in on-site appointment backlog data if, for example, even one provider is absent for one week or works overtime another. Therefore, compliance with this substantive provision will be based in part on data for weekly backlog averages over time. The table below depicts average weekly on-site appointment backlogs, by appointment type, over two four-week periods in October/November 2022, and November/December 2022:

---

[25] In July 2022, PDP began tracking backlogged appointments in all facilities and made other changes to its tracking methodology to achieve greater specificity. The July 2022 backlog data for all facilities, including all appointment types, was 1,587. This total includes 1,242 on-site general medical and behavioral health appointments (July 22, 2022), 104 on-site specialty appointments (July 22, 2022), and 241 off-site specialty appointments (July 18, 2022).

| Appointment Type | Average Weekly Backlog 10/25/22 - 1/15/22 | Average Weekly Backlog 11/22/22 - 12/13/22 | % Change (+/-) |
|---|---|---|---|
| **Average Total Backlog** | **1840** | **1439** | **-22%** |
| BH Initial Psychiatric Evaluation | 30 | 24 | -19% |
| BH Medication Evaluation | 64 | 71 | 11% |
| BH Social Work Sick Call | 18 | 17 | -8% |
| BH SW SCTR | 0 | 2 | * |
| Chronic Care Follow-up | 275 | 274 | 0% |
| Chronic Care Initial | 149 | 87 | -41% |
| MAT | 179 | 136 | -24% |
| MAT Follow-up | 2 | 7 | * |
| Provider Sick Call | 61 | 48 | -22% |
| RN Sick Call | 142 | 54 | -62% |
| Re-Entry Planning | 920 | 719 | -22% |

*Average percent change not calculated for averages appointments <50

The two four-week timeframes analyzed reflect a 22 percent reduction in the average healthcare appointment backlog. Reductions occurred in all appointment types except Behavioral Health Medication Evaluations, with an average increase of 11 percent from the first four-week period to the next. The greatest average backlog reductions were achieved in Registered Nurse Sick Call (by 62 percent), Chronic Care Initial Evaluations (by 41 percent), and MAT appointments (by 24 percent). The total on-site appointment backlog remains high at more than 1,000 appointments in any given week, but reductions are trending positively.

The largest percentage of the backlog remains Reentry Planning appointments, a designated set of meetings between healthcare administrative staff and chronic care and Medication Assisted Treatment (MAT) patients to assist in post-release care. Supported reentry is key to population reduction and recidivism prevention, and post-release continuity of care is essential to successful reentry. Although reentry appointments do not have the same on-site patient care impact as other appointment type backlogs, PDP is correct in tracking them and should maintain a focus on reentry planning.

On-site specialty appointments continue to represent a small percentage of the overall backlog and PDP has made progress in this area since the previous reporting period.[26] Between August 4, 2022, and December 8, 2022, PDP's weekly average of on-site specialty appointment backlogs reduced from 121 to 63, or by 48 percent. On-site specialty backlog data is also susceptible to large fluctuations based on minor staffing changes, but reductions in this reporting period are likely significant enough to reflect a reliable positive trend. PDP reports that it has also made efforts to expand the pool of on-site specialists and increase the presence of current on-site specialists.

---

[26] As previously reported, PDP offers on-site specialty services in optometry, orthopedics, pap testing, podiatry, physical therapy, ultrasound, and x-ray. For on-site specialty appointments, community provider/specialists go to PDP and treat patients on-site.

Some types of specialty appointments are only offered off-site, and patients must be scheduled with and transported to outside providers to receive care.  In the first reporting period, the Monitoring Team reported that PDP data for off-site appointment backlogs showed a reduction of 33 percent from 276 backlogged appointments to 187.  These figures were reported based on data that included the total of off-site appointments that were not yet eligible for scheduling and, therefore, were not backlogged.[27]  PDP healthcare is implementing recommended improvements to its tracking methods to control for this appointment type.  The Monitoring Team will use updated data to measure compliance going forward.

In this reporting period, PDP has also created more uniform categories to measure reasons for missed *off-site* appointments.  PDP data from the first reporting period showed that 56 percent, or 147 of 262 patients made it to their scheduled off-site appointments in the month of July 2022.  The table below reflects scheduled and attended appointments in September through December 2022:

**Off-Site Specialty Appointment Summary**
September 2022 - December 2022

|  | September | October | November | December |
|---|---|---|---|---|
| **# Scheduled** | **348** | **336** | **353** | **366** |
| Out of Custody | 58 | 18 | 59 | 58 |
| Out of Jurisdiction/Open Ward | 6 | 38 | 4 | 6 |
| Cancelled Prior to Transport | 10 | 11 | 11 | 17 |
| COVID-19 Isolation | 3 | 1 | 1 | 1 |
| **# Eligible to Attend Appointment** | **271** | **268** | **278** | **284** |
| Refused | 44 | 31 | 20 | 34 |
| Correctional Officer Shortage | 31 | 63 | 31 | 45 |
| Cancelled by Provider | 6 | 1 | 6 | 5 |
| Scheduling Error | 3 | 5 | 7 | 2 |
| Court | 4 | 3 | 4 | 5 |
| Late to Appointment | 7 | 2 | 4 | 3 |
| Other | 11 | 2 | 5 | 5 |
| Total Not Seen | 106 | 107 | 77 | 99 |
| Total Seen | 165 | 161 | 201 | 185 |
| **% Eligible Patients Seen** | **61%** | **60%** | **72%** | **65%** |

PDP's efforts to improve off-site appointment attendance and tracking are proving successful, with attendance increasing from 56 percent in July 2022, to 65 percent in December 2022.

---

[27] For example, outside treatment providers may order one-year follow-ups but their offices may not allow scheduling more than some months in advance.  The Monitoring Team recommended that PDP continue to track dates at which follow-up appointments can first be scheduled with off-site providers and include those appointments in backlog totals once those dates have passed.

Security staff shortages and patient refusals remain the most frequent reasons for non-attendance. During site visits in this reporting period, the Monitoring Team met with several patients who were documented as refusing to attend off-site appointments. The most common reason for refusals cited by patient Class Members was having to wait too long on the day of scheduled appointments. Class Members who spoke with the Monitoring Team reported being awakened pre-dawn and waiting hours in holding areas for transport to appointments that were not occurring until the afternoon. Patients reported wanting to attend the appointments but growing tired of waiting, ultimately requesting to return to their housing units over attending appointments.

In the first reporting period, the Monitoring Team recommended that PDP create an interdisciplinary workgroup consisting of security and healthcare personnel to improve coordination of transports to off-site appointments and other points of access to healthcare.[28] PDP reports in November 2022 Commissioner Carney convened a weekly Access to Care Workgroup (Workgroup) for this purpose. The Workgroup includes the Commissioner, the Chief of Staff, the Chief of Medical Operations and YesCare management, the Deputy Commissioner for Operations, wardens/deputy wardens, shift commanders, and movement captains. PDP reports that improvements identified by the Workgroup have enhanced coordination of medical transports and off-site appointment attendance reported above.

The Workgroup is also focused on increasing the number of Class Member patients seen by healthcare despite security and healthcare staffing challenges. PDP reports that the Workgroup directed changes in security staff coverage so that breaks do not impede healthcare appointments, modified some clinic schedules to accommodate security staffing schedules, and directing that facility population counts not interrupt healthcare services. The Workgroup should also consider looking more closely at patient refusals with the goal of improving attendance. These are positive steps, and the Monitoring Team will continue to work with PDP to identify additional efficiencies that may be gained despite the staffing crisis.

Given the Workgroup's success, the Monitoring Team has recommended that it also convene following each Class Member patient death in PDP facilities. Critical incident reviews following in-custody deaths are fundamental to identifying any lapses in security or healthcare that require additional investigation or corrective action. In 2022, 10 Class Member patients died in PDP facilities. These deaths included three suicides, four substance overdoses, and two deaths from natural causes, one of which was identified as COVID-19 related. One cause of death is still pending.

PDP completes investigations following each death, which the Monitoring Team has reviewed and determined require significant improvements. Robust interdisciplinary reviews that include analysis of healthcare and security emergency responses and care leading up to and during a Class Member patient's death will improve PDP policies and procedures. Reviews that include transparent and self-critical analysis by both healthcare and security personnel will improve

---

[28] Monitor's First Report, *supra* note 5, at 13.

coordination of care and possibly prevent future deaths.  Effective corrective action plans that are implemented and tracked can improve patient care and jail operations.  The Monitoring Team is assisting PDP in formalizing its in-custody death critical incident reviews and will report any progress.

PDP continues to struggle to meet its goal of completing Class Member patient intake screenings within four hours of arrival.  In the first reporting period, data for the week ending August 6, 2022, showed that the four-hour timeframe was only being met 40 percent of the time.  In this reporting period, PDP provided data for intake screenings completed within four-hours based on averages for each month of 2022, reflected in the following table:

**Percentage of Intake Screenings Within Four Hours**
Monthly Averages 2022

| January | 15% |
|---|---|
| February | 39% |
| March | 34% |
| April | 65% |
| May | 55% |
| June | 56% |
| July | 50% |
| August | 54% |
| September | 44% |
| October | 32% |
| November | 48% |
| December | 44% |

April 2022 data shows that PDP met its four-hour goal an average of 65 percent of the time, its highest for the year.  At the lowest, January 2022 data reflects that screenings were completed within four-hours an average only 15 percent of the time.  PDP reports that it has adequate healthcare staffing to meet the four-hour requirement but that security staffing, essential to escorting Class Member patients to screening appointments, is often inadequate.

**Behavioral Healthcare**

In this reporting period, PDP developed a new Healthcare Performance Indicator Report that tracks timeframes for behavioral health referrals and care on monthly bases.  PDP data for 2022 suggests that behavioral health struggled to complete patient referrals within their required timeframes.[29]  PDP reports that delays were largely due to COVID-19 protocols, limited Class Member patient movement, and healthcare and security staffing shortages, which required the

---

[29] PDP behavioral healthcare policy prescribes the following timeframes for responding to behavioral health patient referrals: Emergency referrals, within four hours; urgent referrals, within 24-hours; and routine referrals, within five days.

triaging and prioritizing of referrals for emergency care over urgent and routine referrals. The following table depicts reported rates of compliance with policy timeframes for behavioral health referrals for each month of 2022:

### Percent Compliance with Behavioral Health Referral Timeframes
2022

| Month | Total Completed Referrals | % All Referrals Completed Within Policy Timeframes | % Emergency Referrals Completed Within 4 Hours | % Emergency Referrals Completed Within 24 Hours | % Urgent Referrals Completed Within 24 Hours | % Routine Referrals Completed Within 5 Days |
|---|---|---|---|---|---|---|
| January | 718 | 68% | 82% | 100% | 61% | 36% |
| February | 688 | 69% | 81% | 100% | 44% | 67% |
| March | 660 | 60% | 77% | 100% | 31% | 48% |
| April | 634 | 58% | 76% | 99% | 33% | 42% |
| May | 630 | 69% | 83% | 100% | 44% | 57% |
| June | 658 | 62% | 74% | 100% | 46% | 45% |
| July | 688 | 58% | 74% | 99% | 35% | 47% |
| August | 811 | 57% | 71% | 100% | 36% | 55% |
| September | 841 | 56% | 76% | 99% | 29% | 58% |
| October | 787 | 55% | 74% | 100% | 24% | 62% |
| November | 627 | 68% | 79% | 100% | 44% | 74% |
| December | 602 | 59% | 76% | 91% | 29% | 53% |

\* Expectation: Emergent within 4 hours, Urgent within 24 hours, Routine within 5 days

Behavioral health referrals were completed within their required timeframes on average 62 percent of the time in 2022. Though clinicians struggled to see emergency referrals within the required four-hour time frame, they were consistently able to see patients within 24 hours, likely at the expense of urgent and routine referrals. Urgent referrals were completed within policy timeframes only 39 percent of the time on average and routine referrals 54 percent of the time on average.

Social Worker Sick Calls, or Class Member patient-initiated referrals/requests, should be seen within 24-hours of receipt. The data reflect that PDP was able to meet this goal 75 percent to 86 percent of the time from June 2022 through November 2022. Finally, all Class Members entering PDP are referred for a 14-day evaluation to be completed by behavioral health staff. PDP data indicate that 14-day evaluations occurred as required from 78 percent to 97 percent of the time from June through December 2022, with consistently high compliance rates of 90 percent or higher beginning in September 2022, as reflected in the following table:

30

## Compliance with 14-Day Evaluations
June 2022 – December 2022

| Month | Number Completed | % Completed within 14 Days |
|-------|------------------|----------------------------|
| June | 736 | 78% |
| July | 712 | 78% |
| August | 882 | 84% |
| September | 821 | 92% |
| October | 832 | 96% |
| November | 754 | 93% |
| December | 682 | 97% |

## Healthcare Staffing

PDP continues to cite inadequate custody and healthcare staffing as the most significant factors preventing the decrease in the healthcare appointment backlog. Correctional healthcare staff vacancy rates are analyzed based on the number of vacant and filled positions for a "staff vacancy" rate and a "functional vacancy" rate, which accounts for shifts filled by overtime staff or temporary agency hires. The following table reflects healthcare staff and functional vacancy rates in December 2022:

## Healthcare Vacancy Report
December 2022

| Position Category | Allocated FTE | Unfilled FTE | FTE Vacancy Rate | Functional Vacancy Rate |
|-------------------|---------------|--------------|------------------|-------------------------|
| Administration | 50.0 | 1.00 | 2.00% | 12% |
| Behavioral Health Aide | 9.0 | 1.00 | 11.11% | -9% |
| Behavioral Health Clinicians: Lic. Social Worker/Psychologist | 25.1 | 11.70 | 46.61% | 48% |
| Behavioral Health Prescribers: Psychiatrist, NP | 16.6 | 6.20 | 37.35% | 26% |
| Behavioral Health Professionals: BH Coun./Activity Therapist | 17.2 | 2.00 | 11.63% | 30% |
| Certified Nursing Assistant | 2.8 | 1.40 | 50.00% | 52% |
| Dialysis RN and Dialysis Technician | 1.6 | 0.00 | 0.00% | 9% |
| Infectious Disease Physician | 2.0 | 0.00 | 0.00% | 37% |
| License Practical Nurse: All LPNs | 64.6 | 26.40 | 40.87% | -19% |
| Medical Assistant | 19.0 | 6.20 | 32.63% | -2% |
| Medical Records Clerk/UM Clerk/Secretary | 18.8 | 2.0 | 10.64% | 27% |
| OB/GYN Physician | 0.8 | 0.00 | 0.00% | 82% |
| Optometrist | 0.8 | 0.8 | 100.00% | 86% |

| | | | |
|---|---|---|---|
| Physical Health Clinicians: Physician, NP, PA | 17.2 | 1.60 | 9.30% | 0% |
| Physical Therapist and Physical Therapist Assistant | 3.0 | 3.00 | 100.00% | 40% |
| Telehealth Coordinators | 2.0 | 2.00 | 100.00% | 50% |
| Radiology Technician | 2.4 | 1.40 | 58.33% | 71% |
| Registered Nurse: All RNs | 72.2 | 28.40 | 39.34% | 22% |
| **Total** | 325.1 | 95.10 | 29.25% | 14% |

In August 2022, PDP reported a staff vacancy rate of 33 percent and a functional vacancy rate of 14 percent. In December 2022, PDP data reflects an overall vacancy rate of 29 percent, or 95 of 325 positions, and a functional vacancy rate of 14 percent, reflecting little change since the first reporting period. Staffing of behavioral health clinician positions is especially challenging, with a functional vacancy rate of approximately 48 percent. It is unlikely that PDP will be able to comply with the Agreement requirement for adequate and timely mental health care without a large influx of additional behavioral health staff.

PDP healthcare also continues to struggle to hire and retain staff. During the four-month period from September through December 2022, PDP was able to hire 14 full-time employees but lost 15, resulting in a net loss of 1 full-time employee in the same period. As previously reported, long-term reliance on overtime and agency staffing negatively impacts healthcare operations and the quality of care provided and prevents reduction of the current backlog. Hiring and separation data are reflected in the following table:

**Healthcare Personnel New Hires and Separations by Job Classification**
September, October, November, December 2022

| Job Classification | New Hires | Separations | Net (+/-) |
|---|---|---|---|
| Behavioral Health Nurse Practitioner | 3 | 1 | +2 |
| Licensed Clinical Social Worker | 2 | 1 | +1 |
| Behavioral Health Registered Nurse | | 2 | -2 |
| Psychiatrist | | 1 | -1 |
| Behavioral Health Counselor | 1 | | +1 |
| Regional Re-Entry Coordinator | 1 | | +1 |
| Nurse Practitioner | 2 | 1 | +1 |
| Registered Nurse | | 1 | -1 |
| Licensed Practical Nurse | 1.4 | 4.2 | -2.8 |
| Medical Assistant | .4 | 2 | -1.6 |
| Certified Nursing Assistant | 1 | | +1 |
| X-Ray Technician | | 1 | -1 |
| Medical Records Clerk | .4 | 1 | -.6 |
| Physical Therapist | 1 | | +1 |
| Administrative Assistant | 1 | | +1 |
| **Total** | **14.2** | **15.2** | **-1** |

PDP reports that it has developed a plan to increase healthcare salaries to a more competitive level, which will hopefully attract new and permanent employees.

Status of Recommendations, Substantive Provision 5—Healthcare, from the Monitor's First Report:

1. Defendants should engage an independent salary survey to assist PDP in identifying salaries and benefits that are sufficiently competitive to attract and retain full-time healthcare staff.
   *The City has not engaged an independent salary survey.  Instead, it worked with YesCare to obtain regional healthcare salary data and developed and submitted a proposal to increase staff salaries by an average of approximately 8 percent initially.  If implemented, this increase would bring salaries nearly commensurate with those in the community.  The Monitoring Team has recommended additional increases to ensure that PDP salaries are competitive regionally and they promote the hiring of additional full-time staff.*

2. Continue to explore options to provide both on and off-site appointment services via telehealth.
   *PDP reports that YesCare is beginning to request meetings with off-site specialists who see a higher number of Class Member patients and explore their willingness participate in telehealth visits.  The Monitoring Team has requested an update in the next reporting period.  PDP also reports that it plans to engage in negotiations to determine if an orthopedic provider can be made available for on-site appointments.*

3. Create an internal interdisciplinary workgroup to evaluate reasons for missed off-site appointments and develop procedures to increase efficiency in arranging and ensuring that scheduled appointments occur.
   *The Workgroup was formed in November 2022 and meets weekly to address both on-site and off-site appointment issues.  Both security and healthcare staff participate and report it has led to positive changes.*

## Substantive Provision 6—Behavioral Health in Segregation

*By September 30, 2022, the PDP and [YesCare] shall re-establish a mental health program for persons who are in segregation units.*

### Compliance Rating:  Partial Compliance

To achieve substantial compliance with this substantive provision, PDP must, at a minimum: (1) resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status; (2) ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on administrative or punitive segregation (segregation) status; (3) resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating SMI; (4) resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation status; (5) establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units; (6) safely discontinue the use of segregation for Class Member patients due to lack of sufficient

Transition Unit housing; and (7) significantly reduce the use of segregation for Class Member patients who require placement on the behavioral health caseload.

*Requirements 1 and 3:  Resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status and resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating SMI.*

Consistent healthcare rounding in isolated settings is the most effective means to identify patients in medical or behavioral health distress and to ensure that patient Class Members are not harmed in or require removal from segregation.  PDP conducts regular audits to track medical rounds and continues to report lapses in segregation rounding.  The Monitoring Team has reviewed PDP's audit methods and determined that they are generally sound.  However, the Monitoring Team will not use PDP's audit findings for compliance determinations until PDP ensures that all Class Member patients on segregation status are tracked and healthcare staff are notified of every patient in need of rounds.  Notifications must occur in real time and the Monitoring Team must be able to verify that PDP healthcare audits include all patients on segregation status.  PDP reports that the issue is close to resolution.  If so, the Monitoring Team anticipates being able to test the tracking system during site visits in the next reporting period.

The Monitoring Team has on-going concerns about the quality of behavioral health rounds, based on observations during site visits of Class Member patients who appeared to be in acute psychiatric distress and held in segregation units for weeks or months.[30]  Some Class Member patients were too acute for isolated segregation environments and should have been flagged for removal to higher levels of care.[31]

*Requirement 2:  Ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on segregation status.*

Healthcare clearances are required for all Class Member patients being considered for placement on segregation status. Clearances require a face-to-face evaluations by a physical healthcare provider and a behavioral health clinician for those on the behavioral health caseload.  Patients who are designated SMI require a behavioral health clearance within four-hours of placement.  Patients who are on the behavioral health caseload but not identified as SMI require a behavioral health clearance within 24-hours of placement on segregation status.  As with requirements one and three above, the Monitoring Team is unable to verify PDP's audit findings regarding the timeliness of behavioral health clearances while above-described issues with segregating in place persist.

---

[30] Monitor's First Report, *supra* note 5, at 21-22.
[31] *Id.* at 22.

34

Regarding the quality of behavioral health clearances, they do not appear to be meeting policy requirements, as discussed in the Monitor's First Report.[32]  In this reporting period, SME Dr. Belavich reviewed a sample of 14 behavioral health clearance forms for SMI Class Member patients placed in segregation.  Of clearances reviewed, all patients identified as SMI were cleared without documented consideration of their ability to safely serve time in segregation, their ability to understand and participate in the discipline process, or any need for reducing the penalty imposed if the patient's mental illness had a role in the reported violation.  In the sample reviewed, clearances occurred despite clinical notes on the same form indicating that patients were acting bizarrely or experiencing potentially severe mental health symptoms.

These findings are consistent with the Monitoring Teams observations of patients and discussions with behavioral health personnel during site visits in both reporting periods.[33]  Discussions with behavioral health personnel during site visits suggest that clinical thresholds for placement in segregation are too high and that some patients who are cleared for segregation should not be.  Behavioral health, and all PDP healthcare personnel, have now endured years of extraordinary pressure.  Due to critical staffing shortages, PDP's healthcare staff have a dramatically multiplied workload in treating ever-increasing physical and behavioral health needs of more than 4,200 patients.  They must do this while simultaneously managing restricted population movement and instituting aggressive testing, vaccination, quarantine, and isolation protocols to limit the spread of COVID-19.  SME Dr. Belavich notes that fatigue and efforts to increase efficiency may be contributing to higher placement thresholds for some of PDP's more acute placements.

Speaking with behavioral health staff during site visits, they are clearly committed to the care of Class Member patients.  Issues with the quality of patient contacts, immediately apparent in the context of segregation rounding and clearances, are not merely the result of poor clinical decision-making on the part of a few providers.  Rather, SME Dr. Belavich has recommended that the Behavioral Health Program as a whole review and recalibrate its segregation practices and level-of-care thresholds.  As discussed in the Monitor's First Report, SME Dr. Belavich also indicates that improvements must be supported by a similar commitment from PDP's security executives and staff.  As noted above, PDP executives have committed to reviewing security segregation practices, and the Monitoring Team is hopeful that consistent interdisciplinary communication via the workgroup will result in parallel program improvements.

*Requirement 4:  Resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation status.*

PDP previously reported that it worked with YesCare to develop "Positive Change/Positive Outcomes," a behavioral health group treatment program for those in segregation.  The program

---

[32] *Ibid*. PDP policy includes extensive discussion of ensuring protections for those who are navigating SMI from the potential harms associated with segregation.  Specifically, policy prohibits the punishment of Class Members for experiencing SMI symptoms and requires the suspension of disciplinary hearings for those who are unable to participate due to SMI.

[33] *Id.* at 21-22.

is designed for delivery five days per week, two hours each day, for a total of 10 possible treatment hours weekly. PDP initially expected the program to be fully operational and serving all Class Members by the end of October 2022. It now reports that it did not meet the October 2022, goal and that efforts to implement the program are ongoing.

PDP reports that clinical staff are available to deliver group services, however, they have yet to designate consistent space to hold groups and security personnel to staff them. PDP reports that it can offer the program mornings and evenings on one unit at PICC but that some evening groups are cancelled due to security personnel shortages. On another PICC unit, PDP has not yet identified space to hold groups because it is currently closed for maintenance and repairs. Because repair and maintenance closures at PICC and other facilities not covered by the contract maintenance provider are typically protracted, there is no way to know whether or when the unit may reopen, and program space may be designated. At CFCF, PDP reports that program patient/participants have been identified, but as of December 2022, security staff shortages prevented implementation. At RCF, Class Members were being interviewed for participation in the program as of December 2022. Group programming is integral to treatment on segregation units. It promotes adaptive coping skills and allows staff to monitor participants' mental health status. SME Dr. Belavich notes that without therapeutic programming, patients in segregation are more likely to decompensate or commit additional infractions, often in direct response to isolative conditions.

*Requirement 5:  Establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units.*

As discussed above, PDP is attempting to ensure that all Class Member patients on segregation status are identified and tracked.

*Requirement 6:  Safely discontinue the use of segregation for Class Member patients due to lack of sufficient Transition Unit housing.*

As previously reported, PDP decreased Transition Unit beds due to COVID-19.[34]  By August 2022, they had reduced by 83 percent for females from 64 cells to 11 cells and by 44 percent for males, from 100 cells to 56 cells. The re-establishment of a robust Transition Unit program as well as expansion with additional beds for patients with mental health and behavioral issues in lieu of segregation is crucial. PDP agrees with expansion as an alternative to segregation for patients whose mental illnesses as well as behaviors associated with disciplinary infractions can be best addressed as part of treatment goals in a therapeutic housing environment.

PDP is making efforts to expand Transition Unit housing, but progress has been slow. Females who were previously housed in a smaller Transition Unit, were transferred to a larger unit, reportedly with the goal of creating more bed space. During the site visit in October 2022, the Monitoring Team observed that the new female Transition Unit space was also housing Class

---

[34] *Id.* at 23.

36

Members who were not Transition Unit patients. Because Class Members with different security or medical classifications are not permitted to be in common areas together, Transition Unit patients were reportedly receiving limited out-of-cell time and programming.

The Monitoring Team observed a similar issue on the men's Transition Unit at PICC. Approximately 66 Transition Unit patients were mixed with general population Class Members, which limited out-of-cell opportunities for everyone in the unit. The Monitoring Team also observed maintenance and sanitation issues on the unit, including food encrusted on living unit walls, shattered glass in a broken door that is used by Class Members and staff, a shattered television screen, and unsanitary conditions in common areas and patients' cells. Again, unlike CFCF and RCF, PICC's maintenance issues are reportedly not being addressed due to maintenance staffing shortages.

*Requirement 7: Significantly reduce the use of segregation for Class Member patients who require placement on the behavioral health caseload.*

Class Member patients who are designated SMI or are on the behavioral health caseload continue to be overrepresented in segregation compared to the total PDP population. On December 30, 2022, the total census for PDP was 4401. Of this population, 35 percent were on the behavioral health caseload and 12 percent were designated SMI. There were 311 Class Members listed on segregation status, of which 44 percent were on the behavioral health caseload and 12 percent were designated SMI.

PDP has not historically tracked whether patients may be safely diverted from segregation to more appropriate treatment environments. Behavioral health personnel confirm that the only available alternative to placement in segregation is inpatient hospitalization, which is reserved for only the most acute patients. Absent Transition Unit or other safe options, some patients with serious mental illness who are experiencing serious symptoms and commit infractions as a result are being placed in segregation. PDP is developing a tracking system that will supply monthly reports of diversions from segregation to Transition Units or inpatient hospitalization.

The Monitoring Team reviewed behavioral health information for Class Members who were in segregation based solely on their criminal matters resulting in state prison sentences. On December 30, 2022, there were 20 Class Members on the state sentenced list. Nine of them were on the behavioral health caseload and three were designated SMI. These patients spent between 2 and 150 days, or an average 25.25 days in segregation. As discussed above, PDP is reevaluating its placement criteria for all Class Members, and this population is a good example of behavioral health patient overrepresentation in segregation. Patients should not be placed on segregation based solely on behavioral health status, charges or case disposition, non-violent infractions, or higher security needs. Each patient should instead be evaluated individually with consideration given to symptom acuity and current institutional behavior.

Recommendations:

1. PDP should reexamine its behavioral health policies and practices for segregation clearances and rounding, with particular focus on thresholds for diversion or removal from segregation based on patient acuity.
2. PDP should make additional progress in identifying personnel to staff Positive Change, Positive Outcome treatment groups and fill Transition Units with only Transition Unit patients or others who can safely program in common spaces with them.

**Substantive Provision 7—Law Library Access**

*PDP will continue to provide law library access for all incarcerated individuals. The Monitor and the parties will discuss access and scheduling matters and the Monitor shall make any recommendations on these matters by August 1, 2022.*

**Compliance Rating:  Partial Compliance**

During site visits in the first reporting period, the Monitoring Team observed law library locations and equipment and spoke with Class members and staff about issues with access.[35] Law library access had resumed in some locations, but equipment failures and lack of out-of-cell opportunities continued to limit access.  PDP was receptive to the Monitoring Team's recommendations regarding law library scheduling, tracking, and equipment maintenance and has made progress in improving access in non-segregation units in this reporting period. PDP has standardized its processes for law library sign-up as well as tracking which Class Members attend law library and any reasons for non-attendance.  PDP reports that the pilot is fully operational and ready to be formalized into policy for non-segregation units.  Segregation units remain without a tracking system for law library access and segregated Class Members continue to receive sporadic access.  PDP also reports that a law library schedule on non-segregation units has not been developed due, in part, to fluctuating out-of-cell time opportunities related to ongoing high post vacancies.  PDP anticipates that the 12-hour shift schedule will improve compliance with out-of-cell and law library requirements on segregated and non-segregated housing units.  PDP agrees with the Monitoring Team that a firm schedule, even one that offers fewer than desired law library opportunities, is important for consistency and accountability.  PDP and has committed to identifying a feasible but consistent schedule for all units in the next reporting period that Class Members should be able to depend on in planning their daily activities.

During site visits in both reporting periods, Class Members continued to note law library equipment failures.  In October 2022, PDP began to track computer and printer functionality and provided documentation for the Monitoring Team's review.

---

[35] Monitor's First Report, *supra* note 5, at 24.

The following table reflects reported issues identified at each facility and dates of any documented repairs in October, November, and December 2022:

### PDP Internal Law Library Equipment Audit
October, November, December 2022

| Month | Equipment | ASD | CFCF | DC | PICC | RCF | Total | Housing Unit Tour Dates | Repairs Completed |
|---|---|---|---|---|---|---|---|---|---|
| Oct 2022 | Computers | 0 | 0 | 1 | 0 | 0 | 1 | 10/14/22-10/25/22 | 10/26/22 |
| | Printers | 0 | 1 | 0 | 2 | 1 | 4 | | |
| Nov 2022 | Computers | N/A | 0 | 0 | 2 | 0 | 2 | 11/14/22-11/22/22 | Unknown |
| | Printers | N/A | 0 | 0 | 0 | 0 | 0 | | |
| Dec 2022 | Computers | 0 | 1 | 0 | 1 | 0 | 2 | 12/15/22-12/22/22 | 12/27/22 |
| | Printers | 0 | 0 | 0 | 0 | 0 | 0 | | |
| **Total** | | **0** | **2** | **1** | **5** | **1** | **9** | | |

Based on documentation provided, it appears that some repairs are taking longer than necessary, however, PDP has committed to continue to track equipment failures and improve repair turnaround. During the Deputy Monitor meetings with Class Members in this reporting period, some Class Members reported incremental improvements in law library access. Others reported ongoing issues with inconsistent or officer-dependent access.

Equitable access to law library for all Class Members remains an area of concern. Proving that everyone who wants to attend law library receives access is more challenging than measuring attendance itself. A well-designed law library schedule, personnel briefings, and post orders regarding equitable access are among the proactive steps that the Monitoring Team has recommended. PDP reports that it continues to work to resolve this issue and the Monitoring Team will update the Court in future reports.

## Substantive Provision 8—Discipline

*Sub-provision 8.1--All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding. See Wolff v. McDonnell, 418 U.S. 539, 563–66 (1974); Kanu v. Lindsey, 739 F. App'x 111, 116 (3d Cir. 2018); Stevenson v. Carroll, 495 F.3d 62, 70–71 (3d Cir. 2007).*

### Compliance Rating:  Partial Compliance

PDP's disciplinary policies, forms, and training curricula require revisions to comply with established due process and Agreement requirements. First, they must reflect the requirement that a Class Member who is the subject of a disciplinary hearing must be present at the hearing unless the Class Member waives attendance. Second, PDP must ensure that effective communication is established during the disciplinary process. For example, PDP should have a consistent mechanism to identify Class Members who are non-English speaking or who have

developmental or learning disabilities or hearing or vision impairments and ensure that they receive assistance as needed and that all necessary accommodations are made.  The policy implies that support may be provided, however, disciplinary reporting forms only include an option to flag Class Members on the behavioral health caseload but none of the additional categories listed above.  There is also no formal process to confirm that effective communication was established throughout the disciplinary process.  PDP policy requires disciplinary clearances for behavioral health Class Member patients but not for those with developmental disabilities or other vulnerable populations.

The Monitoring Team reviewed a sample of "Medical/Behavioral Health Review for Segregation Placement" forms.  Forms reflected consistent identification of Class Member patients on the Behavioral Health Caseload or as SMI, however, they were not always completed and, at times, information on the forms is inconsistent with PDP's disciplinary hearing database.  As noted above under Substantive Provision 6—Behavioral Health in Segregation, regardless of behaviors in question or Class Member patients' symptoms recorded by the reviewing clinician, all forms noted no contraindications to segregation placement and no issues with patients' abilities to understand and participate in the disciplinary process.

The following table depicts PDP's disciplinary hearing data from July-December 2022, including totals for disciplinary sanctions issued, "not guilty" findings, dismissals, and discipline imposed despite Class Members' absence without waiver:

**PDP Disciplinary Hearings Including Discipline Issued, Not Guilty, Dismissed, and Present at Hearing**
July – December 2022

| Month | Total Discipline Issued | Total Not Guilty | % Not Guilty | Dismissed | % Dismissed | SMI | % SMI | Sample % SMI Guilty comply w Policy | Guilty without a hearing | % Guilty without hearing |
|---|---|---|---|---|---|---|---|---|---|---|
| July | 200 | 11 | 6% | 10 | 5% | N/A | N/A | N/A | N/A | N/A |
| August | 330 | 20 | 6% | 63 | 19% | N/A | N/A | N/A | N/A | N/A |
| Sept | 238 | 21 | 9% | 13 | 5% | 23 | 10% | 0% | 4 | 2% |
| Oct | 213 | 7 | 3% | 31 | 15% | 23 | 11% | 0% | 9 | 4% |
| Nov | 325 | 18 | 6% | 41 | 13% | 48 | 15% | 0% | 9 | 3% |
| Dec | 300 | 38 | 13% | 23 | 8% | 43 | 43% | N/A | 5 | 2% |
| **Total/ Average %** | **1606** | **115** | **7%** | **181** | **11%** | **137** | **13%** | **0%** | **27** | **3%** |

PDP's data suggests that an average of 7 percent of disciplinary hearings between July and December 2022, resulted in "not guilty" findings.  An average of 11 percent were dismissed in the same period, most often because either hearings were not conducted within required timeframes or disciplinary reports were incomplete and never reissued.  In an average of three percent of cases, discipline was imposed without Class Members present at the hearings not having waived attendance, discussed under sub-provision 8.3 below.

The Monitoring Team has ongoing concerns about the quality of PDP's disciplinary investigations, adjudications, the frequency with which Class Members are disciplined, and placements in and durations of post-discipline segregation. It is positive, however, that PDP hearing officers both make some "not guilty" determinations and dismiss some cases for failures to meet documentation or investigative requirements. This team's work should be acknowledged, and the Monitoring Team has recommended that the disciplinary hearing officer team attend national trainings on best practices for ensuring due process proceedings for Class Members. Trainings should include protections pursuant to the Americans with Disabilities Act. The hearing officer team should also be supported in conducting internal audits and drafting PDP's disciplinary and administrative segregation policy revisions consistent with established due process requirements and correctional best practices. Finally, the Monitoring Team has recommended additional improvements to the disciplinary tracking system that will produce trend data and assist in reducing PDP's reliance on formal discipline to manage PDP's Class Member population.

*Sub-provision 8.2--The PDP shall expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date [April 12, 2022]. . .*

### Compliance Rating:  Substantial Compliance

In the first reporting period, PDP indicated that it was nearing compliance with this Agreement requirement having expunged disciplinary records in 4,217 cases by October 2022. In total, PDP reports that 4,312 disciplinary records were expunged for Class Members who were not present during hearings from March 2020, through December 2022, beyond the April 12, 2022, Agreement date. During site visits in this reporting period, SME McDonald reviewed case files of 158 Class Members, and confirmed that all 158 cases were documented as expunged.

SME McDonald's review of cases also revealed that, in three percent of cases, between September and December 2022, disciplinary penalties were documented despite other records indicating that Class Members were not present for hearings because they were either at court or had been released. PDP executives report that a directive was reissued to discontinue the practice and the additional records were expunged. SME McDonald confirmed that additional expungements were logged for all cases consistent with Agreement timeframes. The Monitoring Team will continue to check disciplinary records in subsequent reporting periods to ensure that the practice has not reoccurred. In addition to any corrective action taken, PDP policy and disciplinary forms and documentation must be updated, personnel must be retrained, and Class Members must be notified of any changes. PDP has achieved substantial compliance with this sub-provision and the Monitoring Team will discontinue monitoring this aspect of Substantive Provision 8—Discipline.

*Sub-provision 8.3—[PDP shall] release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are [on April 12, 2022] still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing. . .*

**Compliance Rating:  Partial Compliance**

In the first reporting period, PDP reported that all Class Members who were eligible for release from segregation pursuant to this substantive provision had been released.  To verify this information, the Monitoring Team has cross-referenced two types of documentation: (1) the disciplinary and administrative segregation lists generated in April, August, October, and December 2022, and (2) lists of reported expunged disciplinary cases completed by PDP since April 2022.  As with other PDP data limitations, the hand generated weekly segregated tracking report has shown errors.  Figures reported below may be approximations and require on-site individual file review to validate.

The weekly segregated placement list for April 15, 2022, reflects a total of 383 Class Members in administrative or punitive segregation.  Cross-referenced with the expungement lists, 192 of 383 had at least one disciplinary disposition expunged.  When monitoring of this issue was initiated in August 2022, PDP reported that Agreement requirements to remove Class Members from segregation and expunge disciplinary dispositions were both in progress.  The August 19, 2022, weekly segregation placement report reflects 107 Class Members remained in a segregated housing unit since at least April 15, 2022.  Forty-eight of 107 had at least one disciplinary disposition expunged.

On October 4, 2022, PDP executives certified that all Class Members who required release from segregation were released and that all required expungements were complete.  The October 7, 2022, weekly segregation placement report reflects 29 Class Members remained in segregation since at least April 15, 2022, 12 of whom also had at least one disciplinary disposition expunged.[36]  Because classification actions are not maintained in JMS, determining whether retention on segregation is connected to an expunged discipline requires on-site individual Class Member file review.  All but one of the 12 Class Members who were on both lists appear to have been retained on segregation for reasons unrelated to the expunged disciplinary dispositions.  This will be confirmed through file review. The reason for the remaining Class Member's retention in segregation is still being researched.

The December 23, 2022, weekly segregation placement list, compared with JMS and the expunged cases list, reflects 17 Class Members who had remained on segregation since at least April 15, 2022, 12 of whom also had at least one disciplinary disposition expunged and is nearly identical to the October list.  The Monitoring Team will verify whether listed Class Members were retained on disciplinary or administrative segregation based on discipline that was imposed without a proper hearing.

*Sub-provision 8.4—[PDP shall] cancel sanctions [imposed in hearing held between March 2020 and April 12, 2022] that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms.  Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and*

---

[36] When compared against JMS, the weekly segregation list contained several names of Class Members who had been released prior the October 7, 2022, list date.

*discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation. Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline. Defendants shall provide to counsel for plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022.*

**Compliance Rating:  Substantial Compliance**

In the first reporting period, PDP reported that it had reimbursed Class Members for 238 of 279 financial sanctions that had been imposed improperly as of October 4, 2022, totaling more than $27,000.  As noted above, PDP's initial list of 279 cases that required reimbursement excluded cases in which Class Members were not present at hearings that resulted in the imposition of penalties because they had been released, were out to court, or were not present for other reasons.  PDP revised its methods and has now provided the Monitoring Team with documentation of a total of 406 reimbursements or trust account holds that were lifted for a combined total of $38,787.81.

In this reporting period, SME McDonald reviewed a sample of 52 disciplinary files, 100 percent of which reflected reimbursements or lifted trust account holds.  PDP reports that a small number of reimbursements could not be made to Class Members who had been released from PDP custody and whose forwarding addresses could not be verified.  Their PDP files, however, continue to reflect that reimbursements are owed.

PDP reports that none of the nearly 4,500 expunged cases were reheard.  This is consistent with the Monitoring Team's findings and SME McDonald's review of 158 disciplinary files described above under sub-provision 8.2, none of which reflected new hearings or reissued discipline.  PDP has achieved substantial compliance with this sub-provision and the Monitoring Team will discontinue monitoring this aspect of Substantive Provision 8—Discipline.

**Substantive Provision 9—Tablets**

*Sub-provision 9.1--PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational capabilities and housing designs. The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets; and, at RCF, expanding from six (6) to eight (8) tablets on the [first floor] (4 housing units) and expanding from eight (8) to twelve (12) tablets on the [2nd and 3rd floors] of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF.  This expansion process will be completed by May 1, 2022.[37]*

---

[37] The Agreement, as written, requires the expansion of tablets at RCF *"from six (6) to eight (8) tablets on the 2nd and 3rd floor (4 housing units) and expanding from eight (8) to twelve (12) tablets on the 1st floor of RCF (4 larger units). . .".*  In fact, RCF's larger units are located on the 2nd and 3rd floors and the smaller units are located on the 1st floor, suggesting that the numbers of tablets required were inadvertently reversed.  To correct this small oversight in the Agreement's drafting, PDP must instead increase tablets from eight to twelve on the second and third floor

**Compliance Rating:  Partial Compliance**

PDP provided documentation indicating that since April 2022, it has installed an additional 181 tablet docking stations for a total of 427 stations and corresponding tablets that should also be available for use by Class Members.  PDP reports that it has reserved an additional 183 tablets for educational programming.  The following table reflects tablet totals at each PDP facility based on documentation provided:

**Tablet Availability at Each**
**PDP Facility**
December 2022

| Facility/Housing Unit | Total Tablets December 2022 |
|---|---|
| ASD Total | 12 |
| MOD 3 Total | 12 |
| CFCF Total | 198 |
| DC Total | 60 |
| PICC Total | 60 |
| RCF Total | 85 |
| **Total** | **427** |

Documentation provided indicates that PDP has exceeded agreement requirements at CFCF.  PDP reports a total of 188 tablets and docking stations at CFCF, at least six in each housing unit, and PDP reports that it maintains ample tablets in inventory to replace any that become nonoperational.  PDP reports a total of 72 tablets and docking stations at RCF, reflecting an increase of 50 tablets, which exceeds the Agreement requirement by 24 tablets.  The following tables reflects tablet totals in housing units at CFCF and RCF based on documentation provided:

---

housing units and from six to eight on the first-floor housing units to achieve substantial compliance with this aspect of the substantive provision.

**Tablet Totals: CFCF**

December 2022

| Housing Unit | Total Tablets December 2022 |
|---|---|
| CFCF - A1 | 20 |
| CFCF - A2 | 24 |
| CFCF - B1 | 24 |
| CFCF - B2 | 24 |
| CFCF - C1 | 24 |
| CFCF - C2 | 24 |
| CFCF - D1 | 24 |
| CFCF - D2 | 24 |
| **Housing Unit Total** | **188** |
| CFCF – Legal | 10 |
| **CFCF TOTAL** | **198** |

**Tablet Totals: RCF**

December 2020 and 2022

| Housing Unit | Total Tablets December 2022 |
|---|---|
| RCF – A - 1st floor | 8 |
| RCF – B - 1st floor | 8 |
| RCF – C - 1st floor | 8 |
| RCF – D –1st floor | 8 |
| RCF - E - 2nd floor | 10 |
| RCF – F - 2nd floor | 10 |
| RCF – G - 3rd floor | 10 |
| RCF – H - 3rd floor | 10 |
| **RCF Housing Unit totals** | **72** |
| RCF – Law Library | 13 |
| **RCF TOTAL** | **85** |

The Monitoring Team has observed the construction of docking stations and observed their presence in housing units during site visits. The greater and more important challenge for PDP is ensuring that at least as many tablets as docking stations are issued, charged, maintained in good working condition, and made available for use by Class Members. During site visits in this reporting period, the Monitoring Team again observed Class Members using tablets on housing units but also observed units with no tablets in use or fewer tablets than required by the Agreement.

PDP reports that it is developing a tablet policy that will establish clear expectations for unit personnel in managing tablet maintenance access. PDP's efforts to expand tablet access have been largely successful but ensuring that tablets are available requires a clear policy and post orders, interim directives as necessary, and system-wide staff training. The Monitoring Team has also recommended that PDP consider utilizing its internal auditing team to conduct quarterly audits on tablet availability and access for housing unit personnel to ensure they are issued consistently.

*Sub-provision 9.2--The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices.*

### Compliance Rating:  Partial Compliance

PDP reports that it is currently exploring expanding tablet capabilities to include the submission of Class Member requests and grievances. PDP program staff are currently utilizing tablets for in-cell therapeutic self-help programming and PDP is working with a vendor so that sick call requests can be submitted via tablets as well.[38] These are all positive developments.

PDP and the Monitoring Team are concerned that PDP may not be able to ensure equitable access to available tablets. Class Members have reported to the Monitoring Team during site visits that access to tablets is sometimes limited by housing unit "politics" or other issues. In two instances in segregation units, the Monitoring Team noted Class Members using tablets in their cells who had reportedly refused to return them as directed, limiting access for others.

Significantly, PDP is evaluating the feasibility of issuing tablets to all Class Members. PDP executives recognize that physical plant limitations, personal privacy issues, and many other considerations pose substantial challenges, but they remain hopeful that they can be overcome and are discussing strategies in consultation with counsel and the Monitoring Team. If PDP determines that issuing tablets individually is infeasible, a tablet sign-up system is the next best option to support equitable access. However, given existing challenges for overwhelmed housing unit staff in ensuring out-of-cell time and access to phones, law library, and other

---

[38] PICC has 66 tablets and CFCF has 117 tablets reserved for therapeutic programming.

services, the Monitoring Team has recommended against increasing housing unit workloads wherever possible for the time being.  The Monitoring Team is encouraged by PDP's efforts in this area.

**Substantive Provision 10—Phone Calls**

*Sub-provision 10.1--PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population.  Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices.*

### Compliance Rating:  Partial Compliance

As previously reported, PDP's current policy regarding phone access has not been updated to reflect Agreement requirements, however, the required fifteen minutes of free phone calls have been implemented system-wide.  Unit personnel are required to monitor phone usage and ensure equitable access, however, the Monitoring Team doubts that unit personnel are consistently meeting this policy requirement given the current staffing crisis.  Some Class Members have reported to the Monitoring Team during site visits that, like tablets, phone access is at times limited based on housing unit politics or more assertive Class Members who maintain unofficial control.  Class Members have reported tension on housing units as a result, which can contribute to institutional violence.

The greatest barrier to equitable phone access remains limited out-of-cell time and access to living unit dayrooms, also related to the staffing crisis.  In efforts to assess individual Class Member phone usage, PDP reports that it is exploring whether initiated calls can be tracked and randomly sampled.  Alternatively, individually issued tablets may be configured to replace unit telephone calls, which would be a more feasible and more effective path to equitable access.

*Sub-provision 10.2--Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls.*

### Compliance Rating—Non-compliance

As reported above under Substantive Provision 4—Return to Normal Operations, PDP does not yet have a plan for the return to normal operations and is therefore non-compliant with this sub-provision.

**Substantive Provision 11—PICC Emergency Call Systems**

*The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to tablets and/or phones and determine whether any policies and practices are necessary to address these matters considering all relevant factors, including operational feasibility and physical capacity.*

47

### Compliance Rating:  Partial Compliance

The Monitoring Team has toured PICC and discussed the installation of cell-based emergency call systems as well as additional phones and tablet docking stations with PDP's executive and maintenance teams.  The Monitoring Team agrees that PICC's profound maintenance and other physical plant challenges render the cell and control booth modifications necessary to install a call system unadvisable.  For reasons previously reported, the Monitoring Team recommends against the expansion of the call button system to PICC as currently designed, irrespective of physical plant capacity.[39]  Given the ineffectiveness of the call button system, PICC's current policy of completing safety checks every 30 minutes at staggered intervals is likely a more effective option.  The quality and timeliness of the safety checks are issues and the Monitoring Team has recommended greater vigilance and CCTV spot checks.

Regarding expansion of tablets at PICC, SME McDonald inspected PICC's housing units and recommends against the installation of additional docking stations for tablet-based visits.  PICC's physical plant configuration does not allow for additional tablet docking stations without creating privacy issues for housing unit residents or tablet-based visitors.  Regarding the installation of additional phones at PICC, SME McDonald notes that currently installed phones are positioned close to one another, and that the facility has little unencumbered space for placement of additional units.  Like other PDP facilities, phone access is most limited by inconsistent out-of-cell opportunities for Class Members.  Should PDP expand its tablet program to issue tablets with phone capabilities to each Class Member, this issue would be largely resolved.  Existing phones should remain in place at PICC and all PDP facilities if some Class Members are restricted from using tablets or prefer traditional phone calls, or if tablets are unavailable.

The Monitoring Team will revisit this substantive provision and consider additional recommendations once PDP makes a determination about the broad distribution of tablets or is closer to the return to normal operations.

### Substantive Provision 12—Locks

*Sub-provision 12.1--PDP initiated the lock replacement program for PICC. . .which will be completed by June 30, 2022.*

### Compliance Rating:  Partial Compliance

In the first reporting period, PDP had replaced more than 900 locks system-wide and reported that it needed to replace an additional 27 locks at PICC.  In this reporting period, PDP reports that it has replaced an additional 11 locks, however the remaining 16 cells require the installation of new door frames to accommodate them.  PDP has not provided an anticipated completion date yet and those cells remain unoccupied.  An additional 34 cells require replacement of the lights that notify personnel when doors are secure.  In the meantime, personnel must rely on security checks for this safety function.  Bulb replacements are another example of simple routine

---

[39] Monitor's First Report, *supra* note 5, at 27-28.

maintenance that suffers due to City maintenance personnel shortages.  As long as PICC must rely on City maintenance personnel rather than PDP's existing contract maintenance for these repairs, they are certain to remain safety issues for personnel and Class Members.

PDP reports that PICC staff received training on lock inspection and tampering in 2021.  PICC post orders require cell inspections and the submission of work orders for all repairs.  As previously reported, PDP has a policy governing facility captains' responsibilities in overseeing the lock and key protocols, however, housing officer post orders reviewed do not expressly direct staff to perform lock inspections prior to completion of the lock inspection inventory sheet.  Current post orders also do not contain specific steps that personnel must take when locks are nonoperational (such as remove occupants and secure their property), and the Monitoring Team has recommended these and other revisions.

*Sub-provision 12.2-- PDP initiated the lock replacement program for. . .RCF, which will be completed by June 30, 2022.*

> ### Compliance Rating:  Partial Compliance

As previously reported, PDP indicates that lock replacement was completed in May 2022 and that RCF personnel completed training in September 2021.  Post orders include language about lock inspections and tampering.  Once recommended post order revisions described above under sub-provision 12.1 are added to post orders, PDP will achieve substantial compliance with this sub-provision.

*Sub-provision 12.3--For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022.*

> ### Compliance Rating:  Substantial Compliance

In the first reporting period, PDP provided documentation of completed testing and repairs of call buttons prior to April 2022.  The Monitoring Team has not received recent complaints of call button failures and invariably observes blinking call button requests on control panels in all housing units during every site visit.  Responsiveness to call buttons and effectiveness of the call button system remain serious concerns.  PDP has achieved substantial compliance with this sub-provision and the Monitoring Team will discontinue monitoring of this aspect of Substantive Provision 12–Locks.

*Sub-provision 12.4--Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner.*

> ### Compliance Rating:  Partial Compliance

PDP's work order system is used to address both nonoperational call buttons and locks.  PDP has provided copies of work orders, and repair logs reflecting timely repairs at RCF.  PDP has not provided copies of work orders or repair logs for CFCF since monitoring initiated.  The

Monitoring Team presumes the system is in place but requires documentation to verify CFCF's practices and make a compliance determination.

*Sub-provision 12.5--PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system.*

**Compliance Rating: Substantial Compliance**

PDP provided documentation that it completed two rounds of refresher training on call button responses at CFCF and RCF. The first training was completed in April 2022 and was conducted in briefings over a one-week period in both facilities. Following consultation with the Monitoring Team, PDP conducted additional rounds of trainings that were more narrowly tailored to operations at each facility. The second round of trainings was completed by November 2022. PDP has achieved substantial compliance with this sub-provision, and the Monitoring Team will discontinue monitoring of this aspect of Substantive Provision 12 –Locks. For any training to be effective, it must be consistent with policy, however, there is no reference to CFCF or RCF call buttons systems in current post orders. Personnel continue to report to the Monitoring Team during site visits that they understand their responsibility to submit work orders for broken call buttons, however, these requirements must be incorporated into policy or facility post orders for greater accountability.

**Substantive Provision 13—Visiting**

*Sub-provision 13.1--As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members. PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule. At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots.*

**Compliance Rating: Substantial Compliance**

As previously reported, PDP initially resumed in-person visiting in November 2021, but suspended it between January and March 2022, due to a COVID-19 surge. On March 24, 2022, PDP resumed in-person visits and increased the number of available visiting slots consistent with the Agreement. PDP has achieved substantial compliance with this sub-provision and the Monitoring Team will discontinue monitoring of this aspect of Substantive Provision 13—Visiting.

*Sub-provision 13.2--Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues.*

**Compliance Rating: Partial Compliance**

In-person visits are scheduled online by selecting from available visiting slots in a scheduling portal on a webpage that also outlines visiting rules.[40]  The website is available in both English and Spanish and may also be accessed via smartphone.  Limitations in PDP's current tracking and data system make it difficult to monitor the visiting program's effectiveness.  For example, it does not currently track no-shows or when Class Members refuse visits.  It is also not possible to track how long visitors or Class Members have waited for visits to begin or reasons for last-minute cancellations.  These and other issues have been reported to the Monitoring Team during site visits in both reporting periods and are consistent with findings reported by oversight and other advocates.

PDP acknowledges ongoing issues with its visiting program and inconsistency in scheduling, cancellations, and attendance.  Despite limitations in PDP's data and tracking systems, existing visiting data may be useful in establishing a baseline from which to analyze trends and make some recommendations for improvements.  An RFID system and updated JMS database will assist with tracking scheduling and attendance.  PDP has provided some visiting data, however, large fluctuations in totals reported require additional on-site review to clarify.  Once the Monitoring Team is confident in the information provided and in its understanding of visiting practices and program barriers, it will apprise the Court and recommended improvements.  The Monitoring Team has recommended that PDP not finalize visiting policy revisions pending the Monitoring Team's assessment.

In addition to pending tracking and policy recommendations, the Monitoring Team has recommended that PDP analyze filled versus unfilled in-person visiting timeslots and adjust visiting schedules to better accommodate working families and students.  The Monitoring Team has also recommended that PDP address other barriers to visiting such as parking and ADA accessibility issues.  Finally, most of PDP's visiting areas are sterile and institutional.  Visiting loved ones who are incarcerated is stressful, and families are often fearful or apprehensive.  The Monitoring Team has recommended changes to the visiting processing and meeting areas that are designed to reduce stress and create a calmer environment for visitors, children, and Class Members.

Wardens should personally attend and observe some visiting arrivals, welcome families, and invite them to participate in conversations about improving services.  Families and Class Members offer invaluable suggestions for improvements that others may not think of, but which may be easily implemented and improve the visiting experience for everyone.  Wardens and visiting staff should request feedback from Class Members about their experiences and implement requested changes whenever possible.  The work of dedicated visiting personnel who spend the most time with visiting families and Class Members during visits should be recognized.  Visiting personnel could be assigned to reimagine visiting protocols and explore opportunities for immediate improvements.  Because PDP leadership is juggling competing

---

[40] Visit an Incarcerated Person, CITY OF PHILADELPHIA (last updated on August 30, 2022), *available at* https://www.phila.gov/services/crime-law-justice/prisons-incarcerated-people-and-returning-citizens/finding-and-contacting-incarcerated-people/visit-an-incarcerated-person/#:~:text=Appointments%20for%20visits%20are%20first-come%2C%20first-served.%20You%20

priorities, delegating these responsibilities to personnel would allow them to begin implementation immediately and increase staff buy-in to changes. Improving the visiting environment and protocols is a comparatively simple task that can yield extraordinary outcomes for the effort invested.

*Sub-provision 13.3--PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated.*

### Compliance Rating:  Non-compliance

PDP reports that it has had a system in place since the beginning of the COVID-19 pandemic that allows the Regional Infection Control Coordinator to verify any individual's vaccination status in the City's composite record. This has reportedly allowed PDP to verify visitors' vaccination status. The Monitoring Team is awaiting documentation that verifies PDP's assertion and will provide updates once it is received. As of December 2022, proof of vaccination is no longer required for Class Members or their visitors pursuant to changes in PDP's COVID-19 protocols outlined in a memorandum issued by the Commissioner.

## Substantive Provision 14—Attorney Visiting

*Sub-provision 14.1--PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit.*

### Compliance Rating:  Partial Compliance

It appears that language in this sub-provision reflects a miscommunication during settlement negotiations about the process for attorney visiting. Specifically, the reference to ensuring attorneys' access to clients within 45 minutes of their "scheduled" visit assumes that attorney visits are scheduled at specific times against which to measure the 45-minute wait. Attorney visits are not scheduled at specific times. Rather, attorneys are required to give advance notice of visits by 24 to 48 hours depending on which facility a Class Member client resides in. Advance notice of attorney visits was a requirement that was first instituted due to the COVID-19 pandemic and was not required previously. This advance notice requirement was often informally referred to as a "schedule" requirement, which likely explains the miscommunication.

With this in mind, the Monitoring Team has attempted to identify an appropriate compliance measure for this provision and explored the possibility of defining a "scheduled visit" as the moment an attorney's entry is logged in PDP's visiting area. That is, PDP would need to provide attorneys with access to their clients within 45 minutes of their arrival at PDP facilities. Unfortunately, this method of measuring compliance would prove challenging. Attorney arrival and departure times are manually entered into a logbook that is maintained in the visitor processing area. This log does not contain Class Member client arrival times or note delays of any type. PDP maintains records of Class Members who are escorted to attorney visiting areas, but they do not contain information that can be matched to attorney arrival information. Furthermore, many attorneys see multiple clients each time they enter PDP, but their entrance

times are only logged once, making tracking of visits with multiple clients more challenging.  In any case, verifying precise wait times would require the Monitoring Team to compare manually logged attorney arrival times from the visiting logbook with Class Member movement records and then review CCTV to determine when Class Member clients arrived in the visiting area.  This method is possible but not ideal and ongoing compliance with any policy changes would be prohibitively inefficient to measure.

As previously reported, the Monitoring Team has received external feedback that wait times for attorney visits have generally improved with recent positive changes.[41]  Periodic issues reported to the Monitoring Team include lengthy delays resulting from failed population counts, security incidents, or apparent confusion about changing COVID-19 protocols.  The Monitoring Team will complete additional analysis during site visits in the next reporting period, consult with the Parties, and identify an agreeable compliance measure for this provision.

*Sub-provision 14.2--For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment.*

### Compliance Rating:  Partial Compliance

As previously reported, PDP has made progress in providing more space and opportunities for virtual attorney visits and shortened wait times for Class Member clients.  PDP maintains records of scheduled and completed tablet visits, however, completed call reports do not reflect attorney visit schedules or note whether visits were delayed or cancelled.  The Monitoring Team reviewed a small snapshot of PDP's data on remote attorney visits from 2022 and verified that 8 of 10 visits reviewed occurred within minutes of the scheduled calls.  The remaining two visits reviewed connected 35 and 25 minutes after the scheduled times.

Since December 6, 2022, Deputy Monitor Grosso has scheduled weekly remote meetings with individual Class Members.  Of 55 total scheduled visits through February 6, 2023, 43 or 78 percent of the scheduled visits were completed.  Class Members were no-shows for the remaining 12 visits, and delays of 25 and 75 minutes occurred in 2 of 43 completed visits. Plaintiffs' co-counsel has reported similar issues with remote meetings with Class Members. According to data provided, 6 of 13 visits were delayed between 30 and 90 minutes, exceeding the 15-minute window provided for in this sub-provision.  Both the Deputy Monitor and Plaintiffs' co-counsel described direct contact with facility shift officers when remote meetings are delayed as improving attendance.  The Monitoring Team is considering necessary revisions to any post orders in its assessment of visiting protocols.  Details of above-described delays have been provided to PDP.  PDP is investigating the specific reasons for each, and any findings will inform program improvements.

*Sub-provision 14.3--For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay.*

---

[41] Monitor's First Report, *supra* note 5, at 30.

### Compliance Rating: Non-compliance

PDP's current policy does not require notification to attorneys when visits are delayed or cancelled, and no temporary directives have been issued consistent with this requirement. PDP did not notify the Deputy Monitor in advance of the 12 visits that were no-shows, however, he was notified of a unit disturbance that explained 1 of 2 delays. Documentation provided by Plaintiffs' co-counsel reflects that they were not notified of any of the six delayed remote meetings or the of the three meeting cancellations. Personnel should be apprised of the requirement to notify counsel of delays pending permanent policy revisions.

There is currently no way to measure if or when attorneys are notified of delays or reasons for delays or cancellations pursuant to this sub-provision. Proper tracking of these requirements is laborious and requires real-time documentation of delays and cancellations, the reasons therefor, and details of any attorney notifications. In developing recommendations, the Monitoring Team will prioritize improving remote meeting attendance followed by correcting tracking deficiencies to ensure PDP is able to monitor compliance with policy changes.

## Substantive Provision 15—COVID-19 Testing

*The PDP shall continue the present policy regarding testing of persons who are scheduled for court. Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID-19. They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results. Those housed on a "yellow block" may have been exposed to a COVID-19-positive individual, and they will be rapid-tested twice, the night before court and the morning of court. They will be transported to court if both tests are negative. Those housed on a "red block" are COVID-19 positive and will be isolated for ten days and not brought to court during that time frame. These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia Department of Public Health. Provided, however, that the Defendants shall not unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols.*

### Compliance Rating: Partial Compliance

In the first reporting period, PDP indicated that it was compliant with COVID-19 testing requirements recommended by the Philadelphia Department of Public Health (PDPH) and outlined in Commissioner Carney's February 7, 2022, memorandum. Testing protocol required a single rapid COVID-19 test for Class Member patients who reside in "green" or non-quarantined housing units one day prior to scheduled court hearings. Class Member patients who reside in "yellow" or quarantined housing units required two tests, one the day prior to and one the day of scheduled court hearings. PDP provided data that from September 27, 2021 through July 29, 2022 they it had completed nearly 22,000 COVID-19 tests for those going to court.

In November 2022, the Monitoring Team audited a sample of PDP's more recent testing data, using one day from each month from July through November 2022. The audit confirmed that Class Member patients from COVID-19 isolation units were not being transported to court. Results also confirmed that PDP was consistently testing all Class Member patients once on either the day before or day of scheduled court hearings. However, results indicated PDP was not administering second COVID-19 tests to Class Member patients on quarantined housing units pursuant to approved protocol. Class Members on quarantined housing units were instead receiving one COVID-19 test the day prior to scheduled hearings only.

PDP was notified of audit results and non-compliance with testing protocols on November 10, 2022, and initiated a complete audit of testing records to determine when the deficient testing practices began. PDP reports that in the Spring of 2022, PDP experienced periods during which no housing units were on quarantine aside from regular intake units.[42] During these periods, Class Members required only one COVID-19 test. PDP determined that when COVID-19 surged in the Summer 2022, and quarantines were reinstituted, healthcare personnel inadvertently overlooked the requirement to return to the two-test protocol.

In this reporting period, PDP received guidance from PDPH to revise the COVID-19 testing and quarantine protocols, and on November 29, 2022, the Centers for Disease Control (CDC) amended its guidelines for correctional facilities.[43] Commissioner Carney issued a second memorandum on December 6, 2022, directing PDP healthcare to return to the single-test protocol for all Class Member patients in advance of scheduled court hearings. SME Dr. Belavich has reviewed and approved PDP's plan to ensure compliance with all future testing protocols and will complete a second audit in the next reporting period.

**Substantive Provision 16—Quarantine**

*If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19. Under current policy, see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021, for persons who are vaccinated and are exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative.*

      **Compliance Rating: Partial Compliance**

As previously reported, PDP's quarantine protocol is developed and evolves based on guidance from the CDC and in consultation with PDPH, consistent with Agreement requirements. Since the April 12, 2022, Agreement date, PDP's quarantine protocol has been modified twice, first

---

[42] PDP reports that RCF, for example, had no units on COVID-19 quarantine from approximately February 29, 2022 through June 29, 2022, and PICC, from March 1, 2022, through July 20, 2022.

[43] *Guidance on Management of COVID-19 in Homeless Service Sites and in Correctional and Detention Facilities* (November 29, 2022) *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-correctional-settings.html

pursuant to CDC's *Guidance on Prevention and Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* updated on May 3, 2022,[44] and described in the Monitor's First Report.  On November 29, 2022, the CDC issued *Guidance on Management of COVID-19 in Homeless Service Sites and in Correctional and Detention Facilities.*[45]  The November 2022 guidance supersedes the May 2022 guidance and includes the following:

1. Recommends enhanced COVID-19 prevention strategies when the COVID-19 Community Levels are high or when there are facility-specific risks.
2. No longer routinely recommends quarantine after someone is exposed to a person with COVID-19 but continues to provide considerations for facilities that prefer to continue implementing quarantine protocols.
3. Includes an option to end isolation for people with COVID-19 after seven days with a negative viral test.
4. Emphasizes the importance of maximizing access to in-person visitation to promote correctional and detention facility residents' mental health and well-being.

PDP reports that based on the November 2022 updated guidance and in consultation with PDPH, it has again modified its quarantine protocol as outlined in a memorandum issued by Commissioner Carney on December 15, 2022.  Specifically, PDP will:

1. Replace symptom screening at entry with placards and train staff, contractors, and visitors in steps to take if they are symptomatic.
2. Continue requiring masking by everyone when inside PDP facilities.
3. Continue use of Personal Protective Equipment as recommended by the CDC.
4. Discontinue requiring vaccination of Class Members before in-person visits.
5. Continue COVID-19 testing at intake.
6. Test those going to court once, the day before the scheduled court date.
7. Test for official visits once, the day before the scheduled visit.
8. Reduce the length of intake quarantine ensuring Class member patients have: (1) medical screening; (2) a negative COVID-19 PCR test; and (3) a negative TB test.  This revised process is estimated to reduce intake quarantine time from approximately 10 days to approximately 5 days.
9. Retain current COVID-19 isolation at 10 days.
10. Restrict movement if a housing unit has been exposed to COVID-19, testing Class Member patients on day 5 post-exposure.  If all Class Member patients test negative, movement restrictions will be lifted after day 5.  If on day 5, one or more Class member patients test positive, movement will remain restricted and Class Member patients will be tested after 5 additional days.

---

[44] Centers for Disease Control and Prevention, *Guidance on Prevention and Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (May 3, 2022), *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html
[45] *Guidance on Management of COVID-19 in Homeless Service Sites and in Correctional and Detention Facilities, supra* note 43.

PDP reports that it is currently following this protocol.  During site visits in this reporting period, the Monitoring Team was verbally notified which units were on COVID-19 quarantine and isolation.  Observing those units, the Monitoring Team noted that some personnel working in COVID-19 isolation units had not donned appropriate PPE.

The Monitoring Team makes the following recommendation for immediate action:

1. PDP should develop a system, including clear signage, that informs personnel, Class Members, and visitors of the status of every quarantine and isolation housing unit system wide.  Additionally, appropriate PPE should be readily available for everyone entering, working, or living in those units.

**Substantive Provision 17—Sanitation**

*Sub-provision 17.1--Defendants agree to continue conducting the weekly General Inspection ("GI") cleaning days with supplies provided by officers to clean cells and housing areas.*

### Compliance Rating:  Partial Compliance

Despite improvements since the first reporting period, some PDP housing units remain in dangerous disrepair with living conditions that are unsafe, unsanitary, and fail to meet basic correctional standards.  PDP continues to provide documentation of regular cleaning inspections and the provision of cleaning supplies.  It also continues to provide documentation of monthly vector control treatments and PDP executives made efforts to improve them following the Monitoring Team's site visits in the first reporting period.  PDP's efforts thus far have been unsuccessful in some facilities.  Poor living conditions, especially in PDP's older facilities, raise doubt about the quality and frequency of inspections, and PDP's documentation that purports to certify them is unreliable.

Among successful improvements the Monitoring Team observed in this reporting period, conditions at PHSW were cleaner, quieter, and more appropriate for a hospital setting than during previous visits.  However, during site visits in both reporting periods, cells at PHSW were in disrepair and some were unusable due to maintenance delays.  As a small licensed hospital in a carceral setting, each lost infirmary bed greatly impacts patient care.[46]  In the first reporting period, the women residing in the intake unit at DC were subjected to the worst conditions observed system wide in that round of site visits.  PDP has since closed that unit for renovations and relocated women's intake to PICC.  The Monitoring Team observed deep cleaning of housing units at DC as renovations occur.  RCF units visited in this reporting period were also cleaner and the Monitoring Team received fewer complaints from Class Members about lack of access to cleaning supplies.  The Monitoring Team reviews CCTV of uses of force and other incidents and notes housing unit conditions depicted in recordings.  CCTV revealed generally

---

[46] DC and PHSW are not part of PDP's outside maintenance contract and must reply on City maintenance providers for repairs and routine maintenance.

clean dayrooms at CFCF and RCF. Personnel responsible for these improvements should be acknowledged.

The physical plant issues at PICC and occupied units at DC remained unresolved in this reporting period.[47] Emergency and routine maintenance are not occurring, and the older jail facilities are not being deep cleaned with sufficient frequency. Broken windows and doors with shattered glass pose obvious risks to personnel and incarcerated populations and should be repaired immediately. CCTV revealed uncollected trash and accumulated food waste on PICC housing unit floors. Pest and rodent abatement requires continual removal of trash in all cells and living areas, which should be a daily priority in the housing units. At DC, the Monitoring Team observed four male housing units that were crowded, dirty, and hanging items obscured direct line-of-sight supervision. Dirty and nonoperational toilets, sinks, and showers, and other obvious maintenance issues on those units are also unacceptable.

As previously reported, some of the poor conditions described are beyond the control of PDP's executive team to correct. Physical plant barriers and dangerous maintenance deficiencies are among them. Documentation provided reveals that the 50 percent vacancy rate in maintenance personnel noted in the Monitor's First Report has grown to 58 percent in this reporting period, as depicted in the following table:

### Philadelphia Department of Prisons Maintenance Vacancy Report
September 18, 2022 and November 27, 2022

| | Position Classification | Budgeted | 18-Sep-22 | | 27-Nov-22 | | Difference | Vacancy Rate |
|---|---|---|---|---|---|---|---|---|
| | | | Filled | Vacant | Filled | Vacant | | |
| Maintenance Staff | Trades Worker I | 8 | 5 | 3 | 5 | 3 | 0 | 38% |
| | Trades Worker II | 23 | 10 | 13 | 8 | 15 | 2 | 65% |
| | HVAC Mechanic | 3 | 2 | 1 | 2 | 1 | 0 | 33% |
| | Building Engineer | 1 | 0 | 1 | 0 | 1 | 0 | 100% |
| | Maintenance Group Leader | 1 | 0 | 1 | 0 | 1 | 0 | 100% |
| | **Total Maintenance** | **36** | **17** | **19** | **15** | **21** | **2** | **58%** |

Although plant operations issues require action by the City to expand PDP's existing maintenance contract, maintaining clean housing units is within PDP's direct control. Based on electronic logs provided for review, facility supervisors are documenting inspection rounds, however, documentation rarely reflects the obvious maintenance and sanitation issues observed by the Monitoring Team during site visits, and issues are not being addressed. During site visits, living unit staff acknowledge poorly maintained and unsanitary conditions, and PDP's personnel shortages are certainly impacting the frequency and quality of supervisors' inspection rounds.

---

[47] Monitor's First Report, *supra* note 5, at 34.

SME McDonald notes that staffing shortages this severe over long periods of time are so impactful to morale and operations, that higher tolerance for unsanitary conditions often result. The severity of persisting unsanitary conditions in several of PDP's housing units outweigh PDP executives' efforts thus far to mitigate them.  PDP must take immediate action to raise cleanliness standards to a level that affords Class Members a modicum of human dignity and should be highly prioritized with other critical reforms.

The Monitoring Team has noted that when Commissioner Carney is directly involved in identifying solutions to internal issues, corrective action is often swift and effective.  This has been true in her creation of the interdisciplinary Workgroup described under Substantive Provision 5—Healthcare above, and in other improvements to date.  The Monitoring Team does not doubt that the Commissioner's executive and management teams are also committed and hard-working, and the Commissioner's direct oversight of the Agreement's more complex reforms is necessary.  However, developing and maintaining a system to keep housing units clean and free from risk of vector-borne diseases is a routine jail management function that should not require the Commissioner herself to spearhead or supervise.

*Sub-provision 17.2--[Defendants agree] to provide regular laundry services under current PDP policies.*

### Compliance Rating:  Partial Compliance

The Monitoring Team has received regular complaints from Class Members in both reporting periods in most housing units about insufficient laundry services.  As previously reported, the Monitoring Team has inspected PDP's laundry facilities and confirmed adequate reserves of laundry supplies.  PDP has a laundry policy and most applicable post orders contain language about requirements for Class Members to have clean clothing and bed linens.  However, PDP's protocols for laundry services vary by facility and the policy and post orders do not account for operational differences between them.  For example, CFCF assigns a laundry officer to supervise a Class Member work crew and oversees weekly laundry exchange.  PICC, on the other hand, assigns Class Member workers to wash and distribute clean laundry.  Both practices are appropriate, but post orders should reflect operational nuances to ensure consistent laundry and linen exchange.

PDP has improved some protocols in this reporting period.  In the first reporting period, Class Members noted that linen exchange at CFCF was occurring at 4:00 am before most Class Members were awake.  PDP reports that it discontinued the practice in November 2022 and exchanges are now typically occurring after 9:00 am.  CFCF now also requires assigned laundry officers to document the location and time of issuance and captains to audit exchanges via CCTV.  Documentation and video were provided for review and confirm that self-auditing is occurring.

In some facilities, Class Member workers collect all dirty laundry in a housing unit, wash it, and return it to Class Members after cleaning later the same day.  This is an acceptable laundry

program, however, during site visits in this reporting period, the Monitoring Team observed that Class Members in several units had only been issued one set of outer wear. As a result, these Class members were required to wrap themselves in bed sheets or blankets while their clothing was being laundered. PDP executives report that the issue has been corrected.

During the October 2022 site visits, the Monitoring Team received complaints from Class Members that they had not been issued thermal underclothing or a second blanket despite Philadelphia temperatures registering a low of 46 degrees during the site visits. PDP's practice was to issue thermal underclothing and sweatshirts on a specific date each year, approximately 10 days after the dates of the October visit. PDP resolved the issue while the Monitoring Team was on site and agreed to update policy to provide weather-appropriate clothing based on forecasts rather than waiting until temperatures reach uncomfortable levels. The Monitoring Team has also recommended that PDP more closely monitor living unit temperatures and adjust thermostats and issue clothing and blankets accordingly.

Reported improvements will be verified in this reporting period, and if implemented, are effective solutions to identified problems. PDP executives are often highly responsive to issues raised by the Monitoring Team, which is positive. PDP should also endeavor to be more proactive in identifying deficiencies as reported by Class Members, personnel, and oversight and other advocates who enter PDP facilities or speak with Class Members frequently. Class Members who reported laundry issues to the Monitoring Team indicated that they had been complaining to facility personnel for some time to no avail. Similar complaints about laundry and sanitation have been echoed in the Monitoring Teams conversations with Plaintiffs' co-counsel and others. Often, outside entities are not authorized to share Class Member complainants' names with PDP, which can pose challenges in investigating individual complaints. However, even cursory inquiry into anonymous complaints can reveal practices that violate PDP policy or otherwise require correcting.

In the first reporting period, the Monitoring Team learned that PDP does not issue undergarments to the population. Class Members are required to purchase them or may request some through PDP chaplains. This is outside of established correctional practice, and the Monitoring Team recommended that the City issue undergarments, including socks, panties/boxers and brassieres at intake as a matter of course. PDP reports that it will implement this recommendation in the next reporting period.

**Substantive Provision 18—Use-of-Force**

*PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands. The parties agree that correctional officers should follow de-escalation measures provided in PDP policies. The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors. In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states: "Force is only used when necessary and only to the degree*

60

*required to control the inmate(s) or restore order…The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated….  Staff will not use pepper spray as a means of punishment, personal abuse, or harassment."*

### Compliance Rating:  Partial Compliance

In this reporting period, the Monitoring Team continued its review of PDP's use of force practices pursuant to this substantive provision with a review of 24 completed use of force packages, including available CCTV and completed force investigations of incidents that occurred March through June 2022.  SME McDonald analyzed use of force tactics, including de-escalation efforts, use of force investigations, and management and executive level reviews of each incident.  This analysis established a baseline of PDP's practices that shape the Monitoring Team's recommendations and will be used to measure progress as changes are made.

This substantive provision requires PDP to provide refresher training on use of force policy III.A.8 – *Use of Force and Restraints*, which contains language emphasizing the importance of de-escalation.  PDP has satisfied this requirement with more than 90 percent of available staff documented as trained.  PDP's use of force policy is trained first at the academy and annually thereafter.  It governs under which circumstances force is authorized and provides for chain of command review at management, executive, and, in select cases, Commissioner levels.  The presence of use of force policies, training, and a review process provide PDP with a framework for effective practices.

PDP reports that it commenced more in-depth de-escalation and Crisis Intervention Team (CIT) training prior to the onset of the COVID-19 pandemic.  Training was then paused with the COVID-19 related operational changes and has not recommenced.  PDP reports that it has briefed all personnel on the expectation that de-escalation be utilized whenever possible prior to the deployment of force.  The Monitoring Team has observed personnel using verbal communication skills to effectively resolve issues that might otherwise have resulted in uses of force.

The 24 use of force incidents reviewed reveal troubling, deeply flawed use of force practices in which oleoresin capsicum (OC) spray and other types of force are too often used without attempts to de-escalate or resolve issues through verbal communication.  Inadequate force reporting and investigations, low standard and poor quality use of force reviews, and ineffective training foster a culture of complacency towards instances of unnecessary or excessive uses of force.  The Monitoring Team has not yet reviewed internal investigation and accountability practices, however, findings thus far suggest that they are also inadequate.  Implementing consistent de-escalation practices system wide will require profound operational and cultural shifts that the Monitoring Team doubts PDP will be able to achieve with existing personnel resources.

PDP's current force policy is the point of departure for problematic use of force practices present in the 24 cases reviewed.  The policy emphasizes de-escalation but ultimately authorizes the use

of force if a Class Member fails to comply with verbal commands absent active resistance or assaultive behavior. It is also unclear regarding: (1) when force is authorized for passive resistance; (2) protocols for pre-planned versus emergency force; (3) the role of behavioral health in de-escalation; (4) duty to intervene; and (5) duty to report excessive or unnecessary force. The policy also requires a clear statement of zero-tolerance for excessive or unnecessary force, failure to report apparent excessive or unnecessary force, and dishonesty in force reporting, among other revisions.

Despite policy limitations, PDP's internal use of force review process should have identified insufficient reporting and the need for additional investigation and training in 100 percent of 24 incidents reviewed. In only 2 of 24 incidents, lieutenant-level review identified areas for improvement. In one incident involving a group disturbance in a rotunda area, a lieutenant identified that a control booth officer should not have opened housing unit doors, which introduced additional Class Members to the disturbance. A more effective lieutenant-level review of this incident should have also documented:

- Failure to include reports by all responding and witness personnel.
- Inadequate post-incident investigation and interviews of involved Class Members.
- Poor documentation of medical clearances of involved Class Members.
- Poor group control tactics by responding personnel, resulting in one staff member being spat on.
- Failure to replace the victim staff member from supervision and escort duties post-incident with uninvolved personnel.

In at least 6 of 24 incidents, force might have been prevented had personnel used de-escalation or verbal communication. Each of the six incidents involved Class Members who had behavioral issues or acted out and most had failed to follow a direct command. However, none appeared to present an immediate threat of injury or serious threat to institutional security before OC spray was deployed. None of the command-level reviews identified attempts to de-escalate as necessary or appropriate. In one incident, a sergeant is seen on video instigating force by pushing a Class Member. The accompanying use of force review failed to note the sergeant's actions as inappropriate and failed to note a clearly false account of the incident documented in the use of force report. At the time of the review, none of the six incidents had been reviewed at the deputy commissioner or Commissioner levels.

In 2 of 24 incidents, highly problematic cases passed deputy warden and warden level reviews with no policy violations noted. Both cases were only referred for internal affairs investigations at the deputy commissioner level review several weeks later. On CCTV of one particularly violent incident, a staff member is seen using what clearly appears to be unnecessary and excessive force against a Class Member in retaliation for a staff assault. None of the witnessing or involved personnel intervened or reported the incident. The reviewing lieutenant identified one aspect of the incident as problematic and recommended training and a written reprimand. SME McDonald opines that in a properly functioning system, the conduct depicted on CCTV would have resulted in (1) immediate removal of one employee from all contact with Class Members; (2) immediate referral of the same employee for administrative and criminal

investigation and for possible referral to the District Attorney's office; (3) immediate referral for administrative investigation of all involved or witnessing personnel who failed to intervene or report the incident; (4) referral for administrative investigation of all supervisors and managers who failed to take appropriate action upon review of the investigation. Final disposition of this case is still pending.

Additional issues with use of force reporting that were not identified in PDP's review of the 24 incidents provided include the following:

- None of the 24 reports provided complete accounts of incidents that precipitated the force.
- None of the 24 reports provided complete accounts of specific actions taken by personnel or Class Members before, during, and after each incident.
- Few reports quoted any statements by Class Members during incidents and only 2 of 24 documented statements following incidents.
- The majority of the reports reviewed failed to document essential post-incident protocols, such as whether involved Class Members were subsequently restrained, decontaminated if necessary, and whether they were returned to their housing units, reassigned, or placed in restricted housing.
- Incidents involving multiple Class Members were described in one or two paragraphs that lack detail about which Class Member took which action.
- Packages typically failed to contain reports by every involved or witnessing staff member.

In addition to failures to address poor report writing and potential unnecessary or excessive force, PDP's review practices fail to identify areas of need for additional staff training. Many incidents reviewed involved insufficiently trained tactical response and poor isolation and containment. In several incidents, personnel physically intervened in violent assaults when chemical agents would have been a more appropriate force option. In some group disturbances, personnel failed to require uninvolved Class Members to return to their cells or assume a safe seated position until the situation was controlled. In some cases, personnel are observed failing to handcuff involved participants or applying handcuffs improperly, at times resulting in staff assaults that might have been averted with better control.

It is clear that many PDP staff would benefit from additional or refined use of force training. SME McDonald notes that post-incident reviews by managers can identify specific training needs of involved personnel and is a rich source of real-time training for officers. She also notes that it is common to identify the need for additional training in most force scenarios because each incident has unique qualities, they often evolve quickly, and staff can and do make tactical errors. Quality use of force review processes provide for the identification of errors and training needs, they ensure that reports are accurate, thorough, timely, and well-written, and they identify areas for improvement in department policies and protocols.

Correction of the issues identified here requires extraordinary time, effort, and resources. Effective de-escalation practices require significant skills-development resources for personnel.

They require sufficient staffing to allow personnel off post to attend trainings.  They require immediate availability of supervisors to model appropriate tactics and behavior.  They require internal mechanisms to support and reward staff for appropriate handling of incidents.  They require time for close, consistent coordination with behavioral health staff.  De-escalation requires availability of personnel to step in and relieve colleagues who may be showing signs of frustration in an interaction.  It requires communication between Class Members and staff, which requires a sense of safety and a measure of mutual trust.  Unfortunately, de-escalation also requires time and patience that staff struggle to maintain in systems with such high vacancies and corresponding exhaustion and low morale.

Use of force incidents reviewed also highlight systemic deficiencies addressed in other Agreement provisions.  For example, many incidents involving Class Members who exit cells and refuse to return are associated with insufficient out-of-cell time or unresolved maintenance issues.  Group disturbances and other fights often involve the use of manufactured weapons that must be identified through enhanced search practices, which PDP has reported is challenging with such high daily post vacancies.  Ultimately, the City must address PDP's personnel shortages to support a quality de-escalation and use of force training program.

The Monitoring Team will continue its review in the next reporting period to include analysis of PDP's formal accountability mechanisms, internal affairs investigations, and disciplinary processes.  In the meantime, the Monitoring Team has recommended for immediate action the creation of a dedicated, full-time, single assignment team, led by a captain or lieutenant and staffed by lieutenants or sergeants, to serve as PDP's force review and training team.  The team's responsibilities may include:

- Immediate training of staff, supervisors, and managers in expectations regarding force reporting and force review, which include zero tolerance for the use of excessive or unnecessary force or failure of supervisors to address it.
- Initiate updates to PDP's use of force policy.
- Review available video immediately following use of force incidents to identify tactical, training, and policy issues and work with facility supervisors and managers to ensure thorough reviews.
- Mentor officers in appropriate tactics and de-escalation and reporting practices.
- Manage PDP's use of force review process to ensure incidents are reviewed at each appropriate level and within identified timeframes.

The Monitoring Team has also recommended that PDP:

1. Procure an updated use of force reporting and tracking system, and in the meantime, assign a tracking number to every use of force incident.
2. Transition from a fixed camera to a body worn camera system, and in the meantime, install additional fixed cameras when blind spots are identified in incident reviews.
3. Procure a personnel early warning system for use of force and begin to work with labor organizations on policies and procedures to improve policy compliance and reward staff for effective tactics, force prevention, and heroism.

# EXHIBIT H

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **THOMAS REMICK, et al., on behalf of Themselves and all others similarly situated,** : | No.: 2:20-cv-01959-BMS |
| : | |
| **Plaintiffs,** : | |
| : | |
| **v.** : | |
| : | |
| **CITY OF PHILADELPHIA; and BLANCHE CARNEY, in her official capacity as Commissioner of Prisons,** : | |
| : | |
| **Defendants.** : | |

### MONITOR'S THIRD REPORT

Pursuant to Section 19 of the Settlement Agreement (Agreement) and Section 7 of the Monitoring Agreement and Protocols, the Monitor appointed by this Court submits the attached Monitor's Third Report evaluating Defendants' compliance with the terms of the Agreement through June 30, 2023. The Monitor prepared this report as the third of regular reports to be filed of record. The Monitor's fourth and final report in the initial settlement term will be filed March 29, 2024.

I am available to answer any questions the Court may have regarding this report and Defendants' compliance with the Agreement at such times as are convenient for the Court.

DATED: October 12, 2023                    Respectfully submitted,


                                           By: /s/ Cathleen Beltz_____
                                                Monitor

The Agreement between Plaintiffs Thomas Remick, et al., (Plaintiffs), on behalf of themselves and all others similarly situated, and the City of Philadelphia (City) and Blanche Carney, in her official capacity as Commissioner of Prisons (Defendants), in *Thomas Remick et al., v. City of Philadelphia,* Case No. CV 01959-BMS (Action), requires system-wide reform of the Philadelphia Department of Prisons (PDP) as prescribed in 18 substantive provisions.

The Agreement further provides that the Monitor issue "regular reports to counsel and the Court" that assess Defendants' compliance with each substantive provision of the Agreement.  The Monitor will address Defendants' implementation progress and issue "Substantial Compliance," "Partial Compliance," or "Non-compliance" findings for each substantive provision.  Where necessary, the Monitor will make specific recommendations to improve Defendants' compliance with the Agreement.  A "Substantial Compliance" finding means that Defendants "have and are reasonably expected to continue to substantially satisfy" the requirements of an Agreement provision.  A "Partial Compliance" finding means that PDP has successfully completed some of the discrete tasks outlined in a substantive provision and continues to demonstrate progress toward substantial compliance.  A "Non-compliance" finding means that Defendants have "not substantially satisfied" Agreement requirements by failing to complete discrete tasks outlined in a substantive provision.  Defendants will not be found in non-compliance based on "isolated or minor instances of failure [to substantially comply]" or "omissions of a technical or trivial nature."

Where substantial compliance requires the revision of existing policies or promulgation of new ones, Defendants' compliance will be assessed based on policy language and substance, notification and training of personnel, and policy implementation and adherence.  Finally, the Monitor and Parties agree that successful reform is ultimately measured by sustained improvements to living conditions for Class Members.  As such, in issuing compliance findings, the Monitor will consider whether reforms implemented pursuant to the Agreement are durable and their benefits are expected to outlive the Agreement's April 12, 2024, termination date.  In this reporting period, the Monitoring Team utilized data and information tracked through June 30, 2023.

The Agreement requires the Monitor to conduct site inspections "at least once every three months," during which the Monitor has access to conduct confidential interviews with personnel and Class Members.  In addition to at least one quarterly site visit, the Monitoring Team conducts periodic site visits with little advance notice to PDP.  The Monitor also has access to all records, files, electronic files, videos, and other materials, including personnel records and patient protected health information, as necessary to measure Defendants' compliance with the Agreement.

The Remick Monitoring Agreement and Protocol requires the Monitor to "establish means of communication to enable Class Members, their families, and advocates to provide information related to implementation of and compliance with the Agreement."[1]  In this reporting period, Deputy Monitor Ryan Grosso has continued to conduct site visits at least once per month to speak with Class Members on PDP housing units.  Following site visits, the Deputy Monitor

---

[1] Monitoring Agreement and Protocol, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 169 at 4 (E.D. Pa. May 25, 2022).

schedules weekly confidential tablet meetings with Class Members if more privacy is required. Since weekly two-hour tablet meetings commenced on December 6, 2022, the Deputy Monitor has interviewed 162 Class Members across all PDP facilities.  The Monitoring Team has also utilized information provided during tablet meetings to connect with Class Members' family members who are willing to communicate with the Monitoring Team.

The Monitoring Team has periodically received memoranda from Plaintiffs' co-counsel detailing specific allegations and systemic issues communicated by Plaintiffs to co-counsel.  With prior authorization from Class Members, co-counsel provides the Monitoring Team with Class Members' identifying information, and the Monitoring Team follows up with individual Class Members as necessary.  With prior authorization from Class Members, select complaints and systemic issues are forwarded to PDP for response or investigation, which the Monitoring Team tracks and reviews.

Conditions observed and information received via these interviews and protocols are consistent with the improvements and deficiencies detailed in *Remick* filings and in reports by PDP staff and others who work in or inspect PDP facilities.  Information that the Monitor obtains via reports by and communications with oversight agencies, reform advocates, Plaintiffs' co-counsel, and others independent of PDP provides valuable context for PDP's current conditions.  It augments the Monitoring Team's direct observations and helps shape recommendations that the Monitoring Team hopes will produce the most durable reforms.  The Monitoring Team thanks these oversight partners for their contributions and commitment.

In this reporting period, members of the Monitoring Team completed seven site visits to all PDP facilities, including Curran-Fromhold Correctional Facility (CFCF), The Detention Center (DC) and the Prison Health Services Wing (PHSW), Philadelphia Industrial Correctional Center (PICC), the Alternative and Special Detention Central Unit (ASD-CU and MOD 3), and Riverside (RCF).[2]  During each site visit, the Monitoring Team spoke with Class Members and personnel in every area visited regarding Agreement requirements and conditions inside PDP facilities.

The Agreement requires the Monitor to "provide to the parties those documents and reports that are secured by her office which, in her judgment, should be shared to effectuate the terms and conditions of the Agreement."  The Monitor has determined that documentation provided by Defendants and utilized by the Monitoring Team in making compliance determinations will generally be shared with Plaintiffs' co-counsel.

The Monitoring Team continues to meet regularly with PDP Commissioner Blanche Carney (Commissioner) and her staff and receives full access to facilities, documentation, personnel, and Class Members.  PDP remains transparent in providing information and collaborative in identifying solutions to deficiencies that impede compliance with the Agreement.  The Monitoring Team thanks the Commissioner and PDP staff for their contribution to this report.

---

[2] Site visits were conducted January 6, 2023, February 20-23, 2023, March 24, 2023, April 25, 2023, May 8-9, 2023, May 23, 2023, and June 22, 2023.

The Monitoring Team consistently observes PDP staff and leadership exerting significant effort to implement Agreement requirements. As the Monitoring Team analyzes PDP operations and issues recommendations to correct deficiencies, PDP continues to draft corresponding policies and new personnel directives to implement them. Unfortunately, PDP's efforts to change are hampered by the same dearth of personnel resources that existed when settlement monitoring began more than a year ago. As new policies and directives increase while resources to operationalize them do not, each successive reform directive leeches staff, time, and attention from others.

PDP staff report experiencing demoralization, and the Commissioner has communicated to the Monitor her ongoing concerns that PDP's conditions remain unsafe for Class Members and staff. The Commissioner also maintains that without a large influx of new staff or a significant population reduction to no more than 3,500 Class Members, PDP will be unable to implement many Agreement requirements and will struggle to sustain changes implemented thus far.

PDP's population continues to increase, and in mid-August, exceeded 4,700. The City has implemented some but not all of the Monitoring Team's initial recommendations to manage PDP's personnel vacancies. Given the national law enforcement staffing crisis and the City's efforts to date, PDP does not stand to attract new staff sufficient to implement the Agreement in the near term. Neither is it likely that PDP's population will be reduced to manageable levels without a highly coordinated effort among local and state justice partners to curtail pre-trial detention and expedite criminal cases.

The Monitor has discussed with the Parties a third option for population management that involves suspending intake for specified groups of new arrestees until PDP's count decreases to a manageable level. Suspending intake may require police agencies in the City to modify their practices to avoid new arrestees being detained for longer periods in station lockups, community placements, and hospitals, which may be ill-equipped to meet their needs. While suspending intake would yield more expeditious results for PDP in managing its Class Member population, new arrestees would likely be exposed to other constitutional violations at earlier stages in the criminal justice process.

Unconstitutional conditions inside PDP facilities do not occur in a vacuum. Rather, they occur at the end of a long criminal justice pipeline, which suffers greater deficiencies at its various stages than can be remedied through this Action--or through changes to this jail system--alone. PDP is plagued by acute and deeply problematic operational and cultural issues, many of which must be resolved internally. This Agreement and implementation monitoring were designed to address some of these issues and change is occurring slowly, as detailed below. However, broad systemic reform will require the creative reimagination of Philadelphia's criminal justice and detention practices, including a combination of options addressed above and perhaps others not yet identified.

In the meantime, the trauma experienced by Class Members is profound and clearly observable to all who work in, enter, or reside in PDP facilities. Exposure to extended periods of isolation, institutional violence, squalor, and neglect breach all standards for humane confinement and is certain to have lifelong effects for many. For this reason, small changes that result in

incremental improvements to the daily experiences of some Class Members should not be discounted and efforts must continue.  Compliance discussions and findings below were prepared and should be reviewed within this context.

# Table of Provisions

Compliance Findings ................................................................................................ 7

*Substantive Provision 1—Staffing* ...................................................................... **12**

  *Sub-provision 1.1* ................................................................................................ *12*

  *Sub-provision 1.2* ................................................................................................ *15*

  *Sub-provision 1.3* ................................................................................................ *16*

  *Sub-provision 1.4* ................................................................................................ *17*

*Substantive Provision 2—Out-of-Cell Time* ...................................................... **18**

  *Sub-provision 2.1* ................................................................................................ *18*

  *Sub-provision 2.2* ................................................................................................ *20*

*Substantive Provision 3—Out-of-Cell/Segregation* .......................................... **20**

  *Sub-provision 3.1* ................................................................................................ *20*

  *Sub-provision 3.2* ................................................................................................ *22*

*Substantive Provision 4—Resume Normal Operations* ..................................... **26**

*Substantive Provision 5—Healthcare* ................................................................. **28**

*Substantive Provision 6—Behavioral Health in Segregation* ............................ **37**

*Substantive Provision 7—Law Library Access* .................................................. **42**

*Substantive Provision 8—Discipline* ................................................................... **44**

  *Sub-provision 8.1* ................................................................................................ *44*

  *Sub-provision 8.2* ................................................................................................ *47*

  *Sub-provision 8.3* ................................................................................................ *47*

  *Sub-provision 8.4* ................................................................................................ *48*

*Substantive Provision 9—Tablets* ....................................................................... **48**

  *Sub-provision 9.1* ................................................................................................ *49*

  *Sub-provision 9.2* ................................................................................................ *50*

*Substantive Provision 10—Phone Calls* .............................................................. **51**

  *Sub-provision 10.1* .............................................................................................. *51*

  *Sub-provision 10.2* .............................................................................................. *51*

*Substantive Provision 11—PICC Emergency Call Systems* ............................... **51**

*Substantive Provision 12—Locks* ........................................................................ **52**

  *Sub-provision 12.1* .............................................................................................. *52*

  *Sub-provision 12.2* .............................................................................................. *52*

*Sub-provision 12.3* .................................................................................................... *53*

*Sub-provision 12.4* .................................................................................................... *53*

*Sub-provision 12.5* .................................................................................................... *53*

***Substantive Provision 13—Visiting*** ........................................................................ **53**

*Sub-provision 13.1* .................................................................................................... *53*

*Sub-provision 13.2* .................................................................................................... *54*

*Sub-provision 13.3* .................................................................................................... *55*

***Substantive Provision 14—Attorney Visiting*** ........................................................ **55**

*Sub-provision 14.1* .................................................................................................... *55*

*Sub-provision 14.2* .................................................................................................... *56*

*Sub-provision 14.3* .................................................................................................... *57*

***Substantive Provision 15—COVID-19 Testing*** ...................................................... **57**

***Substantive Provision 16—Quarantine*** .................................................................. **58**

***Substantive Provision 17—Sanitation*** .................................................................... **61**

*Sub-provision 17.1* .................................................................................................... *61*

*Sub-provision 17.2* .................................................................................................... *62*

***Substantive Provision 18—Use-of-Force*** ................................................................ **64**

## Compliance Findings

Some of the Agreement's 18 substantive provisions contain related but discrete action items that must be completed for PDP to achieve substantial compliance with each provision. The Monitoring Team created sub-provisions for some of the 18 substantive provisions based on these discrete action items and issues separate compliance findings for each enumerated sub-provision. This will provide additional clarity for Defendants as they work to implement required changes and greater specificity for the Court and Parties in distinguishing between action items that are being successfully implemented and those that require additional attention. To achieve substantial compliance with each substantive provision, PDP must first achieve substantial compliance with every sub-provision.

From the Agreement's 18 substantive provisions, 37 sub-provisions were created. In the previous reporting period, the Monitor determined that PDP had achieved substantial compliance with 5 sub-provisions, partial compliance with 25 sub-provisions, and remained in non-compliance with 7 sub-provisions. In this reporting period, PDP has achieved substantial compliance with 9 sub-provisions, partial compliance with 21 sub-provisions, and remained in non-compliance with 7 sub-provisions.

The table below reflects all provisions and current compliance ratings for each:

| Provision | Requirements | Compliance Status |
|---|---|---|
| 1 | **Staffing** | **PC** |
| 1.1 | No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the *hiring* of correctional officers. | PC |
| 1.2 | No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the retention of correctional officers. . . | PC |
| 1.3 | Ensure that there are sufficient number of correctional officers to cover all posts, according to PDP post plans on each shift at each facility. | NC |
| 1.4 | These measures [1.1-1.3] will continue until achieved and thereafter to maintain the proper number of correctional officers. | NC |
| 2 | **Out-of-Cell Time** | **PC** |
| 2.1 | Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than August 1, 2022, no less than five hours of out-of-cell time each day. | PC |

| Provision | | Requirements | Compliance Status |
|---|---|---|---|
| | 2.2 | The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases of out-of-cell time should continue to be made beyond the August 1, 2022 standard, with a presumptive expected increase to six hours by October 15, 2022.  The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, *infra*, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis.  *See also* para. 4, *infra*. | NC |
| 3 | | **Out-of-Cell/Segregation** | **PC** |
| | 3.1 | Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day. | NC |
| | 3.2 | Defendants further agree that they will continue their practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units. | PC |
| 4 | | **Resume Normal Operations** | **NC** |
| | | By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services).  During the period that precedes a return to normal operations, if the Monitor determines that the Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor.  The parties and the Monitor shall then engage in discussions to resolve the issues in dispute.  If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions. | |
| 5 | | **Healthcare** | **PC** |
| | | The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons.  The Defendants agree to institute the programs and measures (referred to as "the Backlog Plan") set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022, to address the existing backlog.  The "Backlog Plan" is a new, three-month effort to see backlogged patients as soon as possible.  The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs.  Four agencies are contracted to provide staff towards this end. Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort.  Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures.  Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog. | |
| 6 | | **Behavioral Health in Segregation** | **PC** |
| | | By September 30, 2022, the PDP and [YesCare] shall re-establish a mental health program for persons who are in segregation units. | |
| 7 | | **Law Library Access** | **PC** |

| Provision | Requirements | Compliance Status |
|---|---|---|
| | PDP will continue to provide law library access for all incarcerated individuals. The Monitor and the parties will discuss access and scheduling matters and the Monitor shall make any recommendations on these matters by August 1, 2022. | |
| 8 | **Discipline** | **PC** |
| 8.1 | All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding. *See Wolff v. McDonnell*, 418 U.S. 539, 563–66 (1974); *Kanu v. Lindsey*, 739 F. App'x 111, 116 (3d Cir. 2018); *Stevenson v. Carroll*, 495 F.3d 62, 70–71 (3d Cir. 2007). | PC |
| 8.2 | The PDP shall expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date [April 12, 2022]. . . | SC |
| 8.3 | [PDP shall] release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are [on April 12, 2022] still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing. . . | SC |
| 8.4 | [PDP shall] cancel sanctions [imposed in hearing held between March 2020 and April 12, 2022] that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms. Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation. Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline. Defendants shall provide to counsel for plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022. | SC |
| 9 | **Tablets** | **PC** |
| 9.1 | PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational capabilities and housing designs. The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets; and, at RCF, expanding from six (6) to eight (8) tablets on the [first floor] (4 housing units) and expanding from eight (8) to twelve (12) tablets on the [2nd and 3rd floors] of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF. This expansion process will be completed by May 1, 2022. | PC |
| 9.2 | The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices. | PC |
| 10 | **Phone Calls** | **PC** |

9

| Provision | Requirements | Compliance Status |
|---|---|---|
| 10.1 | PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population.  Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices. | PC |
| 10.2 | Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls. | NC |
| **11** | **PICC Emergency Call Systems** | **PC** |
| | The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to phones and/or tablets and determine whether any policies and practices are necessary to address this matter considering all relevant factors, including operational feasibility and physical capacity. | PC |
| **12** | **Locks** | **PC** |
| 12.1 | PDP initiated the lock replacement program for PICC. . . which will be completed by June 30, 2022. | PC |
| 12.2 | PDP initiated the lock replacement program for. . .RCF, which will be completed by June 30, 2022. | PC |
| 12.3 | For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022. | SC |
| 12.4 | Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner. | PC |
| 12.5 | PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system. | SC |
| **13** | **Visiting** | **PC** |
| 13.1 | As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members. PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule.  At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots. | SC |
| 13.2 | Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues. | PC |
| 13.3 | PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated. | SC |
| **14** | **Attorney Visiting** | **PC** |
| 14.1 | PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit. | PC |
| 14.2 | For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment. | PC |

10

| Provision | Requirements | Compliance Status |
|---|---|---|
| 14.3 | For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay. | NC |
| **15** | **COVID-19 Testing** | **SC** |
| | The PDP shall continue the present policy regarding testing of persons who are scheduled for court. Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID-19. They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results. Those housed on a "yellow block" may have been exposed to a COVID-19-positive individual, and they will be rapid-tested twice, the night before court and the morning of court. They will be transported to court if both tests are negative. Those housed on a "red block" are COVID-19 positive and will be isolated for ten days and not brought to court during that time frame. These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia Department of Public Health. Provided, however, that the Defendants shall not unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols. | |
| **16** | **Quarantine** | **SC** |
| | If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19. Under current policy, *see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021*, for persons who are vaccinated and are exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative. | |
| **17** | **Sanitation** | **PC** |
| 17.1 | Defendants agree to continue conducting the weekly General Inspection ("GI") cleaning days with supplies provided by officers to clean cells and housing areas. | PC |
| 17.2 | [Defendants agree] to provide regular laundry services under current PDP policies. | PC |
| **18** | **Use-of-Force** | **PC** |
| | PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands. The parties agree that correctional officers should follow de-escalation measures provided in PDP policies. The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors. In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states: "Force is only used when necessary and only to the degree required to control the inmate(s) or restore order…The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated…. Staff will not use pepper spray as a means of punishment, personal abuse, or harassment." | |

11

**Substantive Provision 1—Staffing**

*Sub-provision 1.1--No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the hiring of correctional officers.*

### Compliance Rating:  Partial Compliance

Some measures to increase recruitment, hiring, and retention have been implemented, but there has been no improvement in staffing levels for critical positions in this reporting period.  The following table reflects changes in security, maintenance, and human resources vacancies since the last reporting period:

### Philadelphia Department of Prisons Vacancy Report
December 2022 and June 2023

| | Position Classification | Budgeted | December 2022 | | June 2023 | | Change in Vacancies (+/-) | Current Vacancy Rate (+/- change) |
|---|---|---|---|---|---|---|---|---|
| | | | Filled | Vacant | Filled | Vacant | | |
| Sworn Staff | Officers | 1719 | 973 | 746 | 967 | 752 | +6 | 44% (+1%) |
| | Sergeants | 129 | 77 | 52 | 73 | 56 | +4 | 43% (+3%) |
| | Lieutenants | 56 | 46 | 10 | 52 | 4 | -6 | 7% (-11%) |
| | Captains | 31 | 24 | 7 | 20 | 11 | +4 | 35% (+12%) |
| | **Custody Total** | **1935** | **1120** | **815** | **1112** | **823** | **+8** | **43% (+1%)** |
| Maintenance Staff | Trades Worker I | 8 | 5 | 3 | 4 | 4 | +1 | 50% (+12%) |
| | Trades Worker II | 23 | 8 | 15 | 8 | 15 | 0 | 65% (0) |
| | HVAC Mechanic | 3 | 2 | 1 | 2 | 2 | +1 | 67% (+34%) |
| | Building Engineer | 1 | 0 | 1 | 2 | 1 | 0 | 100% (0) |
| | Maintenance Group Leader | 1 | 0 | 1 | 1 | 1 | 0 | 100% (0) |
| | **Total Maintenance** | **36** | **15** | **21** | **17** | **23** | **+2** | **64% (+6%)** |
| Human Resources (HR) Staff | HR Professional | 2 | 0 | 2 | 2 | 0 | -2 | 0 (-100%) |
| | HR Program Admin | 2 | 2 | 0 | 2 | 0 | 0 | 0% (0) |
| | HR Manager 3 | 1 | 1 | 0 | 1 | 0 | 0 | 0% (0) |
| | **HR Total** | **5** | **3** | **2** | **5** | **0** | **-2** | **0% (-40%)** |
| **PDP TOTAL** | **All Positions** | **2186** | **1321** | **865** | **1311** | **875** | **+10** | **40% (0)** |

PDP filled two human resources positions, however, sworn and maintenance personnel vacancies continued to increase in this reporting period.

PDP reports that the City's Human Resources department is increasing engagement with employees who are out on long-term sick leave and is preparing a status report of off-duty staff engagement for the Monitoring Team's review in the next reporting period.

Hiring bonuses, salary increases, and attendance incentives following the various arbitration awards were designed to attract new candidates and are now being included in recruitment advertising.[3]  Also supporting recruitment, the City has modified its practice of limiting application periods for new recruits.  The City's new process essentially provides for continuous-fill applications consistent with the Monitoring Team's recommendation.  It is premature to determine whether new application protocols and the other incentives will improve hiring yields, however, the efforts are positive steps.

PDP has successfully increased the number of academies and new hires in 2023, but the retention rate of new hires remains low.  The table below depicts academy schedules, attendance, and graduation data for 2021, 2022, and 2023, and employee retention rates for the 2022 and 2023 academies:

### Philadelphia Department of Prisons Academy Report

| Class Number | Class Dates | Total Cadets | Total Graduated | Still Employed June 2023 | Retention Rate Dec 2022 | Retention Rate June 2023 |
|---|---|---|---|---|---|---|
| 21-01 | February - May, 2021 | 25 | 23 | NA | NA | NA |
| 21-02 | June - September, 2021 | 19 | 15 | NA | NA | NA |
| 21-03 | August - November, 2021 | 35 | 30 | NA | NA | NA |
| 21-04 | November, 2021 - January, 2022 | 30 | 26 | 15 | 70% | 50% |
| 21-05 | December, 2021 - March, 2022 | 20 | 16 | 8 | 55% | 40% |
| 22-01 | March - June, 2022 | 31 | 25 | 12 | 58% | 39% |
| 22-02 | May - July, 2022 | 21 | 20 | 13 | 71% | 62% |
| 22-03 | August - October, 2022 | 18 | 16 | 13 | 78% | 72% |
| 22-04 | October, 2022 - January, 2023 | 26 | 20 | 17 | NA | 65% |
| 23-01 | January - March, 2023 | 21 | 22 | 16 | NA | 76% |
| 23-02 | February - April, 2023 | 17 | 15 | 15 | NA | 88% |
| 23-03 | April - July, 2023 | 20 | In Process | NA | NA | NA |
| 23-04 | June - September, 2023 | 17 | In Process | NA | NA | NA |

---

[3] For example, the August 12, 2022, Arbitration Award authorizes a range of compensation increases.  *See* In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia (decision date, August 12, 2022) Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; *See also* In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2 (decision date, December 8, 2022) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; *See also* In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 4-5 (decision date, January 20, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; *See also* In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2-3 (decision date, January 27, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; *See also* In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2-3 (decision date, March 31, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia.

In the first half of 2021 and 2022, PDP held two academies yielding an average of 58 new cadets. In the first six months of 2023, PDP held five academies yielding a total of 101 new cadets, marking a 40 percent increase in new hires in the first half of 2023. Despite the increases, PDP is not retaining enough new hires to address its staffing crisis. In the last reporting period, the average retention rate of cadets who graduated from academy classes 21-04, 21-05, and 22-01 in the first half of 2022 was 61 percent. As of June 2023, the average retention rate for those three academy classes decreased to 43 percent. To improve overall vacancies, new hires and employee retention must both increase.

Available data on recruitment yields is depicted in the following table:

**Philadelphia Department of Prisons Average Recruitment Yields for New Hires after January 1, 2021**

| Certification List | Total Applicants | Total Hired | Rate (%) | List Status |
|---|---|---|---|---|
| 2020-0210 | 228 | 36 | 15.8 | Closed |
| 2021-0906 | 758 | 50 | 6.6 | Closed |
| 2022-0221 | 298 | 16 | 5.4 | Closed |
| 2022-0516 | 245 | 25 | 10.2 | Closed |
| 2022-0905 | 493 | 34 | 6.9 | Closed |
| **Total Closed** | **2022** | **161** | **9** | |
| 2022-1212 | 422 | 34 | NA | In Process |
| 2023-0306 | 563 | 11 | NA | In Process |
| **Total Open** | **985** | **45** | **NA** | |

Also positive, PDP appears on target to accept twice as many applications in 2023 as it received in the same periods in 2021 and 2022 and achieved a slight increase in new hires in this rating period.

On May 8, 2023, PDP reported the escape of two Class Members from PICC. The investigation is pending, however, the Commissioner anticipates that staff negligence, as well as insufficient staffing were contributing factors. Generally, PDP does not have enough personnel at the ranks of lieutenant and sergeant to maintain a consistent supervisory presence inside facilities and monitor all housing units. PDP also identified inadequate housing unit supervision during the review of at least one Class Member death in this reporting period. Crucial custody transport and emergency backfill positions that support housing units also remain unfilled. PDP's internal critical incident review processes have greatly improved in the last year. Difficult and transparent discussions among involved or witness personnel, facility leadership, and executives reveal specific areas in need of corrective action. PDP reports that it is in the process of promoting 10 new sergeants and 10 new lieutenants, which should assist PDP in implementing Agreement requirements. The Monitoring Team is not confident, however, that PDP can remediate all identified deficiencies, including recommendations from a forthcoming post-escape security analysis, with limited personnel. Working conditions in PDP facilities are seeing some

14

improvements but remain unsafe, and the staffing crisis is an absolute barrier to compliance. The situation is dire, and PDP should expect more critical incidents as long as it persists.

*Sub-provision 1.2--No later than April 20, 2022, the Defendants shall implement measures, including but not limited to hiring and retention bonuses, to enhance the retention of correctional officers. . .*

**Compliance Rating:  Partial Compliance**

There are preliminary signs that measures taken may be raising retention rates.

A January 27, 2023, Supplemental Arbitration Award provides for attendance incentives for employees assigned to a 12-hour shift, among other incentives.[4]  PDP has made progress in implementing its Twelve-hour Shift Initiative in all facilities.  The incentives appear to have attracted a high percentage of PDP employees to volunteer for the 12-hour shift, which now constitute the large majority of PDP's overall posts.  The other benefits pursuant to the arbitration awards may also support employee retention.[5]

In the four-month period immediately following the August 12, 2022, arbitration award (which facilitated step-based salary increases, retention bonuses, longevity pay, and other positive steps), average monthly voluntary separations reduced from 22.75 in the period January through August 2022 to 10.75, or pre-pandemic levels.  In the first six months of 2023, average monthly voluntary separations were higher than the same periods in 2019 and 2020 but remain lower than 2021.  The following table depicts the average number per month of PDP employees who voluntarily separated pre-retirement from January 2022 through June 2023:

**Average Voluntary Separations by PDP Employees**

| | Pre-Arbitration Award | | | | Post-Arbitration Award | |
|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | Jan-Aug 2022 | Sep-Dec 2022 | Jan-June 2023 |
| **Monthly Average** | 10 | 11 | 24.25 | 22.75 | 10.75 | 14.8 |

Short term retention rates have risen since the August 12, 2022, arbitration award.  It will be important to track retention of those new hires to see if those increases hold.

PDP held an employee recognition week in May 2023, which some staff reported was well received.  PDP also created and, in September 2023, filled an Employee Wellness Coordinator position.  However, the City has not initiated a robust employee wellness program to support retention of PDP personnel.  PDP's work environment remains uniquely stressful for employees

---

[4] In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2-3 (decision date, January 27, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia.
[5] *See* awards cited *infra* note 3.

and is exacerbated by forced overtime shifts. Greater staff recognition is meaningful and may give at least a short-term boost to morale, but it is insufficient to equip even the most dedicated and experienced personnel with the tools necessary to persevere in the current work environment.

*Sub-provision 1.3--Ensure that there are sufficient number of correctional officers to cover all posts, according to PDP post plans on each shift at each facility.*

**Compliance Rating: Non-compliance**

With a 44 percent vacancy rate for correctional officers as of June 30, 2023, PDP is simply unable to cover all posts in its post plans consistent with this sub-provision.

As previously reported, PDP's systems for tracking posts and the staff required to fill them were inadequate to measure compliance with this sub-provision.[6] In the last reporting period, the Monitor retained an expert to provide technical support and training, and to update PDP's post and personnel tracking systems. As with all carceral systems, PDP's post plans are dynamic and require regular updates based on population and operational changes. For example, PDP's transition from an 8-hour to a 12-hour shift model required broad changes to the post plans that were referenced during settlement negotiations.

PDP's staffing rosters now reflect nearly every position identified in its current post plan, and personnel now possess the expertise to reconcile and maintain rosters as plans adjust. If progress continues as planned, PDP should be able to generate reports in the next reporting period that measure the number of unfilled posts at each facility and the reasons for each post vacancy. Improvements should allow the Monitoring Team to verify the accuracy of personnel information reported and optimally measure compliance with this sub-provision.

PDP's anticipated staffing analysis, now reportedly being completed by the end of 2023, will not resolve PDP's staffing crisis. It will, however, assist PDP in gaining an up-to-date understanding of current staffing needs, developing a roadmap for a return to normal operations, and identifying areas for interim relief. For example, the Monitoring Team recommended that PDP redirect at least 70 peace officers who are currently performing non-peace officer functions, such as maintaining records and issuing and replacing computers. A staffing analysis will identify how to transition those functions to civilian personnel and reserve peace officers for critical peace officer roles.

There are also functions within the jails that do not require direct contact with Class Members, but which are being performed by sworn personnel, such as control booth operators. These posts may also be converted to alternative classifications. The Monitoring Team is hopeful that PDP's staffing analysis will support efficient reorganization of PDP's current resources, facilitate partnerships with labor, and offer some relief as PDP works to reduce vacancies.

---

[6] Monitor's Second Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 185 at 16 (Mar. 3, 2023).

Ultimately, the staffing crisis can only be addressed through aggressive hiring, effective retention strategies, and collaboration with employees on long-term leave to return them to work in functions they are able to perform. Defendants have made improvements but have not yet met the requirements of this provision or initiated the comprehensive return-to-work strategy recommended by the Monitoring Team.

*Sub-provision 1.4--These measures [1.1-1.3] will continue until achieved and thereafter to maintain the proper number of correctional officers.*

**Compliance Rating: Non-compliance**

A partial or substantial compliance rating first requires PDP to achieve compliance with sub-provision 1.3.

Status of Recommendations, Substantive Provision 1—Staffing, from the Monitor's First Report:

1. Expand existing contracts to correct maintenance vacancies that severely impact conditions of confinement at ASD-CU and MOD 3, DC, and PICC.
   *PDP's maintenance contract has been expanded to allow contractors to perform all repairs and maintenance at PICC and DC when City maintenance employees are unable to meet demands.*
2. Determine whether the current salary and benefits structures pursuant to the arbitration award and other efforts by Defendants are sufficiently competitive with other jurisdictions and agencies to attract applicants, and if not, supplement benefits accordingly.
   *PDP reports that it is still in the process of implementing this recommendation.*
3. Retain a qualified recruitment firm to assist in guiding the City's efforts, which should include salary surveys in support of the previous recommendation, and other validated recruitment and retention strategies.
   *As of the filing of this report, Defendants have not implemented this recommendation.*
4. Engage an independent staffing analysis to determine true staffing needs for each facility. The analysis should be completed by someone with specific expertise in jail staffing studies.
   *PDP reports that a staffing analysis will be completed by the end of 2023.*
5. Evaluate which PDP functions currently performed by sworn personnel can be performed by civilians (information technology, records, intake and release, cashier, etc.) and identify or expand civilian employees or contracted services accordingly.
   *PDP reports that it is attempting to implement this recommendation. The matter will be addressed in an initial arbitration hearing scheduled for November 2023.*
6. Simplify the City's lengthy hiring and onboarding processes that reportedly create delays in recruits reporting to PDP academies.
   *As of the filing of this report, Defendants have not implemented this recommendation.*
7. Establish continuous-fill civil service hiring lists during the staffing crisis.
   *The City reports that the newly structured back-to-back hiring lists function as the continuous-fill lists recommended here. It is too soon to measure any success of the new hiring protocols, but it is positive that the City has taken steps to implement this recommendation.*

8. Assess the impact of Philadelphia's employee residency requirements on PDP's hiring outcomes and consider whether permanent exemptions or modifications are appropriate.

   *The City has not disclosed to the Monitoring Team whether it intends or has taken any steps to implement this recommendation.*

9. PDP should implement strategies for employee retention and a robust employee wellness program.

   *PDP is making efforts to recognize employees, however, a comprehensive employee wellness program has not been developed.*

10. The City should implement a return-to-work strategy that is tailored to the needs of PDP employees who are out on long-term leave or work-related illness.

    *PDP reports the City has increased communication with employees on long-term leave. The City has separated 38 employees who had been on leave since April 2022 and could no longer perform necessary duties. The Monitoring Team awaits additional details regarding the City's efforts.*

11. Retain an expert to build internal capacity to manage systems, coding, and budgetary processes associated with staffing allocations. The expert should assist PDP in identifying and retaining only the most useful database reports and discontinuing the use of non-essential or inaccurate reports.

    *This recommendation is currently being implemented.*

**Substantive Provision 2—Out-of-Cell Time**

*Sub-provision 2.1--Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than August 1, 2022, no less than five hours of out-of-cell time each day.*

**Compliance Rating: Partial Compliance**

The Monitoring Team previously reported that out-of-cell data generated from Deputy Warden Reports is unreliable and the Monitoring Team was therefore unable to establish an accurate baseline of out-of-cell opportunities for Class Members.[7] PDP reports that it is finalizing procurement of a radio frequency identification (RFID) system, which will improve accuracy in tracking Class Member movement and out-of-cell time. PDP reports that it will finalize procurement and begin RFID implementation in the next reporting period. In the meantime, PDP has replaced its Deputy Warden Report tracking system with a spreadsheet tracking system recommended by the Monitoring Team.[8] The spreadsheet tracker was implemented systemwide in April 2023 and tracks individual out-of-cell time in segregation units and group out-of-cell time in non-segregation units.

---

[7] *Id.* at 18; Monitor's First Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 181 at 11-12 (Nov. 4, 2022).

[8] Monitor's Second Report, *supra* note 6, at 19.

Initial results of the spreadsheet tracker suggest that additional staff training is necessary to improve out-of-cell reporting accuracy.  For example, like the Deputy Warden Report tracking system, some personnel continue to document out-of-cell opportunities as being offered exactly on the hour or half hour.  Jail operational needs, such as unlocking each cell door individually, make such precise start times implausible.  The Monitoring Team has recommended that personnel receive additional training in proper out-of-cell documentation, as well as the consequences for falsification of records.  Despite persisting documentation and tracking issues, the spreadsheet system is standardized across PDP housing units, which will allow PDP and the Monitoring Team to verify accuracy via CCTV for sample dates in the next reporting period.  PDP's implementation of a simplified, consistent, and verifiable tracking system reflects a commitment to increase and accurately track out-of-cell opportunities for Class Members.

Data from initial tracking reports for general population units confirms that some units in each facility are attempting to offer some out-of-cell time more than once per day.  It also confirms that not all Class Members are offered out-of-cell time every day, let alone the requisite hours.  Finally, when out-of-cell time is offered, durations do not consistently meet minimum Agreement requirements.  This is, in part, because bed space and staffing limitations require most general population units to house Class Members with various security classifications together in single housing units.  Class Members with different security classifications are not permitted to recreate together and are instead divided into smaller recreation groups.  The number and size of recreation groups in each unit changes based on bed space, staffing, and population dynamics.  Generally, the more groups that reside in the same housing unit, the fewer out-of-cell opportunities each group receives.  The following table depicts out-of-cell time reported for three one-week periods in April, May, and June 2023 based on total recreation groups in each facility:

**General Population Average Out-of-Cell Time Per Day Reported for Three One-Week Periods[*]**

|  |  | April 2023 | | May 2023 | | June 2023 | |
|---|---|---|---|---|---|---|---|
|  | Hours | Groups | % | Groups | % | Groups | % |
| CFCF | Zero | 34 | 27% | 58 | 47% | 4 | 3% |
|  | 1 to 4.9 | 68 | 55% | 17 | 14% | 116 | 94% |
|  | 5 or more | 22 | 18% | 49 | 40% | 4 | 3% |
|  | Total CFCF Groups | 124 | 100% | 124 | 100% | 124 | 100% |
| PICC | Zero | NA | NA | 21 | 27% | 2 | 3% |
|  | 1 to 4.9 | NA | NA | 21 | 27% | 61 | 77% |
|  | 5 or more | NA | NA | 37 | 47% | 16 | 20% |
|  | Total PICC Groups | NA** | NA | 79 | 100% | 79 | 100% |
| RCF | Zero | 3 | 3% | 5 | 5% | 2 | 2% |
|  | 1 to 4.9 | 29 | 29% | 34 | 34% | 45 | 45% |
|  | 5 or more | 69 | 68% | 62 | 61% | 54 | 53% |
|  | Total RCF Groups | 101 | 100% | 101 | 100% | 101 | 100% |

*The weeks were: 4/3-4/9, 5/1-5/7, and 6/5-6/11.
**Tracking system not yet implemented at PICC.

Initial data suggests that RCF met the five-hour Agreement benchmark most consistently over the three weeks reviewed. Between 53 and 68 percent of all RCF groups reportedly received five or more hours of out-of-cell time each day in the weeks reviewed. CFCF and PICC varied from week to week, but data reflects that higher percentages of Class Member groups, up to 47 percent in one of the weeks documented, remained locked down for the week. These lockdowns are reportedly due to inadequate security coverage and are worse on weekends and holidays.

Documentation shows that some CFCF housing units often approach five hours of out-of-cell time daily, and, at times, all three facilities provide out-of-cell time to some Class Members more than once per day. This represents improvement and efforts should continue.

PDP has made notable progress since the Monitoring Team initiated its review in May 2022. Class Members consistently report to the Monitoring Team that they receive more out-of-cell time today than they have received since COVID-19 lockdown protocols were instituted nationwide more than three years ago. Improvements that PDP is making, its receptivity to the Monitoring Team's recommendations, and its acknowledgement of active failures are all commendable. It is also true that ongoing failures to offer all Class Members time outside of their cells every day constitutes one of the most harmful conditions detailed in this Action. The injury inflicted on Class Members as they endure hours, days, or weeks in isolation is immeasurable and is compounded each day that non-compliance persists.

*Sub-provision 2.2--The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases in out-of-cell time should continue to be made beyond the August 1, 2022, standard, with a presumptive expected increase to six hours by October 15, 2022. The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, infra, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis. See also para. 4, infra.*

**Compliance Rating: Non-compliance**

**Substantive Provision 3—Out-of-Cell/Segregation**

*Sub-provision 3.1--Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day.*

**Compliance Rating: Non-compliance**

PDP's initial efforts to improve out-of-cell tracking and increase out-of-cell opportunities for Class Members on segregation units warranted a rating of Partial Compliance in previous reporting periods.[9] Because initial out-of-cell data reflects such low compliance, PDP's compliance rating in this reporting period is reduced to Non-compliance.

---

[9] *Id.* at 19; Monitor's Frist Report, *supra* note 7, at 10.

PDP's new spreadsheet tracking system was implemented in segregation units systemwide in June 2023.  In this reporting period, the Monitoring Team reviewed tracking reports for the week of June 5, 2023, which revealed that only 38 percent of Class Members on segregation units received daily out-of-cell opportunities.  The following table reflects total Class Members on segregation units who received daily out-of-cell opportunities (of any length) for the week of June 5 through June 11, 2023, as documented in PDP's segregation unit spreadsheet tracker:

**Daily Out-of-Cell Opportunities for Class Members on Segregation Units**
June 5, 2023 – June 11, 2023

| Facility | | CFCF | | | PICC** | RCF | Total |
|---|---|---|---|---|---|---|---|
| Unit | | A1P2 | A1P3 | A1P4 | J Unit | C Unit | |
| **Total Stable Population*** | | 60 | 29 | 64 | 3 | 36 | **192** |
| June 5 | Class Members Out-of-Cell | 10 | 13 | 0 | 3 | 26 | **52** |
| | Percent | 17% | 45% | 0% | 100% | 72% | **27%** |
| June 6 | Class Members Out-of-Cell | 32 | 14 | 15 | 3 | 36 | **100** |
| | Percent | 53% | 48% | 23% | 100% | 100% | **52%** |
| June 7 | Class Members Out-of-Cell | 0 | 0 | 31 | 2 | 36 | **69** |
| | Percent | 0% | 0% | 48% | 67% | 100% | **36%** |
| June 8 | Class Members Out-of-Cell | 0 | 0 | 15 | 0 | 36 | **51** |
| | Percent | 0% | 0% | 23% | 0% | 100% | **27%** |
| June 9 | Class Members Out-of-Cell | 0 | 0 | 30 | 2 | 36 | **68** |
| | Percent | 0% | 0% | 47% | 67% | 100% | **35%** |
| June 10 | Class Members Out-of-Cell | 10 | 11 | 32 | 3 | 36 | **92** |
| | Percent | 17% | 38% | 50% | 100% | 100% | **48%** |
| June 11 | Class Members Out-of-Cell | 39 | 23 | 11 | 3 | 0 | **76** |
| | Percent | 65% | 79% | 17% | 100% | 0% | **40%** |
| **Daily Average** | **Class Members Out-of-Cell** | **13** | **9** | **19** | **2** | **29** | **73** |
| | **Percent** | **22%** | **31%** | **30%** | **67%** | **81%** | **38%** |

 *"Stable Population" refers to total Class Members who resided in segregation units for the entire week.
**Out-of-cell tracking for PICC F Unit during the sample week contains several clear inaccuracies and was therefore excluded.

RCF has been more successful than other facilities in offering out-of-cell opportunities.  This is reportedly a result of increased vigilance by managers in monitoring out-of-cell time and ensuring that sufficient personnel or supervisors are assigned or redirected to its segregation unit for this purpose.  CFCF and PICC each have unique personnel and operational issues that will require a more focused approach by PDP leadership to address.

Data reported above is consistent with feedback the Monitoring Team received from Class Members and PDP personnel and executives throughout this reporting period. As with out-of-cell reports for general population units, out-of-cell data for segregation units requires validation via sample CCTV review.

The Monitoring Team reiterates the following recommendations from the previous reporting period:

1. PDP leadership should reevaluate the current practice requiring the presence of three correctional officers on segregation units if a single Class Member is outside of a cell for any reason. Generally, two officers may be necessary to escort the most behaviorally challenging Class Members. PDP's current policy and practice that mandates the presence of three or four correctional officers during any movement on a unit is outside of standard corrections segregation protocols. As previously reported, this requirement appears to be a primary barrier to compliance and should be reevaluated with support from PDP's consulting team as it completes PDP's forthcoming staffing analysis.[10]

2. If a facility determines that it has insufficient personnel on post to offer a full hour out-of-cell, all Class Members should at least be provided time out-of-cell to shower, use the phone, or access the law library. CFCF reported using this approach during two shifts in the week reviewed, and while not sufficient, it was preferable to total isolation on those days.

3. PDP leadership should ensure that out-of-cell schedules are feasible for personnel to implement and that schedules are consistently adhered to. Personnel and Class Members in CFCF and PICC segregation units continue to report that they do not feel confident that these units follow consistent recreation, shower, phone, and other out-of-cell protocols.

PDP leadership should continue to refine its new tracking system and utilize available information to focus on units during specific days and shifts that consistently struggle to provide out-of-cell opportunities. The Monitoring Team is confident that PDP can significantly improve its out-of-cell compliance in segregation units in the next reporting period if it implements the Monitoring Team's recommendations.

*Sub-provision 3.2--Defendants further agree that they will continue their practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units.*

### Compliance Rating:  Partial Compliance

As previously reported, PDP's segregation documentation does not identify a lack of housing space or insufficient staffing as rationales for placement or retention of Class Members in administrative segregation.[11]  However, PDP asserts that the staffing shortage contributed to lengthy delays in reviewing cases for retention of Class Members in administrative segregation.

---

[10] Monitor's Second Report, *supra* note 6, at 20.

[11] *Id.* at 21.

In the first reporting period, reviews were not consistently occurring at 30-day intervals as required by PDP policy, and many were exceeding 60 and 90 days.[12]  These delays contributed to excessive lengths of stay in administrative segregation in violation of this sub-provision.[13]  Punitive segregation placements were also exceeding allowable timeframes in the first reporting period.[14]

In the second reporting period, PDP made improvements in reducing the timeframes for administrative segregation reviews, as well as lengths of stay in both administrative and punitive segregation.[15]  Improvements in these areas continued in this reporting period.  Data for select dates suggests that PDP reduced its reliance on both punitive and administrative segregation, with fewer administrative and punitive segregation placements and shorter lengths of stay in segregation housing.

The following tables depict total and average Class Members in administrative segregation, retention reviews exceeding 30, 60, and 90-day timeframes, and average lengths of stay in administrative segregation for sample dates in two periods, July through December 2022, and January through June 2023:

### Reviews for Retention on Administrative Segregation
### Exceeding 60 and 90 Days and Average Lengths of Stay
July 2022 – December 2022

| | CFCF | | | | | PICC | | | | | RCF* | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Ad-Seg | > 60 Days | > 90 Days | % > 60 Days | Average Days in Ad-Seg | Total Ad-Seg | > 60 Days | > 90 Days | % > 60 Days | Average Days in Ad-Seg | Total Ad-Seg | Average Days in Ad-Seg | Total | Average Days in Ad-Seg |
| 7-1-22 | 60 | 20 | 27 | 78% | 133 | 76 | 6 | 2 | 11% | 78 | 17 | 71 | 153 | 94 |
| 8-5-22 | 80 | 0 | 8 | 10% | 127 | 60 | 1 | 5 | 10% | 88 | 19 | 89 | 159 | 101 |
| 9-2-22 | 99 | 12 | 4 | 16% | 102 | 73 | 1 | 4 | 7% | 66 | 23 | 55 | 195 | 74 |
| 10-7-22 | 89 | 16 | 7 | 26% | 93 | 102 | 1 | 2 | 3% | 49 | 18 | 75 | 209 | 72 |
| 11-4-22 | 115 | 8 | 16 | 21% | 89 | 89 | 1 | 1 | 2% | 52 | 20 | 58 | 224 | 66 |
| 12-2-22 | 124 | 1 | 8 | 7% | 99 | 67 | 0 | 0 | 0% | 53 | 28 | 50 | 219 | 67 |
| Average | 95 | 10 | 12 | 26% | 107 | 78 | 2 | 2 | 6% | 64 | 21 | 66 | 193 | 79 |

*RCF reviews were all completed within policy according to documentation reviewed.

---

[12] Monitor's First Report, *supra* note 7, at 14.
[13] RCF has consistently demonstrated compliance with timely reviews of administrative segregation placements.
[14] Monitor's First Report, *supra* note 7, at 14.
[15] Monitor's Second Report, *supra* note 6, at 21-23.

**Reviews for Retention on Administrative Segregation
Exceeding 30 and 60 Days and Average Lengths of Stay**
January – June 2023

| | CFCF | | | | | PICC | | | | | RCF* | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Ad-Seg | > 30 Days | > 60 Days | % > 60 Days | Average Days in Ad-Seg | Total Ad-Seg | > 30 Days | > 60 Days | % > 60 Days | Average Days in Ad-Seg | Total Ad-Seg | Average Days in Ad-Seg | Total | Average Days in Ad-Seg |
| 1-13-23 | 109 | 32 | 11 | 10% | 115 | 69 | 7 | 0 | 0 | 45 | 22 | 53 | 200 | 71 |
| 2-3-23 | 83 | 8 | 1 | 1% | 68 | 65 | 3 | 0 | 0 | 49 | 16 | 89 | 164 | 69 |
| 3-3-23 | 60 | 14 | 0 | 0% | 74 | 49 | 0 | 0 | 0 | 28 | 15 | 92 | 124 | 65 |
| 4-14-22 | 70 | 2 | 4 | 6% | 64 | 22 | 0 | 0 | 0 | 26 | 12 | 104 | 104 | 65 |
| 5-5-23 | 33 | 0 | 0 | 0 | 61 | 25 | 0 | 0 | 0 | 29 | 14 | 105 | 72 | 65 |
| 6-3-23 | 47 | 2 | 0 | 0 | 46 | 36 | 0 | 0 | 0 | 38 | 6 | 204 | 89 | 96 |
| Average | 67 | 10 | 3 | 3% | 71 | 44 | 2 | 0 | 0% | 36 | 14 | 108 | 126 | 72 |
| Difference, Qs 3 & 4 2022 and Qs 1 & 2 2023 | -29% | N/A | -70% | -88% | -34% | -44% | NA | -100% | -100% | -44% | -33% | +64% | -35% | -9% |

*RCF reviews were all completed within policy according to documentation reviewed.

CFCF data for select dates shows that the percentage of reviews for retention on administrative segregation that exceeded 60 days reduced from an average of 10 cases in the period July through December 2022 to an average of 3 cases in the first 6 months of 2023. May and June 2023 data shows that CFCF had zero retention reviews that exceeded 60 days. The same data for PICC shows that zero administrative segregation retention reviews exceeded 60 days in the first six months of 2023. This marks notable improvement at both facilities. RCF continued to meet policy timeframes for days reviewed in this reporting period.

Data for select dates also shows that the average lengths of stay in administrative segregation decreased by 36 days on average, or 34 percent, at CFCF and by 28 days on average, or 44 percent, at PICC for select dates in 2022 and 2023. RCF data shows a large increase in average lengths of stay from 66 to 108 days on average since the previous reporting days. This increase is driven by the long-term retention of a single Class Member based on an alleged in-custody homicide. The Monitoring Team is working with PDP to identify possible alternatives to segregation for this Class Member.

Based on data reviewed, PDP is making excellent progress in reducing lengths of stay in administrative segregation, including effectively addressing long-term placements.

As recommended in previous reports, PDP discontinued the automatic placement of state sentenced Class Members into administrative segregation based solely on their state commitment status.[16] On June 3, 2022, administrative segregation reports listed 36 state sentenced Class

---

[16] *Id.* at 23.

Members in administrative segregation.  A year later, on June 2, 2023, there were zero Class Members in administrative segregation pending state placement.[17]

On July 3, 2022, there were 44 Class Members in administrative segregation longer than 90 days. Eleven months later, on June 2, 2023, five Class Members remained in administrative segregation beyond 90 days, representing an 89 percent reduction in long-term administrative segregation placements.  By the end of June 2023, three of those five Class Members remained in segregation.  Two of the five are deemed long-term segregation placements, one for the alleged in-cell homicide mentioned above and the other for an alleged in-custody sexual assault. The third was referred for placement in the new Transition Unit for SMI and was subsequently removed from administrative segregation.

Issues remain with the overrepresentation of Class Members on the Behavioral Health caseload in segregation, as discussed below under Substantive Provision 6—Behavioral Health in Segregation.  The Monitoring Team also continues to recommend further modifications to the policy for placements of Class Members in segregation based solely on high bail and other static factors.

The following tables depicts total numbers of Class Members and average lengths of stay in punitive segregation for sample dates, July through December 2022, and January through June 2023:

### Punitive Segregation: Total Placements and Average Lengths of Stay
#### July – December 2022

| | CFCF | | PICC | | RCF | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total in Punitive Segregation | Average Days in Punitive Segregation |
| 7-1-22 | 100 | 89 | 24 | 110 | 27 | 34 | 151 | 78 |
| 8-5-22 | 65 | 98 | 34 | 89 | 36 | 44 | 135 | 77 |
| 9-2-22 | 58 | 87 | 56 | 71 | 65 | 34 | 179 | 64 |
| 10-7-22 | 56 | 37 | 50 | 53 | 64 | 32 | 170 | 41 |
| 11-4-22 | 52 | 38 | 71 | 39 | 39 | 59 | 162 | 45 |
| 12-2-22 | 33 | 30 | 59 | 27 | 36 | 18 | 128 | 25 |
| Average | 61 | 63 | 49 | 65 | 45 | 37 | 154 | 55 |

---

[17] PDP continues to periodically segregate a small number of state sentenced Class Members for short periods while they await movement to their designated housing unit.

**Punitive Segregation: Total Placements and Average Lengths of Stay**
January – June 2023

| | CFCF | | PICC | | RCF | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total in Punitive Segregation | Average Days in Punitive Segregation |
| 1-13-23 | 32 | 27 | 38 | 31 | 29 | 18 | 99 | 25 |
| 2-3-23 | 55 | 16 | 43 | 9 | 34 | 21 | 132 | 15 |
| 3-3-23 | 69 | 16 | 56 | 20 | 24 | 11 | 149 | 16 |
| 4-14-23 | 72 | 25 | 52 | 28 | 16 | 15 | 140 | 23 |
| 5-5-23 | 64 | 23 | 56 | 25 | 19 | 9 | 139 | 19 |
| 6-3-23 | 90 | 19 | 54 | 24 | 31 | 10 | 175 | 18 |
| Average | 64 | 21 | 50 | 23 | 26 | 14 | 139 | 19 |
| Difference, Qs 3 & 4 2022 and Qs 1 & 2 2023 | +5% | -67% | +2% | -65% | -42% | -62% | -10% | -65% |

Data for select dates suggests that average lengths of stay in punitive segregation in the three facilities was reduced by approximately 65 percent from the previous reporting period with each facility showing similar progress. PDP has retrained hearing officers who preside over disciplinary hearings in all three facilities, which has improved consistency. This change has increased consistency and contributed to successful reductions in this reporting period.

RCF also reduced the average number of Class Members placed in punitive segregation from 45 for select dates in the second half of 2022 to 26 in the first half of 2023. In this reporting period, PDP is segregating approximately seven percent of its population, down from 10 percent in the last reporting period.[18] With sustained efforts to reduce the punitive segregation of behavioral health patients, as well as those with non-violent institutional misconduct, PDP should be able to reduce its segregated Class Member population to at least the national average of no more than six percent of its total population.

**Substantive Provision 4—Resume Normal Operations**

*By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services). During the period that precedes a return to normal operations, if the Monitor determines that the Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor. The parties and the Monitor shall then engage in discussions to resolve the issues in dispute. If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions.*

---

[18] Monitor's Second Report, *supra* note 6, at 22.

**Compliance Rating:  Non-compliance**

PDP continues to report that it is not prepared to submit a plan for a return to normal operations that includes all required out-of-cell time and access to other services and programs as required by the Agreement.[19]  PDP reports that while it is able to make some operational improvements with existing staffing resources, it cannot provide a date by which it will be able to return to normal operations.  As previously reported, short staffing is the primary reason articulated by PDP for its failure to comply with several Agreement provisions, including those related to out-of-cell time.[20]

In this reporting period, the Monitor requested that the Parties begin to meet regularly to discuss areas of non-compliance with the Agreement.  Goals of the meetings include: (1) increased transparency regarding PDP's systemic deficiencies and the disclosure of specific reasons for compliance failures, and (2) identification of any available solution, including potential intervention by the Court.  The first meeting of the Parties was held on June 23, 2023, during which the Parties discussed several pressing issues, including out-of-cell time and RFID procurement, staffing and security, use of force, administrative segregation and discipline, and facility maintenance.  The confidential discussions were transparent and collaborative, and the Parties strategized potential solutions.  The Parties have scheduled a follow-up discussion from the initial meeting that will occur in October 2023, and the second meeting of the Parties is scheduled for November 6, 2023.  Areas of specific progress related to meeting agenda items are addressed in discussions of each substantive provision throughout this report.

As part of PDP's eventual plan to return to normal operations, additional personnel vacancies in PDP's Restorative and Transitional Services (RTS) Division must also be filled.  RTS consists of clinicians and other professionals whose services are among the most important to Class Members.  Commencing within the first five days of confinement, RTS personnel initiate case management protocols, including Class Member orientation, individual assessments, and discharge planning.  Among other services, they offer new intake orientations and facilitate town hall meetings, refer for services inside PDP and in the community, provide short-term and informational counseling, and liaise with Class Members' family and friends.  The Monitoring Team has received feedback from RTS personnel and Class Members that some important services are not being offered consistent with PDP policy.  Lapses are reportedly due to insufficient RTS personnel.  RTS vacancies as of June 2023 are depicted in the table below:

---

[19] The Monitoring Team is working with PDP to ensure that "normal operations" is defined according to evidence-based best practices at the time PDP is prepared to implement them.
[20] Monitor's Second Report, *supra* note 6, at 24; Monitor's First Report, *supra* note 7, at 15-16.

### Restorative and Transitional Services Division Staffing
June 2023

| Position Category | Allocated Positions | Filled Positions | Unfilled Positions | Vacancy Rate |
|---|---|---|---|---|
| Instructor | 5 | 4 | 1 | 20% |
| Volunteer Services Director | 1 | 1 | 0 | 0% |
| Psychologist | 4 | 2 | 2 | 50% |
| Prison Psychologist Supervisor | 0 | 1 | -1 | 0% |
| Social Work Services Manager I | 0 | 1 | -1 | 0% |
| Social Work Services Manager II | 53 | 42 | 11 | 21% |
| Social Work Supervisor | 13 | 12 | 1 | 8% |
| Human Services Program Administrator | 2 | 2 | 0 | 0% |
| Social Services/Housing Program Analyst | 0 | 1 | -1 | 0% |
| Prison Closed Circuit TV Specialist | 1 | 1 | 0 | 0% |
| Inmate Computer-Based Education Instructor | 7 | 6 | 1 | 14% |
| Inmate Computer-Based Education Supervisor | 1 | 1 | 0 | 0% |
| Correctional Industries Assistant Director | 1 | 1 | 0 | 0% |
| Correctional Industries Director | 1 | 0 | 1 | 100% |
| Industries Shop Supervisor | 14 | 16 | -2 | 0% |
| Education Director | 1 | 0 | 1 | 100% |
| **Total** | **104** | **91** | **18** | **17%** |

Seventeen percent total vacancies is problematic, and hiring and retention efforts should continue.  RTS services improve the daily lives of Class Members and support security, behavioral health, and all PDP operations.  Without them, the harm experienced by Class Members in PDP's current conditions is exacerbated.  Given the current population of more than 4,700 Class Members, RTS caseloads may be unmanageable, even with a full complement of RTS staff.  The Monitoring Team has recommended that PDP review RTS job descriptions and duties to ensure it has allocated sufficient positions to perform all tasks consistent with policy.

**Substantive Provision 5—Healthcare**

*The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons.  The Defendants agree to institute the programs and measures (referred to as "the Backlog Plan") set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022, to address the existing backlog.  The "Backlog Plan" is a new, three-month effort to see backlogged patients as soon as possible.  The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs.  Four agencies are contracted to provide*

28

*staff towards this end. Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort. Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures. Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog.*

### Compliance Rating:  Partial Compliance

The reduction of both on-site care and off-site specialty care backlogs remains a primary focus for PDP Healthcare, and security and healthcare staff shortages remain the greatest barriers to compliance. PDP has successfully reduced its on-site care appointment backlog in the last two reporting periods. The off-site specialty appointment backlog, however, has not significantly decreased since the previous reporting period. PDP's overall appointment backlog remains far higher than the 238-appointment backlog required for Agreement compliance.

PDP Healthcare and security executives and staff continue to report that weekly Access to Care Committee meetings are ongoing and beneficial.[21] They report, for example, that all operational solutions implemented in this reporting period were identified during workgroup meetings. PDP's progress in creating and sustaining this collaborative workgroup is commendable, and improvements are certain to continue despite little relief from existing staffing and operational barriers.

The table below compares on-site appointment backlogs for two four-week periods in November/December 2022 and May/June 2023:

---

[21] Meetings were initiated in November 2022. They are chaired by the Commissioner and include the Deputy Commissioner for Operations, Chief of Medical Operations, Wardens, Deputy Wardens, CFCF Shift Commanders, Movement Captain, and YesCare Managers.

**On-Site Appointment Backlogs for General Medical and Behavioral Healthcare Weekly Averages, Four-week Comparison**
November/December 2022 and May/June 2023

| Backlog Report Four-week Period | Weekly Average Appointments[*] | | Four-week Difference | Percent Change (+/-) |
|---|---|---|---|---|
| | Nov-Dec 2022 | May-June 2023 | | |
| BH Initial Psychiatric Eval. | 24 | 40 | +16 | ** |
| BH Medication Evaluation | 71 | 42 | -29 | -41% |
| BH Social Work Sick Call | 17 | 15 | -2 | ** |
| BH SW SCTR | 2 | 1 | -1 | ** |
| Chronic Care Follow-up | 274 | 171 | -103 | -38% |
| Chronic Care Initial | 87 | 129 | +42 | +48% |
| MAT | 136 | 181 | +45 | +33% |
| MAT Follow-up | 7 | 1 | -6 | ** |
| Provider Sick Call | 48 | 66 | +18 | +38% |
| RN Sick Call | 54 | 60 | +6 | +11% |
| Re-Entry Planning | 719 | 14 | -705 | -98% |
| **Total Backlog** | **1439** | **718** | **-721** | **-50%** |

\* Weeks were: 11/22/22 to 12/13/22 and 5/30/23 to 6/20/23.
\*\*Average percent change not calculated for average appointments <50.

PDP has reduced its average four-week backlog by 50 percent, or more than 700 appointments in this reporting period. Combined with reductions in the previous reporting period of nearly 400 appointments, PDP's backlog has been reduced by more than 1,100 appointments.[22] Backlogs in some areas have been eliminated. With the addition of new personnel and focused attention, PDP's re-entry planning appointments were reduced by 98 percent, from 719 to a remaining backlog of only 14 appointments. This marks commendable progress and efforts should continue. It is noteworthy that the backlog for some types of services has increased and that, excluding re-entry planning successes, the overall on-site backlog is largely unchanged from the previous reporting period. However, the improvements from the last reporting period were not driven solely by a reduction in the re-entry backlog and the data shows an overall improvement since October 2022.

On-site specialty appointments continue to represent a small percentage of the overall backlog and totals are sensitive to small staffing fluctuations such as single provider absences.[23] For instance, in this reporting period, PDP's pap test and gynecology backlog tripled to 189 appointments with the loss of one provider. PDP reports that it is continuing to seek additional providers for these services to maintain consistent care. Efforts continue to address the off-site

---

[22] *See* Monitor's Second Report, *supra* note 6, at 25-26.
[23] PDP offers on-site specialty services in optometry, pap testing, podiatry, physical therapy, ultrasound, and x-ray. For on-site specialty appointments, community provider/specialists come to PDP and treat patients on-site. PT staff and x-ray techs are YCC employees.

specialty appointments backlog, but progress is limited. PDP's off-site specialty appointment backlog remains largely unchanged in this reporting period despite the completion of approximately 200 monthly appointments. In December 2022, PDP's off-site backlog was 172 scheduled off-site appointments and 50 appointments awaiting scheduling. On June 19, 2023, the backlog was 187 scheduled appointments and 43 pending scheduling.

Off-site specialty appointments require more coordination between security and healthcare personnel, and more security personnel for patient guarding and transports. As previously reported, PDP has been seeking providers who are willing to provide specialty care on-site rather than in ideal, but less efficient, community settings.[24] PDP found a cardiologist to treat patients on-site commencing July 2023, but has not had success securing other specialty providers. PDP also hoped to distribute off-site appointments more evenly across weekdays to reduce transportation burdens, but limitations with off-site provider offices have prevented implementation. Off-site providers are reportedly also unwilling to offer evening appointments, which PDP hoped would help reduce the backlog. The following table depicts off-site specialty appointments scheduled and attended from January through June 2023:

### Off-Site Specialty Appointment Summary
#### January – June 2023

| Month | Jan | Feb | Mar | Apr | May | Jun |
|---|---|---|---|---|---|---|
| # Scheduled | 426 | 334 | 404 | 341 | 420 | 390 |
| Out of Custody | 88 | 7 | 15 | 14 | 21 | 14 |
| Out of Jurisdiction/Open Ward | 11 | 5 | 8 | 5 | 5 | 9 |
| Cancel Prior to Transport | 13 | 16 | 23 | 4 | 7 | 9 |
| COVID-19 Isolation | 0 | 1 | 1 | 0 | 0 | 0 |
| # Eligible Patients to Attend | 314 | 305 | 357 | 318 | 387 | 358 |
| Refused | 42 | 44 | 48 | 54 | 52 | 46 |
| C/O Shortage | 41 | 50 | 71 | 18 | 72 | 97 |
| Cancelled at Office | 2 | 2 | 2 | 7 | 5 | 5 |
| Scheduling Error | 2 | 3 | 7 | 2 | 3 | 2 |
| Court | 5 | 4 | 10 | 4 | 0 | 5 |
| Late to Appointment | 4 | 0 | 5 | 5 | 2 | 10 |
| Other | 6 | 9 | 1 | 7 | 2 | 10 |
| Total NOT Seen | 102 | 112 | 144 | 97 | 136 | 175 |
| Total Eligible Patients Seen | 212 | 193 | 213 | 221 | 251 | 183 |
| % Eligible Patients Seen | 68% | 63% | 60% | 69% | 65% | 51% |

After initial audits revealed that only 56 percent of patients were making it to scheduled off-site appointments, PDP developed uniform categories for tracking missed appointments. Further analysis revealed patient refusals and security staff shortages as the most frequent reasons for missed appointments. Patients have consistently reported to the Monitoring Team that excessive wait times in holding cells for transportation to appointments is a primary reason for their

---

[24] Monitor's Second Report, *supra* note 6, at 26.

refusals.[25]  PDP reports that it has made some operational changes that have improved patient wait times, which is positive.  Even with operational changes and improved wait times, without sufficient security personnel to transport patients, there remains a high number of same-day appointment cancellations.  As a result, some providers are discontinuing relationships with PDP patients due to excessive last-minute cancellations.

PDP reports that it is renewing focus on security scheduling for medical transports in hopes of further reducing the backlog to levels that will allow healthcare to achieve and maintain compliance while managing ongoing referrals.  Despite these barriers, PDP has improved from averages of 56 percent to 65 percent of patients attending their appointments.  The average 65 percent success rate has remained consistent since the previous reporting period and may mark a new threshold for appointment attendance.[26]

PDP continues to struggle to meet policy guidelines for completing patient intake screenings within four hours of arrival at PDP.  The following table depicts PDP's reported compliance with four-hour timeframes for each month in the first half of 2023:

### Percentage of Intake Screenings Within Four Hours
Monthly Averages 2023

| | |
|---|---|
| January | 30% |
| February | 48% |
| March | 37% |
| April | 40% |
| May | 31% |
| June | 24% |

PDP reports that it typically has adequate healthcare staffing to meet the four-hour requirement but that security staff availability to deliver patients for screenings remains challenging.  The Monitoring Team has recommended that the Access to Care Committee retain this issue on its agenda for further consideration.

In this reporting period, PDP initiated the recommended critical incident review process following Class Member deaths.  Six Class Member patients died while in PDP custody in the first six months of 2023.  Manners of death for two patients include one suicide and one homicide.  PDP is awaiting final medical examiner reports for the four remaining patients.  The Monitoring Team has observed each review, which are consistently presided over by the Commissioner and attended by PDP's entire healthcare and security executive management teams, the security and healthcare teams, and assisting and witness personnel.  The reviews are held in the days immediately following a Class Member death, so information discussed is preliminary.  All known facts and circumstances related to each death are discussed, including movement and operational timelines leading up to, during, and after each death.  Care and access

---

[25] *Id.* at 27-28; Monitor's First Report, *supra* note 7, at 20.
[26] Monitor's Second Report, *supra* note 6, at 27.

to services, as well as healthcare and security emergency responses, are also discussed.  Reviews thus far have been transparent, and discussions have been thorough and self-critical.  Every review has yielded identification of necessary corrective action, for which the Commissioner issued corresponding directives or requested additional information and follow-up.  As with the Access to Care Committee, the death review process is among the more significant, systemically impactful changes PDP has achieved thus far.  The Monitoring Team will continue to work with PDP to refine its corrective action planning and implementation and improve its finalized death investigations.

**Behavioral Healthcare**

PDP has continued to collect data regarding the frequency and timeliness of healthcare delivery.  PDP's Performance Indicator Report reflects continued challenges in completing behavioral health referrals within required timeframes.[27]  The behavioral health appointments backlog comprises 14 percent of the entire on-site appointment backlog and has not changed significantly since the last reporting period.  However, patients are not receiving care within policy timelines.  Delays are reportedly due to healthcare and custody staffing deficiencies, and they continue despite efforts to improve service delivery in this reporting period (such as delivering services directly on housing units rather than the national best practice of delivering patients to a central clinic with space for confidential communication).  The following tables depict PDP's compliance with policy timeframes for behavioral health referrals, social worker sick calls, and 14-day patient evaluations for the first six months of 2023:

**Percent Compliance with Behavioral Health Referral Timeframes**
January – June 2023

| Month | Total Completed Referrals | % All Referrals Completed Within Policy Timeframes | % Emergency Referrals Completed Within 4 Hours | % Emergency Referrals Completed Within 24 Hours | % Urgent Referrals Completed Within 24 Hours | % Routine Referrals Completed Within 5 Days |
|---|---|---|---|---|---|---|
| January | 621 | 54% | 76% | Unavailable | 21% | 38% |
| February | 611 | 63% | 81% | Unavailable | 22% | 59% |
| March | 757 | 59% | 84% | 100% | 17% | 43% |
| April | 658 | 65% | 88% | 100% | 22% | 52% |
| May | 766 | 64% | 86% | 100% | 25% | 38% |
| June | 650 | 61% | 87% | 100% | 18% | 34% |

*Expectation: emergent within 4 hours, urgent within 24 hours, routine within 5 days.

---

[27] PDP behavioral healthcare policy prescribes the following timeframes for responding to behavioral health patient referrals: emergency referrals, within four hours; urgent referrals, within 24-hours; and routine referrals, within five days.

**Social Worker Sick Calls 2023**
January 2023 – June 2023

| Month | Number Completed | % Completed within 14 Days |
|---|---|---|
| January | 413 | 70% |
| February | 454 | 67% |
| March | 393 | 69% |
| April | 355 | 70% |
| May | 363 | 69% |
| June | 380 | 69% |

**Compliance with 14-Day Evaluations**
January 2023 – June 2023

| Month | Number Completed | % Completed within 14 Days |
|---|---|---|
| January | 654 | 97% |
| February | 667 | 98% |
| March | 685 | 99% |
| April | 774 | 99% |
| May | 795 | 95% |
| June | 780 | 96% |

Behavioral health referrals were completed within required timeframes less than 70 percent of the time. PDP has made improvements in recent months but still has difficulty responding to emergency referrals within the required four-hour time frame. Behavioral Health was always able to complete emergency referrals within 24 hours. This was likely at the expense of urgent referrals, which were completed within required 24-hour timeframes less than 25 percent of the time, and routine referrals, which were completed within six-day timeframes less than 50 percent of the time.

Policy requires that social worker sick calls, or Class Member initiated requests, are responded to by a Behavioral Health clinician face-to-face within 24-hours of receipt. PDP data shows that timeframes were met between 67 to 70 percent of the time from January through June 2023. This reflects a decrease from 75 to 86 percent compliance since the previous reporting period.[28]

Finally, all Class Members entering PDP are referred for a 14-day evaluation to be completed by Behavioral Health staff. As previously reported, PDP achieved increased compliance in the last three months of 2022, meeting policy guidelines more than 90 percent of the time.[29] Progress has continued and PDP is close to 100 percent compliance in this reporting period.

---

[28] Monitor's Second Report, *supra* note 6, at 30.
[29] *Id.* at 30-31.

**Healthcare Staffing**

Correctional healthcare staff vacancy rates are analyzed based on the number of vacant and filled positions, or a "staff vacancy" rate and a "functional vacancy" rate, which accounts for shifts filled by overtime or temporary agency staff.  In the first reporting period, PDP reported a staff vacancy rate of 33 percent and a functional vacancy rate of 14 percent.[30]  In this reporting period, PDP reports a similar staff vacancy rate but a lower functional vacancy rate of six percent.  Functional vacancy rates tend to fluctuate depending on need and availability of overtime and registry staff.  Hiring and retaining permanent staff is the best way to ensure consistently high staffing levels and control for fluctuations in functional staffing.  Behavioral health classifications continue to show a high functional vacancy rate of 40 percent for clinicians and 37 percent for prescribers.  At these rates, PDP cannot meet requirements for the provision of timely and adequate behavioral healthcare.

Despite persisting vacancies, data in this reporting period suggests improvements in hiring and retention, which saw little progress in previous reporting periods.[31]  In the first six months of 2023, PDP was able to fill 26.35 positions.  In the same period, PDP lost 14.95 full time positions/employees.  The following tables depict healthcare new hires and separations for each classification in this reporting period, January through June 2023, and total healthcare vacancies for May 2023:

**Healthcare Personnel New Hires and Separations by Job Classification**
January – June 2023

| Job Classification | New Hires | Separations | Net (+/-) |
|---|---|---|---|
| Behavioral Health Nurse Practitioner | 1 | | +1 |
| Licensed Clinical Social Worker | 1 | 1 | 0 |
| Behavioral Health Counselor | 1 | | +1 |
| Nurse Practitioner | 1 | 1 | 0 |
| Registered Nurse | 5.35 | 3.55 | +1.8 |
| Licensed Practical Nurse | 6.2 | 3.4 | +2.8 |
| Medical Assistant | 4.8 | 3 | +1.8 |
| Medical Records Clerk | 3 | 2 | +1 |
| Administrative Assistant | | 1 | -1 |
| Scheduler | 3 | | +3 |
| **Total** | **26.35** | **14.95** | **+11.4** |

---

[30] *See* Monitor's First Report, *supra* note 7, at 19.
[31] *See Id.* at 19-20; Monitor's Second Report, *supra* note 6, at 31-33.

**Healthcare Vacancy Report**
May 2023

| Position Category | Allocated FTE December 2022 | Allocated FTE June 2023 | Unfilled FTE | FTE Vacancy Rate | Functional Vacancy Rate |
|---|---|---|---|---|---|
| Administration | 50 | 49 | 1 | 2% | -16% |
| Behavioral Health Aide | 9 | 7.8 | 1.8 | 23.1% | -31% |
| Behavioral Health Clinicians: Social Worker/Psychologist | 25.1 | 23.8 | 16.6 | 69.8% | 40% |
| Behavioral Health Prescribers: Psychiatrist, NP | 16.6 | 16 | 6.5 | 40.6% | 37% |
| Behavioral Health Professionals: BH Coun./Activity Th. | 17.2 | 15 | 0 | 0% | 44% |
| Certified Nursing Assistant | 2.8 | 2.8 | 2.4 | 85.7% | 61% |
| Dialysis RN and Dialysis Technician | 1.6 | 1.6 | 0.8 | 50% | 46% |
| Infectious Disease Physician | 2 | 2 | 0 | 0% | 35% |
| License Practical Nurse: All LPNs | 64.6 | 68.2 | 27.2 | 39.9% | -13% |
| Medical Assistant | 19 | 18 | 8.8 | 48.9% | 1% |
| Medical Records Clerk | 18.8 | 13.8 | 4.8 | 34.8% | 5% |
| OB/GYN Physician | 0.8 | 0.8 | 0 | 0% | 100% |
| Optometrist | 0.8 | 0 | 0 | 0% | 0% |
| Physical Health Clinicians: Physician, NP, PA | 17.2 | 17.2 | 1.6 | 9.3% | -5% |
| Physical Therapist and Physical Therapist Assistant | 3 | 3 | 0 | 0% | 19% |
| Telehealth Coordinators | 2 | 4 | 2 | 50% | 43% |
| Radiology Technician | 2.4 | 2.4 | 1.4 | 58.3% | 48% |
| Registered Nurse: All RNs | 72.2 | 68.8 | 28.1 | 40.8% | 10% |
| **Total** | **325.1** | **314.2** | **103** | **32.8%** | **6%** |

In efforts to improve healthcare efficiency and employee recruitment and retention, PDP and YesCare reviewed PDP's current allocated positions and compensation. PDP made adjustments to some positions, and following negotiations with the correctional healthcare labor unions, has increased compensation for many positions up to 13 percent. Increases were made effective July 28, 2023, with a retroactive date of April 1, 2023. This is positive news and PDP is now better positioned to attract more candidates in the competitive market.

Status of Recommendations, Substantive Provision 5—Healthcare, from the Monitor's First Report:

1. Defendants should engage an independent salary survey to assist PDP in identifying salaries and benefits that are sufficiently competitive to attract and retain full-time healthcare staff.

   *In the previous reporting period, PDP reported that it was planning to offer up to eight percent salary increases for many healthcare positions.[32]  Following additional review, PDP elected to offer a more significant 13 percent increase, as described above.  PDP's implementation of this recommendation reflects significant progress.*

2. Continue to explore options to provide both on and off-site appointment services via telehealth.

   *PDP reports that YesCare has engaged a cardiology group that is willing to provide telehealth services, which began in July 2023, but has been otherwise unsuccessful in these efforts.*

3. Create an internal interdisciplinary workgroup to evaluate reasons for missed off-site appointments and develop procedures to increase efficiency in arranging and ensuring that scheduled appointments occur.

   *The Access to Care Committee was formed in November 2022 to address on-site and off-site appointment issues.  As discussed above, the workgroup has been successful in identifying and correcting deficiencies and continues to meet weekly.*

**Substantive Provision 6—Behavioral Health in Segregation**

*By September 30, 2022, the PDP and Corizon shall re-establish a mental health program for persons who are in segregation status.*

**Compliance Rating:  Partial Compliance**

In order to achieve substantial compliance with this substantive provision, PDP must, at a minimum:  (1) resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status; (2) ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on administrative or punitive segregation status; (3) resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating serious mental illness (SMI); (4) resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation status; (5) establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units; (6) safely discontinue the use of segregation for Class Member patients due to lack of sufficient Transition Unit housing; and (7) significantly reduce the use of segregation for Class Member patients who require placement on the behavioral health caseload.

*Requirements 1 and 3:  Resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status and resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating SMI.*

---

[32] Monitor's Second Report, *supra* note 6, at 33.

As discussed in prior reports, daily physical healthcare rounds and weekly behavioral healthcare rounds are essential to patients in segregated settings.[33]  Rounds allow healthcare staff to assess patients and monitor for signs of physical or mental health distress or decline.  Rounds also offer patients opportunities to express their healthcare needs with consistency, and providers may seek the removal of at-risk patients from segregation housing.

Recent audit results reflect a significant reduction and low compliance with required physical healthcare rounding.  A previous PDP Healthcare audit from September 2022 revealed that required medical rounds were occurring 84 percent of the time.[34]  The March 2023 audit reflects that only 22 percent of required rounds were occurring, and in two of three facilities, did not occur at all on some days.  PDP Healthcare reports it is increasing training and monitoring of healthcare rounding in hopes of improving compliance.

PDP has shown improvement, however, in weekly behavioral health rounds from 75 percent compliance in September 2022 to 96 percent compliance in March 2023.  This is a notable accomplishment given the behavioral health vacancies discussed above under Substantive Provision 5—Healthcare.

PDP does not currently track when clinicians initiate the removal of patients from segregation housing due to physical or mental health deterioration while in isolation.  The Monitoring Team has received reports from individual healthcare providers that patients are periodically removed or that additional services are requested.  The Monitoring Team has recommended that PDP Healthcare track these occurrences and is working with PDP to develop a system.

*Requirement 2:  Ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on segregation status.*

Healthcare clearances are required for all Class Members being considered for placement on segregation status.  This requires a face-to-face evaluation by a physical healthcare provider, and for those on the Behavioral Health caseload, a Behavioral Health clinician.  Patients designated SMI require behavioral health clearances within four hours of placement.  Patients who are on the Behavioral Health caseload but not designated SMI require behavioral health clearances within 24 hours of placement in segregation.

The subject matter experts reviewed a sample of physical and behavioral healthcare clearance documentation, which suggests that physical health clearances are continuing to be documented consistently prior to patients' placements in segregated housing.  Dr. Belavich has determined that physical health clearances are completed using a sound practice, which sees each patient delivered to a medical clinic for physical health evaluations prior to transport to segregation units.

As discussed in more detail under Substantive Provision 8—Discipline below, behavioral health clearances are not being documented consistently.  This is due in part to discrepancies in security and healthcare documentation.  Other issues may include failures to identify patients as SMI or

---

[33] *Id.* at 34; Monitor's First Report, *supra* note 7, at 22.
[34] Monitor's Second Report, *supra* note 6, at 34.

on the Behavioral Health caseload, or failures to notify behavioral health staff of patients pending segregation placement. The Monitoring Team has also observed that some Behavioral Health clinicians are documenting clearances in the electronic medical record, which security personnel do not have access to, but not on PDP's required disciplinary forms. Disciplinary forms are shared with and used by security hearing officers to make segregation determinations and must be completed for each patient. PDP is revising its process for completing and documenting behavioral health clearances and improvements will be addressed in future reports.

*Requirement 4: Resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation status.*

PDP reported previously that it had developed "Positive Change/Positive Outcomes" (PC/PO), a behavioral health group treatment program for patients in isolation. The program is designed and staffed with 13 providers for robust delivery five days per week for two hours, or a total of 52 groups per day or 10 possible treatment hours for each segregated patient every week. However, documentation in this reporting period reflects that only 19 percent of total groups are being offered, largely due to security staffing shortages. In this reporting period, PDP developed a system to track which patients are eligible for the PC/PO program, which patients are offered participation but refuse, and how much time patients in the PC/PO program spend doing program-related treatment. PDP began tracking the information in early 2023 and are developing a better understanding of specific program needs and patient participation.

Dr. Belavich indicates that without treatment programming, Class Member patients in segregation are more likely to psychiatrically decompensate or commit additional infractions in response to their isolated conditions. He opines that patients with SMI or mental health diagnoses accompanied by acute symptoms should not be exposed to isolation. If no alternatives exist and these patients require placement in segregation, then they must receive close observation, frequent clinical contacts, and increased therapeutic programming.

*Requirement 5: Establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units.*

As previously reported, PDP's tracking of behavioral health and SMI patients on segregation status was unreliable.[35] PDP was unable to reconcile security and healthcare documentation and prove that Class Members were not "segregating in place" or serving a segregation sentence in non-segregation housing. Segregating in place prevents healthcare staff from completing proper rounding and providing necessary care for vulnerable behavioral health patients. PDP reports that it has corrected tracking discrepancies and issued a directive that prohibits segregating in place. PDP Healthcare reports that audits are now being conducted to verify reconciled documentation and ensure (1) patients on segregation status are all housed in segregation housing units; and (2) clinical personnel are able to round on all segregated patients. Results will be discussed in the next reporting period.

---

[35] *Ibid.*

*Requirement 6: Safely discontinue the use of segregation for Class Member patients due to lack of sufficient Transition Unit housing.*

Dr. Belavich maintains that PDP should reduce its dependence on segregation for all Class Members and discontinue its use altogether for SMI patients unless no alternatives exist. Many correctional systems are now implementing Therapeutic Housing Units as alternative settings for the mentally ill. As previously reported, prior to the COVID-19 pandemic, PDP had three therapeutic housing or "Transition Units" (TU), which by August 2022 had reduced from 64 to 11 cells for women and from 100 to 56 cells for men.[36] The re-establishment of TUs and the creation of a new TU for patients engaging in self-harm, or other dangerous behaviors in lieu of placement in segregation, are crucial for this population.

PDP has agreed to implement the Monitoring Team's recommendations for TU expansion. During the Monitoring Team's October 2022 tour, one unit at PICC housed 66 male TU Class Members and some general population Class Members as well. In February 2023, PDP expanded housing for male Class Members by transferring its TU to a unit at RCF with a 128-patient capacity. The entire 128-bed unit is reserved for patients on the Behavioral Health caseload, which allows for more programming and recreation time for the population. Unfortunately, in June 2023, the RCF TU housed only 49 patients. PDP must immediately reevaluate its TU placement criteria, increase the current TU population, and dedicate some of its current bed space to behavioral health patients who should be diverted from segregation.

The female TU remains at PICC and TU patients must share the unit with Class Members of various security classifications, including general population and pregnant Class Members. PDP has reserved 17 of 64 two-person cells for TU patients for a total occupancy of 34 Class Members. The inability to mix Class Members of different security classifications results in TU patients receiving limited out-of-cell programming. PDP acknowledges that current programming for women generally, and TU patients specifically, remains unacceptable. Among other recommendations for improved conditions for women, the Monitoring Team has recommended that PDP reevaluate the structure of the female TU, reserve additional beds for TU patients, and then utilize pre-COVID-19 thresholds to identify more TU patients to fill them.

PDP Healthcare is developing a procedure to allow SMI Class Members to remain in TUs throughout their disciplinary terms and the imposition of any accompanying sanctions rather than be transferred to segregation housing. This alternative to traditional punitive segregation would allow patients to reside in familiar settings and maintain continuity of clinical contacts and TU services and programs. If patients' behavior becomes severely disruptive to TU programming, patients will be moved to segregation housing but will still receive at least 10 hours per week of group programming through the PC/PO program. Patients will also receive appropriate treatment planning to address identified behaviors with the goal of reintegrating patients to either a TU or general population setting.

Once implemented, these changes should reduce the presence of SMI and Behavioral Health caseload Class Members in segregation. For PDP to meet this requirement, it will need to

---

[36] *Id.* at 36; Monitor's First Report, *supra* note 7, at 23.

reserve sufficient bedspace to accommodate all Class Member patients who are eligible for the TU program and maintain sufficient security and healthcare personnel to operate the units.

*Requirement 7: Significantly reduce the use of segregation for Class Member patients who require placement on the behavioral health caseload.*

On December 30, 2022, PDP's total census was 4,401 Class Members. Thirty-five percent of Class Members were on the Behavioral Health caseload and 12 percent were designated SMI.[37] There were a total of 311 Class Members on segregation status.[38] Of the segregation population, 44 percent were part of the Behavioral Health caseload and 12 percent were SMI.[39] This reflected significant overrepresentation of behavioral health patients in segregation.[40] On June 9, 2023, PDP's census was 4,565 Class Members. Thirty-six percent of the population was on the Behavioral Health caseload and 10 percent were designated SMI. There were 268 Class Members on segregation status, reflecting an overall reduction of 43 individuals. Of the segregation population, 38 percent were part of the Behavioral Health caseload and eight percent were SMI, reflecting a 10 percent reduction in SMI and behavioral health Class Members in segregation. Overrepresentation of the mentally ill in segregation persists, but the reduction, despite PDP's census increase, is a positive development and efforts should continue. The following table depicts SMI and Behavioral Health patients in segregation housing on December 30, 2022, and June 9, 2023:

**SMI and Behavioral Health Class Members in Segregation**
December 30, 2022 and June 9, 2023

| | December 30, 2022 | | June 9, 2023 | |
|---|---|---|---|---|
| | Count | Percent of Population | Count | Percent of Population |
| **PDP Census** | 4401 | 100% | 4565 | 100% |
| **Number of SMI** | 516 | 12% | 439 | 10% |
| **Number on BH Caseload** | 1546 | 35% | 1653 | 36% |
| **Number in Segregation** | 311 | 7% | 268 | 6% |
| | | Percent of Segregation Population | | Percent of Segregation Population |
| **Number of SMI in Segregation** | 36 | 12% | 21 | 8% |
| **Number of BH in Segregation** | 138 | 44% | 102 | 38% |

---

[37] Monitor's Second Report, *supra* note 6, at 37.
[38] *Ibid.*
[39] *Ibid.*
[40] *Ibid.*

Until TU policies are in place, clinicians' only option for diversion of SMI and behavioral health patients from segregation is placement in PDP's Mental Health inpatient unit at PHSW. Hospital placement criteria are rigid and require high acuity with severe symptoms. The Monitoring Team has recommended that PDP Healthcare issue an interim directive authorizing diversion to the TUs, which will give clinicians another option with a lower placement threshold than the hospital. PDP may then have to contend with insufficient TU bed space until expansion is completed, but the risk to behavioral health patients in isolation warrants interim action.

The Monitoring Team also continues to observe patients in segregation settings whom Dr. Belavich flags as inappropriate for placement or whose conditions deteriorated while in isolation. PDP's Behavioral Health clinicians and leadership face unique challenges in managing their patient population with current staffing shortages and fewer options for increasingly ill patients. These providers' dedication despite PDP's current conditions is rare and admirable. However, PDP's current thresholds for isolating people with SMI or severe mental health symptoms, and retaining them on segregation status, remain outdated and must end.

PDP does not currently track when individuals are diverted from segregation and where they may be appropriately placed instead. PDP reports it is developing a tracking system that will produce monthly reports of patient diversions from segregation to TUs or PHSW. Tracking will also assist with identifying TU needs and trends in patient acuity.

Status of Recommendations, Substantive Provision 6—Behavioral Health in Segregation, from the Monitor's Second Report:

1. PDP should reexamine its behavioral health policies and practices for segregation clearances and rounding, with particular focus on thresholds for diversion or removal from segregation based on patient acuity.
   *In consultation with the Monitoring Team, PDP is in the process of implementing this recommendation.*
2. PDP should make additional progress in identifying personnel to staff Positive Change/Positive Outcome treatment groups and fill Transition Units with only Transition Unit patients or others who can safely program in common spaces with them.
   *Discussed above, the PC/PO program is staffed to deliver more than 50 groups per day, but security staff shortages reportedly prevent it. The men's TU contains only single security classification TU patients, but the women's TU continues to house Class Members of various classifications, including general population and pregnant women.*

**Substantive Provision 7—Law Library Access**

*PDP will continue to provide law library access for all incarcerated individuals. The Monitor and the parties will discuss access and scheduling matters and the Monitor shall make any recommendations on these matters by August 1, 2022.*

**Compliance Rating:  Partial Compliance**

In this reporting period, PDP created a new rotating law library schedule and standardized the Class Member sign-up process for general population housing units.  During site visits, Class Members have reported some improvements to the Monitoring Team regarding access to law libraries and properly functioning equipment.  Larger issues with out-of-cell time and staffing, which limit law library access, are ongoing.

A standardized sign-up process and formalized schedule for general population units allow PDP executives and the Monitoring Team to begin tracking law library access.  Beginning in April 2023, all PDP facilities were required to implement the new law library processes.[41]  The rotating schedule provides multiple days and time slots each week for all general population housing units.  The rotation was designed to accommodate Class Member court appearances, medical appointments, visiting, work, and program assignments.

The Monitoring Team reviewed a one-week sample of rosters in each of April, May, and June 2023.  Some of the rosters for some housing units were missing, so the Monitoring Team has recommended additional training for housing unit and law library officers to ensure all schedules are retained.  The sample comparison of sign-up rosters against the law library schedules suggests that only 32 percent of the scheduled slots were documented as filled.  It is unclear whether any of the remaining 68 percent of slots were offered but not documented or documentation was not retained.  It also appears that law libraries were not always open during scheduled times due to insufficient security personnel.  PDP's new law library documentation is not yet reliable and requires improvements, which PDP has committed to implementing in the next reporting period.  With some improvements, PDP's system for tracking access to the law library in general population housing units will be useful to PDP management and the Monitoring Team in measuring compliance.

In restricted housing environments, law library access is offered during out-of-cell time but is not tracked individually.  As reported above, out-of-cell, and therefore law library, opportunities in segregation are more limited and PDP will be unable to achieve Substantial Compliance with this provision until access improves.

PDP continues to document monthly audits of law library equipment.  The following table reflects equipment issues identified at each facility during equipment audits between January and June 2023 and dates by which repairs were completed:

---

[41] CFCF did not implement the new law library process but reportedly will in the next monitoring period.

**PDP Internal Law Library Equipment Audit**
January – June 2023

| Month | Equipment | CFCF | DC | PICC | RCF | Total Issues Documented | Housing Unit Audit Dates | Repairs Completed |
|-------|-----------|------|-----|------|-----|-------------------------|--------------------------|-------------------|
| Jan 2023 | Computers | 0 | 1 | 0 | 0 | 1 | 1/19/23- 1/20-23 | 1/24/23 |
| | Printers | 0 | 0 | 0 | 0 | 0 | | |
| Feb 2023 | Computers | 0 | 0 | 0 | 0 | 0 | 2/22/23- 2/28/23 | NA |
| | Printers | 0 | 0 | 0 | 0 | 0 | | |
| Mar 2023 | Computers | 0 | 0 | 0 | 0 | 0 | 3/21/23- 3/27/23 | 3/22/23 |
| | Printers | 0 | 0 | 1 | 0 | 1 | | |
| Apr 2023 | Computers | 0 | 0 | 0 | 1 | 1 | 4/20/23- 4/27/23 | 4/28/23 |
| | Printers | 0 | 0 | 0 | 1 | 1 | | |
| May 2023 | Computers | 0 | 0 | 0 | $2^{42}$ | 2 | 5/23/23- 5/24/23 | 6/5/23 |
| | Printers | 0 | 0 | 0 | 0 | 0 | | |
| June 2023 | Computers | 0 | 0 | 0 | 0 | 0 | 6/23/23- 6/30/23 | N/A |
| | Printers | 0 | 0 | 0 | 0 | 0 | | |
| **Total** | | **0** | **1** | **1** | **4** | **6** | | |

## Substantive Provision 8—Discipline

*Sub-provision 8.1--All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding. See Wolff v. McDonnell, 418 U.S. 539, 563–66 (1974); Kanu v. Lindsey, 739 F. App'x 111, 116 (3d Cir. 2018); Stevenson v. Carroll, 495 F.3d 62, 70–71 (3d Cir. 2007).*

**Compliance Rating:  Partial Compliance**

The following tables depict PDP's disciplinary hearing data for the six-month period, July through December 2022, and each month, January through June 2023, including totals for disciplinary sanctions issued, "not guilty" findings, dismissals, and discipline imposed despite Class Members' absence without waiver:

---

[42] PDP reports that during the May 2023 audit, two computers were identified as compromised.  Both units were removed and replaced.

**PDP Disciplinary Hearings**
July – December 2022[43]

| Six-month Total | Total Discipline Issued | Total Not Guilty | | Dismissed | | SMI[44] | | Guilty without a hearing | |
|---|---|---|---|---|---|---|---|---|---|
| | n | n | % | n | % | n | % | n | % |
| Average/Average % | 268 | 19 | 7% | 30 | 11% | 24 | 9% | 6 | 2% |

**PDP Disciplinary Hearings**
January – June 2023

| Month | Total Discipline Issued | Total Not Guilty | | Dismissed | | SMI | | Guilty without a hearing - excludes refusals | |
|---|---|---|---|---|---|---|---|---|---|
| | n | n | % | n | % | n | % | n | % |
| January | 333 | 22 | 7% | 59 | 18% | 36 | 11% | 0 | 0 |
| February | 294 | 26 | 9% | 22 | 7% | 30 | 10% | 0 | 0 |
| March | 365 | 32 | 9% | 36 | 10% | 34 | 9% | 0 | 0 |
| April | 263 | 18 | 7% | 18 | 7% | 24 | 9% | 0 | 0 |
| May | 290 | 19 | 7% | 40 | 14% | 27 | 9% | 0 | 0 |
| June | 270 | 19 | 7% | 29 | 11% | 26 | 10% | 0 | 0 |
| Average/Average % | 303 | 23 | 8% | 34 | 11% | 30 | 10% | 0 | 0 |

In this reporting period, no disciplinary hearings were documented as occurring without the subject Class Member present unless attendance was waived or refused.  Of 1,815 total disciplinary hearings documented from January through June 2023, 54 Class Members reportedly refused to participate, reflecting a relatively low three percent refusal rate.  PDP policy and practice now appear to be aligned, and PDP is in compliance with this aspect of the sub-provision.

As previously reported, the Monitoring Team recommended that PDP revise its disciplinary policies and hearing documentation to comply with due process and Agreement requirements.[45]  In this reporting period, PDP initiated a review of its disciplinary policies, forms, and training materials to ensure: (1) staff assistants are assigned to support Class Members throughout the hearing process whenever necessary and assignments are documented; (2) communication is facilitated for non-English speaking Class Members, those with developmental or learning disabilities, hearing or vision impairments, or other needs; (3) consistent identification and documentation of SMI and behavioral health Class Members; and (4) input from clinical

---

[43] Monthly totals included in the Monitor's Second Report.  *See* Monitor's Second Report, *supra* note 6, at 40.
[44] SMI data was incomplete in the previous reporting period when this average was calculated, and the table was generated.  *See Id.* at 40-41.
[45] *Id.* at 39-41; Monitor's First Report, *supra* note 7, at 25.

personnel regarding behavioral health or SMI Class Members subject to discipline. New forms will provide additional guidance for hearing officers in ensuring Class Members' legal rights are protected and they are able to understand the proceedings and present a defense.

In this reporting period, the Monitoring Team expanded its review of disciplinary actions to include 25 completed disciplinary cases involving Class Members who were designated SMI. As previously reported, security and behavioral health documentation is inconsistent, so the review included cases where SMI designations are present in at least one documentation source.[46] The expanded review confirmed discrepancies in security and healthcare documentation of Class Members experiencing SMI. It also revealed: (1) failures to document if hearing officers seek or receive clinical feedback about subject SMI Class Members and whether they should be held accountable for the alleged behavior; (2) whether clinical indications should limit any sanctions imposed; (3) failures in behavioral health documentation and communication of Class Members' SMI status to hearing officers; and (4) insufficient clinical assessment or documentation regarding SMI Class Members' fitness for segregation and the presence of mitigating clinical indications.

Behavioral Health staff are required to complete an assessment form (PDP 86-733) prior to placement of each Class Member into a segregated setting. The form contains a section for treating clinicians to note any behavioral health contraindication to placement in segregation. It also contains sections to document whether a Class Member is able participate in the hearing process and present a defense, and whether a Class Member's mental illness should be considered a mitigating factor in any discipline imposed. Every time a hearing officer is aware that a Class Member may be SMI, this information must be considered before a hearing may proceed. This requirement is consistent with PDP's disciplinary philosophy, but its policies, documentation, and practices do not currently align.

Of 24 cases reviewed, only six Class Members were correctly documented as SMI for disciplinary hearings. In cases where SMI documentation was ambiguous, hearings should not have proceeded without clarification. Of six cases in which Class Members' SMIs were properly documented, only one contained completed documentation of mitigating clinical indications that the hearing officer should have considered in issuing sanctions. For some SMI Class Members subject to discipline, clinicians enter appropriate notes in the electronic medical record but fail to complete 86-733 forms. Because hearing officers do not have access to patient electronic medical records and rely largely on 86-733 forms, these Class Members' mental illnesses were not likely considered in their disciplinary hearings. If they were considered, they were not documented.

Human error and documentation omissions are expected and will likely continue even after improvements are implemented, particularly given PDP's staffing shortages. However, PDP continues to discipline a high number of patients with acute mental illness whose symptoms may be severe and contribute to or cause their institutional misconduct. Dr. Belavich opines that these patients may be unable to control their behavior or understand that it violates rules, or they may lack capacity to understand the rule they violated or be deterred from future misconduct. Placement of these individuals into segregation must be avoided whenever possible, and PDP

---

[46] Monitor's Second Report, *supra* note 6, at 40.

executives agree that policies and practices should be revised accordingly. They also correctly observe that staffing and other barriers limit current options for meeting this population's unique needs. PDP anticipates it will begin piloting new disciplinary forms in the next reporting period.

*Sub-provision 8.2--The PDP shall expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date [April 12, 2022]. . .*

> **Compliance Rating:  Substantial Compliance (March 3, 2023, monitoring discontinued)**

*Sub-provision 8.3--[PDP shall] release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are [on April 12, 2022] still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing. . .*

> **Compliance Rating:  Substantial Compliance**

In December 2022, 12 Class Members remained in administrative segregation since at least the April 15, 2022, Agreement compliance date despite having at least one disciplinary disposition reversed and their records expunged.[47]  If these Class Members' retention in administrative segregation was related to their expunged cases, they would require removal pursuant to this sub-provision.  If, however, they received new disciplinary dispositions, or posed other legitimate security risks, their retention in segregation may have been appropriate.  In this reporting period, the Monitoring Team evaluated additional Jail Management System and classification committee documentation for these 12 cases.

Of the 12 cases requiring additional review, four of the Class Members had been released from segregation consistent with this provision and subsequently received additional infractions before being retained on administrative segregation.  Of the remaining eight Class Members who had remained in segregation for more than eight months as of December 2022, none had received a subsequent disciplinary report, classification committee actions were overdue, and documentation failed to articulate the classification committee's decisions to retain them.  Four of the eight Class Members were released from segregation in January 2023, nine months from the April 15, 2022, compliance date.  Three were released in February 2023, or 10 months later, and the final Class Member was released in March 2023, after at least 11 months in segregation.

Although the classification timelines were not met and committee decisions were poorly documented throughout the Class Members' protracted periods of isolation, some of the Class Members may have required administrative segregation.  For example, one Class Member was determined to have committed a serious assault on another Class Member with a weapon and continued to commit gang-related infractions while in segregation.  Had this and other issues been properly documented, prolonged segregation may have been justified.  Because they were not, these Class Members' retention on segregation was inappropriate.

---

[47] *Id.* at 42.

By mid-March 2023, no Class Members remained in segregation in violation of this sub-provision and PDP has now achieved substantial compliance. PDP's practices are improving, including classification committee timeliness and documentation. The Monitoring Team continues to review segregation placements, documentation, and practices pursuant to other Agreement provisions.

The Monitor has consistently reported that there are several Agreement provisions that cannot be fully implemented with PDP's existing resources. It is important to note that this sub-provision was not one of them. PDP incorrectly certified to the Monitoring Team in August 2022, and again in October 2022, that no Class Members remained in segregation in violation of this sub-provision.[48] Had PDP exercised more care in reviewing its own documentation prior to offering assurances that the deficiency was corrected, several Class Members might have been spared months of additional isolation. Instead, this easily correctible yet highly consequential systemic failure persisted nearly one year into Agreement implementation and unnecessarily exposed Class Members to harm as a result.

It does not appear that PDP failed to correct this issue for lack of will to comply with this Court's order, and its negligence in doing so is uncharacteristic of its approach to the Agreement as a whole. PDP executives were admonished to the potential consequences of the failure to correct, yet certify that a deficiency was corrected. They expressed regret for the error and have committed to greater vigilance going forward. Finally, PDP acknowledges the many harms Class Members must endure inside PDP facilities in violation of this Agreement and their constitutional rights. PDP correctly observes that without support from its Co-Defendants and Philadelphia's other criminal justice partners, it will not be able to protect Class Members from every harm they face. However, this bleak and dangerous reality in no way absolves PDP of its responsibility to protect Class Members wherever possible, and it failed to do so in this instance.

*Sub-provision 8.4--[PDP shall] cancel sanctions [imposed in hearing held between March 2020 and April 12, 2022] that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms. Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation. Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline. Defendants shall provide to counsel for plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022.*

**Compliance Rating: Substantial Compliance (March 3, 2023, monitoring discontinued)**

**Substantive Provision 9—Tablets**

---

[48] *Id.* at 42*; Monitor's First Report, supra* note 7, at 25.

*Sub-provision 9.1--PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational capabilities and housing designs. The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets; and, at RCF, expanding from six (6) to eight (8) tablets on the [first floor] (4 housing units) and expanding from eight (8) to twelve (12) tablets on the [2nd and 3rd floors] of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF. This expansion process will be completed by May 1, 2022.[49]*

**Compliance Rating:  Partial Compliance**

PDP reports that it continues to maintain an inventory of tablets, consistent with this sub-provision, with no significant change since the last reporting period.  In addition to the 421 tablets maintained in housing units, PDP reports that it has reserved an additional 187 tablets for educational programming, which is consistent with previously reported availability.[50]  PDP reports that it will also be activating additional tablets in the next reporting period designated for sick call requests.  Future reports will include outcomes from that project in Substantive Provision 5–Healthcare.  The following table reflects current tablet totals at each PDP facility based on documentation provided:

**Tablet Availability at Each PDP Facility**
December 2022 and June 2023

| Facility/Housing Unit | Total Tablets December 2022 | Total Tablets June 2023 | Difference |
|---|---|---|---|
| ASD Total | 12 | 12 | 0 |
| MOD 3 Total | 12 | 12 | 0 |
| CFCF Total | 198 | 184 | -14 |
| DC Total | 60 | 63 | 3 |
| PICC Total | 60 | 66 | 6 |
| RCF Total | 85 | 84 | -1 |
| **Total** | **427** | **421** | **-6** |

---

[49] The Agreement, as written, requires the expansion of tablets at RCF *"from six (6) to eight (8) tablets on the 2nd and 3rd floor (4 housing units) and expanding from eight (8) to twelve (12) tablets on the 1st floor of RCF (4 larger units) . . .".*   In fact, RCF's larger units are located on the 2nd and 3rd floors and the smaller units are located on the 1st floor, suggesting that the numbers of tablets required were inadvertently reversed.  To correct this small oversight in the Agreement's drafting, PDP must instead increase tablets from eight to twelve on the second and third floor housing units and from six to eight on the first-floor housing units in order to achieve substantial compliance with this aspect of the substantive provision.

[50] Monitor's Second Report, *supra* note 6, at 44.

PDP leadership acknowledges ongoing failures to ensure that tablets are charged, operational, and available to Class Members consistent with this sub-provision. In April 2023, PDP issued a directive reiterating expectations that housing unit personnel charge tablets overnight, reissue them each morning, and follow protocol for any broken tablets. The written directive and expectations were reportedly discussed with staff during briefings at all three jails between April 12 and April 19, 2023. In May 2023, despite the April directive, the Monitoring Team observed that some housing units did not have required numbers of tablets available. Feedback from Class Members regarding tablet availability continues to vary. Some Class Members report consistent access and others report receiving limited or inconsistent access. The Monitoring Team continues to recommend that PDP consider utilizing PDP's internal auditing team to conduct quarterly audits of tablet availability.

*Sub-provision 9.2--The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices.*

**Compliance Rating: Partial Compliance**

PDP reports that it plans to provide tablets to all eligible Class Members as part of its next telephone contract procurement. Procurement is anticipated to begin in the spring of 2024 when the existing telephone contract expires. This is a positive development, though procurement will not likely be completed until late 2024. With all required infrastructure upgrades that must be completed first, tablets may not be issued to Class Members until mid-2025.

PDP's tablet expansion to include sick call requests should be piloted by the end of 2023. PDP has begun implementation of its plan to expand capabilities to include the submission of grievances and other requests. The grievance pilot was initiated in May 2023. In June 2023, 320 grievances were filed via tablets and an additional 225 requests for services were received via tablets. As anticipated, the challenge for PDP going forward will be providing timely and meaningful responses to significant increases in requests and grievances. PDP will need mechanisms for triaging emergent grievances and requests, as well as managing administrative issues like duplicate requests. PDP has developed a training video for Class Members in English and Spanish, which was made available to Class Members systemwide in July 2023.

Once the tablet expansion for grievances and requests is finalized, the Monitoring Team will be able to consider them in making compliance determinations. Previously, access to PDP's grievance system was inadequate and data was therefore unreliable. A review of grievances in this reporting period demonstrated that no grievances were logged regarding lack of access to tablets from January through May 2023, prior to the tablet grievance pilot. In June 2023, 14 grievances were submitted alleging limited access to tablets, eight of which were duplicate filings by the same person and six of which were new grievances. All grievances were filed in the same housing unit, which is valuable information that should be utilized by PDP management in correcting problems. The Monitoring Team has recommended that PDP

management and executives regularly review grievance information to identify and address areas of non-compliance.

The Monitoring Team has considered recommending that PDP pilot a tablet sign-up process to ensure more equitable access for Class Members. This recommendation will be revisited in the future, but given PDP's current staffing levels, a tablet sign-up would not likely be successful. PDP should instead continue to focus on ensuring staff are following existing tablet protocols, expansion, and enhanced tablet functionality.

**Substantive Provision 10—Phone Calls**

*Sub-provision 10.1--PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices.*

**Compliance Rating: Partial Compliance**

PDP reports that it continues to provide 15 minutes of free phone calls on a daily basis in all but its punitive segregation units. The greatest barrier to compliance remains critical staff vacancies, which limit out-of-cell time, and eliminate access to phones. Other barriers that impede Class Members' access to phones may include housing unit dynamics that result in more assertive Class Members controlling phone access.

PDP is able to generate a "zero-usage report" that allows PDP to determine whether a given phone is operational and identifies any Class Member who did not utilize the phone system in a given time frame. In the next reporting period, the Monitoring Team will use the zero-usage report to attempt to audit phone access for a sample of Class Members to determine whether they chose not to use the phone or were otherwise prevented from making a call.

*Sub-provision 10.2--Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls.*

**Compliance Rating: Non-compliance**

As reported above under Substantive Provision 4—Return to Normal Operations, PDP does not yet have a plan for the return to normal operations and, therefore, remains in non-compliance with this sub-provision.

**Substantive Provision 11—PICC Emergency Call Systems**

*The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to tablets and/or phones and determine whether any policies and practices are necessary to address these matters considering all relevant factors, including operational feasibility and physical capacity.*

**Compliance Rating: Partial Compliance**

51

As previously reported, the Monitoring Team has discussed cell-based emergency call systems and tablet and phone expansion at PICC with PDP executive and maintenance teams.[51]  The Monitoring Team continues to recommend against the expansion of PICC's current call button system and instead recommends consistent adherence to PDP's security check protocols.  In this reporting period, PDP attempted to implement the Monitoring Team's recommendation to audit the timeliness and quality of PDP's safety checks.  PDP reports that without an integrated system, CCTV download times were excessively burdensome and unsustainable.  PDP executives acknowledge deficiencies in safety check practices, evidenced most recently by the May 2023 escape.  PDP reports that it is awaiting recommendations from the post-escape security analysis to determine the best path forward.

The Monitoring Team will evaluate any proposed strategies in the next reporting period, which may include random audits of housing units by on-duty supervisors or the use of light duty supervisors to assist with independent reviews on-site at PICC.  The Monitoring Team has also recommended upgrades to the CCTV system that would give PDP executives direct terminal access to CCTV from their desktop computers.

**Substantive Provision 12—Locks**

*Sub-provision 12.1--PDP initiated the lock replacement program for PICC. . . which will be completed by June 30, 2022.*

**Compliance Rating:  Partial Compliance**

In the second reporting period, 16 cells at PICC required new door frames before locks could be changed.[52]  In this reporting period, 11 doors remain.  PDP reports that lock replacement will be completed by August 2023.  If so, and if PDP also updates post orders to include protocols for nonoperational locks, it will achieve substantial compliance with this sub-provision in the next reporting period.

*Sub-provision 12.2--PDP initiated the lock replacement program for. . .RCF, which will be completed by June 30, 2022.*

**Compliance Rating:  Partial Compliance**

As previously reported, staff training on lock inspections and lock replacement at RCF was completed in May 2022.[53]  As with sub-provision 12.1, PDP must update post orders to achieve substantial compliance with this sub-provision.

Though not subject to the Agreement, PDP reports that it is also replacing locks at CFCF, which it anticipates completing in September 2023.

---

[51] *Id.* at 48.
[52] *Ibid.*
[53] Monitor's First Report, *supra* note 7, at 28-29.

*Sub-provision 12.3--For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022.*

>**Compliance Rating: Substantial Compliance (March 3, 2023, monitoring discontinued)**

*Sub-provision 12.4--Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner.*

>**Compliance Rating: Partial Compliance**

In the previous reporting period, PDP had not provided evidence that call button repairs were occurring at CFCF.[54] In this reporting period, CFCF submitted completed work orders for 42 call button repairs from January through June 2023. RCF maintenance staff reported there were no work orders for call buttons during the period of January through May 2023, which seems unusual given patterns of call button damage and repairs in PDP.

The average time for call button repairs at CFCF is difficult to ascertain based on the work orders alone. Some work orders list several cells requiring call button repairs in one, and some include single cell call button repairs but list additional repairs needed for the same cell. Work orders with limited cells or limited repairs generally occurred within 48 hours. More extensive repairs or repairs to multiple cells took longer, including up to several days to complete. The Monitoring Team will review a second set of work orders from CFCF in the next reporting period to verify that work is being completed in a timely manner.

As with sub-provisions 12.1 and 12.2, updates to post orders are required to ensure staff are informed of their responsibilities when a call button is nonoperational, which may require rehousing the occupant or increasing the frequency of security checks while repairs are pending.

*Sub-provision 12.5--PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system.*

>**Compliance Rating: Substantial Compliance (March 3, 2023, monitoring discontinued)**

**Substantive Provision 13—Visiting**

*Sub-provision 13.1--As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members. PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule. At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots.*

---

[54] Monitor's Second Report, *supra* note 6, at 49-50.

**Compliance Rating:  Substantial Compliance (March 3, 2023, monitoring discontinued)**

*Sub-provision 13.2--Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues.*

**Compliance Rating:  Partial Compliance**

As recommended in the previous reporting period, PDP administered surveys and held focus groups to receive feedback from Class Members, visitors, and visiting personnel regarding the quality of PDP's visiting program.[55]  PDP also posted signage in the visiting processing areas encouraging visitors to reach out to the Office of Community Justice and Outreach to provide feedback.

PDP reports that it has received the following feedback thus far:
- PDP's website should include all visiting policies and procedures.
- When the visiting website is down for "scheduled maintenance," visitors are unable to schedule visits, and the durations of scheduled maintenance are not clearly communicated to users.
- Visitors report that the visiting website's technical support phone line has excessive wait times.
- Visitors report that they are not notified when scheduled visits are cancelled.  This is frequently true when a Class Member is in punitive segregation at the time of scheduling or is placed in punitive segregation after a visit is scheduled.
- Class Members and staff request that Class Members receive the ability to approve or deny visits.  Currently, Class Members are unable to manage visits and do not know who is visiting until the day of a visit.  Class Members report that they may want to refuse some visits or prioritize some visitors over others.  Staff report that it would be more efficient for them, and helpful in avoiding potential conflict in the visiting area, if Class Members were able to accept or deny scheduled visits.
- Class Members request more support from PDP in visiting with their children.  For example, they have requested that PDP personnel liaise with caregivers and facilitate visits.
- Visitors and Class Members request that PDP allow visitors to resume taking photographs during visits.
- Class Members request additional access to tablet visits generally, and specifically on weekends.  They also report that existing tablets are often unavailable and request greater consistency with current tablet visiting.
- Visitors and Class Members request expanded visiting hours to include evenings for visitors who work and children who attend school during the day.

---

[55] *Id.* at 51.

PDP has committed to research the feasibility of implementing improvements consistent with this feedback and will provide updates in the next reporting period.

The Monitoring Team made additional recommendations in previous reporting periods that PDP has agreed to include in its visiting improvement plans.[56]  These include analyzing filled versus unfilled in-person visiting timeslots and making any necessary scheduling adjustments (consistent with the evening visiting request above), and ensuring that family visiting spaces in all facilities are regularly sanitized and consistently stocked with age and culturally appropriate activities for youth and Class Members to have meaningful engagement.

*Sub-provision 13.3--PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated.*

### Compliance Rating:  Substantial Compliance

In the previous reporting period, PDP indicated that it utilized Philadelphia's composite record to verify Class Members' vaccination status when they self-reported being vaccinated outside of PDP.[57]  In February 2023, PDP provided documentation of this practice.  PDP has, therefore, achieved substantial compliance with this sub-provision, and the Monitoring Team will discontinue monitoring this aspect of the substantive provision.

### Substantive Provision 14—Attorney Visiting

*Sub-provision 14.1--PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit.*

### Compliance Rating:  Partial Compliance

As previously reported, the requirement that attorneys receive access to their clients within 45 minutes of scheduled visits is not possible to measure because attorney visits are not scheduled for specific times.[58]  PDP and the Monitoring Team explored different possibilities for defining "scheduled visit" and measuring compliance with the 45-minute requirement.  The Monitoring Team determined that the current official visiting protocol and PDP's tracking system are inadequate to accurately measure wait times.

The Monitor receives regular updates from counsel from the Defender Association of Philadelphia, the private bar, and *Remick* class counsel regarding delays in official visiting and other issues reported by their Class Member clients.  Visiting issues reported to the Monitoring Team continue to include lengthy delays resulting from failed population counts and other security incidents.  Attorneys at times report waiting for hours to see clients.  On two occasions, the Monitor spoke with attorneys in PDP's visitor waiting area, some of whom reported having

---

[56] *Id.* at 51-52; Monitor's First Report, *supra* note 7, at 29-30.

[57] Monitor's Second Report, *supra* note 6, at 52.

[58] When COVID-19 testing protocols were instituted, attorneys were required to give advance notice of visits but not for specific timeslots.  In this reporting period, PDP reverted to pre-COVID-19 protocols and attorneys are no longer required to provide advance notice of visits.  *See also Id.* at 52-53.

waited more than two hours with no status updates from PDP personnel and were appropriately exasperated. Although most attorneys report that visiting wait times have generally improved since the most rigid COVID-19 pandemic restrictions were removed, the frequency of reported excess wait times remains unacceptable. This is especially true given PDP's population reduction goals, which require timely access to counsel and the courts.

Finally, the 45-minute Agreement requirement is too long for counsel to wait for clients in any case absent institutional emergencies. Therefore, the Monitoring Team requested that PDP revisit its official visiting policies and prioritize changes that are most likely to improve access to counsel by significantly reducing wait times. PDP's compliance with this sub-provision will be measured against the 45-minute wait time negotiated by the Parties; however, revisions should be designed to exceed the Agreement requirement.

In this reporting period, the Monitor requested that PDP work directly with the Defender Association of Philadelphia, which represents the large majority of Class Members in their pending criminal matters, to strategize mutually agreeable solutions to official visiting delays. Tom Innes, Director, Prison Policy and Advocacy, Defender Association of Philadelphia, dedicates much time and attention to this issue and, in consultation with a representative from the private bar, agreed to work with PDP's Deputy Commissioner of Administration and facility wardens to identify solutions. Options considered included: (1) modifying PDP count times, which reportedly cause the most frequent delays; (2) adjusting tablet visiting schedules to free up space in tablet visiting rooms for in-person visits during high-traffic hours; and (3) requiring attorneys to schedule visits in advance, giving PDP more time to prepare for visits.

As a result of this collaboration, versions of all three options were piloted in this reporting period. With additional trial and error planned in the next reporting period, PDP anticipates a solution will be finalized before the end of 2023. The Monitoring Team will then work with the Parties to revise this sub-provision and identify an appropriate compliance measure. The Monitor thanks Mr. Innes for his assistance in resolving this issue and is hopeful that access to counsel will improve as a result.

*Sub-provision 14.2--For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment.*

### Compliance Rating:  Partial Compliance

In the first reporting period, PDP made progress in providing additional space and opportunities for virtual attorney visits and shortened wait times for Class Member clients.[59] As with in-person official visits, PDP's data is cumbersome and measuring compliance will require evaluating information from a combination of sources. Although in-person official visits remain the source of the most frequent complaints, attorneys also continue to report delays with tablet visits that exceed 15 minutes. This information is consistent with delays tracked by the Monitoring Team.

---

[59] Monitor's First Report, *supra* note 7, at 30.

From December 6, 2022, through September 1, 2023, Deputy Monitor Grosso scheduled a total of 192 remote tablet meetings. From February 6, 2023, through September 1, 2023, 119 of 137 scheduled tablet visits were attended by Class Members, which is an encouraging attendance rate. The remaining 18 visits were no-shows. Some visits continue to be delayed beyond the 15-minute window provided for in this sub-provision, and, at times, have exceeded 90 minutes. Direct contact with shift commanders when remote meetings are delayed generally improves attendance, however, shift commanders did not always answer when called. PDP explained delays and cancellations as resulting from delayed population counts or other security incidents, which is consistent with explanations reportedly provided to attorneys.

Currently, all tablet meetings are scheduled in one-hour time slots. The Monitoring Team has recommended that PDP increase efficiency by also offering 30-minute time slots for tablet visits.

*Sub-provision 14.3--For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay.*

**Compliance Rating: Non-compliance**

As previously reported, PDP's policy does not require notification to attorneys when visits are delayed or cancelled, and no temporary directives have been issued consistent with this requirement.[60] Since February 6, 2023, the Deputy Monitor was not notified in advance of delayed or cancelled tablet meetings, which is consistent with information the Monitoring Team received from attorneys.

PDP acknowledges on-going failures to communicate delays and cancellations and has committed to policy revisions once it finalizes solutions currently being piloted. PDP executives report that, in the interim, personnel have been instructed to notify attorneys of delays, cancellations, and refusals, and personnel have reported to the Monitoring Team that they understand the requirement. However, personnel may not be held accountable for failure to comply with the notification requirement until policies and post orders are revised and personnel are trained.

**Substantive Provision 15—COVID-19 Testing**

*The PDP shall continue the present policy regarding testing of persons who are scheduled for court. Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID-19. They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results. Those housed on a "yellow block" may have been exposed to a COVID-19-positive individual, and they will be rapid-tested twice, the night before court and the morning of court. They will be transported to court if both tests are negative. Those housed on a "red block" are COVID-19 positive and will be isolated for ten days and not brought to court during that time frame. These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia Department of Public Health. Provided, however, that the Defendants shall not*

---

[60] Monitor's Second Report, *supra* note 6, at 54.

*unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols.*

### Compliance Rating: Substantial Compliance

In the second reporting period, PDP received guidance from the Philadelphia Department of Public Health (PDPH) to revise the COVID-19 testing and quarantine protocols, and on November 29, 2022, the Centers for Disease Control (CDC) amended its guidelines for correctional facilities.[61]  Commissioner Carney issued a memorandum on December 6, 2022, directing PDP Healthcare to administer a single COVID-19 test for all Class Member patients in advance of scheduled court hearings.  In February 2023, the Monitoring Team audited PDP's compliance with the December 2022, protocols and determined that PDP was in compliance.

In consultation with PDPH, PDP further reduced testing requirements via a memorandum issued by the Commissioner on March 9, 2023.  PDP discontinued COVID-19 testing for Class Members going to court except those housed in quarantine units, who receive tests within 24-hours of transport.  In May 2023, the Monitoring Team again audited compliance with the most recent testing protocols and determined that PDP was in compliance.

Changes to PDP's COVID-19 testing protocols were made in consultation with PDPH and pursuant to CDC guidelines.  The Agreement also requires that PDP timely notify plaintiffs' co-counsel of any changes in testing protocols.  In October 2023, Plaintiffs' co-counsel reported, and PDP confirmed, that PDP had failed to notify plaintiffs' co-counsel of changes to COVID-19 testing protocols in previous reporting periods.  PDP then established a protocol to ensure Plaintiffs' co-counsel are notified of changes consistent with Agreement requirements and initial notifications were made via email communication dated October 11, 2023.

PDP has achieved substantial compliance with this substantive provision.  The Monitoring Team will continue to monitor PDP's protocol for notifying Plaintiffs' co-counsel of any changes in COVID-19 testing requirements through the next reporting period.  Once this requirement is satisfied, monitoring of this substantive provision will be discontinued.  The Monitoring Team will, however, continue to report any changes in PDP's testing protocols.

### Substantive Provision 16—Quarantine

*If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19. Under current policy, see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021, for persons who are vaccinated and are exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative.*

---

[61] Guidance on Management of COVID-19 in Homeless Service Sites and in Correctional and Detention Facilities (November 29, 2022) *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-correctional-settings.html

**Compliance Rating: Substantial Compliance**

As previously reported, on November 29, 2022, the CDC revised its guidance for managing COVID-19 in correctional facilities, which superseded the May 2022, guidance referenced in this substantive provision.[62]  The November 2022 guidance remains in effect and includes the following:

1. Recommends enhanced COVID-19 prevention strategies when the COVID-19 Community Levels are high or when there are facility-specific risks.
2. No longer routinely recommends quarantine after someone is exposed to a person with COVID-19 but continues to provide considerations for facilities that prefer to continue implementing quarantine protocols.
3. Includes an option to end isolation for people with COVID-19 after seven days with a negative viral test.
4. Emphasizes the importance of maximizing access to in-person visitation to promote correctional and detention facility residents' mental health and well-being.

PDP reports that it consulted with PDPH, the Court of Common Pleas, the District Attorney's Office, the Defender Association of Philadelphia, Private Counsel, and the Sheriff's Department and again revised its COVID-19 response protocols via a memorandum issued by the Commissioner on March 9, 2023.  PDP agreed to:

1. Continue requiring masking by everyone when inside PDP facilities.
2. Continue use of Personal Protective Equipment (PPE) as recommended by the CDC.
3. Not require vaccination of Class Members for in-person visits.
4. Continue testing for COVID-19 at intake.
5. Discontinue testing for court transfers for those in non-quarantine areas.  Those in quarantine housing areas will be tested once, the day before their scheduled court date.
6. Continue to send people to court in masks.
7. Discontinue testing for official visits for those in non-quarantine housing areas.  Class Members in quarantine housing will be tested once within 24-hours prior to their visit, requiring the attorney for the Class Member to provide notice of the visit 24-hours prior to the requested visit time so that testing may occur.
8. Continue the length of intake quarantine to ensure the following is completed: medical screening, a negative COVID-19 PCR test, and negative TB test are received.  This is estimated to take 3-5 days.
9. COVID-19 isolation will remain at least 10 days in length.
10. If a housing unit has been exposed to COVID-19, movement will be restricted and the housing unit's residents will be tested on day 5.  If the residents test negative, movement restrictions will be lifted after day 5.  If on day 5 one or more residents test positive, movement will remain restricted and the residents will be tested after 5 additional days.
11. Discontinue symptom screening of everyone entering PDP.

---

[62] *Ibid.*

On May 11, 2023, the federal public health emergency expired. Again, in consultation with PDPH and based on CDC guidelines, PDP supplemented the March memorandum with the following COVID-19 protocols:

1. Masking due to COVID-19 is no longer required.
2. Masks will be used as medically necessary (e.g., infirmary, N95 required for healthcare staff when interacting with COVID-19 positive or suspected COVID-19 positive Class Members).
3. Masks may be required if infections recur within PDP or community levels rise.
4. Employees and Class Members may wear masks if they wish.
5. Healthcare staff are encouraged to wear masks at the request of Class Members during healthcare visits.
6. PDP will continue to provide COVID-19 vaccinations to Class Members.
7. The healthcare worker mandate is still in effect.
8. Frequent handwashing or the use of sanitizer along with routine cleaning of workspaces is encouraged.

On September 12, 2023, PDP again modified its COVID-19 guidelines based on CDC guidelines and PDPH recommendations for managing a spike in COVID-19 cases nationally. Current guidelines include:

a. Testing of all Class Members at intake.
b. Rapid testing of those who report symptoms either in person or in writing.
c. After identification of a positive case, cellmates or those residing in the same dorm section will be screened after 5 days.
d. The entire unit will not be screened.
e. Masking is strongly encouraged for Class Members on units where a positive case has been identified.
f. Isolation of COVID-19 positive Class Members for 10 days.
g. No movement restriction except for those in isolation.
h. There will be no testing for the following: courts, official visits, family visits, and programs.

During site visits, the Monitoring Team noted that some staff were unaware which housing units were on quarantine and which were under isolation and observed some staff working in these units without appropriate PPE. The Monitoring Team recommended that PDP use signage to inform staff and visitors of housing unit quarantine and isolation status.[63] PDP has implemented this recommendation, and all staff interviewed during site visits in this reporting period were aware of COVID-19 status of all housing units. Periodically, personnel were observed with inadequate or improperly donned PPE despite reporting awareness of a unit's COVID-19 status. This issue must be monitored by facility supervisors and addressed individually.

---

[63] Monitor's Second Report, *supra* note 6, at 57.

PDP has achieved substantial compliance with this substantive provision and compliance monitoring is discontinued.  The Monitoring Team will continue to report any changes in COVID-19 protocols.

**Substantive Provision 17—Sanitation**

*Sub-provision 17.1--Defendants agree to continue conducting the weekly General Inspection ("GI") cleaning days with supplies provided by officers to clean cells and housing areas.*

**Compliance Rating:   Partial Compliance**

In this reporting period, PDP filled two additional maintenance vacancies and, on April 24, 2023, temporarily expanded its external maintenance contract.  City maintenance personnel now primarily serve DC and other smaller housing units, and contractors have expanding services to include PICC.  As discussed above under *Status of Recommendations, Substantive Provision 1*, contract expansion was limited largely to emergency repairs and does not include preventative maintenance necessary for physical plant upkeep, especially of older facilities.  However, maintenance contract expansion marks progress and improvements will be assessed in subsequent reporting periods.

PDP continues to provide documentation of regular general cleaning inspections (GI) and issuance of cleaning supplies.  All staff interviewed during site visits report awareness of GI requirements.  Many units are clean and maintained consistent with industry standards and the Monitoring Team has noted improvements in some areas, including medical housing units.  As PDP closes units for lock replacement and other maintenance issues, maintenance personnel have been updating them with fresh paint, lighting and tile replacement, deep cleaning of showers, and plumbing repairs.

Unfortunately, some units remain unacceptably dirty with unabated vector control issues and continue to require significant maintenance.  In addition to previously reported conditions, flooring in some PICC housing units is crumbling, and uncollected trash and food waste are still frequently observed during site visits and on CCTV.  During a site visit in May 2023, the Monitoring Team again observed unsanitary conditions in restricted housing units at CFCF.[64]

With population increases, DC has been repopulated with more than 500 Class Members in both renovated and unrenovated housing units.  During a site visit in August 2023, Class Members in one unrenovated dormitory reported the ongoing frequent presence of rodents and insects.  Many dormitory occupants were wearing masks, reportedly not to guard against COVID-19, but to protect them from a perceived risk of respiratory illness from mold visible throughout shower areas.  PDP has not addressed weekly deep cleaning needs in cells, showers, and common areas in most housing facilities systemwide.  This is especially true in housing units where incarcerated workers are not permitted.

The Monitoring Team was encouraged by the appointment of three new wardens, all of whom have made improvements in their respective facilities in their short tenures thus far.  Facility

---

[64] *Id.* at 57-60; Monitor's First Report, *supra* note 7, at 33-35.

leadership is responsive to Monitoring Team observations during site visits and acts quickly to resolve problems.  For example, DC's Warden took immediate action when alerted to dormitory conditions described above, and all wardens have communicated to the Monitoring Team an understanding of their leadership obligations in ensuring clean, safe, and habitable living units. Following the February 2023 site visits, the Monitoring Team recommended increased rounds by wardens and deputy wardens to assess maintenance and sanitation and, reportedly, recommended rounds are occurring.

Some Class Members in this reporting period continued to complain of lack of access to soap and toilet paper, and staff have offered inconsistent reports about the frequency of soap and toilet paper distribution.  Leaking or non-operational toilet and sink units, showers with no hot water or water that is scalding, and personal belongings and commissary items regularly destroyed by rodents are among common complaints.

Women continue to report unnecessary staff control over and inconsistent supplies of feminine hygiene products.  Staff typically report that supplies are unlimited and unrestricted, but simultaneously note that Class Members frequently misuse feminine hygiene products.  Use of maxi pads for cleaning, as toilet seat covers or art supplies, and other purposes is common, largely unavoidable, and in no way reduces jailers' obligation to provide them for menstruation. Class Members' efforts to make uncomfortable and unsanitary conditions more livable are never appropriate rationales for denying feminine hygiene products.  Unless misuse of pads or tampons poses a risk to safety and security, they must be provided upon request, without fail.

PDP continues to utilize pest and rodent control services for both routine treatments and emergencies.  However, deteriorating infrastructure and inadequate food and trash collection are ideal conditions for rodents to enter PDP facilities and breed at a pace that current efforts fail to correct.  Inconsistent supplies of such basic yet vital provisions as soap, toilet paper, and feminine hygiene products are due in part to inconsistent staff in PDP housing units.  In a properly functioning direct supervision model, staff are part of the housing unit community and are committed to the overall operations of their assigned units, including ensuring the population has necessary supplies to maintain cell sanitation and personal hygiene.  Inconsistent housing unit personnel is a function of the staffing crisis and is currently unavoidable in PDP.

PDP's extensive and protracted staffing shortages have resulted in collective indifference to various systemic deficiencies, including unsanitary conditions in some housing units.  Given PDP's shortage of lieutenants and sergeants, correcting the issues requires daily guidance from deputy wardens and wardens to set expectations, ensure sufficient provision of supplies, and address unresolved maintenance problems.  It also requires closer monitoring by and support of PDP executives to reinforce expectations and ensure appropriate acknowledgement and accountability as needed.

*Sub-provision 17.2--[Defendants agree] to provide regular laundry services under current PDP policies.*

> **Compliance Rating:  Partial Compliance**

The Monitoring Team continues to receive regular complaints from Class Members about insufficient laundry services.  As previously reported, there are policies and systems in place to ensure appropriate laundry exchange.[65]  However, some Class Members in general population units are not consistently receiving two sets of outer clothing, and those in segregation are not consistently receiving a change of clothing during showers.  During site visits, Class Members routinely report to the Monitoring Team having only one set of outer clothing and nothing to wear when exchanging clothing or when clothing is taken for laundering.

At CFCF, linen exchange is supervised and documented by staff and facility leadership is able to audit linen exchange via CCTV.  CCTV does not capture quantity or quality of items issued but depicts exchanges occurring consistent with documentation.  Audits can also verify or disprove allegations that items are not received so that managers can target problem areas.  Similar audits are more challenging at other facilities where Class Member workers are responsible for laundering and exchanging linens, such as at PICC and RCF, or where camera placement is limited, such as at DC.  PDP policy and post orders have not yet been revised to reflect these operational nuances and clarify expectations, as recommended.[66]

In the previous reporting period, PDP executives reported that issues with linen exchange had been identified and corrected.[67]  However, members of the Monitoring Team personally inspected the cells of some reporting Class Members' and confirmed the presence of only one set of outer wear.  When these types of reports persist with this frequency across housing units systemwide, it is inconceivable that leadership would not take immediate steps to verify and, if necessary, address them.

Despite these issues, PDP has also made improvements in this reporting period.  Consistent with the Monitoring Team's recommendation, PDP procured and began issuing underclothing to Class Members at intake.[68]  Meeting the needs of the entire population will require additional orders of large quantities of undergarments, but PDP is making progress in this area.  PDP also implemented the Monitoring Team's recommendation to revise its policy for issuing blankets and cold weather clothing.  Rather than issuing these items on the same date each year, they are now issued based on weather forecasts and the outside temperature, which are more appropriate measures.

Defendants should immediately consider the following recommendations:

1. PDP should modify schedules to increase the frequency of deep cleaning rounds.
2. PDP should provide Class Members with secure, rodent-proof containers for their belongings.
3. PDP should procure sufficient undergarments to meet the needs of all Class Members.
4. PDP jail managers should conduct thorough assessments in every facility to identify specific deficiencies in the areas of general sanitation and vector control, clothing and linen exchange, and issuance of hygiene supplies.

---

[65] Monitor's Second Report, *supra* note 6, at 59.
[66] *Ibid*.
[67] *Ibid*.
[68] *Id.* at 60.

5. PDP should revise its post orders to reflect operational nuances at each facility. Post orders should account for the needs of unique populations, such as women, youth, and those navigating mental illness or other disabilities.

6. PDP executives and facility leadership should develop plans to increase guidance for unit personnel in meeting expectations for general sanitation and vector control, clothing and linen exchange, and the issuance of cleaning and hygiene supplies. Plans should include effective monitoring via audits, or other modes of verification, and specific acknowledgement of personnel who meet expectations and support or discipline, as appropriate, of those who do not.

## Substantive Provision 18—Use-of-Force

*PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands. The parties agree that correctional officers should follow de-escalation measures provided in PDP policies. The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors. In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states: "Force is only used when necessary and only to the degree required to control the inmate(s) or restore order…The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated…. Staff will not use pepper spray as a means of punishment, personal abuse, or harassment."*

### Compliance Rating:  Partial Compliance

As previously reported, PDP's use of force policy is too permissive and lacks clarity.[69]  It emphasizes de-escalation as quoted in this substantive provision but ultimately authorizes use of force for failure to follow verbal commands without accompanying active resistance or assaultive behavior.  It is also unclear regarding: (1) when force is authorized for passive resistance; (2) protocols for pre-planned versus emergency force; (3) the role of behavioral health in de-escalation; (4) duty to intervene; and (5) duty to report excessive or unnecessary force, among other issues.  A review of sample use of force incidents in the previous reporting period revealed frequent violations of PDP's existing policy, unnecessary and excessive uses of force, inadequate use of force reviews, and poor accountability.[70]

PDP's current use of force review practices includes reviews of all use of force incidents in PDP facilities by supervising lieutenants, deputy wardens, and wardens.  More complex cases, or cases with serious injuries, are reviewed by deputy commissioners and, at times, the Commissioner.  At the time of SME McDonald's review, all 24 incidents had completed the facility command level of review required of all use of force incidents.  The majority of reviews failed to identify the need for higher levels of review or additional investigation, reporting,

---

[69] *Id.* at 61-62.
[70] *See Id.* at 61-64.

training, and/or accountability in every case. Some of the incidents reviewed had reached PDP's executive-level review, during which some additional issues were identified and addressed. However, serious issues were missed at every completed level of review in all 24 cases.

Based on these findings, the Commissioner prioritized improving PDP's use of force review process in this reporting period. Larger revisions and updates to PDP's use of force and discipline policies will require many months of planning and negotiations to complete. Implementation of any revisions made will not be successful until PDP is able to reduce security staff vacancies. Ultimately, correcting PDP's use of force deficiencies requires dramatic cultural redirection of personnel at every rank in PDP's security chain of command. It requires systems for intensive supervision, instruction, mentorship, support, incentives, and rigid accountability that PDP does not currently possess the capacity to execute.

Despite these barriers, PDP made progress in this reporting period consistent with the Monitoring Team's recommendations, including:

- On April 27, 2023, the Commissioner issued a memorandum to all staff reiterating her expectations for de-escalation wherever possible and personnel duties to summon a supervisor, intercede if a colleague appears to be acting outside of policy during an incident, and accurately report all uses of force. With this memorandum, the Commissioner also established a zero-tolerance policy for abuse and failure to report abuse, which should be incorporated into policy.
- In May 2023, as a temporary measure until the recommended use of force review team could be established, PDP leadership assigned a small team to review available CCTV of all use of force incidents shortly after they occurred. The goal of the initial reviews was to determine whether significant policy violations occurred that required immediate intervention, rather than waiting for completion of the lengthy use of force review process. In consultation with SME McDonald, the team began reviewing cases and developed a system to capture details from incidents going back to January 1, 2023. Information tracked from the team's initial reviews informed the creation of a formal use of force review team and associated policy.
- In June 2023, PDP executives, wardens, and deputy wardens met with SME McDonald to complete CCTV review of select use of force incidents that occurred in January and February 2023. Discussed in more detail below, the goal of the meeting, and other similar meetings in this reporting period, was to build internal capacity for critical evaluation of use of force incidents, including identifying cases that require referrals for administrative or criminal investigation.
- On July 1, 2023, PDP began piloting new use of force review forms at RCF, with the goal of revising PDP's use of force review policy and initiating associated training in the next reporting period.
- In August 2023, the Commissioner issued Executive Order 23-03: Use of Force Review Team (UFRT). The UFRT assumed responsibility for CCTV review following use of force incidents and monitoring the quality of PDP's use of force review process. The UFRT was established by redirecting one captain and two lieutenants, and creating one new analyst position. PDP recognizes the UFRT requires additional staff to implement all recommendations for training, policy updates, and other tasks. However, UFRT will

begin by reviewing designated incidents, managing the force review process, tracking trends, and specifying training needs, which will support change and help identify specific resources needed to implement recommendations from this and prior reports.

- PDP has committed to CCTV upgrades, including converting PDP facilities to a single centralized camera system with limited expansion to address gaps in coverage. Planned upgrades will not include audio recording, and it is unclear whether conversion to a single camera system will fully address server capacity issues that limit remote monitoring, such as those discussed above under Substantive Provision 11–PICC Emergency Call Systems.

With the goal of supporting PDP's efforts to improve its use of force review process, SME McDonald selected 46 completed use of force packages, including available CCTV footage and completed force investigations, for review and detailed discussions with PDP leadership. Cases were selected from January and February 2023. At the time of the review, all reports and chain-of-command reviews were completed. Any referrals for internal administrative or criminal investigation of formal discipline would have been issued as part of completed reviews. Specific cases from this sample were analyzed in detail with PDP's jail and executive leadership teams, and post-incident reviews at all levels were critiqued.

The quality of completed force packages reviewed by SME McDonald in this reporting period contained similar weaknesses to those reviewed in the previous reporting period.[71] Some packages were incomplete, missing investigative reports or witness statements, or lacked complete accounts or statements of Class Members, among other issues that should have been identified during the multiple layers of review.

All 46, or 100 percent, of use of force incidents warranted additional training for personnel, and several should have spurred additional investigation into personnel conduct, including potential excessive or unnecessary force. PDP's use of force review process identified issues in only 5 of 46, or 11 percent, of incidents reviewed. Sample cases contained inappropriate deployment of OC spray and failures to follow decontamination protocols that were not identified by reviewers. They contained significant deviations from standards for basic correctional controls during disturbances that were not identified in reviews despite dangers to Class Members and staff. Virtually every staff use of force report was substandard, yet none were returned for clarification as is the norm with effective force reviews.

The following examples are among those addressed with PDP use of force leadership and reviewers:

- In an intake unit, a Class Member patient experiencing a mental health crisis is seen smearing feces in a cell. There is no evidence that medical or mental health staff were requested to assess the patient or assist security in devising a plan. Instead, a cell extraction is initiated and OC spray is deployed under the cell door. Staff do not maintain a constant presence at cell front to observe, communicate with or encourage the Class Member to comply with commands. Eight minutes later, a second round of OC is

---

[71] *Ibid.*

deployed, again without communication or direction from staff. No medical personnel are standing by and the Class Member is not removed from the cell for more than 30 minutes following the first OC deployment. Staff neither observe nor record the Class Member's responses for the incident's duration. Once removed from the cell, the Class Member is not decontaminated or evaluated by medical staff prior to being placed in a safety cell with no running water. The body weight resistance and positioning of the Class Member during placement into the safety cell risked positional asphyxia, yet none of the supervisors present throughout the incident interceded with quality direction. The poor tactics, absence of clinical care, and failure to decontaminate are not addressed in any of the reviews.

- In a housing unit, a sergeant responds with additional staff to address a Class Member who is refusing to enter a cell. The sergeant uses a significant quantity of OC spray, fully expending his assigned OC canister and then orders another officer to deploy additional OC. The sergeant authors a report that reflects deployment of "a short burst" of OC despite CCTV and the Class Member's clothing clearly depicting that a significant amount of OC was deployed to the Class Member's head area. Five additional responding staff who were present throughout the incident all author identical reports containing the same language. The review failed to address likely over-deployment of OC, discrepancies between CCTV and staff accounts, and the authoring of "canned" reports.

- In a housing unit, an officer deployed OC spray and authored a report stating force was necessary to stop the Class Member from attacking another "unknown" person. The corresponding incident report notes the reason for OC deployment as, "IP refusing to recall to [IP's] cell." The video file that would have depicted the event was unavailable, and the other camera angles did not depict actions that corroborated the officer's statement. Post-force, the involved officer is observed escorting the Class Member by the collar of the Class Member's clothing, an inappropriate practice. The review does not identify or address these concerns.

- In an intake area, a Class Member refused to undress for processing. A sergeant responded and ordered the deployment of OC spray. No medical or mental health professionals were requested to assist pre-force or during the OC deployment. After the Class Member was restrained and decontaminated, staff are seen on CCTV inappropriately forcing the Class Member's head into position for a photograph and then pulling the Class Member's clothing during an unprofessional escort. These issues were not addressed in the review.

- In a housing unit, an officer begins to recall a unit of Class Members to their cells. When one Class Member blocks the cell door with his foot, the officer kicks the Class Member, who then exits the cell. The officer loses control of the unit but is not carrying a radio to request assistance and does not retreat while awaiting backup, as would be tactically appropriate. The officer is then observed shoving a second Class Member into a cell and slapping food trays out of a third Class Member's hands. The officer deploys OC spray on a fourth Class Member who then chases the officer up the housing unit stairs, hitting the officer in the head from behind. This assault might have been prevented by a second

officer who should have controlled the Class Member post-OC deployment. Responding staff then took the first Class Member to the floor, but failed to regain control of the housing unit. The facility warden appropriately requested additional information and review of this incident, yet many clear issues were missed in earlier reviews.

All use of force issues regarding tactics, safety, investigations, reporting, and reviews discussed in previous reports were present in cases reviewed in this reporting period and will not be restated here.[72] The Monitoring Team reemphasizes two issues in this reporting period that PDP has committed to address. First, some staff use more force than others, perhaps as a function of their post assignments. However, PDP does not have an early warning system that flags these personnel for additional review and support if necessary. For example, one officer from the 46 cases reviewed failed to use appropriate de-escalation tactics in every use of force incident the officer was involved in. This officer is assigned to a high stress environment, which can easily lead to frustration, poor tactics, and decision making. An early warning system would have flagged this officer for additional support in managing the stress of the officer's assignment and potentially prevented future uses of force. PDP has committed to implementing the Monitoring Team's recommendation to procure an early warning system.

Second, PDP's current camera system is inadequate for use of force review. In the best circumstances with the most advanced technology, use of force review is time consuming. Because PDP does not have a centralized camera system, incidents from PICC and RCF must be downloaded and copied using separate software systems. Server capacity is limited, so video storage is insufficient and frames per second are too low, which causes skipping and missed footage. PDP facilities, especially RCF, have many areas where camera placement leaves gaps in coverage, or incidents may occur too far away from fixed cameras to properly assess them. Finally, PDP's system does not have audio, so statements and other context for use of force incidents are missing in most cases. Audio is particularly important when incidents involve conflicting statements or information. SME McDonald also notes that in 40 to 50 percent of incidents reviewed, available video footage fails to capture actions of Class Members and staff to allow for proper evaluation of incidents. In addition to upgrading PDP's CCTV system, PDP reports that it is researching the feasibility of implementing a body worn camera pilot program.

It is important to acknowledge two recently completed use of force reviews that illustrate supervisors' willingness to address policy violations and training issues directly and unapologetically. These supervisors, and others like them, should be commended and perhaps considered for roles in use of force policy development and revisions. Additionally, in this reporting period, PICC improved its process for ensuring that all involved and witness personnel submit reports. PICC's force packages have improved as a result.

Incidents reviewed in this reporting period occurred prior to improvements reported above, including the Commissioner's April directive and the creation of the UFRT. Reviews in the next reporting period should begin to reveal any progress as a result of these changes.

---

[72] *Ibid.*

# EXHIBIT I

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS REMICK, et al., on behalf of Themselves and all others similarly situated, | : : : | No.: 2:20-cv-01959-GAM |
| Plaintiffs, | : : | |
| v. | : : | |
| CITY OF PHILADELPHIA; and BLANCHE CARNEY, in her official capacity as Commissioner of Prisons, | : : : : | |
| Defendants. | : : | |

## MONITOR'S FOURTH REPORT

Pursuant to Section 19 of the Settlement Agreement (Agreement) and Section 7 of the Monitoring Agreement and Protocols, the Monitor appointed by this Court submits the attached Monitor's Fourth Report evaluating Defendants' compliance with the terms of the Agreement through December 31, 2023. The Monitor prepared this report as the fourth of regular reports to be filed of record through the second settlement term ending April 30, 2026. Subsequent reports will be filed according to the following schedule:

| | |
|---|---|
| Monitor's Fifth Report | September 30, 2024 |
| Monitor's Sixth Report | March 31, 2025 |
| Monitor's Seventh Report | September 30, 2025 |
| Monitor's Final Report | March 30, 2026 |

I am available to answer any questions the Court may have regarding this report and Defendants' compliance with the Agreement at such times as are convenient for the Court.

DATED: March 29, 2024

Respectfully submitted,

By: /s/ Cathleen Beltz
Monitor

The Agreement between Plaintiffs Thomas Remick, et al., on behalf of themselves and all others similarly situated (Plaintiffs), and the City of Philadelphia (City) and Blanche Carney, in her official capacity as Commissioner of Prisons (Commissioner), in *Thomas Remick et al., v. City of Philadelphia,* Case No. CV 01959-BMS (Action), requires system-wide reform of the Philadelphia Department of Prisons (PDP) as prescribed in 18 substantive provisions. The two-year Agreement was scheduled to terminate on April 12, 2024. In the initial settlement term, Defendants met the requirements for substantial compliance with Substantive Provision 15—COVID-19 Testing and Substantive Provision 16—Quarantine. Defendants also substantially complied with sub-provisions 12.3 and 12.5 (Substantive Provision 12—Locks) and 13.1 and 13.3 (Substantive Provision 13—Visiting). On January 4, 2024, the parties stipulated to a two-year extension with a new Agreement termination date of April 30, 2026.[1]

The Agreement provides that the Monitor issue "regular reports to counsel and the Court" that assess Defendants' compliance with each substantive provision of the Agreement. The Monitor will address Defendants' implementation progress and issue "Substantial Compliance," "Partial Compliance," or "Non-compliance" findings for each substantive provision. Where necessary, the Monitor will make specific recommendations to improve Defendants' compliance with the Agreement. A "Substantial Compliance" finding means Defendants "have and are reasonably expected to continue to substantially satisfy" the requirements of an Agreement provision. A "Partial Compliance" finding means that PDP has successfully completed some of the discrete tasks outlined in a substantive provision and continues to demonstrate progress toward substantial compliance. A "Non-compliance" finding means that Defendants have "not substantially satisfied" Agreement requirements by failing to complete the discrete tasks outlined in a substantive provision. Defendants will not be found in non-compliance based on "isolated or minor instances of failure [to substantially comply]" or "omissions of a technical or trivial nature."

Where substantial compliance requires the revision of existing policies or promulgation of new ones, Defendants' compliance will be assessed based on policy language and substance, notification and training of personnel, and policy implementation and adherence. Finally, the Monitor and Parties agree that successful reform is ultimately measured by sustained improvements to living conditions for Class Members. In issuing compliance findings, the Monitor will consider whether reforms implemented pursuant to the Agreement are durable and their benefits are expected to outlive the Agreement's April 30, 2026, termination date. In this reporting period, the Monitoring Team utilized data tracked through December 31, 2023, and additional information received through February 28, 2024.

The Agreement requires the Monitor to conduct site inspections "at least once every three months." In addition to at least one quarterly site visit, the Monitoring Team conducts periodic site visits with little advance notice to PDP. During site visits, the Monitor has access to conduct confidential interviews with personnel and Class Members. The Monitor also has access to all records, files, electronic files, videos, and other materials, including personnel records and

---

[1] On January 4, 2024, upon the agreement of the Parties, the *Remick* Court issued an order extending the Agreement through April 30, 2026. Stipulated Order, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 197 (E.D. Pa. Jan. 4, 2024).

patient protected health information, as necessary to measure Defendants' compliance with the Agreement.

In this reporting period, the Monitoring Team continued to meet regularly with PDP Commissioner Blanche Carney (Commissioner) and her staff and received full access to facilities, personnel, and Class Members. PDP remained collaborative in identifying solutions to deficiencies that impede compliance with the Agreement. On March 25, 2024, the Commissioner announced her retirement effective April 5, 2024. The Monitoring Team thanks the Commissioner for her service and for her commitment to systemic reform despite persistent barriers.

The Remick Monitoring Agreement and Protocol requires the Monitor to "establish means of communication to enable Class Members, their families, and advocates to provide information related to implementation of and compliance with the Agreement."[2] In this reporting period, Deputy Monitor Grosso (Deputy Monitor) has continued to conduct site visits at least once per month to speak with Class Members on PDP housing units. Following site visits, the Deputy Monitor schedules weekly confidential virtual meetings with Class Members if more privacy is required. Since weekly two-hour tablet meetings commenced December 6, 2022, the Deputy Monitor has interviewed 247 Class Members across PDP facilities. The Monitoring Team also utilizes information provided during tablet meetings to connect with Class Members' family members who are willing to communicate with the Monitoring Team.

The Monitoring Team periodically receives complaints from Plaintiffs' co-counsel detailing specific allegations and systemic issues communicated by Plaintiffs to co-counsel. With prior authorization from Class Members, co-counsel provides the Monitoring Team with Class Members' identifying information, and the Monitoring Team follows up with individual Class Members as necessary. With prior authorization from Class Members, select complaints and systemic issues are forwarded to PDP for response or investigation, which the Monitoring Team tracks and reviews. Conditions observed and information received via these interviews and protocols are consistent with *Remick* filings and reports by PDP staff and others who work in or inspect PDP facilities.

The Monitoring Team also receives information via published reports and communications with oversight agencies, reform advocates, Plaintiffs' co-counsel, criminal defense attorneys, and others independent of PDP. This information augments the Monitoring Team's direct observations and helps shape recommendations that the Monitoring Team hopes will produce the most durable reforms. The Monitoring Team thanks these oversight partners for their continued contributions and commitment.

In this reporting period, members of the Monitoring Team completed six site visits to all PDP facilities, including Curran-Fromhold Correctional Facility (CFCF), The Detention Center (DC) and the Prison Health Services Wing (PHSW), Philadelphia Industrial Correctional Center (PICC), the Alternative and Special Detention Central Unit (ASD-CU and MOD 3), and

---

[2] Monitoring Agreement and Protocol, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 169 at 4 (E.D. Pa. May 25, 2022).

Riverside (RCF).[3]  During each site visit, the Monitoring Team spoke with Class Members and personnel in every area visited regarding Agreement requirements and conditions inside PDP facilities.

The Agreement requires the Monitor to "provide to the parties those documents and reports that are secured by her office which, in her judgment, should be shared to effectuate the terms and conditions of the Agreement."  The Monitor has determined that documentation provided by Defendants and utilized by the Monitoring Team in making compliance determinations will generally be shared with Plaintiffs' co-counsel.

The Monitoring Team has consistently reported that PDP will be unable to achieve compliance with the Agreement while its staffing deficit persists.[4]  Personnel vacancies remain the largest factor in incidence of non-compliance; nearly every substantive provision requires additional security personnel to implement.  The Monitor's First Report detailed 11 initial recommendations for immediate action that the Monitoring Team believes would begin to address staff vacancies and some of the associated deficiencies.[5]  The City authorized PDP to implement some of the recommendations, which has resulted in some improvements.  For other recommendations, the City appears to have taken little or no action, without explanation, over three reporting periods.

In December 2023, the City committed to take additional action on some of the Monitoring Team's recommendations but cited legal barriers to others.  Despite progress in some areas over four reporting periods and nearly two years of compliance monitoring, the City's efforts to reduce PDP's dangerously high vacancy rates have failed.  PDP facilities remain unsafe for both staff and Class Members.  Frequent staff assaults, fights, stabbings, rampant contraband and extortion, and security breaches have been made possible or exacerbated by the staffing shortage.  Any recruitment or hiring gains are negated by attrition and an expanding incarcerated population.  PDP staff make noble efforts to correct deficiencies but have clearly reached their capacity, and the Monitoring Team does not anticipate additional meaningful progress without a dramatic influx of new staff.

Philadelphia is neither alone in its challenges to staff its law enforcement agencies amid a national staffing crisis nor is it ignoring its obligations under the Agreement.  Its efforts, however, do not reflect the urgency and enormity of its problem and the life-threatening conditions it breeds.  PDP has not received the support necessary to reach the lowest constitutional baseline, let alone the cultural transformation that sustaining any reform will require.  The City has instead pursued a course of half measures steeped in bureaucratic and political rigidity with devastating consequences for Class Members and PDP staff.

---

[3] Site visits were conducted July 28, 2023, August 30, 2023, September 27, 2023, October 27, 2023, November 6-9, 2023, and December 18, 2023.

[4] *See* Monitor's First Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 181 at 10-11, 13, 15, 18-20, 22, 24, 28, 34 (Nov. 4, 2022); *See also* Monitor's Second Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 185 at 21, 24-29, 31-32, 35-37, 47, 58, 64 (Mar. 3, 2023); *See also* Monitor's Third Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 193 at 14-15, 19, 22, 27, 29, 31, 33, 39, 42-43, 47, 51, 62 (Oct. 12, 2023).

[5] Monitor's First Report, *supra* note 4, at 9-10, 20.

# Table of Provisions

*Compliance Findings* .................................................................................................. 6

*Substantive Provision 1—Staffing* ......................................................................... 11

*Sub-provision 1.1* ................................................................................................ 11

*Sub-provision 1.2* ................................................................................................ 14

*Sub-provision 1.3* ................................................................................................ 14

*Sub-provision 1.4* ................................................................................................ 15

*Substantive Provision 2—Out-of-Cell Time* ........................................................ 19

*Sub-provision 2.1* ................................................................................................ 19

*Sub-provision 2.2* ................................................................................................ 22

*Substantive Provision 3—Out-of-Cell/Segregation* ............................................ 23

*Sub-provision 3.1* ................................................................................................ 23

*Sub-provision 3.2* ................................................................................................ 24

*Substantive Provision 4—Resume Normal Operations* ...................................... 29

*Substantive Provision 5—Healthcare* ................................................................... 32

*Substantive Provision 6—Behavioral Health in Segregation* ............................ 42

*Substantive Provision 7—Law Library Access* .................................................... 48

*Substantive Provision 8—Discipline* ..................................................................... 49

*Sub-provision 8.1* ................................................................................................ 49

*Sub-provision 8.2* ................................................................................................ 52

*Sub-provision 8.3* ................................................................................................ 52

*Sub-provision 8.4* ................................................................................................ 52

*Substantive Provision 9—Tablets* .......................................................................... 52

*Sub-provision 9.1* ................................................................................................ 52

*Sub-provision 9.2* ................................................................................................ 54

*Substantive Provision 10—Phone Calls* ............................................................... 55

*Sub-provision 10.1* .............................................................................................. 55

*Sub-provision 10.2* .............................................................................................. 55

*Substantive Provision 11—PICC Emergency Call Systems* ................................ 56

*Substantive Provision 12—Locks* .......................................................................... 57

*Sub-provision 12.1* .............................................................................................. 57

4

*Sub-provision 12.2* ................................................................................................. 57

*Sub-provision 12.3* ................................................................................................. 57

*Sub-provision 12.4* ................................................................................................. 57

*Sub-provision 12.5* ................................................................................................. 58

***Substantive Provision 13—Visiting*** ..................................................................... **58**

*Sub-provision 13.1* ................................................................................................. 58

*Sub-provision 13.2* ................................................................................................. 58

*Sub-provision 13.3* ................................................................................................. 59

***Substantive Provision 14—Attorney Visiting*** ...................................................... **59**

*Sub-provision 14.1* ................................................................................................. 59

*Sub-provision 14.2* ................................................................................................. 60

*Sub-provision 14.3* ................................................................................................. 61

***Substantive Provision 15—COVID-19 Testing*** ..................................................... **61**

***Substantive Provision 16—Quarantine*** ................................................................. **61**

***Substantive Provision 17—Sanitation*** ................................................................... **62**

*Sub-provision 17.1* ................................................................................................. 62

*Sub-provision 17.2* ................................................................................................. 64

***Substantive Provision 18—Use-of-Force*** ............................................................... **65**

## Compliance Findings

Some of the Agreement's 18 substantive provisions contain related but discrete action items that must be completed for PDP to achieve substantial compliance with each provision. The Monitoring Team created sub-provisions for some of the 18 substantive provisions based on these discrete action items and issues separate compliance findings for each enumerated sub-provision. This provides additional clarity for Defendants as they work to implement required changes and greater specificity for the Court and Parties in distinguishing between action items that are being successfully implemented and those that require additional attention. To achieve substantial compliance with each substantive provision, PDP must first achieve substantial compliance with every sub-provision.

From the Agreement's 18 substantive provisions, 37 sub-provisions were created. In the previous reporting period, the Monitor determined that PDP had achieved substantial compliance with 9 sub-provisions, partial compliance with 21 sub-provisions, and remained in non-compliance with 7 sub-provisions. In this reporting period, PDP has achieved substantial compliance with 11 sub-provisions, partial compliance with 19 sub-provisions, and remained in non-compliance with 7 sub-provisions.

The table below reflects all provisions and current compliance ratings for each:

| Provision | | Requirements | Compliance Status |
|---|---|---|---|
| **1** | | **Staffing** | **PC** |
| | 1.1 | No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the *hiring* of correctional officers. | PC |
| | 1.2 | No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the *retention* of correctional officers. . . | PC |
| | 1.3 | Ensure that there are sufficient number of correctional officers to cover all posts, according to PDP post plans on each shift at each facility. | NC |
| | 1.4 | These measures [1.1-1.3] will continue until achieved and thereafter to maintain the proper number of correctional officers. | NC |
| **2** | | **Out-of-Cell Time** | **PC** |
| | 2.1 | Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than August 1, 2022, no less than five hours of out-of-cell time each day. | PC |

6

| Provision | | Requirements | Compliance Status |
|---|---|---|---|
| | 2.2 | The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases of out-of-cell time should continue to be made beyond the August 1, 2022 standard, with a presumptive expected increase to six hours by October 15, 2022.  The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, *infra*, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis.  *See also* para. 4, *infra*. | NC |
| 3 | | **Out-of-Cell/Segregation** | **PC** |
| | 3.1 | Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day. | NC |
| | 3.2 | Defendants further agree that they will continue their practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units. | PC |
| 4 | | **Resume Normal Operations** | **NC** |
| | | By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services).  During the period that precedes a return to normal operations, if the Monitor determines that the Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor.  The parties and the Monitor shall then engage in discussions to resolve the issues in dispute.  If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions. | |
| 5 | | **Healthcare** | **PC** |
| | | The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons.  The Defendants agree to institute the programs and measures (referred to as "the Backlog Plan") set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022, to address the existing backlog.  The "Backlog Plan" is a new, three-month effort to see backlogged patients as soon as possible.  The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs.  Four agencies are contracted to provide staff towards this end. Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort.  Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures.  Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog. | |
| 6 | | **Behavioral Health in Segregation** | **PC** |
| | | By September 30, 2022, the PDP and [YesCare] shall re-establish a mental health program for persons who are in segregation units. | |
| 7 | | **Law Library Access** | **PC** |

| Provision | Requirements | Compliance Status |
|---|---|---|
| | PDP will continue to provide law library access for all incarcerated individuals. The Monitor and the parties will discuss access and scheduling matters and the Monitor shall make any recommendations on these matters by August 1, 2022. | |
| 8 | **Discipline** | **PC** |
| 8.1 | All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding. *See Wolff v. McDonnell*, 418 U.S. 539, 563–66 (1974); *Kanu v. Lindsey*, 739 F. App'x 111, 116 (3d Cir. 2018); *Stevenson v. Carroll*, 495 F.3d 62, 70–71 (3d Cir. 2007). | PC |
| 8.2 | The PDP shall expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date [April 12, 2022]. . . | SC |
| 8.3 | [PDP shall] release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are [on April 12, 2022] still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing. . . | SC |
| 8.4 | [PDP shall] cancel sanctions [imposed in hearing held between March 2020 and April 12, 2022] that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms. Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation. Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline. Defendants shall provide to counsel for plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022. | SC |
| 9 | **Tablets** | **PC** |
| 9.1 | PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational capabilities and housing designs. The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets; and, at RCF, expanding from six (6) to eight (8) tablets on the [first floor] (4 housing units) and expanding from eight (8) to twelve (12) tablets on the [2nd and 3rd floors] of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF. This expansion process will be completed by May 1, 2022. | PC |
| 9.2 | The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices. | PC |
| 10 | **Phone Calls** | **PC** |

8

| Provision | Requirements | Compliance Status |
|---|---|---|
| 10.1 | PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices. | PC |
| 10.2 | Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls. | NC |
| **11** | **PICC Emergency Call Systems** | **PC** |
| | The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to phones and/or tablets and determine whether any policies and practices are necessary to address this matter considering all relevant factors, including operational feasibility and physical capacity. | PC |
| **12** | **Locks** | **PC** |
| 12.1 | PDP initiated the lock replacement program for PICC. . . which will be completed by June 30, 2022. | SC |
| 12.2 | PDP initiated the lock replacement program for. . .RCF, which will be completed by June 30, 2022. | SC |
| 12.3 | For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022. | SC |
| 12.4 | Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner. | PC |
| 12.5 | PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system. | SC |
| **13** | **Visiting** | **PC** |
| 13.1 | As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members. PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule. At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots. | SC |
| 13.2 | Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues. | PC |
| 13.3 | PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated. | SC |
| **14** | **Attorney Visiting** | **PC** |
| 14.1 | PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit. | PC |
| 14.2 | For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment. | PC |

| Provision | Requirements | Compliance Status |
|---|---|---|
| 14.3 | For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay. | NC |
| **15** | **COVID-19 Testing** | **SC** |
| | The PDP shall continue the present policy regarding testing of persons who are scheduled for court. Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID-19. They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results. Those housed on a "yellow block" may have been exposed to a COVID-19-positive individual, and they will be rapid-tested twice, the night before court and the morning of court. They will be transported to court if both tests are negative. Those housed on a "red block" are COVID-19 positive and will be isolated for ten days and not brought to court during that time frame. These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia Department of Public Health. Provided, however, that the Defendants shall not unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols. | |
| **16** | **Quarantine** | **SC** |
| | If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19. Under current policy, *see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021,* for persons who are vaccinated and are exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative. | |
| **17** | **Sanitation** | **PC** |
| 17.1 | Defendants agree to continue conducting the weekly General Inspection ("GI") cleaning days with supplies provided by officers to clean cells and housing areas. | PC |
| 17.2 | [Defendants agree] to provide regular laundry services under current PDP policies. | PC |
| **18** | **Use-of-Force** | **PC** |
| | PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands. The parties agree that correctional officers should follow de-escalation measures provided in PDP policies. The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors. In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states: "Force is only used when necessary and only to the degree required to control the inmate(s) or restore order…The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated….Staff will not use pepper spray as a means of punishment, personal abuse, or harassment." | |

10

**Substantive Provision 1—Staffing**

*Sub-provision 1.1--No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the hiring of correctional officers.*

**Compliance Rating:  Partial Compliance**

PDP's correctional officer vacancies increased by 79 positions or 4 percent from June 2023 to December 2023.  PDP's total staff vacancy rate also increased by 4 percent between June 2023 and December 2023.  The following table reflects changes in security, maintenance, human resources, and total staff vacancies since the previous reporting period:

**Philadelphia Department of Prisons Vacancy Report**
June 2023 and December 2023

| | Position Classification | Budgeted* | June 2023 | | December 2023 | | Vacancies (+/- change) | Vacancy Rate (+/- change) |
|---|---|---|---|---|---|---|---|---|
| | | | Filled | Vacant | Filled | Vacant | | |
| Sworn Staff | Officers* | 1715 | 967 | 752 | 888 | 827 | +79 | 48% (+4%) |
| | Sergeants* | 118 | 73 | 56 | 68 | 50 | +5 | 42% (-1%) |
| | Lieutenants* | 64 | 52 | 4 | 53 | 11 | -1 | 17% (+10%) |
| | Captains* | 29 | 20 | 11 | 24 | 5 | -4 | 17% (-18%) |
| | **Custody Total** | **1926** | **1112** | **823** | **1033** | **893** | **+79** | **46% (+3%)** |
| Maintenance Staff | Trades Worker I | 8 | 4 | 4 | 5 | 3 | -1 | 38% (-12%) |
| | Trades Worker II* | 18 | 8 | 15 | 8 | 10 | 0 | 56% (-9%) |
| | HVAC Mechanic | 3 | 2 | 1 | 2 | 1 | 0 | 33% (-34%) |
| | Building Engineer | 1 | 1 | 0 | 1 | 0 | 0 | 0% (-100%) |
| | Maintenance Group Leader | 1 | 0 | 1 | 0 | 1 | 0 | 100% (0) |
| | **Total Maintenance** | **31** | **15** | **21** | **16** | **15** | **-1** | **48% (-16%)** |
| Human Resources (HR) Staff | HR Professional | 2 | 2 | 0 | 1 | 1 | +1 | 50% (+50%) |
| | HR Program Admin | 2 | 2 | 0 | 2 | 0 | 0 | 0% (0) |
| | HR Manager 3 | 1 | 1 | 0 | 1 | 0 | 0 | 0% (0) |
| | **HR Total** | **5** | **5** | **0** | **4** | **1** | **+1** | **20% (+20%)** |
| **PDP TOTAL** | **All Positions**** | **2187** | **1311** | **875** | **1231** | **956** | **+80** | **44% (+4%)** |

*Changes in budgeted positions from June 2023 to December 2023:  Officers -4; Sergeants -11; Lieutenants +8; Captains -2; Trade Worker II -5.
** "All Positions" totals include classifications not listed in the table and therefore exceed the sum of budgeted, filled, and vacant positions for each of the Sworn Staff, Maintenance Staff, and HR Staff categories.

PDP hiring and retention issues are exacerbated by the rising PDP population as reflected in the following table:

**PDP Total Population Effective January 1**
2021 – 2024

| Date | January 1, 2021 | January 1, 2022 | January 1, 2023 | January 1, 2024 |
|---|---|---|---|---|
| Total Population | 4395 | 4489 | 4343 | 4666 |

Between January 1, 2023, and January 1, 2024, PDP's incarcerated population increased by more than seven percent while security staffing reduced by eight percent in the same period.[6]

Available data on recruitment yields is depicted in the following table:

**Philadelphia Department of Prisons Recruitment Yields**
**for New Hires after January 1, 2021**

| Certification List | Total Applicants | Total Hired | Rate (%) | List Status |
|---|---|---|---|---|
| 2020-0210 | 228 | 36 | 15.8 | Closed |
| 2021-0906 | 758 | 50 | 6.6 | Closed |
| 2022-0221 | 298 | 16 | 5.4 | Closed |
| 2022-0516 | 245 | 25 | 10.2 | Closed |
| 2022-0905 | 493 | 34 | 6.9 | Closed |
| 2022-1212 | 422 | 34 | 8.1 | Closed |
| 2023-0306 | 563 | 32 | 5.7 | Closed |
| **Total Closed** | **3007** | **227** | **7.5** | |
| 2023-0501 | 436 | 24 | 5.5 | In-Process |
| 2023-0626 | 626 | 34 | 5.4 | In-Process |
| 2023-0724 | 492 | N/A | N/A | In-Process |
| 2023-0821 | 464 | N/A | N/A | In-Process |
| 2023-0918 | 402 | N/A | N/A | In-Process |
| **Total Open** | **2420** | **58** | **N/A** | |

PDP accepted more applications in 2023 than in each of 2021 and 2022, perhaps attributable in part to the City's continuous-fill hiring lists and increased recruitment advertising. Since December 2022, hiring yields have decreased from 8.3 percent to 7.5 percent, representing a 10 percent decrease.[7] Of 3,007 applicants from 2020 through early 2023, only 227 were hired. This suggests PDP would have needed approximately 9,000 more applicants to fill the existing 893 security vacancies, and 1,500 additional applicants to address the annual attrition of 160 security staff. The current efforts are not keeping up with attrition as reflected by the increase in total

---

[6] The number of filled security positions decreased from 1,120 to 1,033 or 8 percent from December 2022 to December 2023.
[7] *See* Monitor's Second Report, *supra* note 4, at 13.

custody vacancies between June 2023 and December 2023, and the problem is compounded as the incarcerated population increases.

**Academies and Retention**

PDP successfully increased the number of academies in 2023 over 2021 and 2022, however, retention rates remain low. The table below depicts academy schedules, attendance, and graduation data for 2021, 2022, and 2023, and employee retention rates for the 2022 and 2023 academies:

**Philadelphia Department of Prisons Academy Report and Retention Rates**

| Class Number | Class Dates | Total Cadets | Total Graduated | Still Employed June 2023 | Retention Rate December 2022 | Retention Rate June 2023 | Retention Rate December 2023 |
|---|---|---|---|---|---|---|---|
| 21-01 | February - May, 2021 | 25 | 23 | N/A | N/A | N/A | N/A |
| 21-02 | June - September, 2021 | 19 | 15 | N/A | N/A | N/A | N/A |
| 21-03 | August - November, 2021 | 35 | 30 | N/A | N/A | N/A | N/A |
| 21-04 | November, 2021 - January, 2022 | 30 | 26 | 8 | 70% | 50% | 27% |
| 21-05 | December, 2021 - March, 2022 | 20 | 16 | 6 | 55% | 40% | 30% |
| 22-01 | March - June, 2022 | 31 | 25 | 11 | 58% | 39% | 36% |
| 22-02 | May - July, 2022 | 21 | 20 | 8 | 71% | 62% | 38% |
| 22-03 | August - October, 2022 | 18 | 16 | 8 | 78% | 72% | 44% |
| 22-04 | October, 2022 - January, 2023 | 26 | 20 | 17 | N/A | 65% | 65% |
| 23-01 | January - March, 2023 | 21 | 22 | 13 | N/A | 76% | 59% |
| 23-02 | February - April, 2023 | 17 | 15 | 13 | N/A | 88% | 76% |
| 23-03 | April - July, 2023 | 20 | 15 | 10 | N/A | N/A | 50% |
| 23-04 | June - September, 2023 | 17 | 16 | 15 | N/A | N/A | 88% |
| 23-05 | August - October, 2023 | 32 | 30 | 27 | N/A | N/A | 87% |
| 23-06 | October - December, 2023 | 28 | 25 | 25 | N/A | N/A | 75% |

In 2023, PDP operated six academies, compared to five in 2021 and four in 2022 and had a 41 percent increase in new cadets enrolled in academies from 2022 to 2023.

Of new security staff who graduated from an academy in 2022, only 40 percent remained employed with PDP as of December 2023. For new staff who graduated from an academy in 2023, the retention rate as of December 2023 was 84 percent. The Monitoring Team will revisit rates at the end of 2024 to determine whether one-year retention of the 2023 graduates improved over the 40 percent one-year retention of 2022 graduates.

To improve internal monitoring of critical issues, including staff hiring and retention, the City has authorized PDP to create a six-person data analysis unit. The analyst team can also evaluate PDP's use of segregation, out-of-cell time, access to care, grievances, use of force, and other Agreement requirements. The team is also expected to analyze outcomes of PDP's various policy changes.

*Sub-provision 1.2--No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the retention of correctional officers. . .*

**Compliance Rating:  Partial Compliance**

In 2019 and 2020, PDP lost averages of 10 and 11 officers per month respectively.  In 2021 and the first eight months of 2022, average separations more than doubled to 24 and 23 per month respectively.  In the last four months of 2022, after salary increases and retention bonuses went into effect, monthly average severances reduced to 11 per month.  In 2023, the number of average employee separations per month increased to 13 but remained lower than 2021, suggesting salary incentives had a positive effect.  The following table depicts monthly averages of PDP employees who voluntarily separated pre-retirement from January 2019 through December 2023:

**Average Voluntary Separations by PDP Employees**

|  | Pre-Arbitration Award | | | | Post-Arbitration Award | |
|---|---|---|---|---|---|---|
|  | 2019 | 2020 | 2021 | Jan-Aug 2022 | Sep-Dec 2022 | 2023 |
| **Monthly Average** | 10 | 11 | 24 | 23 | 11 | 13 |

In this reporting period, PDP hired an employee wellness coordinator and reported several employee appreciation events.  Without additional personnel, however, PDP will be unable to implement a meaningful employee wellness program as recommended.  Improving staff morale and employee retention initially requires a safe working environment, which PDP does not currently offer.

*Sub-provision 1.3--Ensure that there are sufficient numbers of correctional officers to cover all posts, according to PDP post plans on each shift at each facility.*

**Compliance Rating:  Non-compliance**

In this reporting period, PDP finalized its new system to track the number of required posts for each shift at each facility and the number of vacant posts due to staffing shortages.  This was a complex project and an important accomplishment for PDP.

The following tables depict monthly average percentages of vacant posts at each facility and posts filled with overtime staff for September through December 2023:[8]

---

[8] Some posts may have been filled for a portion of some shifts.

**Percentage of Posts Left Vacant Due to Staffing Shortage**
September – December 2023

| Date | September | October | November | December | Average |
|------|-----------|---------|----------|----------|---------|
| RCF | 42% | 39% | 30% | 36% | 37% |
| PICC | 42% | 45% | 35% | 42% | 41% |
| CFCF | 45% | 46% | 34% | 41% | 42% |
| **Average** | **43%** | **43%** | **33%** | **40%** | **40%** |

**Percentage of Posts Filled with Overtime Staff**
September – December 2023

| Facility | September | October | November | December | Average |
|----------|-----------|---------|----------|----------|---------|
| RCF | 25% | 24% | 21% | 23% | 23% |
| PICC | 25% | 27% | 30% | 30% | 28% |
| CFCF | 27% | 22% | 22% | 24% | 24% |
| **Average** | **26%** | **24%** | **24%** | **26%** | **25%** |

As anticipated, the number of vacant posts is unacceptably high, and would be higher without the use of significant voluntary and involuntary overtime. From September through December 2023, an average of 40 percent of posts remained vacant and an average of 25 percent of posts were filled with overtime staff. This suggests PDP is only able to fill an average of 35 percent of necessary posts with regularly scheduled shifts.

PDP has also initiated improvements to its transportation and medical guarding of Class Member patients at outside hospitals. PDP coordinated with other local law enforcement to share guarding responsibilities for Class Members who are at outside hospitals and have not yet been processed into the jail. PDP reports it is also in contract negotiations to re-establish a secure unit at an outside hospital, which will allow PDP patients to be housed together in a single hospital wing. These improvements will reduce the number of personnel being redirected from jail posts to outside hospitals.

*Sub-provision 1.4--These measures will continue until achieved and thereafter to maintain the proper number of correctional officers.*

**Compliance Rating: Non-compliance**

A partial or substantial compliance rating with sub-provision 1.4 first requires PDP to achieve compliance with sub-provision 1.3.

**Status of Recommendations, Substantive Provision 1—Staffing, from the Monitor's First Report (November 2022):**

15

1. Expand existing contracts to correct maintenance vacancies that severely impact conditions of confinement at ASD-CU and MOD 3, DC, and PICC.

    *The City has partially addressed this recommendation.  In December 2023, the City reported it had accepted this recommendation and is in the process of expanding the current maintenance contract to include routine and emergency maintenance not currently being performed as a result of City maintenance vacancies.  As previously reported and discussed in more detail below under Substantive Provision 17—Sanitation, the contract was temporarily expanded in April 2023, and improvements were noticeable during subsequent site visits.*

    *PDP reports that maintenance contract expansion included the new, more effective vector control program at PICC but did not include enhanced vector control at DC/PHSW or MOD 3.  These facilities continue to be managed under the City's existing, less effective vector control contract.  PDP reports it has requested that the City's existing contractor increase the frequency of scheduled treatments in DC/PHSW and MOD 3, but the contractor reported it lacks capacity to scale up.  PDP reports it does not have the authority to further expand the maintenance contract to include all PDP facilities outside of the City's current procurement process and must instead wait for the City's existing contract to expire.*

    *PDP also reports the planned maintenance contract expansion does not include the completion of capital projects.  A few of PDP's outstanding capital projects in populated housing units include the replacement of antiquated cell doors in some segregation units, HVAC upgrades, repair of windows and vents that cannot be secured to reduce entry ports for rodents or during inclement weather, and the construction of dayroom tables for Class Members to use during out-of-cell time.*

    *As a result of these remaining contract and procurement issues, rodent and insect infestations are still regularly observable in some facilities, doors in some segregation units lack food ports necessary for staff safety, some units lack furniture for Class Members to sit on when not confined to their cells, and cold winter air blows through ill-fitting windows in at least two units that house elderly Class Members.  The Monitoring Team, therefore, makes additional recommendations 12 and 13 below for immediate action.*

2. Determine whether the current salary and benefits structures pursuant to the arbitration award and other efforts by Defendants are sufficiently competitive with other jurisdictions and agencies to attract applicants, and if not, supplement benefits accordingly.

    *The City has partially addressed this recommendation.  In December 2023, the City provided documentation of a comparison of correctional officer salaries in local jurisdictions.  The City cited this comparison as the basis for determining that PDP compensation is competitive.  The City also indicated that it was conducting a Citywide compensation study with results expected in January 2024.  The Monitoring Team has not received the study for review.  Documentation provided gives no indication that that City also evaluated benefits structures (including pensions and other forms of compensation), whether current salary and benefits are sufficient to attract enough candidates, or whether current salary and benefits should be supplemented.  This work*

16

> *may have been more appropriately performed by an outside firm with more time and specific expertise as initially recommended in the Monitor's First Report and restated under recommendation 3 below.*[9]

3. Retain a qualified recruitment firm to assist in guiding the City's efforts, which should include salary surveys in support of the previous recommendation, and other validated recruitment and retention strategies.

    > *In December 2023, the City indicated that it would accept this recommendation and pursue additional recruitment support from a firm currently under contract with the City. The City also indicated that it intends to expand a second existing contract with another recruitment firm to include recruitment of correctional peace officers.*

4. Engage an independent staffing analysis to determine true staffing needs for each facility. The analysis should be completed by someone with specific expertise in jail staffing studies.

    > *PDP reports that the anticipated staffing study was completed and a report was received by PDP in January 2024. The City shared the report March 7, 2024.*

5. Evaluate which PDP functions currently performed by sworn personnel can be performed by civilians (information technology, records, intake and release, cashier, etc.) and identify or expand civilian employees or contracted services accordingly.

    > *PDP reports that two arbitration hearings were scheduled in December, a third in January, and a fourth in February, all of which were canceled.*

6. Simplify the City's lengthy hiring and onboarding processes that reportedly create delays in recruits reporting to PDP academies.

    > *In December 2023, the City reported that it had reduced its hiring timeframe from two months to approximately one month, beginning in 2021. This reported change, which occurred before compliance monitoring began in 2022, is positive. The City did not indicate whether it has taken any action pursuant to this recommendation, or whether the process is now as efficient as possible or requires further refinement.*

7. Establish continuous-fill civil service hiring lists during the staffing crisis.

    > *The City has implemented back-to-back hiring lists, which essentially provides for the continuous-fill process as recommended.*

8. Assess the impact of Philadelphia's employee residency requirements on PDP's hiring outcomes and consider whether permanent exemptions or modifications are appropriate.

    > *In December 2023, the City reported that it retained a firm to complete an internal assessment of the residency requirement. The City did not indicate when the assessment was initiated or completed but reports, "[t]he assessment provided various data points and recommendations when considering changes to the residency requirements." The City asserts it cannot unilaterally change the requirement citing City of Philadelphia Home Rule Charter and collective bargaining requirements. The City did not address whether it has considered temporary modifications to or suspension of the requirements and did not provide or share findings or recommendations from the assessment.*

9. PDP should implement strategies for employee retention and a robust employee wellness program.

---

[9] *See* Monitor's First Report, *supra* note 4, at 20.

*PDP has partially addressed this recommendation. PDP reports it initiated employee wellness training in 2023 and is in the process of hiring a manager to serve as the employee wellness lead.*

10. The City should implement a return-to-work strategy that is tailored to the needs of PDP employees who are out on long-term leave or work-related illness.

*The City has partially addressed this recommendation. In December 2023, the City reported it initiated discussions with PDP to enhance return-to-work strategies in January 2023. Strategies reportedly included prioritizing PDP's worker's compensation claims and increasing involvement of healthcare staff in the review process. The City also reportedly changed the medical panel provider and worked with PDP to develop a local light duty return-to-work strategy. The City reported that when the project began in early 2023, there were approximately 100 employees off work due to work-related injuries. That number reportedly reduced to 40 by November 2023, and another 44 employees on long-term leave were separated from PDP service. The City should ensure it makes every effort to return injured employees to work as soon as possible, if only to light duty assignments. The City should also ensure that well-trained return-to-work specialists are engaging off-work employees quickly and frequently. The Departments of Risk Management and Human Resources should also ensure they are evaluating employee injuries to improve PDP's employee safety program.*

11. Retain an expert to build internal capacity to manage systems, coding, and budgetary processes associated with staffing allocations. The expert should assist PDP in identifying and retaining only the most useful database reports and discontinuing the use of non-essential or inaccurate reports.

*PDP implemented this recommendation, increased internal capacity, and developed transparent systems designed to maximize limited staffing resources.*

**Additional recommendations for immediate action:**

12. The City should authorize PDP to immediately implement an effective vector control program at DC/PHSW and MOD 3.

13. The City should expand its maintenance contract or redeploy City personnel to expedite the completion of capital projects. PDP should prioritize projects that pose health and safety risks in populated housing units.

14. Immediately authorize additional double-time pay each day of the week as necessary to staff all vacant shifts.

*In December 2023, the City reported it consistently authorizes double-time pay to cover necessary posts. However, data provided by the City to support this assertion suggests double-time pay is routinely offered Thursdays and Sundays, but not Fridays and Saturdays, which consistently have higher post vacancy rates. The City suggests that employees may be rejecting additional double-time opportunities but this assertion is not supported by documentation provided. The City and PDP should immediately evaluate whether additional double-time pay would reduce post vacancies and authorize additional double-time pay and other incentives as needed to cover as many PDP posts as possible.*

15. The City should establish a well-resourced team to assist with recruitment, application processing, onboarding, and supporting new staff. The team should conduct meaningful exit interviews of staff leaving PDP to determine what is needed to improve retention.

**Substantive Provision 2—Out-of-Cell Time**

*Sub-provision 2.1--Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than August 1, 2022, no less than five hours of out-of-cell time each day.*

**Compliance Rating: Partial Compliance**

In this reporting period, PDP offered additional training in the proper documentation of out-of-cell time. The training appears to have improved tracking of group out-of-cell time in general population housing units. Out-of-cell trackers in this reporting period generally appear to reflect more accurate timeframes and more often denote when no out-of-cell time is offered. Although trackers are being completed more consistently, the only method of verifying reported data remains CCTV review.

In this reporting period, the Monitoring Team reviewed general population housing unit out-of-cell trackers for one week per month, July through December 2023. As previously reported, Class Members with different security classifications are often housed together in single housing units because of bed space and staffing limitations.[10] Class Members with different security classifications, however, are not permitted to recreate together and are instead divided into smaller recreation groups. The numbers and sizes of recreation groups differ in each housing unit and may fluctuate significantly based on security and other operational needs.

The following tables depict average out-of-cell time that CFCF general population recreation groups received daily for one week of each month, April through June 2023, and July through December 2023:

---

[10] Monitor's Third Report, *supra* note 4, at 19.

**General Population Average Out-of-Cell Time**
**Hours Per Day**
**CFCF, Three One-Week Periods***
April – June 2023[11]

| Hours | Monthly Average | |
| --- | --- | --- |
| | Groups | Percent (%) |
| 0 to .9 | 32 | 26% |
| 1 to 4.9 | 67 | 54% |
| ≥ 5, < 6 | 25 | 20% |
| Total CFCF Groups | 124 | 100% |

*Weeks reviewed include: April 3-9, May 1-7, and June 5-11.

**General Population Average Out-of-Cell Time Per Day Reported for CFCF,**
**Six One-Week Periods***
July – December 2023

| Hours** | July-Sept 2023 | | Oct-Dec 2023 | | Monthly Average | |
| --- | --- | --- | --- | --- | --- | --- |
| | Groups | % | Groups | % | Groups | % |
| 0 to .9 | 35 | 19% | 45 | 16% | 13 | 17% |
| 1 to 4.9 | 118 | 63% | 229 | 81% | 58 | 74% |
| ≥ 5, < 6 | 33 | 18% | 10 | 3% | 7 | 9% |
| Total CFCF Groups | 186 | 100% | 284 | 100% | 78 | 100% |

*Weeks reviewed include: July 10-16, August 7-13, September 4-10, October 9-15, November 13-19, and December 18-24. From July through December 2023, not all CFCF housing units completed out-of-cell trackers, so sampled housing units include A1, A2, B1, B2, C1, C2, D1, and D2 – Pod 1 only.
**When PDP fails to log recreation time for a group, zero out-of-cell time is assumed.

Total recreation groups that received an average of five or more hours daily out-of-cell time at CFCF decreased from 20 percent in the period April through June 2023, to 18 percent in the period July through September 2023 and, again, to three percent in the period October through December 2023. However, the percentage of groups that received an average of one to five hours increased from 54 percent in the period April through June 2023 to 63 percent in the period July through September 2023 and, again, to 81 percent in the period October through December 2023. Total groups that received less than one hour daily also decreased from 26 percent in April through June 2023 to 19 percent and 16 percent in July through September 2023 and October through December 2023 respectively. CFCF remains in non-compliance with Agreement out-of-cell benchmarks and too many Class Members continue to spend at least 23 hours in their cells daily. Some of CFCF's reported changes, however, appear consistent with the Monitoring Team's recommendation to ensure more Class Members receive at least one hour out-of-cell time daily, even if it means reducing longer out-of-cell durations for others.

The following tables depict average out-of-cell time that PICC general population recreation groups received daily for one week of each month, May and June 2023, and July through December 2023:

---

[11] For detailed data for April-June 2023, *see Ibid.*

**General Population Average Out-of-Cell Time Hours Per Day
PICC, Two One-Week Periods** *
May – June 2023**

| Hours | Monthly Average | |
|---|---|---|
| | Groups | Percent (%) |
| 0 to .9 | 11 | 14% |
| 1 to 4.9 | 41 | 52% |
| ≥ 5, < 6 | 27 | 34% |
| **Total PICC Groups** | **79** | **100%** |

*Weeks reviewed include: May 1-7, and June 5-11.
**Tracking system not yet implemented at PICC in April.

**General Population Average Out-of-Cell Time Per Day Reported for PICC,
Six One-Week Periods***
July – December 2023

| Hours** | July-Sept 2023 | | Oct-Dec 2023 | | Monthly Average | |
|---|---|---|---|---|---|---|
| | Groups | % | Groups | % | Groups | % |
| 0 to .9 | 20 | 5% | 59 | 15% | 13 | 10% |
| 1 to 4.9 | 206 | 56% | 189 | 47% | 66 | 51% |
| ≥ 5, < 6 | 145 | 39% | 154 | 38% | 50 | 39% |
| **Total PICC Groups** | **371** | **100%** | **402** | **100%** | **129** | **100%** |

*Weeks reviewed include: July 10-16, August 7-13, September 4-10, October 9-15, November 13-19, and December 18-24. Lockdown days were not included for the following: week of 10/9 unit G2 (2 days); week of 11/13, unit F2 (2 days); week of 12/18, for K (3 days) and H2 (2 days).
** When PDP fails to log recreation time for a group, zero out-of-cell time is assumed.

Like CFCF, PICC initially reduced the percentage of groups receiving an average of less than one hour out-of-cell time from 14 percent in the period May through June 2023 to five percent in the period July through September 2023.  However, in the period October through December 2023, groups receiving an average of less than one hour out-of-cell time increased to 15 percent. PICC also slightly increased the percentage of groups that received an average of five or more hours out-of-cell time from 34 percent in the period May through June 2023 to 39 percent and 38 percent in July through September 2023 and October through December 2023 respectively.

The following tables depict average out-of-cell time that RCF general population recreation groups received daily for one week of each month, April through June 2023, and July through December 2023:

**General Population Average Out-of-Cell Time Hours Per Day
RCF, Three One-Week Periods**\*
April – June 2023

| Hours | Monthly Average | |
| --- | --- | --- |
| | Groups | Percent (%) |
| 0 to .9 | 3 | 3% |
| 1 to 4.9 | 36 | 36% |
| ≥ 5, < 6 | 62 | 61% |
| **Total RCF Groups** | **101** | **100%** |

\*Weeks reviewed include: April 3-9, May 1-7, and June 5-11.

**General Population Average Out-of-Cell Time Per Day Reported for RCF,
Six One-Week Periods\***
July – December 2023

| Hours\*\* | July-Sept 2023 | | Oct-Dec 2023 | | Monthly Average | |
| --- | --- | --- | --- | --- | --- | --- |
| | Groups | % | Groups | % | Groups | % |
| 0 to .9 | 28 | 10% | 25 | 9% | 9 | 9% |
| 1 to 4.9 | 72 | 26% | 145 | 49% | 36 | 38% |
| ≥ 5, < 6 | 180 | 64% | 124 | 42% | 51 | 53% |
| **Total RCF Groups** | **280** | **100%** | **294** | **100%** | **96** | **100%** |

\*Weeks reviewed include: July 10-16, August 7-13, September 4-10, October 9-15, November 13-19, and December 18-24.

\*\* When PDP fails to log recreation time for a group, zero out-of-cell time is assumed.

At RCF-Main Facility, the percentage of groups that received an average of five or more hours out-of-cell time daily initially increased from 61 percent in the period April through June 2023 to 64 percent in the period July through September 2023 but then decreased to 42 percent from October through December 2023.  Unfortunately, the number of groups that received an average of less than one hour out-of-cell time daily increased from three percent in the period April through June 2023 to 10 percent and 9 percent in July through September 2023 and October through December 2023 respectively.

Trackers for all facilities note staffing shortages or redirection of housing unit staff (for cell searches or Class Member transportation, for example) among primary reasons for limiting out-of-cell time.  PDP has implemented the Monitoring Team's recommendations regarding improved tracking of out-of-cell time.  However, until PDP employs sufficient staff to fill more housing unit posts and critical support positions, it will not meet Agreement requirements.

*Sub-provision 2.2--The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases in out-of-cell time should continue to be made beyond the August 1, 2022, standard, with a presumptive expected increase to six hours by October 15, 2022.  The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, infra, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all*

*relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis. See also para. 4, infra.*

**Compliance Rating:  Non-Compliance**

**Substantive Provision 3—Out-of-Cell/Segregation**

*Sub-provision 3.1--Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day.*

**Compliance Rating:  Non-Compliance**

PDP remains in non-compliance with daily out-of-cell requirements in segregation units. There has been no improvement since the previous reporting period and PDP staff continued to struggle with documenting individual out-of-cell time in this reporting period.  Failures to document out-of-cell time likely result from high staff turnover and temporary staff who are unfamiliar with tracking requirements on segregation units.  Additional training in out-of-cell documentation resulted in improvements in November and December 2023, so the Monitoring Team sampled from those months in this reporting period.

The following table reflects total populations of Class Members on segregation units and the average total Class Members who were offered one hour out-of-cell time for the week of June 5 through June 11, 2023:[12]

**Daily Out-of-Cell Opportunities for Class Members on Segregation Units**
June 5, 2023 – June 11, 2023

| | Facility | CFCF | | | PICC | RCF | Total |
|---|---|---|---|---|---|---|---|
| | Unit | A1P2 | A1P3 | A1P4 | J Unit | C Unit | |
| | **Total Stable Population*** | 60 | 29 | 64 | 3 | 36 | **192** |
| **Daily Average** | **Class Members Out-of-Cell** | **13** | **9** | **19** | **2** | **29** | **73** |
| | **Percent** | **22%** | **31%** | **30%** | **67%** | **81%** | **38%** |

*"Stable Population" refers to total Class Members who resided in segregation units for the entire week.

The following table reflects total populations of Class Members on segregation units and the average total Class Members who were offered one hour out-of-cell time for two one-week periods in November and December 2023:

---

[12] The same table was presented in the Monitor's Third Report with additional detail for each day of the week.  *See Id.* at 21.

**Daily Out-of-Cell Opportunities for Class Members on Segregation Units for
Two One-Week Periods**
November – December 2023*

| | Facility | CFCF | | | PICC** | RCF | Total |
|---|---|---|---|---|---|---|---|
| | Unit | A1P2 | A1P3 | A1P4 | J/F Unit | C Unit | |
| November | **Total Stable Population\*\*\*** | 61 | 32 | 64 | 18 | 52 | **227** |
| | Class Members Out-of-Cell Daily Average | 19 | 9 | 16 | 11 | 31 | **86** |
| | Percent | 31% | 28% | 25% | 61% | 60% | **38%** |
| December | **Total Stable Population** | 62 | 32 | 62 | 18 | 58 | **232** |
| | Class Members Out-of-Cell Daily Average | 20 | 8 | 19 | 3 | 14 | **64** |
| | Percent | 32% | 25% | 31% | 17% | 24% | **28%** |
| **Daily Average** | **Class Members Out-of-Cell** | **20** | **9** | **18** | **7** | **23** | **75** |
| | **Percent** | **32%** | **27%** | **28%** | **39%** | **42%** | **33%** |

*Weeks reviewed include: November 13-19 and December 18-24.
**PICC J Unit, evaluated in November 2023; PICC F Unit, evaluated in December 2023.
*** "Stable Population" refers to total Class Members who resided in segregation units for the entire week.

Across the three one-week periods reviewed, the average percentage of Class Members in segregation units who received no daily out-of-cell time was 62 percent in June 2023, 62 percent in November 2023, and 72 percent in December 2023. PDP will not show meaningful compliance with this provision until there are fewer Class Members in segregated settings, sufficient staff to work in the housing units and supervisors to monitor compliance.

PDP's new data analysis unit should conduct real-time monitoring of daily out-of-cell time. This information may assist PDP executives and supervisors in considering whether personnel should be redistributed to spare Class Members from spending days at a time isolated in single-person cells, which is their current reality.

*Sub-provision 3.2--Defendants further agree that they will continue their normal practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units.*

**Compliance Rating:  Partial Compliance**

As previously reported, PDP's segregation documentation does not identify a lack of housing space or insufficient staffing as rationales for placement or retention of Class Members in administrative segregation.[13]  Class Members' removal from segregation units is sometimes delayed, however, because PDP does not have enough staff to conduct timely investigations, initial disciplinary hearings, and hearings for retention on administrative segregation.  PDP has

---

[13] *Monitor's Second Report, supra* note 4, at 21.

redirected staff to hold more frequent hearings for retention on administrative segregation. This and other efforts have successfully reduced lengths of stay in administrative segregation and fewer total placements in administrative segregation since the first reporting period.

The following tables depict average Class Members in administrative segregation, retention reviews exceeding 30, 60, and 90 days, and average lengths of stay in administrative segregation for sample dates in three periods, July through December 2022, January through June 2023, and July through December 2023:[14]

### Reviews for Retention on Administrative Segregation
### Exceeding 60 and 90 Days and Average Lengths of Stay
#### July – December 2022

| | CFCF | | | | | PICC | | | | | RCF | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Ad-Seg | > 60 Days | > 90 Days | % > 60 Days | Average Days in Ad-Seg | Total Ad-Seg | > 60 Days | > 90 Days | % > 60 Days | Average Days in Ad-Seg | Total Ad-Seg | Average Days in Ad-Seg | Total | Average Days in Ad-Seg |
| Average | 95 | 10 | 12 | 26% | 107 | 78 | 2 | 2 | 6% | 64 | 21 | 66 | 193 | 79 |

### Reviews for Retention on Administrative Segregation
### Exceeding 30 and 60 Days and Average Lengths of Stay
#### January – June 2023

| | CFCF | | | | | PICC | | | | | RCF | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Ad-Seg | > 30 Days | > 60 Days | % > 60 Days | Average Days in Ad-Seg | Total Ad-Seg | > 30 Days | > 60 Days | % > 60 Days | Average Days in Ad-Seg | Total Ad-Seg | Average Days in Ad-Seg | Total | Average Days in Ad-Seg |
| Average | 67 | 10 | 3 | 3% | 71 | 44 | 2 | 0 | 0% | 36 | 14 | 108 | 126 | 72 |

---

[14] Dates reviewed, July-December 2022 and January-June 2023, are indicated in the Monitor's Third Report, *supra* note 4, at 23-24.

**Reviews for Retention on Administrative Segregation**
**Exceeding 30 and 60 Days and Average Lengths of Stay**
July – December 2023

| | CFCF | | | | | PICC | | | | | RCF* | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Ad-Seg | > 30 Days | > 60 Days | % > 60 Days | Average Days in Ad-Seg | Total Ad-Seg | > 30 Days | > 60 Days | % > 60 Days | Average Days in Ad-Seg | Total Ad-Seg | Average Days in Ad-Seg | Total | Average Days in Ad-Seg |
| 7-7-23 | 62 | 0 | 0 | 0% | 41 | 13 | 0 | 0 | 0% | 93 | 13 | 93 | 88 | 76 |
| 8-4-23 | 84 | 2 | 0 | 0% | 50 | 28 | 0 | 0 | 0% | 17 | 10 | 29 | 122 | 32 |
| 9-1-23 | 69 | 0 | 0 | 0% | 43 | 17 | 0 | 0 | 0% | 13 | 9 | 22 | 95 | 26 |
| 10-6-23 | 64 | 0 | 0 | 0% | 35 | 20 | 0 | 0 | 0% | 20 | 18 | 20 | 102 | 25 |
| 11-10-23 | 77 | 8 | 0 | 0% | 37 | 7 | 0 | 0 | 0% | 8 | 17 | 46 | 101 | 30 |
| 12-8-23 | 88 | 3 | 0 | 0% | 39 | 10 | 0 | 0 | 0% | 11 | 35 | 19 | 133 | 23 |
| Average | 74 | 2 | 0 | 0% | 41 | 16 | 0 | 0 | 0% | 27 | 17 | 38 | 107 | 35 |
| Difference, Jan-June 2023 and July-Dec 2023 | +10% | -80% | -100% | -100% | -42% | -64% | -100% | NA | NA | -25% | +21% | -65% | -15% | -51% |

*RCF reviews were all completed within policy according to documentation reviewed.

Comparing administrative segregation data from two six-month periods, July through December 2022 and July through December 2023, the average number of Class Members in administrative segregation on select dates reduced by 45 percent, from 193 to 107. When accounting for population differences between the two periods, the reduction is even higher. Class Members in administrative segregation from July through December 2022 represented an estimated 4.4 percent of the total population. From July through December 2023, however, Class Members in administrative segregation represented an estimated 2.3 percent of the total population, reflecting an approximate 48 percent reduction.[15] Average lengths of stay in administrative segregation for select dates also reduced by 56 percent, from 79 days in the last six months of 2022 to 35 days in the last six months of 2023.

PDP has made additional progress reducing timeframes for retention hearings. In the first two reporting periods, Class Members were regularly held in administrative segregation without hearings beyond 30, 60, and 90 days at all three facilities.[16] In this reporting period, none of the facilities on dates reviewed held Class Members in administrative segregation without hearings beyond 60 or 90 days, and hearings exceeding 30 days were limited to CFCF and reduced by an average of 80 percent. Eleven of 13 delayed hearings at CFCF occurred in the months of November and December 2023.

---

[15] Percentages were calculated based on monthly averages for two six-month periods, July-December 2022 and July-December 2023, as reported in the Philadelphia Prison Population Reports. *See* Philadelphia Prison Population Report | July 2015 – January 2024, MacArthur Safety and Justice Challenge (Feb. 13, 2024), https://www.phila.gov/media/20240213123438/January-2024-Full-Public-Report.pdf.
[16] Monitor's Second Report, *supra* note 4, at 21; Monitor's First Report, *supra* note 4, at 13, n. 13.

PDP's anticipated data analysis unit should be able to expand on the above findings by using representative samples and accounting for population changes.  Their work could also include trend analysis or address variables such as reasons for placement, population increases, demographic changes, system-wide violence and violent segregation commitment offenses, the expansion of transitional units, and enhanced programming.

PDP has permanently discontinued the automatic placement of state sentenced Class Members into administrative segregation based solely on their state commitments.[17]  The Monitoring Team continues to recommend additional policy revisions to reduce automatic placements of Class Members in administrative segregation based solely on static factors such as "no bail/high bail" and "change in custody level."

On December 29, 2023, eight Class Members remained in administrative segregation beyond 90 days.  Three of the eight had been removed from segregation by mid-January 2024. Three Class Members who remained in administrative segregation as of mid-January 2024 were determined to have committed serious assaults and additional misconduct while in segregation or a serious escape attempt.  One Class Member was in segregation based on protective custody status and was no longer in PDP custody as of mid-January 2024.  One Class Member was in segregation at CFCF for 227 days as of December 29, 2023, for on-going disciplinary actions.  This Class Member is on the Behavioral Health caseload.  In the next reporting period, the Monitoring Team will evaluate behavioral healthcare records for a sample of patients on the behavioral health caseload who are in segregation.

The following tables depict total punitive segregation placements and average lengths of stay in punitive segregation for sample dates, July through December 2022, January through June 2023, and July through December 2023:

**Class Members in Punitive Segregation: Total Placements and Average Lengths of Stay**
July – December 2022

| | CFCF | | PICC | | RCF | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total in Punitive Segregation | Average Days in Punitive Segregation |
| Average | 61 | 63 | 49 | 65 | 45 | 37 | 154 | 55 |

---

[17] PDP continues to periodically segregate a small number of state sentenced Class Members for short periods while they await movement to their designated housing unit.  On June 3, 2022, administrative segregation reports listed 36 state sentenced Class Members in administrative segregation.  Subsequent reviews on June 2, 2023 and December 29, 2023, confirmed there were zero Class Members in administrative segregation exclusively due to pending state prison transfers.

**Class Members in Punitive Segregation: Total Placements and Average Lengths of Stay**
January – June 2023

| | CFCF | | PICC | | RCF | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total in Punitive Segregation | Average Days in Punitive Segregation |
| Average | 64 | 21 | 50 | 23 | 26 | 14 | 139 | 19 |

**Class Members in Punitive Segregation: Total Placements and Average Lengths of Stay**
July – December 2023

| | CFCF | | PICC | | RCF | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Total Punitive Segregation | Ave Days in Punitive Segregation | Total Punitive Segregation | Ave Days in Punitive Segregation | Total Punitive Segregation | Ave Days in Punitive Segregation | Total in Punitive Segregation | Average Days in Punitive Segregation |
| 7-7-23 | 75 | 24 | 51 | 20 | 25 | 12 | 151 | 19 |
| 8-4-23 | 62 | 25 | 51 | 23 | 40 | 14 | 153 | 21 |
| 9-1-23 | 71 | 22 | 42 | 25 | 37 | 12 | 150 | 20 |
| 10-6-23 | 75 | 21 | 47 | 26 | 33 | 18 | 155 | 22 |
| 11-10-23 | 77 | 31 | 27 | 18 | 50 | 16 | 154 | 22 |
| 12-8-23 | 58 | 32 | 34 | 18 | 35 | 19 | 127 | 23 |
| Average | 70 | 26 | 42 | 22 | 37 | 15 | 148 | 21 |
| Difference, Jan-June 2023 and July-Dec 2023 | +9% | +24% | -16% | -4% | +42% | +7% | +6% | +11% |

Comparing data from select dates in two six-month periods, July through December 2022 and July through December 2023, average days Class Members spent in punitive segregation reduced significantly, from 55 to 21 days or 62 percent. The total average number of Class Members in punitive segregation reduced by four percent, from 154 to 148, in the same period.

Despite overall reductions in PDP's use of punitive segregation from 2022 to 2023, both punitive segregation placements and lengths of stay increased at CFCF and RCF from the first half of 2023 to the second half of the year. Also, the total average number of Class Members in punitive segregation increased by six percent and lengths of stay increased by eleven percent. PICC, however, has consistently reduced its use of punitive segregation since 2022.

PDP's efforts to reduce its reliance on administrative and punitive segregation must remain a priority given the risks associated with isolation and PDP's non-compliance with out-of-cell

requirements. The Monitoring Team reiterates the following recommendations from the Monitor's Second Report regarding out-of-cell time in segregation units:[18]

1. Provide daily out-of-cell time for all Class Members, even if Agreement requirements cannot be met. PDP should reevaluate the current requirement that three officers must be present to provide out-of-cell time.
2. Ensure that current out-of-cell schedules are feasible for personnel to implement, that Class Members receive schedules in advance, and that schedules are consistently adhered to.
3. Use currently available information, including anecdotal reports from staff, supervisors, and Class Members, to identify and attend to housing units that are struggling to offer out-of-cell time.
4. Document the reasons for any failures to offer out-of-cell time.

The Monitoring Team has made the following recommendations over the course of implementation monitoring to assist PDP in reducing its reliance on punitive segregation:

5. Increase educational, therapeutic, and other positive programming in general population units.
6. Utilize sanctions that do not require isolation, such as creating loss of privilege tiers where Class Members receive out-of-cell time but access to commissary, tablets, and phones is limited or restricted.
7. Expand Therapeutic Housing Units, discussed below under Substantive Provision 6— Behavioral Health in Segregation, and develop accompanying disciplinary policies that limit the placement of patients in isolation.
8. Improve systems for behavioral health input in the disciplinary process, discussed below under sub-provision 8.1.
9. Establish an interdisciplinary committee to create behavior management plans for Class Members who cycle in and out of segregation.
10. Develop programming for Class Members in segregation units to address behavior and assist with the transition back to general population.
11. Direct the new data analysis unit to analyze punitive segregation practices and trends.
12. Revise classification policies and procedures to ensure they are designed to maximize programming and reserve segregation for those with the most serious behavioral issues for the shortest possible durations.

PDP has accepted the Monitoring Team's recommendations and makes efforts in some areas but has consistently reported it is unable to implement them with current staffing.

**Substantive Provision 4—Resume Normal Operations**

*By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services). During the period that precedes a return to normal operations, if the Monitor determines that the*

---

[18] Monitor's Third Report, *supra* note 4, at 22; Monitor's Second Report, *supra* note 4, at 20.

*Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor. The parties and the Monitor shall then engage in discussions to resolve the issues in dispute. If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions.*

### Compliance Rating:  Non-compliance

The Monitor has continued to meet with the Parties regarding areas of non-compliance. In this reporting period, meetings were held on the following dates:  October 16, 2023, November 6, 2023, December 15, 2023, and February 5, 2024. Multiple deficiencies have been discussed including out-of-cell time, segregation, facility sanitation and maintenance, and use of force. The primary focus of the meetings, however, remains the City's insufficient efforts to address PDP's staffing crisis, which is the root cause of persistent non-compliance. The Parties have engaged in good faith exchanges, which have resulted in creative solutions to some operational challenges, and meetings will continue in the next reporting period.

PDP's only conceivable pathways to compliance remain some combination of population reduction and increased staffing, neither of which is within PDP's unilateral control. Absent immediate solutions to PDP's staffing crisis, the City should initiate a coordinated effort among local justice partners to pursue all opportunities for population reduction. Initial efforts should include identifying and correcting inefficiencies in Philadelphia's criminal justice process that prolong criminal cases and pre-trial detention.

As expected, PDP continues to report that it is not prepared to submit a plan for a return to normal operations that includes out-of-cell time and access to services and programs required by the Agreement.[19]  Due to PDP's staffing deficiencies, the Monitoring Team has consistently recommended that PDP prioritize reforms that:  (1) can be initiated with existing personnel and (2) are most likely to improve the daily experiences of Class Members.

As recommendations were issued, it was unclear how much progress was possible and whether and for how long any progress achieved could be sustained. PDP acknowledged that monumental efforts were necessary given the conditions Class Members must endure and progress has exceeded expectations in several areas. Incremental improvements have been made, but PDP is far from returning to its pre-COVID-19 operations or redefining "normal operations" based on the most current evidence-based practices. Any projected timeframes for implementation of this provision would be conjecture.

As stated previously, PDP appears to have reached its capacity for interim change and will be unlikely to make additional progress or sustain improvements made thus far. If so, PDP conditions will descend further into constitutional inadequacy and Class Members' health and safety will continue to decline. Staff will remain in acute fear and the indignity of their working

---

[19] The Monitoring Team is working with PDP to ensure that "normal operations" is defined according to evidence-based best practices at the time PDP is prepared to implement them.

conditions will remain a cultural bar to humane treatment of the 4,700 people confined in PDP facilities.

**Restorative and Transitional Services**

Clinical and other professional staff assigned to the Restorative and Transitional Services Division (RTS) perform case management, release planning, counseling, and other important programs and services. Based on RTS staff vacancies and reported lapses in the provision of services in the previous reporting period, the Monitoring Team recommended that PDP review RTS job descriptions to ensure it has allocated sufficient positions to offer all services consistent with policy.[20] In this reporting period, PDP reports it reclassified some existing RTS positions to better align with current staffing needs. Position changes and RTS vacancies in January 2024 are depicted in the table below:

**Restorative and Transitional Services Division Staffing**
June 2023 and January 2024

| Position Category | Allocated Positions June 2023 | Filled Positions June 2023 | Vacancy Rate June 2024 | Allocated Positions January 2024 | Filled Positions January 2024 | Vacancy Rate January 2024 |
|---|---|---|---|---|---|---|
| Instructor | 5 | 4 | 20% | 4 | 1 | 75% |
| Volunteer Services Director | 1 | 1 | 0% | 1 | 1 | 0% |
| Psychologist | 4 | 2 | 50% | 6 | 4 | 33% |
| Prison Psychologist Supervisor | 0 | 1 | 0% | 1 | 1 | 0% |
| Social Work Services Trainee | 0 | 0 | 0% | 0 | 4 | 0% |
| Social Work Services Manager I | 0 | 1 | 0% | 1 | 0 | 100% |
| Social Work Services Manager 2 | 53 | 42 | 21% | 44 | 33 | 25% |
| Social Work Supervisor | 13 | 12 | 8% | 14 | 11 | 21% |
| Human Services Program Administrator | 2 | 2 | 0% | 2 | 2 | 0% |
| Social Services/Housing Program Analyst | 0 | 1 | 0% | 2 | 0 | 100% |
| Prison Close Circuit TV Specialist | 1 | 1 | 0% | 2 | 1 | 50% |
| Inmate Computer-Based Education Instructor | 7 | 6 | 14% | 7 | 4 | 43% |
| Inmate Computer-Based Education Supervisor | 1 | 1 | 0% | 1 | 1 | 0% |
| Correctional Industries Assistant Director | 1 | 1 | 0% | 1 | 1 | 0% |
| Correctional Industries Director | 1 | 0 | 100% | 1 | 0 | 100% |
| Industries Shop Supervisor | 14 | 16 | -14% | 16 | 14 | 13% |
| Education Director | 1 | 0 | 100% | 1 | 1 | 0% |
| **Total** | **104** | **91** | **17%[21]** | **104** | **79** | **24%** |

---

[20] Monitor's Third Report, *supra* note 4, at 28.
[21] For detailed data, *see Ibid*.

In the past six months, RTS lost twelve staff members, increasing its total vacancy rate from 17 percent in June 2023 to 24 percent in January 2024.  In addition to programs and services described above, in 2023, RTS led the development of a behavioral modification unit recommended by the Monitoring Team.  The goal of the behavioral modification unit is to offer individual behavior modification plans and programming for a small subset of patients who exhibit extreme maladaptive behaviors.  These patients often spend extended periods in segregation, are frequently hospitalized, and require substantial security and clinical resources. Given the increase in RTS staff vacancies, the Monitoring Team reiterates its recommendation to analyze the work required of this division and the staffing needed to complete required tasks.

**Substantive Provision 5—Healthcare**

*The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons. The Defendants agree to institute the programs and measures (referred to as "the Backlog Plan") set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022, to address the existing backlog. The "Backlog Plan" is a new, three-month effort to see backlogged patients as soon as possible. The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs.  Four agencies are contracted to provide staff towards this end. Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort. Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures. Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog.*

**Compliance Rating: Partial Compliance**

Healthcare staffing has continued to improve in this reporting period.  PDP has made efforts to reduce its appointment backlogs, but reductions have been largely temporary based on data through December 2023.  PDP reports the Access to Care Committee has continued to meet since it was convened in November 2022, but has been unsuccessful in reducing overall backlogs to a level approaching compliance with this provision.  PDP reports in recent months delayed facility counts, which can interfere with Class Members attending scheduled appointments, have posed new challenges to the provision of healthcare services.

The table below compares on-site appointment backlogs for two four-week periods in May/June 2023, and November/December 2023:

**On-Site Appointment Backlogs for General Medical and Behavioral Healthcare**
**Weekly Averages, Four-week Comparison**
May/June 2023 and November/December 2023

| Backlog Report Four-week Period | Weekly Average Backlogged Appointments** | | Change | Percent Change (+/-) |
|---|---|---|---|---|
| | May-June 2023 | Nov-Dec 2023 | | |
| BH Initial Psychiatric Eval. | 40 | 82 | +42 | +105% |
| BH Medication Evaluation | 42 | 73 | +31 | +74% |
| BH Social Work Sick Call | 15 | 25 | +10 | * |
| BH SW SCTR | 1 | 0 | -1 | * |
| Chronic Care Follow-up | 171 | 268 | +97 | +57% |
| Chronic Care Initial | 129 | 121 | -8 | -6% |
| MAT | 181 | 129 | -52 | -29% |
| MAT Follow-up | 1 | 0 | -1 | * |
| Provider Sick Call | 66 | 204 | +138 | +209% |
| RN Sick Call | 60 | 42 | -18 | * |
| Re-Entry Planning | 14 | 46 | +32 | * |
| **Total Backlog** | **720** | **989** | **+269** | **+37%** |

*Average percent change not calculated for average appointments <50.
**Weeks reviewed include: 5/30/23 to 6/20/23 and 11/29/23 to 12/21/23.

PDP's average four-week on-site backlog (excluding reentry planning) was 944 in November/December 2023, which exceeded the 920 average backlog reported in October/November 2022.[22]  Despite hiring successes and a reported increase in healthcare staff, PDP's average four-week backlog increased by 269 appointments, or 37 percent, between May/June and November/December 2023.

Weekly backlog data for September 2023 reflects a spike to an average of 1402 backlogged appointments.  PDP reports the increase was caused in part by a fire at an off-site data center that houses PDP's electronic medical records, which blocked PDP's access for more than one week.  Despite poor compliance reflected in data for this reporting period, PDP reports that the recent influx of additional healthcare staff reduced the September 2023 spike by approximately 400 appointments to the average 989 reported in November/December 2023.  Preliminary data for February 2024 shows the backlog was further reduced to 559 appointments as a result of staff additions.  This is a significant improvement in a short period of time and PDP anticipates it will sustain improvements through the next reporting period.

In November 2023, PDP initiated a pilot program offering some types of primary and chronic care appointments inside housing units rather than relying on security personnel to escort patients to on-site medical clinics.  The housing unit spaces being used for patient care are not

---
[22] Monitor's Second Report, *supra* note 4, at 26.

ideal and are not designated clinical spaces.  As such, healthcare services offered in the housing units are limited to sick call triage, behavioral health sick call appointments, and other services that do not require physical contact with patients.  The pilot is currently limited to CFCF and RCF because other PDP facilities reportedly lack space for clinical care.

## On-Site Specialty Care

On-site specialty appointments represent nine percent of the overall backlog.[23]  The on-site specialty backlog decreased by 25 percent, from 189 appointments in the previous reporting period to 141 in this reporting period.  As previously reported, a single provider absence in June 2023 resulted in a backlog of 126 pap test and gynecology appointments, or 67 percent of the total on-site backlog at that time.[24]  In this reporting period, that backlog reduced to 13 appointments, or nine percent of the total backlog.  In this reporting period, provider unavailability has resulted in an increase in backlogged podiatry appointments, from 15 in June 2023 to 54 in December 2023.

PDP reports it has begun to offer on-site specialty care appointments at facility clinics rather than requiring patients to be escorted to the main clinic at DC/PHSW.  Changes like this reduce reliance on security escorts but also reduce the efficiency of providers who must now move between facilities across PDP's compound to see patients.

## Off-Site Specialty Care

Deficiencies in off-site specialty care are worsening.  In December 2022, PDP's off-site appointment backlog was 172 scheduled appointments and 50 awaiting scheduling.  In June 2023, the backlog was 187 scheduled appointments and 43 awaiting scheduling, reflecting little change.  In December 2023, the backlog had grown to 375 scheduled appointments with 116 pending scheduling.  The following table depicts off-site specialty appointments scheduled and attended from July through December 2023:

---

[23] PDP offers on-site specialty services in obstetrics, gynecology, optometry, pap testing, podiatry, physical therapy, ultrasound, and x-ray. For on-site specialty appointments, specialty providers come to PDP and treat patients on-site. The on-site specialty backlog is sensitive to minor staffing changes or provider absences.
[24] Monitor's Third Report, *supra* note 4, at 30.

**Off-Site Specialty Appointment Summary**
July – December 2023

| Month | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|
| # Scheduled | 340 | 402 | 339 | 439 | 499 | 419 | 2438 |
| Out of Custody | 16 | 24 | 10 | 24 | 21 | 20 | 115 |
| Out of Jurisdiction/Open Ward | 7 | 7 | 3 | 4 | 10 | 6 | 37 |
| Cancel Prior to Transport | 17 | 12 | 10 | 23 | 7 | 21 | 90 |
| COVID-19 Isolation | 0 | 3 | 0 | 1 | 0 | 0 | 4 |
| *Total Ineligible* | *40* | *46* | *23* | *52* | *38* | *47* | *199* |
| # Eligible to Attend Appointment | 300 | 356 | 316 | 387 | 461 | 372 | 2192 |
| Refused | 28 | 25 | 30 | 38 | 46 | 44 | 211 |
| C/O Shortage | 76 | 132 | 122 | 160 | 220 | 193 | 903 |
| Cancelled at Office | 3 | 3 | 0 | 1 | 4 | 0 | 11 |
| Scheduling Error | 6 | 2 | 0 | 3 | 4 | 1 | 16 |
| Court | 6 | 4 | 5 | 2 | 1 | 4 | 22 |
| Late to Appointment | 12 | 3 | 5 | 8 | 5 | 6 | 39 |
| Other | 3 | 13 | 5 | 6 | 19 | 4 | 50 |
| *Total NOT Seen* | *134* | *182* | *169* | *218* | *299* | *252* | *1254* |
| **Total Seen** | **166** | **174** | **147** | **169** | **162** | **120** | **938** |
| **% of Eligible Patients Seen** | **55%** | **49%** | **47%** | **44%** | **35%** | **32%** | **43%** |

PDP improved patient attendance at off-site appointments from 56 percent attendance in 2022 to 62 percent attendance in the first half of 2023. Over the last six months of 2023, total patient attendance decreased to 43 percent from 62 percent attendance in the first six months of 2023.[25] The number of scheduled appointments in the last six months of 2023 increased by an average of almost 20 appointments per month, although the percentage of patients who made it to their appointments reduced from 55 percent to 32 percent in the same period. When patients no-show for appointments, the next available appointments are often months later, further increasing the backlog. Extended delays occur not only for patients who require routine or preventive specialty care, but also for patients with serious or life-threatening conditions.

Since monitoring began in 2022, PDP has made efforts to reduce its off-site specialty backlog. Efforts have included adjusting appointment times for greater uniformity in scheduling, batching patients together to reduce the numbers of patient transports, and seeking providers who can offer evening appointments. None of these efforts were successful. PDP data reflects security staff shortages remain the largest factor in missed appointments. In the first half of 2023, correctional officer shortages explained a monthly average of 58 missed appointments.[26] In the last six months of 2023, correctional officer shortages accounted for a monthly average of 151 missed appointments, or a 160 percent increase.

PDP has thus far reported limited success in attracting more specialty care physicians to offer services at PDP. Although PDP currently pays commercial rates for healthcare services, it should evaluate pay scales for both on-site and off-site specialty services and increase incentives

---

[25] *Id.* at 31.
[26] *Ibid.*

for providers to offer more specialty care on-site rather than transporting patients to off-site facilities. Some incentives may include: (1) offering outside providers reimbursement for travel to PDP facilities; (2) guaranteed pay for all scheduled appointments, whether patients attend or not; and (3) reimbursing off-site specialty care providers at higher rates to provide care on site rather than in their community offices.

An effective off-site specialty care program requires a dedicated healthcare escort and transportation unit. As previously reported, Class Members have cited excessive wait times for transportation as the most common reason for refusing to attend off-site medical appointments.[27] Because canceled appointments due to Class Member refusals and insufficient transportation staff often occur on the day of scheduled appointments, some providers have voiced frustration, which could further reduce the number of providers willing to treat PDP patients. PDP reports it has made efforts to reduce wait times for transportation to medical appointments that contributed to high refusal rates. In the first six months of 2023, an average of 48 patients per month refused off-site medical appointments.[28] Patient refusals reduced to an average 35 patients per month in the last six months of 2023, reflecting a 27 percent decrease. A total of 286 patient refusals in the first half of 2023 reduced to 211 patient refusals in the second half of the year.[29] PDP's overall physical healthcare backlog remains substantially higher than the required 238 total backlogged appointments.[30]

## Intake Screenings

PDP remains unable to meet policy guidelines for completing patient intake screenings within four hours of arrival at PDP. The following table depicts PDP's reported compliance with four-hour timeframes for each month in the second half of 2023:

### Percentage of Intake Screenings Within Four Hours
Monthly Averages, July – December 2023

| | |
|---|---|
| July | 31%* |
| August | 22% |
| September | 19% |
| October | 16% |
| November | 29% |
| December | Not available** |

*July data is incomplete reportedly due to a data collection issue.
**December data was not available reportedly due to a data collection issue.

PDP continues to struggle to meet policy timeframes for intake screenings. PDP reports it has adequate healthcare and security staffing in the intake area to meet the four-hour requirement, yet PDP's healthcare performance indicator reports suggest patients are often not escorted to the medical intake area until long after the four-hour benchmark has passed. This appears to be

---

[27] *Id.* at 31-32; Monitor's Second Report, *supra* note 4, at 27-28; Monitor's First Report, *supra* note 4, at 20.

[28] Monitor's Third Report, *supra* note 4, at 31.

[29] *Ibid.*

[30] As previously reported, substantial compliance requires PDP to reduce its backlog to 238 appointments, or 15 percent of 1,587. *See* Monitor's First Report, *supra* note 4, at 18.

another area of poor interdisciplinary coordination.  Intake policy compliance is an interdisciplinary process that the Access to Care Committee, or another interdisciplinary group of healthcare and security staff should address.  Once intake screenings are completed, within any timeframe, movement of Class Members from intake to housing units is also frequently delayed due to staffing shortages.  Housing delays may be reduced with more focused attention but will not likely be corrected without more staff.

**Mortality Information**

Fourteen Class Member's died while in PDP custody in 2023.  Two of the 14 deaths were ruled suicides and one was ruled a homicide.  Two deaths were ruled accidental secondary to substance overdose and seven deaths were reportedly due to natural causes.  Two deaths are pending causes from the medical examiner.

In September 2022, PDP implemented a process for reviewing deaths that occur in PDP custody as recommended by the Monitoring Team.[31]  The Monitoring Team observed all reviews that occurred in this reporting period.  Circumstances of each death and emergency responses of healthcare and security staff were evaluated during the reviews.  Reviews were interdisciplinary and attended by PDP's executive management team, security and healthcare managers, and other personnel who interacted with or treated the Class Members who died.  Discussions were transparent and identified areas for corrective action.  PDP reports that it intends to formalize reviews in PDP policy.  The Monitoring Team has recommended that PDP also develop a process for ensuring that all corrective action is implemented and tracked, including any disciplinary action taken against individual personnel.

**Behavioral Healthcare**

PDP remains out of compliance with required timeframes for behavioral health referrals.[32]  In this reporting period, the behavioral health appointments backlog increased and now comprises 18 percent of the entire on-site non-specialist appointment backlog.  Average appointment backlog totals for initial psychiatric and medication evaluations for weeks reviewed increased by 105 percent and 74 percent respectively.  The following tables depict PDP's compliance with policy timeframes for behavioral health referrals, social worker sick calls, and 14-day patient evaluations for the last six months of 2023:

---

[31] *See* Monitor's Second Report, *supra* note 4, at 28-29.
[32] PDP behavioral healthcare policy prescribes the following timeframes for responding to behavioral health patient referrals:  emergency referrals, within four hours; urgent referrals, within 24-hours; and routine referrals, within five days.

**Percent Compliance with Behavioral Health Referral Timeframes**
July – December 2023

| Month | Total Completed Referrals | Total Referrals Completed within Timeframes (%) | Emergency Referrals Completed within 4 hours (%) | Emergency Referrals Completed within 24 hours (%) | Urgent Referrals Completed within 24 hours (%) | Urgent Referrals Completed within 48 hours (%) | Routine Referrals Completed within 5 days (%) |
|---|---|---|---|---|---|---|---|
| July | 529 | 56% | 70% | 91% | 22% | 34% | 46% |
| August | 609 | 59% | 78% | 100% | 24% | 34% | 55% |
| September | 584 | 57% | 73% | 100% | 22% | 35% | 44% |
| October | 686 | 53% | 62% | 100% | 20% | 31% | 60% |
| November | 675 | 55% | 64% | 100% | 25% | 42% | 54% |
| December | 622 | 58% | 71% | 100% | 23% | 36% | 49% |

*Expectation: emergent within 4 hours, urgent within 24 hours, routine within 5 days.

**Social Worker Sick Calls**
July – December 2023

| Month | Number Completed | Completed within 24 hours (%) |
|---|---|---|
| July | 457 | 69% |
| August | 452 | 72% |
| September | 449 | 70% |
| October | 495 | 68% |
| November | 531 | 66% |
| December | 467 | 58% |

**Compliance with 14-Day Patient Evaluations**
July – December 2023

| Month | Number Completed | Completed within 14 Days (%) |
|---|---|---|
| July | 677 | 86% |
| August | 849 | 93% |
| September | 790 | 96% |
| October | 732 | 96% |
| November | 655 | 91% |
| December | 592 | 91% |

Despite salary increases averaging 13 percent for behavioral health personnel, there has been no significant increase in behavioral health staffing in this reporting period and little change in PDP's ability to comply with required referral timeframes since the previous reporting period. Like physical healthcare providers, clinicians have begun providing some services on or near

housing units to reduce the need for custody escorts. PDP cites lack of behavioral health staff, delayed institutional counts, and lack of patient movement and security escorts among primary barriers to more timely responses.

In this reporting period, behavioral health staff referrals were completed within required timeframes less than 60 percent of the time. Compliance with four-hour emergency referral timeframes ranged from 62 percent to 78 percent in the second half of 2023, reduced from the 76 percent to 88 percent range in the previous reporting period.[33] Patients who receive emergency referrals are observed one-on-one by security personnel until they are seen by clinicians. One-on-one observation is necessary for patient safety but further strains security staff resources.

Urgent and routine referrals improved slightly but not significantly in this reporting period, typically occurring within required timeframes less than 25 percent and 60 percent of the time respectively. Now that some services are being offered on housing units, PDP anticipates improvements in the next reporting period. Social work sick call requests are patient initiated and require face-to-face triaging of patients within 24 hours of receipt. Data for this reporting period shows PDP met this goal an average of 67 percent of the time, similar to the 69 percent compliance rate in the previous reporting period.[34]

All Class Members entering PDP are referred for a 14-day evaluation by behavioral health staff. PDP has increased compliance with required timeframes over the course of monitoring, reaching an average of 97 percent compliance in the previous reporting period.[35] In this reporting period, 14-day evaluations were completed an average of 92 percent of the time.

**Healthcare Staffing**

As stated above, PDP healthcare staffing has improved since the previous reporting period. Correctional healthcare staff vacancy rates are analyzed based on the number of vacant and filled positions for a "staff vacancy" rate and a "functional vacancy" rate. The functional vacancy rate includes shifts that are filled by overtime and temporary agency hires and accounts for permanent staff who are out on leave and not reporting for duty. As previously reported, PDP and its healthcare contractor, YesCare, reviewed salaries and compensation packages and offered an average 13 percent pay increases for most healthcare positions.[36] Increases took effect in mid-2023 and improved healthcare staffing as a result.

PDP's healthcare staff vacancy rates from August 2022 through May 2023 were approximately 33 percent. In this reporting period, PDP reduced the healthcare staff vacancy rate by more than half to 16 percent. The functional vacancy rate has also reduced slightly from six percent in the previous reporting period to five percent in this reporting period. The following tables depict healthcare new hires and separations for each classification in this reporting period, July through December 2023, and total healthcare vacancies for May and December 2023:

---

[33] *See* Monitor's Third Report, *supra* note 4, at 33.
[34] *Id.* at 34.
[35] *Ibid.*
[36] *Id.* at 36.

**Healthcare Personnel New Hires and Separations by Job Classification**

July – December 2023

| Job Classification | New Hires | Separations | Net (+/-) |
|---|---|---|---|
| Administration | 2 | 0 | +2 |
| Administrative Assistant | 1 | 1 | 0 |
| Behavioral Health Nurse Practitioner | 1 | 1 | 0 |
| Behavioral Health Aide | 1 | 0 | +1 |
| Certified Nursing Assistant | 2.4 | .4 | +2 |
| Licensed Practical Nurse | 18.2 | 2.2 | +16 |
| Medical Assistant | 6.0 | 1.4 | +4.6 |
| Medical Records Clerk | 4.8 | 0 | +4.8 |
| Nurse Practitioner | 1 | 1 | 0 |
| Physician | 0 | 1 | -1 |
| Radiology Technician | 1 | 0 | +1 |
| Re-Entry Coordinator | 0 | 1 | -1 |
| Registered Nurse | 12.6 | 3.2 | +9.4 |
| Scheduler | 1 | 0 | +1 |
| Social Worker | 2 | 0 | +2 |
| Total | 54 | 12.2 | 41.8 |

**Healthcare Vacancy Report**
May and December 2023

| Position Category | Allocated Positions | Unfilled Positions May 2023 | Vacancy Rate May 2023 | Unfilled Positions December 2023 | Vacancy Rate December 2023 | Functional Vacancy Rate |
|---|---|---|---|---|---|---|
| Administration | 49.0 | 1.0 | 2% | 0.0 | 0% | 6% |
| Behavioral Health Aide | 8.4 | 1.8 | 21% | 0.0 | 0% | -18%* |
| Behavioral Health Clinicians: Social Worker/Psychologist | 24.0 | 16.6 | 69% | 10.0 | 42% | 45% |
| Behavioral Health Prescribers: Psychiatrist, NP | 15.4 | 6.5 | 42% | 5.4 | 35% | 36% |
| Behavioral Health Professionals: BH Coun./Activity Th. | 15.0 | 0.0 | 0% | 1.0 | 7% | 29% |
| Certified Nursing Assistant | 2.8 | 2.4 | 86% | 0.4 | 14% | 23% |
| Dialysis RN and Dialysis Technician | 1.6 | 0.8 | 50% | 0.0 | 0% | 7% |
| Infectious Disease Physician | 2.0 | 0.0 | 0% | 0.0 | 0% | 34% |
| License Practical Nurse: All LPNs | 68.2 | 27.2 | 40% | 12.2 | 18% | -18% |
| Medical Assistant | 17.0 | 8.8 | 52% | 1.0 | 6% | 1% |
| Medical Records Clerk | 14.8 | 4.8 | 32% | 0.4 | 3% | -3% |
| OB/GYN Physician | 0.8 | 0.0 | 0% | 0.0 | 0% | 54% |
| Physical Health Clinicians: Physician, NP, PA | 18.0 | 1.6 | 9% | 3.6 | 20% | 28% |
| Physical Therapist/Therapist Assistant | 3.0 | 0.0 | 0% | 0.0 | 0.0% | 32% |
| Telehealth Coordinators | 3.0 | 2.0 | 67% | 1.0 | 33% | 75% |
| Radiology Technician | 2.4 | 1.4 | 58% | 0.4 | 17% | 26% |
| Registered Nurse: All RNs | 68.8 | 28.1 | 41% | 15.0 | 22% | -7% |
| **Total** | **314.2** | **103.00** | **33%** | **50.40** | **16%** | **5%** |

*For this total, a negative functional vacancy rate reflects over-staffing in one classification in efforts to reduce the impact of vacancies in others.

PDP improved its staffing from a net gain of 11.4 full-time positions to 41.8 positions for a 267 percent increase since the previous reporting period. The influx of new staff should continue to reduce backlogs in the next reporting period. Unfortunately, salary increases have not yet improved hiring across behavioral health classifications. PDP should consider whether raises applied to behavioral health classifications are enough to attract candidates and make appropriate adjustments. Functional vacancy rates for clinicians increased from 40 percent in the previous reporting period to 45 percent in this reporting period and decreased only slightly for prescribers from 37 percent to 36 percent.

**Status of Recommendations, Substantive Provision 5—Healthcare, from the Monitor's First Report:**

1. Defendants should engage an independent salary survey to assist PDP in identifying salaries and benefits that are sufficiently competitive to attract and retain full-time healthcare staff.

    *PDP has instituted 13 percent raises on average for almost all healthcare classifications, which has improved recruitment and retention in several classifications. A more focused recruitment strategy, which may include additional compensation increases, is necessary to reduce vacancies among behavioral health classifications.*

2. Continue to explore options to provide both on and off-site appointment services via telehealth.

    *PDP reports that YesCare remains unsuccessful in identifying providers who are willing to provide telehealth, with the exception of limited cardiology services. In response, Subject Matter Expert (SME), Dr. Belavich, has recommended improvements to YesCare's current engagement strategy, including salary incentives described above, that YesCare should implement to increase the likelihood of success.*

3. Create an internal interdisciplinary workgroup to evaluate reasons for missed off-site appointments and develop procedures to increase efficiency in arranging and ensuring scheduled appointments occur.

    *The Access to Care Committee continues to meet, but some issues, such as timely intake assessments, have reportedly not been addressed in weekly meetings. Some problems will not be resolved without additional security or healthcare staff. The committee should, however, analyze new or more complex problems as they arise to ensure: (1) current operations are as efficient as possible with existing resources, and (2) plans are in place to improve operations as resources increase.*

**Additional recommendations for immediate action:**

4. PDP should evaluate reimbursement rates for both on-site and off-site specialty services and make increases sufficient to attract necessary providers.

5. PDP should increase incentives for providers to offer specialty care on-site rather than transporting patients to off-site facilities. Some incentives may include: (1) offering outside providers reimbursement for travel time to PDP facilities; (2) guaranteed reimbursement for all scheduled appointments, whether patients attend or not; and (3) reimbursement of off-site specialty care providers at higher rates to provide care on site.

6. The City should explore contracting with outside law enforcement or private security agencies to establish a team dedicated to off-site transport details.

**Substantive Provision 6—Behavioral Health in Segregation**

*By September 30, 2022, the PDP and Corizon shall re-establish a mental health program for persons who are in segregation status.*

**Compliance Rating:  Partial Compliance**

To achieve substantial compliance with this substantive provision, PDP must, at a minimum:  (1) resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status; (2) ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on segregation status; (3) resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating serious mental illness (SMI); (4) resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation status; (5) establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units; (6) safely discontinue the use of segregation for Class Member patients due to lack of sufficient Transition Unit (TU) housing; and (7) significantly reduce the use of segregation for Class Member patients who require placement on the Behavioral Health caseload.

*Requirements 1 and 3:  Resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status and resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating SMI.*

As previously reported, PDP completes audits of physical and behavioral healthcare rounds with patients in segregation.[37]  Due to ongoing discrepancies in PDP's healthcare and security segregation data, also discussed below under *Requirement 2, Requirement 5,* and Substantive Provision 8—Discipline*,* audit findings are useful for comparison purposes but not for compliance determinations.

The most recent data from an October 2023 audit shows 94 percent of required daily *physical* health rounds occurred and every facility achieved at least 90 percent compliance.  This marks a significant improvement from the March 2023 audit results reflecting 22 percent compliance with required physical health rounds.  PDP attributes improvements to enhanced training and internal compliance monitoring.

As with other behavioral health markers reported above, compliance with *behavioral* health daily rounding has decreased from 96 percent compliance in March 2023 to 85 percent compliance in October 2023.[38]  Both March and October compliance rates mark improvement from the 75 percent compliance rate reported in September 2022.

An essential part of rounding is identifying patients who show signs of decline or poor coping in segregation housing and making timely referrals for additional services or recommend removal from segregation.  Behavioral healthcare staff who complete rounds in segregation housing report that they may request evaluations from higher level clinicians as needed but PDP does not currently track referrals for further assessment or recommendations for removal.  The Monitoring Team has recommended that PDP begin to track this information both for quality improvement and to establish compliance with this requirement.

---

[37] Monitor's Third Report, *supra* note 4, at 39.
[38] *Id.* at 38.

*Requirement 2: Ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on segregation status.*

Healthcare clearances are required for all Class Members being considered for placement on segregation status. This requires a face-to-face evaluation by a physical healthcare provider and for those in Behavioral Health programs, a behavioral health clinician. Patients designated SMI are required to have a behavioral health clearance performed within four hours of placement in segregation. Patients who are on the Behavioral Health caseload but not identified as SMI are to receive a behavioral health clearance within 24-hours of placement.

A review of 24 physical and behavioral healthcare clearance forms (PDP 86-733) from September and October 2023 suggest that physical health sections of the clearances are still being completed consistently, as previously reported.[39] Issues with behavioral health clearances identified in the previous reporting period were also present in the sample reviewed in this reporting period. In multiple instances, patients on the Behavioral Health caseload, some of whom were also SMI, were not designated as such and therefore did not receive clearance evaluations. In some instances, SMI patients were mis-identified as being on the Behavioral Health caseload only. These patients would have received behavioral health clearances based on the 24-hour policy timeframe rather than the 4-hour timeframe required for SMI patients.

PDP developed a pilot project to improve the quality of mental health clinical input in disciplinary hearings and dispositions, accurate identification of the SMI populations, and ensuring staff assistant support is provided and documented. The pilot is scheduled for implementation at PICC in the next reporting period. As previously reported, the Monitoring Team determined that the threshold for diverting patients from segregation is too high and some patients are unsafe in the isolated environment. Currently, the only available alternative to segregation is inpatient hospitalization, and many patients do not meet inpatient criteria. The PICC pilot includes the option of diversion from segregation to TUs, which is the more appropriate level of care for many patients.

*Requirement 4: Resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation status.*

As previously reported, PDP developed "Positive Change/Positive Outcomes" (PC/PO), a behavioral health group treatment program for patients in segregation.[40] The program is designed to deliver group treatment for two hours, five days per week, for a total of 10 possible treatment hours each week for every program participant. PDP has begun tracking PC/PO treatment hours based on healthcare staff projections, which is now part of PDP's monthly performance indicator report. The following table reflects total PC/PO group treatment hours possible with current Healthcare staffing versus hours offered to segregated patients from July through December 2023:

---

[39] *Ibid.*
[40] *Id.* at 40.

**PC/PO Structured Group Treatment Hours in Segregation**
July – December 2023

| Month | Treatment Hours Possible | Treatment Hours Offered | Percent (%) |
|---|---|---|---|
| July | 210 | 78 | 37% |
| August | 260 | 114 | 44% |
| September | 234 | 56 | 24% |
| October | 240 | 60 | 25% |
| November | 472* | 68 | 14% |
| December | 462 | 54 | 11% |

*Through October, Treatment Hours Possible were measured based on both security and healthcare staffing projections.  Beginning in November, Possible Hours reflect healthcare staffing projections only, which is a more accurate measure.

In the previous reporting period, preliminary data suggested that only 19 percent of available PC/PO group hours were being offered.  Newer data suggests more group hours were offered most months in this reporting period, but far fewer than are possible with available healthcare personnel.  PDP does not currently have a way to track the number of patients who are eligible for and participate in PC/PO groups but reports it is in the process of refining its eligibility criteria.

*Requirement 5:  Establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units.*

Previously reported discrepancies in security and healthcare tracking of total patients cleared for segregation versus total patients placed in segregation persisted in this reporting period.[41]  PDP previously reported it was completing audits to ensure no Class Members were on segregation status outside of designated segregation areas and all patients in segregation were receiving required healthcare rounds.  Audits reportedly identified the sources of some discrepancies, such as insufficient tracking and communication when housing units are converted to or from segregation units based on population fluctuations.

Despite assurances that PDP had resolved discrepancies, segregation data from December 2023 revealed the same previously reported inconsistencies.  The Monitoring Team has met with PDP about this issue multiple times since 2022.  The problem is convoluted but not intractable and should have been resolved sooner.  PDP's failure to identify the specific sources of data discrepancies reflects poor interdisciplinary communication.

In recent months, the Monitoring Team directly facilitated discussions between security and healthcare managers.  Additional solutions were identified, and January 2024 data now appears consistently collected across disciplines.  Until PDP implements a new automated Jail Management System (JMS), PDP's segregation and other data must be tracked and reconciled manually.  Given PDP's staffing crisis, data accuracy is not a top priority.  The number of

---

[41] *Id.* at 39; Monitor's Second Report, *supra* note 4, at 34.

patients impacted by poor segregation tracking is likely small; however, potential consequences for those who do not receive required behavioral health clearances and clinical contacts are great.

*Requirement 6: Safely discontinue the use of segregation for Class Member patients due to lack of sufficient Transition Unit housing.*

Dr. Belavich maintains that PDP should reduce its dependence on segregation for all Class Members, especially those on the Behavioral Health caseload, and discontinue its use altogether for SMI patients unless no alternatives exist.[42] PDP's TU housing provides an alternative to segregation housing in a more therapeutic setting for the mentally ill. Pre-COVID-19, PDP reserved 128 TU beds for women and 200 for men. During the COVID-19 lockdown, PDP reduced its available TU beds and, by August 2022, 134 beds remained including 22 for women and 112 for men.

The women's TU currently has 19 patients enrolled in a 34-patient program. The women's TU is housed in PICC D-unit, which has a 128-bed capacity. As previously reported, women with various security classifications are also housed in the unit, which limits out-of-cell and therapeutic programming time.[43] PDP acknowledges that current TU space is inappropriate for this program and has committed to activating a 100-bed women's TU. The City initially committed to expansion by March 2024, however, that has not occurred.

In February 2023, PDP moved the men's TU to a larger, 128-bed unit at RCF. As of June 2023, approximately 50 patients resided in the TU. PDP reported it was having difficulty identifying eligible patients to fill the program and, in October 2023, moved the program to a smaller 64-bed unit. Dr. Belavich generally supports the idea of smaller units as more effective therapeutically. However, as of January 2024, only 51 patients resided in the 64-bed TU. PDP's population consists of approximately 1,600 patients on the Behavioral Health caseload, 340 of whom experience SMI. PDP has not finalized a sound interdisciplinary process for patient referrals to the TU or appropriate eligibility criteria. PDP recognizes it is implausible that only 51 of 1,600 patients can benefit from the program and is working with Dr. Belavich on formalized, less restrictive eligibility criteria and an effective referral process.

The small TU patient population has consistently reported to the Monitoring Team during site visits in February 2023, November 2023, and January 2024 that they are benefitting from treatment offered and enjoy several hours of out-of-cell time daily. PDP confirms its goal is to improve care for the mentally ill by diverting as many patients as possible from segregation to TUs and offering at least 10 hours of PC/PO group treatment for patients in segregation. There is, however, no definitive plan in the near term to expand TUs or increase PC/PO group hours.

*Requirement 7: Significantly reduce the use of segregation for Class Member patients who require placement on the behavioral health caseload.*

Behavioral Health patients have been consistently overrepresented in segregation over three reporting periods. Segregation data from select dates in December 2022, June 2023, and January

---

[42] Monitor's Third Report, *supra* note 4, at 40.
[43] *Id.* at 40; Monitor's Second Report, *supra* note 4, at 37.

2024, shows that patients on the Behavioral Health caseload totaled between 35 and 37 percent of PDP's overall population yet represented 44 percent of the segregation population in 2022, 38 percent in June 2023, and 40 percent in January of 2024.[44]

SMI patients have reduced from 12 percent of PDP's total population in 2022 to 10 percent in June 2023 to 8 percent in January 2024. SMI patients are not overrepresented in segregation and PDP has successfully reduced their percentages of the total segregation population in each reporting period from 12 percent in 2022 to 8 percent in June 2023 to 5 percent in January 2024. This data is reflected in the following table, which depicts SMI and Behavioral Health patients in segregation housing on specific dates in December 2022, June 2023, and January 2024.[45]

**SMI and Behavioral Health Class Members in Segregation**
December 30, 2022, June 9, 2023, and January 12, 2024

| | December 30, 2022 | | June 9, 2023 | | January 12, 2024 | |
|---|---|---|---|---|---|---|
| | Count | Percent of PDP Population | Count | Percent of PDP Population | Count | Percent of PDP Population |
| **PDP Census** | 4401 | 100% | 4565 | 100% | 4455 | 100% |
| **Number of SMI** | 516 | 12% | 439 | 10% | 342 | 8% |
| **Number on BH Caseload** | 1546 | 35% | 1653 | 36% | 1633 | 37% |
| **Number in Segregation** | 311 | 7% | 268 | 6% | 280 | 6% |
| | | Percent of Segregation Population | | Percent of Segregation Population | | Percent of Segregation Population |
| **Number of SMI in Segregation** | 36 | 12% | 21 | 8% | 15 | 5% |
| **Number of BH in Segregation** | 138 | 44% | 102 | 38% | 113 | 40% |

PDP continues to report that it has not finalized a system to track when patients are diverted from segregation to PHSW or a TU. Once PDP develops and implements recommended policies to divert those on the Behavioral Health caseload or with SMI to TUs, the number of mentally ill in segregation should reduce.

**Status of Recommendations, Substantive Provision 6—Behavioral Health in Segregation, from the Monitor's Second Report:**

1. PDP should reexamine its behavioral health policies and practices for segregation clearances and rounding, with particular focus on thresholds for diversion or removal from segregation based on patient acuity.

---

[44] Monitor's Second Report, *supra* note 4, at 37; Monitor's Third Report, *supra* note 4, at 41.
[45] As discussed above under *Requirement 5,* PDP's December 2023 data contained inconsistencies. Dr. Belavich was able to verify PDP had reconciled the data by January 12, 2024 and, therefore, selected that date for analysis.

> *PDP reports it is piloting a new procedure at PICC in the next reporting period, which will improve practices for segregation clearances.*

2. PDP should make additional progress in identifying custody personnel to staff Positive Change, Positive Outcome treatment groups and fill Transition Units with only Transition Unit patients or others who can safely program in common spaces with them.

> *PDP reports it is unable to implement this recommendation without additional security staff.*

## Substantive Provision 7—Law Library Access

*PDP will continue to provide law library access for all incarcerated individuals. The Monitor and the parties will discuss access and scheduling matters and the Monitor shall make any recommendations on these matters by August 1, 2022.*

### Compliance Rating:  Partial Compliance

PDP remains unable to provide consistent law library access.  PDP has attempted to implement an equitable rotation schedule but evaluating compliance with the schedule was not possible in this reporting period because documentation is incomplete.

As recommended, PDP maintains a law library schedule for all non-segregation housing units that provides for access at varying times each week.  Also as recommended, PDP instituted a sign-up process that tracks who requests access, whether Class Members attend, and durations of time spent in the law library.  The schedule and roster were intended to serve as interim compliance tools for PDP executives and the Monitoring Team until a computerized system can be implemented.

Too many sign-up sheets are missing from documentation provided for randomly sampled weeks from July through December 2023 to measure compliance.[46]  In the previous reporting period, an estimated 32 percent of scheduled law library timeslots were filled.[47]  Limited documentation for sampled weeks suggests that system-wide compliance reduced in this reporting period, but this cannot be verified without more complete documentation.  In this reporting period, PICC's documentation was more complete than other facilities and it, therefore, appears to have achieved greater compliance, but this also cannot be verified.

Law library access in segregation units remains highly restricted largely because Class Members frequently spend entire days inside their cells.  PDP's goals of ensuring law library access and effectively tracking access will not likely be met without more staff.

In November 2023, PDP assigned a sergeant to conduct monthly audits of law library access.  Audits track whether law libraries are open as scheduled, schedules are posted on housing

---

[46] The weeks reviewed were as follows:  July 17-23, 2023; August 14-20, 2023; September 18-24, 2023; October 16-22, 2023; November 13-19, 2023; and December 11-17, 2023.

[47] Monitor's Third Report, *supra* note 4, at 43.

units, and sign-up sheets are being used.[48]  Law library documentation appears to have improved in November and December as a result of internal monitoring.  However, it is unlikely that PDP supervisors will be able to monitor and ensure consistent documentation of law library access in the next reporting period.

Based on out-of-cell data, Class Member complaints, and reports from housing unit personnel and supervisors, PDP is far from substantial compliance with this provision.  Class Member grievances submitted via tablets in this reporting period frequently cite insufficient staff as rationales provided for law library closures.

PDP tracks maintenance of law library printers and computers via monthly audits.  Audits in this reporting period reflect no issues for dates sampled as depicted in the following table:

### PDP Internal Law Library Equipment Audit
July – December 2023

| Month | Equipment | CFCF | DC | PICC | RCF | Total Issues Documented | Housing Unit Audit Dates | Repairs Completed |
|---|---|---|---|---|---|---|---|---|
| Jul 2023 | Computers | 0 | 0 | 0 | 0 | 0 | 7/18/23, 7/31/23, 8/1/23 | NA |
| | Printers | 0 | 0 | 0 | 0 | 0 | | |
| Aug 2023 | Computers | 0 | 0 | 0 | 0 | 0 | 8/8/23, 8/16/23, 8/22/23 | NA |
| | Printers | 0 | 0 | 0 | 0 | 0 | | |
| Sept 2023 | Computers | 0 | 0 | 0 | 0 | 0 | 9/26/23-9/27/23 | NA |
| | Printers | 0 | 0 | 0 | 0 | 0 | | |
| Oct 2023 | Computers | 0 | 0 | 0 | 0 | 0 | 10/23/23-10/31/23 | NA |
| | Printers | 0 | 0 | 0 | 0 | 0 | | |
| Nov 2023 | Computers | 0 | 0 | 0 | 0 | 0 | 11/16/23-11/28/23 | NA |
| | Printers | 0 | 0 | 0 | 0 | 0 | | |
| Dec 2023 | Computers | 0 | 0 | 0 | 0 | 0 | 12/15/23-12/21/23 | NA |
| | Printers | 0 | 0 | 0 | 0 | 0 | | |
| | Total | 0 | 0 | 0 | 0 | 0 | | |

Numerous tablet grievances filed in December 2023 reported a broken printer at PICC.  PDP reports the issue was resolved.

**Substantive Provision 8—Discipline**

*Sub-provision 8.1--All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding.  See Wolff v. McDonnell, 418 U.S. 539, 563–66 (1974); Kanu v.*

---

[48] Examples include:  CFCF, November 6, 2023, law library suspended pending investigation; PICC, November 13, 2023, law library suspended due to search; PICC, November 21, 2023, medium law library closed, reasons not documented; PICC, November 17, 2023, law libraries closed, reasons not documented.  PICC generally had posted schedules. RCF and CFCF postings varied by unit and date.

*Lindsey, 739 F. App'x 111, 116 (3d Cir. 2018); Stevenson v. Carroll, 495 F.3d 62, 70–71 (3d Cir. 2007).*

**Compliance Rating:  Partial Compliance**

The following tables depict PDP's disciplinary hearing data in six-month periods for July through December 2022 and January through June 2023, as well as each month, July through December 2023, including totals for disciplinary sanctions issued, "not guilty" findings, dismissals, and discipline imposed despite Class Members' absence without waiver:

### PDP Disciplinary Hearings
July – December 2022[49]

| Six-month Total | Total Discipline Issued | Total Not Guilty | | Dismissed | | SMI | | Guilty without a hearing - excludes refusals | |
|---|---|---|---|---|---|---|---|---|---|
| | n | n | % | n | % | n | % | n | % |
| Average/Average % | 268 | 19 | 7% | 30 | 11% | 24 | 9% | 6 | 2% |

### PDP Disciplinary Hearings[50]
January – June 2023

| Six-month Total | Total Discipline Issued | Total Not Guilty | | Dismissed | | SMI | | Guilty without a hearing - excludes refusals | |
|---|---|---|---|---|---|---|---|---|---|
| | n | n | % | n | % | n | % | n | % |
| Average/Average% | 303 | 23 | 8% | 34 | 11% | 30 | 10% | 0 | 0 |

---

[49] Monthly totals included in the Monitor's Second Report.  *See* Monitor's Second Report, *supra* note 4, at 40.
[50] Monthly totals included in the Monitor's Third Report.  *See* Monitor's Third Report, *supra* note 4, at 45.

**PDP Disciplinary Hearings**
July – December 2023

| Month | Total Discipline Issued | Total Not Guilty | | Dismissed | | SMI | | Guilty without a hearing - excludes refusals | |
|---|---|---|---|---|---|---|---|---|---|
| | n | n | % | n | % | n | % | n | % |
| July | 279 | 27 | 10% | 25 | 9% | 26 | 9% | 0 | 0 |
| August | 381 | 22 | 6% | 31 | 8% | 26 | 7% | 0 | 0 |
| September | 309 | 15 | 5% | 39 | 13% | 28 | 9% | 0 | 0 |
| October | 285 | 21 | 7% | 30 | 11% | 20 | 7% | 0 | 0 |
| November | 277 | 22 | 8% | 11 | 4% | 18 | 6% | 0 | 0 |
| December | 401 | 28 | 7% | 45 | 11% | 25 | 6% | 0 | 0 |
| Average/Average% | 322 | 23 | 7% | 30 | 9% | 24 | 7% | 0 | 0 |

PDP's practice of holding disciplinary hearings without affording the subject Class Member the opportunity to be present has not recurred since December of 2022.  PDP remains in compliance with this aspect of the sub-provision.

In the second reporting period, the Monitoring Team recommended that PDP revise its disciplinary policies, hearing documentation, and training materials to comply with due process and Agreement requirements.[51]  The 24 completed disciplinary cases reviewed in this reporting period revealed no meaningful improvements from the previous reporting period.  Challenges identified previously continued through this reporting period.  Some examples include failure to document when interpreters are provided for non-English speaking Class Members and staff assistants for Class Members with disabilities, inconsistent documentation of the behavioral health and SMI population, and inadequate input from the clinical personnel regarding behavioral health Class Members.

Disciplinary actions reviewed in this reporting period showed little improvement in the quality of mental health assessments in the disciplinary process or the accuracy by which Class Members were designated SMI.[52]  As previously reported, Behavioral Health staff are required to complete an assessment form (PDP 86-733) prior to placement of each Class Member into a segregated setting.[53]  The form contains a section for treating clinicians to note any behavioral health contraindication to placement in segregation and to document whether a Class Member is able to participate in the hearing process and present a defense.  It also denotes whether a Class Member's mental illness should be considered a mitigating factor in any discipline imposed.

---

[51] Monitor's Second Report, *supra* note 4, at 39-40.
[52] PDP reported that deficiencies noted in the September/October samples were not corrected by December 31, 2024, so the review was not replicated later in the reporting period.
[53] Monitor's Third Report, *supra* note 4, at 46.  Also discussed in the Substantive Provision 6—Behavioral Health in Segregation section of this report, *infra* at 41.

However, in addition to frequent misidentification of patients' mental health status, hearing officers have not begun to document consideration of notes from the mental health assessment form (PDP 86-733) in their findings.

Correctly identifying Class Members with SMI or on the Behavioral Health caseload and consideration of those factors in disciplinary hearings is critical to ensuring Class Members' rights are protected.  PDP's pilot project discussed above under Substantive Provision 6—Behavioral Health in Segregation, *Requirement 2*, will begin to address these issues and some of the Monitoring Team's other recommendations.

*Sub-provision 8.2--The PDP shall expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date [April 12, 2022]. . .*

**Compliance Rating:  Substantial Compliance (March 3, 2023, monitoring discontinued)**

*Sub-provision 8.3--[PDP shall] release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are [on April 12, 2022] still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing. . .*

**Compliance Rating:  Substantial Compliance (October 12, 2023, monitoring discontinued)**

*Sub-provision 8.4--[PDP shall] cancel sanctions [imposed in hearing held between March 2020 and April 12, 2022] that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms.  Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation.  Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline.  Defendants shall provide to counsel for plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022.*

**Compliance Rating:  Substantial Compliance (March 3, 2023, monitoring discontinued)**

**Substantive Provision 9—Tablets**

*Sub-provision 9.1--PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational capabilities and housing designs. The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets;*

*and, at RCF, expanding from six (6) to eight (8) tablets on the [first floor] (4 housing units) and expanding from eight (8) to twelve (12) tablets on the [2nd and 3rd floors] of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF. This expansion process will be completed by May 1, 2022.[54]*

**Compliance Rating:  Partial Compliance**

PDP reports that it continues to maintain an inventory of tablets consistent with this sub-provision. PDP's total tablet inventory meets Agreement requirements but Class Member access to tablets does not.

PDP previously miscalculated, and the Monitor erroneously reported, that PDP maintained 421 tablets in populated housing units in June 2023.[55]  The reported 421 included tablets reserved for attorney visiting and other purposes that are not contemplated in this Agreement provision.  The correct number of tablets issued to housing units in June 2023 was 368.  PDP's inventory for January 2024 reflects 392 tablets were issued to housing units.  In the previous reporting period, PDP reserved an additional 187 tablets for educational programming.  That number reduced to 113 in this reporting period.  PDP reports that it redirected 74 underutilized tablets to housing units to replace broken or missing tablets.  The following table reflects current tablet totals at each PDP facility based on documentation provided:

### Tablet Availability at Each PDP Facility
June 2023 and January 2024

| Facility/Housing Unit | Total Tablets June 2023 | Total Tablets January 2024 | Difference |
|---|---|---|---|
| ASD Total* | 12 | 0 | -12 |
| MOD 3 Total | 12 | 12 | 0 |
| CFCF Total | 159 | 188 | +29 |
| DC Total | 51 | 52 | +1 |
| PICC Total | 50 | 61 | +11 |
| RCF Total | 84 | 79 | -5 |
| **Total** | **368** | **392** | **+24** |

*ASD was closed and the 12 remaining tablets were reportedly redistributed.

[54] The Agreement, as written, requires the expansion of tablets at RCF *"from six (6) to eight (8) tablets on the 2nd and 3rd floor (4 housing units) and expanding from eight (8) to twelve (12) tablets on the 1st floor of RCF (4 larger units) . . .".*   In fact, RCF's larger units are located on the 2nd and 3rd floors and the smaller units are located on the 1st floor, suggesting that the numbers of tablets required were inadvertently reversed.  To correct this small oversight in the Agreement's drafting, PDP must instead increase tablets from eight to twelve on the second and third floor housing units and from six to eight on the first-floor housing units in order to achieve substantial compliance with this aspect of the substantive provision.

[55] Monitor's Third Report, *supra* note 4, at 49.  Previously, PDP likewise erroneously reported that there were 427 tablets in populated housing units in December 2022.  *See* Monitor's Second Report, *supra* note 4, at 44.

During the November 2023 site visit, the Monitoring Team frequently observed units with empty docking stations, and staff and Class Members continue to report that tablets are frequently broken, not charged, or otherwise not issued for use.  There were seven grievances filed via the tablet grievance system in this reporting period alleging limited tablet access.

In this reporting period, PDP provided additional staff training, reiterated expectations, updated post orders regarding tablet access, and, in November 2023, dispatched a team to complete internal tablet audits.  Initial audit results cannot be verified due to poor or inconsistent audit methods, but findings generally confirm that some tablets listed on PDP inventories were not available for use in housing units on audit days.

As previously reported, PDP has committed to the use of tablets for Class Members to initiate sick call requests.[56]  PDP reports it has procured 170 tablets for this purpose, but patient confidentiality issues are creating unanticipated delays to its initial December 2023 pilot date.

Despite PDP's best efforts, it is unlikely to achieve substantial compliance with this substantive provision without more staff to monitor functionality of and access to tablets.

*Sub-provision 9.2--The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices.*

### Compliance Rating:  Partial Compliance

PDP continues to report that it plans to provide tablets to all eligible Class Members as part of its next telephone contract procurement.  This is positive, but due to the City's complex procurement process and necessary physical plant infrastructure changes, it is not likely tablets will be issued to Class Members until at least mid-2025.

PDP's pilot initiative to allow for the filing of grievances on tablets was expanded to all PDP facilities by September 2023.  An average of 801 grievances were filed by Class Members via tablet each month from September to December, the majority of which relate to commissary and food items purchased through a third-party vendor.  Smaller numbers of grievances were filed regarding access to medical and mental healthcare, allegations against staff, and out-of-cell time. The following table depicts total monthly and average grievances for the two largest categories of complaints and "others" submitted via tablet for the period September through December 2023:

---

[56] Monitor's Third Report, *supra* note 4, at 50; Monitor's Second Report, *supra* note 4, at 46.

**Monthly Tablet Grievances**
September – December 2023

| Month | September | October | November | December | Average |
|---|---|---|---|---|---|
| Commissary | 426 | 420 | 632 | 449 | 482 |
| Food Vendor | 63 | 100 | 124 | 185 | 118 |
| Other | 234 | 192 | 302 | 75 | 201 |
| **Total** | **723** | **712** | **1058** | **709** | **801** |

As anticipated, the challenge for PDP going forward will be providing timely and meaningful responses to significant increases in requests and grievances. PDP will need mechanisms for triaging emergent grievances and requests, as well as managing administrative issues like duplicate requests. PDP will also need to ensure Class Members are able to obtain evidence of their filed grievances, appeals, and any responses. Finally, PDP should ensure all Class Members have access to paper grievance forms at all times, and that they may choose the methods by which grievances are submitted. The Monitoring Team has recommended that PDP management and executives regularly review grievance information to identify and address areas of non-compliance and will work with PDP in the next reporting period to improve data analysis of grievances filed both in paper form and via tablets. Grievance analysis is another key area for the new data analysis unit to explore when it is established. Much can be learned from reviewing grievances as trends emerge that warrant executive support to resolve.

**Substantive Provision 10—Phone Calls**

*Sub-provision 10.1--PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices.*

**Compliance Rating: Partial Compliance**

When Class Members in general population units have access to dayrooms, PDP continues to provide free 15-minute phone calls. However, during site visits in this reporting period, Class Members continued to report to the Monitoring Team that restricted phone access continues to exacerbate housing unit tension and, at times, causes fights. As a result, phone time remains a form of dangerous jail currency, which ensures inequitable access. PDP is unlikely to achieve substantial compliance with this substantive provision without additional staff.

*Sub-provision 10.2--Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls.*

**Compliance Rating: Non-compliance**

As reported above under Substantive Provision 4—Return to Normal Operations, PDP does not have a plan for the return to normal operations and therefore remains in non-compliance with this sub-provision.

**Substantive Provision 11—PICC Emergency Call Systems**

*The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to tablets and/or phones and determine whether any policies and practices are necessary to address these matters considering all relevant factors, including operational feasibility and physical capacity.*

### Compliance Rating:  Partial Compliance

The Monitoring Team continues to recommend against the expansion of a call button system at PICC and instead recommends significant improvements to security check protocols and accountability.

In the previous reporting period, PDP attempted to use CCTV to assess the quality and timeliness of security checks at PICC, but outdated technology, excessive download times, and limited staffing reportedly prevented a thorough review.[57]  In July 2022, the Monitoring Team recommended that PDP install a unified CCTV system that will give supervisors, managers, and executives direct terminal access to real-time and historical CCTV footage.  In December 2023, the City reported it is exploring procurement options and developing a project plan consistent with this recommendation.  The City has not provided subsequent updates or project timelines, but upgrades will not likely be introduced in 2024.

As previously reported, physical plant limitations prevent PICC from installing additional phones and tablet docking stations.[58]  PDP's plan to provide every eligible Class Member with a tablet would be an appropriate alternative if implemented.  In December 2023, the City indicated its goal is to issue tablets to Class Members in fiscal year 2025.  The Monitoring Team recommends that PDP prioritize PICC for tablet issuance if it does not interfere with other aspects of the project timeline.

Regarding the May 2023 escape from PICC, PDP reports that it received the final security assessment completed by the Pennsylvania Department of Corrections in December 2023.  In January 2024, the Monitoring Team toured PDP's compound and observed several security upgrades pursuant to its findings.  The Monitoring Team has consistently requested the final report for review.  To date, neither the report nor a summary of its findings or recommendations have been provided.  The City's failure to promptly produce requested documentation that directly intersects with Agreement provisions marks an unfortunate deviation from the transparency Defendants demonstrated through most of the initial settlement term.

---

[57] *See* Monitor's Third Report, *supra* note 4, at 52.
[58] *See* Monitor's Second Report, *supra* note 4, at 48.

**Substantive Provision 12—Locks**

*Sub-provision 12.1--PDP initiated the lock replacement program for PICC. . . which will be completed by June 30, 2022.*

**Compliance Rating:  Substantial Compliance**

PDP initiated the lock replacement project at PICC and RCF in 2022.  In June 2023, PDP reported approximately 95 percent of the locks at PICC had been replaced.[59]  The remaining locks needing replacement were in cells that required additional renovation.  Those cells were decommissioned pending renovation and lock replacement.  PDP reports as of January 2024, all required locks were replaced.  PDP has completed additional training on requirements to conduct lock safety checks when officers assume their posts and to immediately notify a supervisor of any lock malfunctions.  Finally, PICC updated staff post orders to include direction on lock inspections, as well as the responsibility to deactivate cells and submit work orders for inoperable locks.  PDP has, therefore, achieved substantial compliance with this sub-provision, and the Monitoring Team will discontinue monitoring this aspect of the substantive provision.

*Sub-provision 12.2--PDP initiated the lock replacement program for. . .RCF, which will be completed by June 30, 2022.*

**Compliance Rating:  Substantial Compliance**

As previously reported, lock replacement and initial staff training at RCF were completed in May 2022.[60]  PDP provided additional training on lock security and updated post orders in this reporting period.  PDP has, therefore, achieved substantial compliance with this sub-provision, and the Monitoring Team will discontinue monitoring this aspect of the substantive provision.

Though not subject to the Agreement, PDP reports all locks at CFCF have now also been replaced.

*Sub-provision 12.3--For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022.*

**Compliance Rating:  Substantial Compliance (March 3, 2023, monitoring discontinued)**

*Sub-provision 12.4--Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner.*

**Compliance Rating:  Partial Compliance**

---

[59] Monitor's Third Report, *supra* note 4, at 52.
[60] Monitor's First Report, *supra* note 4, at 28-29.

PDP provided copies of 37 call-button work orders completed at CFCF and RCF from July through December 2023. Twenty-nine or 78 percent of repairs were documented as completed within one working day. Remaining work orders were documented as completed within an average of one week. PDP's efficient maintenance contractor also completed tamper-proof upgrades to call-button plates in the cells at CFCF in this reporting period.[61] The Monitoring Team will review work orders in the next reporting period to verify consistency in timeliness of repairs and determine whether the call-button upgrades at CFCF reduced the volume of required repairs.

As recommended, PDP updated its post orders in this reporting period to include requirements to submit work orders and ensure quality security checks if call buttons are inoperable, and to depopulate cells if damage to the call-button systems becomes dangerous (with exposed wires, for example).

*Sub-provision 12.5--PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system.*

> **Compliance Rating: Substantial Compliance (March 3, 2023, monitoring discontinued)**

## Substantive Provision 13—Visiting

*Sub-provision 13.1--As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members. PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule. At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots.*

> **Compliance Rating: Substantial Compliance (March 3, 2023, monitoring discontinued)**

*Sub-provision 13.2--Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues.*

> **Compliance Rating: Partial Compliance**

PDP acknowledges previously reported weaknesses in its visiting program and reports it has not made meaningful progress in this reporting period. PDP made initial progress in the previous reporting period by soliciting feedback from visitors and Class Members.[62] PDP reports it intends to incorporate feedback into a visiting improvement plan scheduled for completion in the next reporting period but is currently unable to commit to changes based on specific feedback received.

---

[61] The four-person temporary cells were not included in the upgrade. PDP will assess future renovation needs based on the outcome of the current project.

[62] *See* Monitor's Third Report, *supra* note 4, at 54.

The Monitoring Team remains unable to make informed recommendations for new or additional visiting timeslots without a reliable baseline of scheduled, attended, canceled, and refused visits. PDP reports it will be unable to augment its current visiting schedule without additional staff. The Monitoring Team previously made interim recommendations for improvement based on anecdotal information and observations during site visits, including: (1) analyzing filled versus unfilled in-person visiting timeslots and making any necessary scheduling adjustments (consistent with the evening visiting request above); (2) ensuring family visiting spaces in all facilities are regularly sanitized; and (3) ensuring family visiting areas are stocked with age and culturally appropriate activities for youth.[63]

*Sub-provision 13.3--PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated.*

**Compliance Rating:  Substantial Compliance (October 12, 2023, monitoring discontinued)**

**Substantive Provision 14—Attorney Visiting**

*Sub-provision 14.1--PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit.*

**Compliance Rating:  Partial Compliance**

As in previous reporting periods, the requirement that attorneys receive access to their clients within 45 minutes of scheduled visits was not possible to measure because attorney visits are not scheduled and current systems are not designed to track attorney arrival and wait times.[64] Because data is limited, the Monitoring Team has relied largely on reports from PDP, Class Members, the Defender Association of Philadelphia (Defender Association), members of the private bar, and *Remick* class counsel in assessing deficiencies.  By all accounts, delays in official visiting continue but have reduced both in frequency and duration since 2022.

Delayed population counts, institutional lockdowns, and other operational emergencies have been the most common reasons cited for visiting delays or cancelations.  Attorneys have also reported lengthy delays between clients during back-to-back visits and that visiting rooms are left unoccupied during high-traffic hours.

In the third reporting period, the Monitor requested that PDP Deputy Commissioner of Administration and the Warden of CFCF work directly with the Defender Association to strategize mutually agreeable solutions to official visiting delays.  As a result of these efforts, PDP has instituted or agreed to the following changes:

- On September 18, 2023, PDP adjusted tablet visiting schedules at CFCF to begin at 12 pm rather than during morning high-traffic hours.  Tablet visits occur in the same rooms

---

[63] *Id.* at 55; Monitor's Second Report, *supra* note 4, at 51-52; Monitor's First Report, *supra* note 4, at 29-30.
[64] *See* Monitor's Third Report, *supra* note 4, at 55; *See also* Monitor's Second Report, *supra* note 4, at 52-53.

as in-person visits, so this schedule change increased available space for in-person visits during peak hours.

- In October 2023, PDP modified institutional count times at CFCF to reduce the likelihood that clearance delays will interfere with peak official visiting hours.
- In November 2023, PDP began utilizing two additional rooms for official visits with all Class Members that had previously been reserved exclusively for visits with Class Members in segregation or protective custody at CFCF. The Defender Association has also agreed to allow afternoon official visits to take place in a room typically reserved for Defender Association personnel only.
- In March 2024, PDP reported it began utilizing an additional room for official visits that had previously been reserved exclusively for First Judicial District of Pennsylvania hearings. This room is reportedly available for visits each day when proceedings adjourn, typically in the early afternoon.
- PDP has agreed to permit the use of City-issued internet hotspots in the visiting area.

The Monitoring Team is still awaiting determinations regarding additional proposals, but PDP's proactivity in this reporting period has resulted in marked improvements. PDP reports that staffing deficiencies continue to cause delays with some frequency, which is consistent with ongoing issues reported by the Defender Association and other counsel. PDP's efforts to improve efficiency and Class Members' access to counsel are commendable; however, PDP will be unlikely to comply with all policy revisions without additional personnel.

The Monitoring Team will track the durability of improvements in the next reporting period and incorporate findings into policy recommendations that PDP will use as the basis for policy changes in subsequent reporting periods. Compliance with Substantive Provision 14—Visiting will then be measured based on PDP's compliance with its revised policies.

*Sub-provision 14.2--For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment.*

### Compliance Rating: Partial Compliance

PDP reports it is not approaching compliance with the 15-minute requirement for remote legal visits due to staffing shortages. This is consistent with delays tracked by the Monitoring Team. As previously reported, PDP tracks delays for completed calls but does not track calls that are scheduled but not completed, which will pose methodological challenges once PDP is ready for a compliance audit. For now, the Monitoring Team will continue to use its own tablet visiting data to assess progress.

From September 1, 2023, through December 31, 2023, 63 of 77 or 82 percent of the Deputy Monitor's scheduled tablet visits were attended by Class Members. This reflects a good attendance rate and is consistent with the second and third reporting periods. However, 14 of the 77 visits were no-shows and another 18 were delayed beyond the 15-minute compliance window, suggesting a 58 percent compliance rate for sub-provision 14.2 in this reporting period.

Currently, all tablet meetings are scheduled in one-hour time slots.  The Monitoring Team previously recommended that PDP increase efficiency by also offering 30-minute time slots for tablet visits.[65]  In February 2024, PDP confirmed with the third-party vendor that it is capable of offering 30-minute time slots.  As a result, PDP reports that it anticipates implementing a pilot program when operationally feasible in the next reporting period.  However, like in-person visits, delays and problems are likely to persist without additional staff.

*Sub-provision 14.3--For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay.*

> **Compliance Rating:  Non-compliance**

As previously reported, PDP's current policy does not require notification to attorneys when visits are delayed or canceled, and PDP has not issued an interim directive regarding this requirement.[66]  Personnel have been instructed to notify attorneys of delays, cancelations, or refusals; however, they may not be held accountable for failures to comply until policies and post orders have been revised and personnel have been trained.  The Monitoring Team does not anticipate meaningful progress toward implementation of this sub-provision in the next reporting period.

## Substantive Provision 15—COVID-19 Testing

*The PDP shall continue the present policy regarding testing of persons who are scheduled for court.  Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID-19.  They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results. Those housed on a "yellow block" may have been exposed to a COVID-19-positive individual, and they will be rapid-tested twice, the night before court and the morning of court.  They will be transported to court if both tests are negative.  Those housed on a "red block" are COVID-19 positive and will be isolated for ten days and not brought to court during that time frame.  These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia Department of Public Health. Provided, however, that the Defendants shall not unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols.*

> **Compliance Rating:  Substantial Compliance (October 12, 2023, monitoring discontinued)**

## Substantive Provision 16—Quarantine

*If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19. Under*

---

[65] Monitor's Third Report, *supra* note 4, at 57.
[66] *Id.* at 57; Monitor's Second Report, *supra* note 4, at 54.

*current policy, see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021, for persons who are vaccinated and are exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative.*

**Compliance Rating:  Substantial Compliance (October 12, 2023, monitoring discontinued)**

**Substantive Provision 17—Sanitation**

*Sub-provision 17.1--Defendants agree to continue conducting the weekly General Inspection ("GI") cleaning days with supplies provided by officers to clean cells and housing areas.*

**Compliance Rating:  Partial Compliance**

As with previous reporting periods, sanitation quality in this reporting period varied among PDP facilities and housing units.  Facility wardens and staff remain responsive to issues brought to their attention and make noticeable efforts to improve between site visits.  Despite incremental systemic improvements and intermittent unit-specific improvements, nearly every sanitation issue reported in the first three reporting periods persisted to an unacceptable degree in this reporting period.

In November 2023, the Commissioner implemented internal sanitation inspections consistent with some of the Monitoring Team's recommendations.  Initial audits included 10 inspections in November 2023.  Findings were provided for review and largely mirror deficiencies observed by the Monitoring Team.  Examples include:

- An initial inspection at CFCF identified units lacked cleaning supplies.  At that time, trash was noted as routinely collected but showers required deep cleaning.[67]  Although sample sizes were not noted, an estimated 80 to 90 percent of Class Members interviewed reported they do not consistently receive clean clothing and linen.  Thirty percent of those interviewed reported not having a second set of outer wear, 50 percent reported not consistently receiving soap, and 30 percent reported not having toilet paper.  Follow-up inspections completed later in November 2023, again, noted a lack of cleaning supplies, unsatisfactory shower cleaning, inadequate clothing/linen exchange, and inconsistent distribution of cleaning supplies.  Also, trash was uncollected and overflowing at the time of the follow-up inspection.[68]
- At RCF and DC housing units, auditors noted serious facility maintenance issues, vector control concerns, and lack of access to cleaning supplies and clean clothing.[69]

---

[67] PDP Audit – CFCF – November 6, 2023.
[68] PDP Audit – CFCF – November 20, 2023.
[69] PDP Audit RCF Detention Facility – November 13, 2023.

- At PHSW, auditors noted unresolved maintenance issues and damaged, inoperable cells.[70]
- At RCF-Main Facility, the findings were generally more positive, which is consistent with conditions observed during site visits.[71]
- At MOD 3, youth reported access to laundry, cleaning supplies, and linen. The unit was determined to be in satisfactory condition.[72]
- In PICC units, Class Members reported having sufficient access to cleaning supplies, and most units were noted as being in acceptable condition. No vector control issues were noted, and Class Members interviewed stated they were generally receiving clean clothing. An estimated 20 percent of Class Members interviewed reported only one set of outerwear. Approximately 50 percent of Class Members interviewed raised issues with insufficient supplies of toilet paper and/or soap.[73] The auditors conducted a follow-up review at PICC later in the month and reported improved compliance with outer wear but new complaints regarding clean linens. In general, the follow-up review found that trash was collected, showers were clean, vector control was sustained, and Class Members interviewed reported adequate access to toilet paper, soap, and cleaning supplies.[74]

Audit reporting methods were not consistent across facilities and will require refinement in the next reporting period. It appears that small samples of Class Members were interviewed, so percentages reported may be misleading; however, findings reflect critical, transparent self-assessment and internal audits should continue. Additional improvements were observable during subsequent site visits in January and February, presumably resulting from closer internal monitoring.

Initial expansion of PDP's maintenance contract resulted in the completion of nearly 80 projects at PICC and an apparent reversal of that facility's extreme rodent and insect infestations. In previous reporting periods, PICC was inappropriately restricting Class Members' access to feminine hygiene products.[75] In September 2023, PICC's leadership team met with Class Members who reportedly requested a set distribution schedule for feminine hygiene products. In response, the Warden directed facility lieutenants to ensure each Class Member received packets three times per week containing two rolls of toilet paper, eight sanitary pads, four tampons, and one bar of soap. During site visits in November 2023 and January 2024, the Warden reported that staffing shortages were impacting compliance with the schedule and Class Members, again, reported inconsistent supplies. In February 2023, the Warden reported improved compliance with the feminine hygiene distribution schedule. On March 26, 2023, PDP installed dispensers in all women's housing units, which provide Class Members with direct access to tampons free of charge. This reported change is consistent with the Monitoring Team's recommendations and

---

[70] PDP Audit RCF PHSW – November 13, 2023.

[71] PDP Audit RCF Main – November 13, 2023.

[72] PDP Audit RCF MOD 3 – November 15, 2023. Mod 3 is an old unit and the housing environment and program offerings do not meet current youth confinement standards.

[73] PDP Audit – PICC – November 9, 2023.

[74] PDP Audit – PICC – November 24, 2023.

[75] *See* Monitor's Third Report, *supra* note 4, at 62.

marks important progress for a facility that struggled more than others through most of the initial settlement term.

Many managers and staff in all PDP facilities are also committed to higher cleanliness standards and should be acknowledged for their efforts. However, PDP's sanitation issues are long standing, progressive, and deeply systemic. They intersect with dilapidated facilities and inconsistent maintenance and vector control programs that have rendered some neglected units unlivable. Class Members simply cannot be forced to reside in unsanitary, poorly maintained 7-by-13-foot spaces with only periodic relief during limited out-of-cell time. Conditions will not be corrected system-wide with less than half of necessary security staff and require immediate, focused intervention.

*Sub-provision 17.2--[Defendants agree] to provide regular laundry services under current PDP policies.*

### Compliance Rating: Partial Compliance

There have been no reported improvements in laundry distribution in this reporting period.

**Status of Recommendations, Substantive Provision 17—Sanitation, from the Monitor's Third Report:**

1. PDP should modify schedules to increase the frequency of deep cleaning rounds.
   *PDP reports it was unable to implement this recommendation due to insufficient staffing. The Monitoring Team therefore makes additional recommendation 7 below for immediate action.*
2. PDP should provide Class Members with secure, rodent-proof containers for their belongings.
   *PDP has not implemented this recommendation.*
3. PDP should expedite procurement of sufficient undergarments to meet the needs of all Class Members.
   *In January 2024, PDP reported it has procured a consistent supply of undergarments for all female Class Members. This should be expanded to include the provision of undergarments to all Class Members.*
4. PDP jail managers should conduct thorough assessments in every facility to identify specific deficiencies in the areas of general sanitation and vector control, clothing and linen exchange, and issuance of hygiene supplies.
   *Internal audits are being completed and PDP has committed to refining the audit process in the next reporting period.*
5. PDP should revise its post orders to reflect operational nuances at each facility. Post orders should account for the needs of unique populations, such as women, youth, and those navigating mental illness or other disabilities.
   *PDP reports revisions are in progress.*
6. PDP executives and facility leadership should develop plans to increase guidance for unit personnel in meeting expectations for general sanitation and vector control, clothing and

linen exchange, and the issuance of cleaning and hygiene supplies.  Plans should include effective monitoring via audits or other modes of verification and specific acknowledgement of personnel who meet expectations and support or discipline, as appropriate, of those who do not.

*Internal audits have been initiated but this recommendation is unlikely to be fully implemented with current staff.*

**Additional recommendation for immediate action:**

7. The City should authorize the emergency procurement of outside contractors to deep clean housing units on a regular schedule, similar to its approach in medical and mental health housing units, which have shown improvement as a result.  The contract should include entire housing units, showers, and all biohazardous cells prior to re-occupancy.

**Substantive Provision 18—Use-of-Force**

*PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands.  The parties agree that correctional officers should follow de-escalation measures provided in PDP policies.  The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors.  In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states: "Force is only used when necessary and only to the degree required to control the inmate(s) or restore order…The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated….Staff will not use pepper spray as a means of punishment, personal abuse, or harassment."*

**Compliance Rating:  Partial Compliance**

As anticipated, deficiencies with PDP's use of force policies and practices outlined in the Monitor's second and third reports persisted in this reporting period.[76]  Procurement of technology-based upgrades such as an early warning system, body-worn cameras, and unified CCTV is slow and upgrades are not anticipated in 2024.  Procurement delays notwithstanding, implementation of these technologies would require personnel resources that PDP does not currently have.  Insufficient staff at all security levels remains PDP's greatest barrier to correcting deficiencies and PDP appears to lack internal capacity to manage a use of force reform project of this scope and complexity.  Until additional staff are hired and trained, and policies are updated and implemented, PDP's use of force practices will continue to pose high risk for injury and abuse with limited compliance and accountability.

In the previous reporting period, the Commissioner reiterated her expectations for use of force reporting and established a Use of Force Review Team (UFRT) by redirecting one captain, two

---

[76] *See Id.* at 64; *See* Monitor's Second Report, *supra* note 4, at 61-62.

lieutenants, and one analyst to assess designated incidents. The Commissioner correctly predicted the five-person team would be too small to spur meaningful change and that any change would be slow. Findings in this reporting period generally support this prediction and confirm negative findings from previous reporting periods. PDP has shown improvement in this reporting period in the area of critical use of force analysis. Because unconstitutional use of force practices are so destructive, and because each small improvement lays the foundation for reform, efforts to improve should be acknowledged and must continue. PDP's staffing crisis continues to prevent timely, quality completion and review of use of force cases at every step in PDP's chain of command, and many policy and training issues identified remain unaddressed.

In this reporting period, SME Terri McDonald (SME McDonald) focused on establishing the Monitoring Team's expectations for quality reviews of use of force incidents. She sampled 49 use of force cases from July and August 2023, notified PDP which cases would be reviewed, and scheduled frequent technical support meetings with the UFRT and/or facility wardens and PDP executives throughout the reporting period. By September 2023, the UFRT had reviewed 14 of the 49 sampled cases. SME McDonald highlighted deficiencies in initial reviews, reemphasized expectations for warden and UFRT-level reviews, and encouraged the UFRT to focus on correcting previously highlighted deficiencies in the remaining 35 cases. The quality of subsequent UFRT reviews improved and, by January 2024, the UFRT had completed another 22 reviews, for a total of 36 of 49 cases reviewed in this reporting period.

The quality of UFRT and warden-level reviews showed improvement in this reporting period. Examples include:

- The UFRT identified failures to de-escalate and employ planning procedures during non-emergent incidents, such as requesting assistance from mental health staff and video recording of pre-force interactions.
- The UFRT identified canned, conflicting, or otherwise poor report writing.
- The UFRT identified and is tracking gaps in CCTV coverage.
- The UFRT flagged reports and reviews that were not completed within required timeframes.
- Every UFRT review identified the need for additional training.

UFRT reviews typically occur after warden-level reviews and many of the issues identified above were not captured in warden-level reviews in this reporting period. There were, however, improvements noted in warden-level reviews as well. In previous reporting periods, warden-level reviews consistently failed to document training issues, policy violations, or unnecessary or excessive uses of force.[77] In this reporting period, multiple warden-level reviews documented one or more of these issues. PICC's reviews, for example, are more thorough and show a marked improvement from previous reporting periods. PICC's warden-level reviews were also completed within required timeframes more consistently, resulting in more timely UFRT reviews.

---

[77] *See* Monitor's Second Report, *supra* note 4, at 62.

PDP reports increased efforts in issuing internal corrective action, which may have supported the following additional improvements noted in SME McDonald's review:

- The sample contained fewer incidents of unnecessary force against Class Members who refuse to follow orders but do not present an immediate threat.
- Sampled cases showed more correctional officers sought assistance from supervisors before using force.
- The sample contained examples of effective post-force restraint of combative Class Members, which decreases the likelihood of additional or more serious force during incidents.
- Sampled cases reflect slight improvements in report quality.
- CCTV of sampled cases suggests staff are more frequently maintaining radios on their person and using them when backup is needed. The Monitoring Team has recommended personal alarm devices to rapidly summon back-up to critical incidents.[78] This recommendation is particularly important given PDP's dangerous staffing crisis.

Despite important progress noted above, sample cases reflect the following ongoing issues, some of which were identified in PDP's internal reviews:

- Use of force reports continue to lack specificity and information necessary to evaluate decision making of involved personnel.
- Correctional officers and supervisors too frequently use force prematurely, with insufficient effort to de-escalate, against Class Members who are secured behind locked doors or otherwise pose little immediate threat.
- PDP staff and supervisors too often fail to request assistance from mental health personnel in efforts to de-escalate and prevent force.
- In some cases, it appears that Class Members attempt to comply with commands but are not given the opportunity before force is used against them.
- Some cases that should have been referred for investigation for inappropriate or excessive force are not, and some disciplinary action does not reflect the seriousness of the misconduct.

PDP's staffing shortage results in overcrowding, delayed and withheld services, and extended periods of cell confinement and is too often the root cause of force incidents. The staffing shortage often increases the length and size of disturbances, the severity of force used, and resulting injury to Class Members and staff. PDP supervisors and managers are generally not exposed to evolving national standards for jail use of force and some lack the skills necessary to properly mentor their staff. They are unlikely to receive additional training as long as PDP lacks coverage to relieve them from their posts.

PDP requires additional managers to identify necessary policy revisions, thoroughly review incidents, and issue appropriate corrective action, it requires additional supervisors to guide and instruct staff during use of force incidents and in after-action reviews, and it requires enough

---

[78] *Id.* at 64.

line-level staff to ensure coverage in all housing units to meet basic safety standards.  PDP cannot be expected to correct deficiencies through force review, briefings, and discipline alone and will require additional staff to achieve substantial compliance with this substantive provision.

# EXHIBIT J

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THOMAS REMICK, et al., on behalf of Themselves and all others similarly situated,** | : | **No.: 2:20-cv-01959-GAM** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA; and BLANCHE CARNEY, in her official capacity as Commissioner of Prisons,** | : | |
| | : | |
| **Defendants.** | : | |

## MONITOR'S FIFTH REPORT

Pursuant to Section 19 of the Settlement Agreement (Agreement) and Section 7 of the Monitoring Agreement and Protocols, the Monitor appointed by this Court submits the attached Monitor's Fifth Report evaluating Defendants' compliance with the terms of the Agreement through June 30, 2024. The Monitor prepared this report as the fifth of regular reports to be filed of record through the second settlement term ending April 30, 2026. Subsequent reports will be filed according to the following schedule:

| | |
|---|---|
| Monitor's Sixth Report | March 31, 2025 |
| Monitor's Seventh Report | September 30, 2025 |
| Monitor's Final Report | March 30, 2026 |

I am available to answer any questions the Court may have regarding this report and Defendants' compliance with the Agreement at such times as are convenient for the Court.

DATED:  September 30, 2024

Respectfully submitted,

By: /s/ Cathleen Beltz
Monitor

The Agreement between Plaintiffs Thomas Remick, et al., on behalf of themselves and all others similarly situated (Plaintiffs), and the City of Philadelphia (City) and Blanche Carney, in her official capacity as Commissioner of Prisons (Commissioner), in *Thomas Remick et al., v. City of Philadelphia,* Case No. CV 01959-GAM (Action), requires system-wide reform of the Philadelphia Department of Prisons (PDP) as prescribed in 18 substantive provisions. The two-year Agreement was scheduled to terminate on April 12, 2024. In the initial settlement term, Defendants met the requirements for substantial compliance with Substantive Provision 15—COVID-19 Testing and Substantive Provision 16—Quarantine. Defendants also substantially complied with sub-provisions 12.3 and 12.5 (Substantive Provision 12—Locks) and 13.1 and 13.3 (Substantive Provision 13—Visiting). On January 4, 2024, the parties stipulated to a two-year extension with a new Agreement termination date of April 30, 2026.[1]

The Agreement provides that the Monitor issue "regular reports to counsel and the Court" that assess Defendants' compliance with each substantive provision of the Agreement. The Monitor will address Defendants' implementation progress and issue "Substantial Compliance," "Partial Compliance," or "Non-compliance" findings for each substantive provision. Where necessary, the Monitor will make specific recommendations to improve Defendants' compliance with the Agreement. A "Substantial Compliance" finding means Defendants "have and are reasonably expected to continue to substantially satisfy" the requirements of an Agreement provision. A "Partial Compliance" finding means that PDP has successfully completed some of the discrete tasks outlined in a substantive provision and continues to demonstrate progress toward substantial compliance. A "Non-compliance" finding means that Defendants have "not substantially satisfied" Agreement requirements by failing to complete the discrete tasks outlined in a substantive provision. Defendants will not be found in non-compliance based on "isolated or minor instances of failure [to substantially comply]" or "omissions of a technical or trivial nature."

Where substantial compliance requires the revision of existing policies or promulgation of new ones, Defendants' compliance will be assessed based on policy language and substance, notification and training of personnel, and policy implementation and adherence. Finally, the Monitor and Parties agree that successful reform is ultimately measured by sustained improvements to living conditions for Class Members. In issuing compliance findings, the Monitor will consider whether reforms implemented pursuant to the Agreement are durable and their benefits are expected to outlive the Agreement's April 30, 2026, termination date. In this reporting period, the Monitoring Team utilized data tracked through June 30, 2024, and additional information received through September 15, 2024.

The Agreement requires the Monitor to conduct site inspections "at least once every three months." In addition to at least one quarterly site visit, the Monitoring Team conducts periodic site visits with little advance notice to PDP.[2] During site visits, the Monitor has access to conduct confidential interviews with personnel and Class Members. The Monitor also has access to all records, files, electronic files, videos, and other materials, including personnel records and

---

[1] On January 4, 2024, upon the agreement of the Parties, this Court issued an order extending the Agreement through April 30, 2026. Stipulated Order, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 197 (E.D. Pa. Jan. 4, 2024).

[2] The Monitoring Team completed an unannounced site visit on January 10-11, 2024, during this reporting period.

patient protected health information, as necessary to measure Defendants' compliance with the Agreement.

The Remick Monitoring Agreement and Protocol requires the Monitor to "establish means of communication to enable Class Members, their families, and advocates to provide information related to implementation of and compliance with the Agreement."[3]  In this reporting period, Deputy Monitor Grosso (Deputy Monitor) has continued to conduct site visits at least once per month to speak with Class Members on PDP housing units.  Following site visits, the Deputy Monitor schedules weekly confidential virtual meetings with Class Members if more privacy is required.  Since weekly two-hour tablet meetings commenced December 6, 2022, the Deputy Monitor has interviewed 308 Class Members across PDP facilities.  The Monitoring Team also utilizes information provided during tablet meetings to connect with Class Members' family members who are willing to communicate with the Monitoring Team.

The Monitoring Team periodically receives complaints from Plaintiffs' co-counsel detailing specific allegations and systemic issues communicated by Plaintiffs to co-counsel.  With prior authorization from Class Members, co-counsel provides the Monitoring Team with Class Members' identifying information, and the Monitoring Team follows up with individual Class Members as necessary.  With prior authorization from Class Members, select complaints and systemic issues are forwarded to PDP for response or investigation, which the Monitoring Team tracks and reviews.  Conditions observed and information received via these interviews and protocols are consistent with *Remick* filings and reports by PDP staff and others who work in or inspect PDP facilities.

The Monitoring Team also receives information via published reports and communications with oversight agencies, reform advocates, Plaintiffs' co-counsel, criminal defense attorneys, and others independent of PDP.  This information augments the Monitoring Team's direct observations and helps shape recommendations that the Monitoring Team hopes will produce the most durable reforms.  The Monitoring Team thanks these oversight partners for their continued contributions and commitment.

In this reporting period, members of the Monitoring Team completed seven site visits to all PDP facilities, including Curran-Fromhold Correctional Facility (CFCF), The Detention Center (DC) and the Prison Health Services Wing (PHSW), Philadelphia Industrial Correctional Center (PICC), the Alternative and Special Detention Central Unit (ASD-CU and MOD 3), and Riverside (RCF).[4]  During each site visit, the Monitoring Team spoke with Class Members and personnel in every area visited regarding Agreement requirements and conditions inside PDP facilities.

The Agreement requires the Monitor to "provide to the parties those documents and reports that are secured by her office which, in her judgment, should be shared to effectuate the terms and conditions of the Agreement."  The Monitor has determined that documentation provided by

---

[3] Monitoring Agreement and Protocol, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 169 at 4 (E.D. Pa. May 25, 2022).
[4] Site visits were conducted January 10-11, 2024, January 29, 2024, February 22, 2024, March 27, 2024, April 17-19, 2024, May 24, 2024, and June 25-27, 2024.

Defendants and utilized by the Monitoring Team in making compliance determinations will be shared with Plaintiffs' co-counsel.

In this reporting period, the Monitoring Team met regularly with newly appointed PDP Commissioner, Michael Resnick (Commissioner or Commissioner Resnick), and his staff and continued to receive access to facilities, personnel, and Class Members. PDP's tradition of unfettered access and cooperation with the Monitoring Team was first established by PDP's previous Commissioner, Blanche Carney (Retired Commissioner Carney), and has been key to the Monitoring Team's effective working relationship with PDP. Commissioner Resnick has committed to honoring this tradition, and the Monitor thanks both commissioners on behalf of the Monitoring Team.

PDP executives and staff have expressed optimism about some of Commissioner Resnick's new initiatives and efforts thus far in his tenure. The Commissioner brings energy, expertise, and a fresh perspective to PDP operations, which the Monitoring Team is confident will serve him as he navigates the significant challenges of his new role. The Monitoring Team thanks the Commissioner and his team for their commitment to improving PDP conditions and the daily experiences of Class Members.

Pursuant to Substantive Provision 4—Resume Normal Operations, PDP and the Monitor were required to submit a plan for PDP to return to "normal operations" once COVID-19 restrictions were lifted. The plan was due for submission to this Court by November 1, 2022. PDP has been unable to finalize a plan due to high vacancies among correctional officer positions. Also pursuant to Substantive Provision 4, the Monitor convened several meetings of the parties to strategize solutions to the staffing shortage that resulted in failures to comply with this and other substantive provisions.[5] Meetings involved transparent, good faith collaboration between Retired Commissioner Carney, her executive team, and counsel for the parties and produced solutions to some of PDP's operational issues. Ultimately, meetings revealed that the City was unwilling to expend necessary resources to address the staffing crisis.

COVID-19 wreaked havoc in jails nationwide, and the City could not have predicted the extent of the damage in its department of prisons. Unprecedented officer vacancies have contributed to lapses in security protocols, the introduction of contraband, injuries to Class Members and staff, escapes, and deaths. At times, post vacancies result in unattended housing units and pose serious risk to Class Members' health and safety. Class Members have, at times, been denied access to routine and complex healthcare services, therapeutic and educational programming, communication and visits with loved ones, timely meal delivery, the provision of clean clothing and bed linens, and showers to maintain personal hygiene. Some Class Members have been exposed to periods of isolation that exceed legal benchmarks for humane cell confinement, which have likely caused or exacerbated mental illness and maladaptive, violent, and self-harming behaviors.

---

[5] Meetings of the parties occurred over eight months on June 23, 2023, October 16, 2023, November 6, 2023, December 15, 2023, and February 5, 2024.

In the first two years of settlement implementation, PDP staff across job classifications reported experiencing demoralization due to poor working conditions and a sense of powerlessness to improve services for Class Members.  Some housing unit personnel acknowledged reluctance to search for or retrieve contraband because they lack backup, which exacerbates safety risks.  Some personnel believed they were unable to comply with multiple PDP policies and Agreement provisions, and some believed they were unable to fulfill their law enforcement oaths of office.  PDP executives and staff have gone to great lengths in efforts to reduce risk and improve conditions despite inadequate resources and support.  Although the City did not cause PDP's COVID-19-related deficiencies, it bears responsibility for correcting them and should have done far more, much sooner.

On April 8, 2024, Plaintiffs filed a motion for civil contempt seeking the imposition of sanctions to address Defendants' persistent failure to comply with the Agreement and improve conditions of confinement for Class Members.[6]  On July 12, 2024, this Court held Defendants in civil contempt[7] and on August 16, 2024 ordered the City and PDP to take immediate action on multiple requirements designed to address the following areas of non- or partial compliance:  (1) Recruitment, Staffing, and Hiring; (2) Healthcare Access for Class Members; (3) Programming and Services for Class Members; (4) Facility Maintenance; (5) Facility Security; and (6) Population Management.[8]  Several of the remedial measures ordered require additional analysis and subsequent direction from this Court to ensure proper implementation.  Anticipated improvements based on each remedial measure ordered will be discussed in more detail below.

In implementing this Court's orders through the second settlement term, the City's new administration must ensure that it does not repeat the errors of the previous two years.  By its own inaction, the City failed to honor its dedicated workforce and prolonged the neglect of many incarcerated persons.  The City must instead allocate sufficient resources to meaningfully correct its staffing crisis while working closely with Philadelphia's justice partners to reduce PDP's population.  It must take ownership of every substantive provision in this Court's orders and resist any political inclination to shirk responsibility, blame shift, or scapegoat as occurred

---

[6] Plaintiffs' Motion for Civil Contempt and Sanctions, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 205 (E.D. Pa. Apr. 8, 2024).  Defendants filed their response to Plaintiffs' motion for civil contempt on May 6, 2024.  *See* Defendants' Response in Opposition to Plaintiffs' Motion for Contempt and Sanctions, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 208 (E.D. Pa. May 6, 2024).  Plaintiffs replied to Defendants' opposition motion on May 24, 204.  *See also* Plaintiffs' Reply Memorandum on Motion for Civil Contempt of Court, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 209 (E.D. Pa. May 24, 2024).  Additional motion practice was followed by oral argument, which was heard by this Court on June 27, 2024.  During oral argument, Defendants requested an evidentiary hearing.  On July 9, 2024, Defendants submitted an affidavit to this Court documenting their compliance efforts to date which included ten exhibits.  Defendants presented their evidence to this Court during an evidentiary hearing on July 11, 2024.

[7] Order, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 220 (E.D. Pa. July 12, 2024).

[8] *See* Order, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 221 (E.D. Pa. Aug. 16, 2024).  The remedial sanctions described in the August 16, 2024 Order primarily seek to remedy non-compliance with Substantive Provision 1—Staffing, Substantive Provision 2—Out-of-Cell Time, Substantive Provision 3—Out-of-Cell/Segregation, Substantive Provision 4—Resume Normal Operations, Substantive Provision 5—Healthcare, Substantive Provision 6—Behavioral Health in Segregation, Substantive Provision 7—Law Library Access, Substantive Provision 10—Phone Calls, Substantive Provision 13—Visiting, Substantive Provision 14—Attorney Visiting, Substantive Provision 17—Sanitation, and Substantive Provision 18—Use-of-Force.

4

during the initial settlement term.  Finally, it must reposition PDP to a higher priority among other City departments whose failures to the population they serve do not violate the United States Constitution.

5

# Table of Provisions

***Compliance Findings*** ........................................................................................................ **8**

***Substantive Provision 1—Staffing*** ............................................................................... **13**

*Sub-provision 1.1* ........................................................................................................... 13

*Sub-provision 1.2* ........................................................................................................... 16

*Sub-provision 1.3* ........................................................................................................... 17

*Sub-provision 1.4* ........................................................................................................... 18

***Substantive Provision 2—Out-of-Cell Time*** ............................................................... **22**

*Sub-provision 2.1* ........................................................................................................... 22

*Sub-provision 2.2* ........................................................................................................... 28

***Substantive Provision 3—Out-of-Cell/Segregation*** .................................................. **28**

*Sub-provision 3.1* ........................................................................................................... 28

*Sub-provision 3.2* ........................................................................................................... 31

***Substantive Provision 4—Resume Normal Operations*** ............................................. **37**

***Substantive Provision 5—Healthcare*** .......................................................................... **40**

***Substantive Provision 6—Behavioral Health in Segregation*** .................................... **52**

***Substantive Provision 7—Law Library Access*** ........................................................... **60**

***Substantive Provision 8—Discipline*** ........................................................................... **61**

*Sub-provision 8.1* ........................................................................................................... 61

*Sub-provision 8.2* ........................................................................................................... 64

*Sub-provision 8.3* ........................................................................................................... 64

*Sub-provision 8.4* ........................................................................................................... 64

***Substantive Provision 9—Tablets*** ............................................................................... **65**

*Sub-provision 9.1* ........................................................................................................... 65

*Sub-provision 9.2* ........................................................................................................... 66

***Substantive Provision 10—Phone Calls*** ...................................................................... **68**

*Sub-provision 10.1* ......................................................................................................... 68

*Sub-provision 10.2* ......................................................................................................... 68

***Substantive Provision 11—PICC Emergency Call Systems*** ....................................... **69**

***Substantive Provision 12—Locks*** ................................................................................ **70**

*Sub-provision 12.1* ......................................................................................................... 70

*Sub-provision 12.2* ............................................................................ 70

*Sub-provision 12.3* ............................................................................ 70

*Sub-provision 12.4* ............................................................................ 70

*Sub-provision 12.5* ............................................................................ 71

**Substantive Provision 13—Visiting** ............................................ **71**

*Sub-provision 13.1* ............................................................................ 71

*Sub-provision 13.2* ............................................................................ 71

*Sub-provision 13.3* ............................................................................ 73

**Substantive Provision 14—Attorney Visiting** ............................ **73**

*Sub-provision 14.1* ............................................................................ 73

*Sub-provision 14.2* ............................................................................ 74

*Sub-provision 14.3* ............................................................................ 75

**Substantive Provision 15—COVID-19 Testing** ......................... **75**

**Substantive Provision 16—Quarantine** ..................................... **75**

**Substantive Provision 17—Sanitation** ....................................... **76**

*Sub-provision 17.1* ............................................................................ 76

*Sub-provision 17.2* ............................................................................ 78

**Substantive Provision 18—Use-of-Force** ................................. **81**

**Compliance Findings**

Some of the Agreement's 18 substantive provisions contain related but discrete action items that must be completed for PDP to achieve substantial compliance with each provision. The Monitoring Team created sub-provisions for some of the 18 substantive provisions based on these discrete action items and issues separate compliance findings for each enumerated sub-provision. This provides additional clarity for Defendants as they work to implement required changes and greater specificity for this Court and the Parties in distinguishing between action items that are being successfully implemented and those that require additional attention. To achieve substantial compliance with each substantive provision, PDP must first achieve substantial compliance with every sub-provision.

From the Agreement's 18 substantive provisions, 37 sub-provisions were created. In this reporting period, PDP has achieved substantial compliance with 11 sub-provisions, partial compliance with 20 sub-provisions, and remained in non-compliance with 6 sub-provisions.

The table below reflects all provisions and current compliance ratings for each:

| Provision | Requirements | Compliance Status |
|---|---|---|
| **1** | **Staffing** | **PC** |
| 1.1 | No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the *hiring* of correctional officers. | PC |
| 1.2 | No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and *retention* bonuses, to enhance the *retention* of correctional officers. . . | PC |
| 1.3 | Ensure that there are sufficient number of correctional officers to cover all posts, according to PDP post plans on each shift at each facility. | NC |
| 1.4 | These measures [1.1-1.3] will continue until achieved and thereafter to maintain the proper number of correctional officers. | PC |
| **2** | **Out-of-Cell Time** | **PC** |
| 2.1 | Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than August 1, 2022, no less than five hours of out-of-cell time each day. | PC |

| Provision | Requirements | Compliance Status |
|---|---|---|
| 2.2 | The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases of out-of-cell time should continue to be made beyond the August 1, 2022 standard, with a presumptive expected increase to six hours by October 15, 2022.  The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, *infra*, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis. *See also* para. 4, *infra*. | NC |
| **3** | **Out-of-Cell/Segregation** | **PC** |
| 3.1 | Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day. | NC |
| 3.2 | Defendants further agree that they will continue their practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units. | PC |
| **4** | **Resume Normal Operations** | **NC** |
| | By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services).  During the period that precedes a return to normal operations, if the Monitor determines that the Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor.  The parties and the Monitor shall then engage in discussions to resolve the issues in dispute.  If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions. | |
| **5** | **Healthcare** | **PC** |
| | The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons.  The Defendants agree to institute the programs and measures (referred to as "the Backlog Plan") set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022, to address the existing backlog.  The "Backlog Plan" is a new, three-month effort to see backlogged patients as soon as possible.  The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs.  Four agencies are contracted to provide staff towards this end. Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort.  Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures.  Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog. | |
| **6** | **Behavioral Health in Segregation** | **PC** |
| | By September 30, 2022, the PDP and [YesCare] shall re-establish a mental health program for persons who are in segregation units. | |

| Provision | Requirements | Compliance Status |
|---|---|---|
| 7 | **Law Library Access** | **PC** |
|  | PDP will continue to provide law library access for all incarcerated individuals. The Monitor and the parties will discuss access and scheduling matters and the Monitor shall make any recommendations on these matters by August 1, 2022. |  |
| 8 | **Discipline** | **PC** |
| 8.1 | All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding. *See Wolff v. McDonnell*, 418 U.S. 539, 563–66 (1974); *Kanu v. Lindsey*, 739 F. App'x 111, 116 (3d Cir. 2018); *Stevenson v. Carroll*, 495 F.3d 62, 70–71 (3d Cir. 2007). | PC |
| 8.2 | The PDP shall expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date [April 12, 2022]. . . | SC |
| 8.3 | [PDP shall] release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are [on April 12, 2022] still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing. . . | SC |
| 8.4 | [PDP shall] cancel sanctions [imposed in hearing held between March 2020 and April 12, 2022] that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms. Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation. Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline. Defendants shall provide to counsel for plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022. | SC |
| 9 | **Tablets** | **PC** |
| 9.1 | PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational capabilities and housing designs. The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets; and, at RCF, expanding from six (6) to eight (8) tablets on the [first floor] (4 housing units) and expanding from eight (8) to twelve (12) tablets on the [2nd and 3rd floors] of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF. This expansion process will be completed by May 1, 2022. | PC |
| 9.2 | The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices. | PC |
| 10 | **Phone Calls** | **PC** |

10

| Provision | Requirements | Compliance Status |
|---|---|---|
| 10.1 | PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population.  Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices. | PC |
| 10.2 | Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls. | NC |
| **11** | **PICC Emergency Call Systems** | **PC** |
| | The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to phones and/or tablets and determine whether any policies and practices are necessary to address this matter considering all relevant factors, including operational feasibility and physical capacity. | PC |
| **12** | **Locks** | **PC** |
| 12.1 | PDP initiated the lock replacement program for PICC. . . which will be completed by June 30, 2022. | SC |
| 12.2 | PDP initiated the lock replacement program for. . .RCF, which will be completed by June 30, 2022. | SC |
| 12.3 | For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022. | SC |
| 12.4 | Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner. | PC |
| 12.5 | PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system. | SC |
| **13** | **Visiting** | **PC** |
| 13.1 | As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members. PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule.  At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots. | SC |
| 13.2 | Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues. | PC |
| 13.3 | PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated. | SC |
| **14** | **Attorney Visiting** | **PC** |
| 14.1 | PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit. | PC |
| 14.2 | For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment. | PC |

| Provision | Requirements | Compliance Status |
|---|---|---|
| 14.3 | For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay. | NC |
| **15** | **COVID-19 Testing** | **SC** |
| | The PDP shall continue the present policy regarding testing of persons who are scheduled for court. Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID-19. They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results. Those housed on a "yellow block" may have been exposed to a COVID-19-positive individual, and they will be rapid-tested twice, the night before court and the morning of court. They will be transported to court if both tests are negative. Those housed on a "red block" are COVID-19 positive and will be isolated for ten days and not brought to court during that time frame. These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia Department of Public Health. Provided, however, that the Defendants shall not unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols. | |
| **16** | **Quarantine** | **SC** |
| | If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19. Under current policy, *see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021,* for persons who are vaccinated and are exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative. | |
| **17** | **Sanitation** | **PC** |
| 17.1 | Defendants agree to continue conducting the weekly General Inspection ("GI") cleaning days with supplies provided by officers to clean cells and housing areas. | PC |
| 17.2 | [Defendants agree] to provide regular laundry services under current PDP policies. | PC |
| **18** | **Use-of-Force** | **PC** |
| | PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands. The parties agree that correctional officers should follow de-escalation measures provided in PDP policies. The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors. In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states: "Force is only used when necessary and only to the degree required to control the inmate(s) or restore order…The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated….Staff will not use pepper spray as a means of punishment, personal abuse, or harassment." | |

12

**Substantive Provision 1—Staffing**

*Sub-provision 1.1--No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the hiring of correctional officers.*

      **Compliance Rating:  Partial Compliance**

PDP's correctional officer vacancies decreased by 21 positions, or 1 percent, from December 2023 to June 2024.  PDP's total staff vacancies also decreased by 36 positions between December 2023 and June 2024.  The following table reflects changes in security, maintenance, human resources, and total staff vacancies since the previous reporting period:

**Table 1: Philadelphia Department of Prisons Vacancy Report**
December 2023 and June 2024

| | Position Classification | Budgeted* | December 2023 | | June 2024 | | Vacancies (+/- change) | Vacancy Rate (+/- change) |
|---|---|---|---|---|---|---|---|---|
| | | | Filled | Vacant | Filled | Vacant | | |
| Sworn Staff | Officers | 1712 | 888 | 827 | 906 | 806 | -21 | 47% (-1%) |
| | Sergeants | 118 | 68 | 50 | 70 | 48 | -2 | 41% (-1%) |
| | Lieutenants | 64 | 53 | 11 | 55 | 9 | -2 | 14% (-3%) |
| | Captains | 29 | 24 | 5 | 26 | 3 | -2 | 10% (-7%) |
| | **Custody Total** | **1923** | **1033** | **893** | **1057** | **866** | **-27** | **45% (-1%)** |
| Maintenance Staff | Trades Worker I | 7 | 5 | 3 | 7 | 0 | -2 | 0% (-38%) |
| | Trades Worker II | 18 | 8 | 10 | 8 | 10 | 0 | 56% (0%) |
| | HVAC Mechanic | 3 | 2 | 1 | 2 | 1 | 0 | 33% (0) |
| | Building Engineer | 1 | 1 | 0 | 0 | 1 | +1 | 100% (+100%) |
| | Maintenance Group Leader | 1 | 0 | 1 | 0 | 1 | 0 | 100% (0) |
| | **Total Maintenance** | **30** | **16** | **15** | **17** | **13** | **-1** | **43% (-5%)** |
| Human Resources (HR) Staff | HR Professional | 2 | 1 | 1 | 0 | 2 | +1 | 100% (+50%) |
| | HR Professional II | 2 | 2 | 0 | 3 | 0 | 0 | 0% (0%) |
| | HR Manager 3 | 1 | 1 | 0 | 1 | 0 | 0 | 0% (0%) |
| | **HR Total** | **5** | **4** | **1** | **4** | **2** | **+1** | **40% (+20%)** |
| **PDP TOTAL** | **All Positions**** | **2186** | **1231** | **956** | **1266** | **920** | **-36** | **42% (-2%)** |

*Changes in budgeted positions from December 2023 to June 2024: Officers -3; Trades Worker I -1.  HR Professional II operates with one additional filled position above budget authority.
**"All Positions" totals include classifications not listed in the table and, therefore, exceed the sum of budgeted, filled, and vacant positions for each of the Sworn Staff, Maintenance Staff, and HR Staff categories.

13

PDP staffing issues have been exacerbated by the rising PDP population as reflected in the following table:

**Table 2: PDP Average Daily Population\***
2022 – 2024

| Date | Jan-June 2022 | July-Dec 2022 | Jan-June 2023 | July-Dec 2023 | Jan-June 2024 |
|---|---|---|---|---|---|
| Average Daily Population[9] | 4421 | 4432 | 4429 | 4732 | 4660 |

\*Data reflects the average daily population total over each reporting period using statistics compiled from publicly available First Judicial District of Pennsylvania Philadelphia Prison Population Reports via the MacArthur Safety and Justice Challenge.

PDP's average daily population (ADP) slightly decreased in this reporting period from 4,732, to 4,660.  However, by July 31, 2024, PDP's population exceeded 4,800 Class Members.

Available data on recruitment yields is depicted in the following table:

**Table 3: Philadelphia Department of Prisons Recruitment Yields**
**for New Hires after January 1, 2021**

| Certification List | Total Applicants | Total Hired | Rate (%) | List Status |
|---|---|---|---|---|
| 2020-0210 | 228 | 36 | 15.8 | Closed |
| 2021-0906 | 758 | 50 | 6.6 | Closed |
| 2022-0221 | 298 | 16 | 5.4 | Closed |
| 2022-0516 | 245 | 25 | 10.2 | Closed |
| 2022-0905 | 493 | 34 | 6.9 | Closed |
| 2022-1212 | 422 | 34 | 8.1 | Closed |
| 2023-0306 | 563 | 32 | 5.7 | Closed |
| 2023-0501 | 436 | 24 | 5.5 | Closed |
| 2023-0626 | 626 | 34 | 5.4 | Closed |
| 2023-0724 | 492 | 28 | 5.7 | Closed |
| **Total Closed** | **4561** | **313** | **6.9** | |
| 2023-0821 | 464 | 16 | N/A | In Process |
| 2023-0918 | 402 | 16 | N/A | In Process |
| 2023-1023 | 869 | 1 | N/A | In Process |
| 2024-0205 | 981 | 1 | N/A | In Process |
| **Total Open** | **2716** | **34** | **N/A** | |

[9] Average Daily Population is the industry standard for tracking prison populations, which is calculated and used by PDP.  These numbers are included within the publicly available Philadelphia Prison Population Reports.  *See* Philadelphia Prison Population Report | July 2015 – June 2024, MacArthur Safety and Justice Challenge (July 16, 2024), https://www.phila.gov/media/20240716150642/June-2024-Full-Public-Report.pdf.

PDP's hiring yield continues to hover below 7 percent, which Subject Matter Expert, Terri McDonald (SME McDonald), notes is low but not unusual for correctional systems. PDP has significantly increased the number of applications it has received each year since 2020, as reflected in the table below:

**Table 4: Philadelphia Department of Prisons Employment Applications By Year**
2020 – 2023

| Year | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| Applicants | 228 | 758 | 1455 | 3852 |
| Applicants Hired[10] | 36 | 50 | 109 | 151 |

Despite hiring efforts and increases in applicants, PDP continues to struggle with low employee retention rates. The table below depicts academy schedules, attendance, and graduation data for 2022, 2023, and 2024, and employee retention rates for the 2022, 2023, and 2024 academies:

**Table 5: Philadelphia Department of Prisons Academy Report and Retention Rates**
2022 – 2024

| Class Number | Class Dates | Total Cadets | Total Graduated | Still Employed June 2024 | Retention Rate Dec 2023 | Retention Rate June 2024 |
|---|---|---|---|---|---|---|
| 21-04 | November, 2021 - January, 2022 | 30 | 26 | 8 | 27% | 27% |
| 21-05 | December, 2021 - March, 2022 | 20 | 16 | 6 | 30% | 30% |
| 22-01 | March - June, 2022 | 31 | 25 | 10 | 36% | 32% |
| 22-02 | May - July, 2022[11] | 21 | 20 | 9 | 43% | 43% |
| 22-03 | August - October, 2022 | 18 | 16 | 9 | 44% | 50% |
| 22-04 | October, 2022 - January, 2023 | 26 | 20 | 11 | 65% | 42% |
| 23-01 | January - March, 2023 | 21 | 22 | 10 | 59% | 48% |
| 23-02 | February - April, 2023 | 17 | 15 | 13 | 76% | 76% |
| 23-03 | April - July, 2023 | 20 | 15 | 10 | 50% | 50% |
| 23-04 | June - September, 2023 | 17 | 16 | 12 | 88% | 71% |
| 23-05 | August - October, 2023 | 32 | 30 | 19 | 87% | 59% |
| 23-06 | October - December, 2023 | 28 | 25 | 22 | 79% | 79% |
| 24-01 | January - March, 2024 | 34 | 30 | 28 | N/A | 82% |
| 24-02 | March - May, 2024 | 20 | 20 | 19 | N/A | 95% |
| 24-03 | May - July, 2024 | 38 | N/A | N/A | N/A | N/A |

For classes graduating in the first half of 2022, the two-year retention rate is currently 30 percent and the retention rate for classes graduating in the second half of 2022 and first half of 2023 is 51

---

[10] Hires from the list may have started employment in subsequent year.
[11] In the Monitor's Fourth Report, PDP's data erroneously indicated that eight correctional officers were still employed by PDP in June 2024. This has been changed to reflect that nine correctional officers were still employed by PDP in June 2024.

percent.  As with previous reporting periods, any progress PDP has achieved remains largely negated by high attrition rates, and trends reported here emphasize the need for more thoughtful recruitment and retention strategies.[12]

*Sub-provision 1.2--No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the retention of correctional officers. . .*

### Compliance Rating:  Partial Compliance

As previously reported, the City has instituted various pay raises, signing and retention bonuses, alternative work schedules, and other strategies designed to enhance retention of correctional peace officers.[13]  The following table depicts monthly averages of PDP employees who voluntarily separated pre-retirement from January 2019 through June 2024:

### Table 6: Average Voluntary Separations by PDP Employees
2019 – 2024

| | Pre-Arbitration Award | | | Post-Arbitration Award | | |
|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | Jan-Aug 2022 | Sep-Dec 2022 | 2023 | Jan-June 2024 |
| **Monthly Average** | 10 | 11 | 24 | 23 | 11 | 13 | 12 |

Voluntary separations of PDP employees appear to have stabilized over much of the previous two years, averaging 12 voluntary separations per month from September 2022 through June

---

[12] Monitor's Fourth Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 204 at 3 (Mar. 29, 2024); Monitor's Third Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 193 at 15-16 (Oct. 12, 2023); Monitor's Second Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 185 at 14 (Mar. 3, 2023); Monitor's First Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 181 at 9 (Nov. 4, 2022).

[13] For example, the August 12, 2022, Arbitration Award authorizes a range of compensation increases.  *See* In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia (decision date, Aug. 12, 2022) Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2 (decision date, Dec. 8, 2022) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 4-5 (decision date, Jan. 20, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2-3 (decision date, Jan. 27, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2-3 (decision date, March 31, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia (decision date, June 12, 2024), Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia.

2024. Average separations remain slightly higher than pre-COVID pandemic average separations of 10 per month. They are, however, reduced by half since 2021 and the first eight months of 2022, likely attributable to changes ordered by the arbitration panel. Correcting PDP's staffing crisis will require far greater efforts than have been made thus far to increase applications, hiring yields, and new employee retention, and to dramatically reduce employee separations.[14]

*Sub-provision 1.3--Ensure that there are sufficient numbers of correctional officers to cover all posts, according to PDP post plans on each shift at each facility.*

**Compliance Rating: Non-compliance**

The following tables depict monthly average percentages of vacant posts at each facility and posts filled with overtime staff for two-periods, September through December 2023, and January through June 2024:[15]

**Table 7: Percentage of Posts Left Vacant Due to Staffing Shortage**
September – December 2023

| Date | September | October | November | December | Average |
|------|-----------|---------|----------|----------|---------|
| Average | 43% | 43% | 33% | 40% | 40% |

**Table 8: Percentage of Posts Filled with Overtime Staff**
September – December 2023

| Date | September | October | November | December | Average |
|------|-----------|---------|----------|----------|---------|
| Average | 26% | 24% | 24% | 26% | 25% |

**Table 9: Percentage of Posts Left Vacant Due to Staffing Shortage**
January – June 2024

| Date | January | February | March | April | May | June | Average |
|------|---------|----------|-------|-------|-----|------|---------|
| RCF | 40 | 38 | 40 | 40 | 37 | 36 | 39 |
| PICC | 37 | 37 | 38 | 42 | 36 | 30 | 37 |
| CFCF | 42 | 45 | 43 | 43 | 38 | 42 | 42 |
| **Average** | **40%** | **40%** | **40%** | **42%** | **37%** | **36%** | **39%** |

---

[14] Monitor's Fourth Report, *supra* note 12, at 16-18.
[15] Some posts may have been filled for a portion of some shifts.

**Table 10: Percentage of Posts Filled with Overtime Staff**
January – June 2024

| Date | January | February | March | April | May | June | Average |
|------|---------|----------|-------|-------|-----|------|---------|
| RCF | 23 | 23 | 24 | 25 | 25 | 28 | 25 |
| PICC | 29 | 28 | 28 | 30 | 26 | 26 | 28 |
| CFCF | 22 | 24 | 24 | 25 | 24 | 26 | 24 |
| Average | 25% | 25% | 26% | 27% | 25% | 27% | 26% |

Average percentages of post vacancies and the use of mandatory or voluntary overtime to fill posts remain largely unchanged in this reporting period. Average post vacancies reduced from 40 percent in the previous reporting period to 39 percent in this reporting period, and the average percentage of posts filled with overtime staff increased slightly from 25 percent in the previous reporting period to 26 percent in this reporting period.

*Sub-provision 1.4--These measures will continue until achieved and thereafter to maintain the proper number of correctional officers.*

**Compliance Rating:  Partial Compliance**

A substantial compliance rating with sub-provision 1.4 first requires PDP to achieve compliance with sub-provisions 1.1, 1.2, and 1.3.

**Status of Recommendations, Substantive Provision 1—Staffing, from the Monitor's First Report (November 2022):[16]**

1.  Determine whether the current salary and benefits structures pursuant to the arbitration award and other efforts by Defendants are sufficiently competitive with other jurisdictions and agencies to attract applicants, and if not, supplement benefits accordingly.
    *As previously reported, the City partially addressed this recommendation by comparing PDP correctional peace officer salaries to those in systems in the surrounding area.[17] The City did not compare non-wage benefits with other jurisdictions and it did not compare PDP salaries with Philadelphia's other sworn law enforcement agencies.*

    *On August 16, 2024, this Court ordered the City to compare salaries and other benefits offered to PDP correctional officers with those offered to uniformed employees from other City law enforcement agencies.[18]  The comparison across City departments must*

---

[16] Original Recommendations 1, 12, and 13 as discussed in the Monitor's First, Second, Third, and Fourth Reports, address facility sanitation and maintenance.  These recommendations were initially addressed under Substantive Provision 1—Staffing because PDP's staffing crisis extends to maintenance personnel, as displayed above in Table 1, page 13.  These recommendations have been moved and are now discussed *infra* under Substantive Provision 17—Sanitation, Additional Recommendations 7, 8, 9, and 10.

[17] Affidavit, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 216-7, Ex. G (E.D. Pa. July 9, 2024).

[18] Order, *supra* note 8, at 3.

*also include all other PDP job classifications with vacancy rates exceeding 10 percent.[19] The comparison is due for submission by October 15, 2024 and should allow the City to identify potential changes it must make to PDP's current compensation package to attract qualified candidates.*

2. Retain a qualified recruitment firm to assist in guiding the City's efforts, which should include salary surveys in support of the previous recommendation, and other validated recruitment and retention strategies.

    *The City's recruitment efforts thus far have been inadequate. The City reports that it contracts with a recruitment firm that supports recruitment for all City departments.[20] However, it does not appear that a comprehensive recruitment strategy designed specifically to attract correctional officers to reduce PDP's staffing vacancies has been developed.[21]*

    *On August 16, 2024, this Court ordered the City to generate a list of outside recruitment firms with a proven track record of hiring for law enforcement agencies.[22] The list was submitted on September 16, 2024 for the Courts consideration as required. Within 90 days of the date of the Court's approval, the City must retain the approved firm to manage the hiring and recruitment of PDP personnel.*

3. Engage an independent staffing analysis to determine true staffing needs for each facility. The analysis should be completed by someone with specific expertise in jail staffing studies.

    *The Monitoring Team reviewed the final staffing analysis in this reporting period and made recommendations for further analysis to address gaps in the report. Some areas requiring additional analysis include timeframes and other details regarding civilianization of posts, resources to reduce the impact of the staffing crisis and to assist with Class Members' access to healthcare, the span of employee supervision, and the creation of a compliance unit to manage the reform effort. The Commissioner reports he is in the process of considering recommendations from the staffing analysis.*

4. Evaluate which PDP functions currently performed by sworn personnel can be performed by civilians (information technology, records, intake and release, cashier, etc.) and identify or expand civilian employees or contracted services accordingly.

    *The City's efforts to implement this recommendation through the first settlement term were inadequate. The civilianization of some work currently performed by sworn personnel may offer relief for more than 50 correctional officer positions. It would likely increase the provision of out-of-cell time and required services in PDP facilities and reduce PDP's reliance on excessive overtime. The City has acknowledged that civilianization would offer relief in critical staffing areas and PDP has reported since September 2023 that arbitration is pending.*

    *On August 16, 2024 this Court ordered the City to evaluate which departments within PDP may be served in full or in part by civilian employees.[23] The evaluation was*

---

[19] *Ibid.*

[20] Affidavit, *supra* note 17, Ex. I.

[21] Monitor's Fourth Report, *supra* note 12, at 16-17, 19; Monitor's Third Report, *supra* note 12, at 17; Monitor's First Report, *supra* note 12, at 9.

[22] Order, *supra* note 8, at 2.

[23] *Ibid.*

*submitted on September 16, 2024 and included potential barriers to the reclassification of any positions as required.[24]*

*This Court further ordered that the City identify companies that are capable of providing medical guarding of open ward Class Member patients after the first 24 hours following admission, and to transport PDP patients to and from off-site medical appointments. These functions are currently performed by PDP correctional officers who must often be redirected from housing unit posts. On September 16, 2024, PDP submitted a proposal from a vendor to provide some of the required medical guarding and transportation services. As of this filing, the proposal is reportedly being revised to include all required services.*

*PDP must initiate contract negotiations within 90 days following the Court's approval of a vendor. The City has also been ordered to initiate engagement with PDP's correctional officer labor union on these requirements by September 30, 2024.[25]*

5. Simplify the City's lengthy hiring and onboarding processes that reportedly create delays in recruits reporting to PDP academies.

   *As previously reported, the City indicated that it streamlined its hiring process in 2021 and that it is processing the current volume of applications within a reasonable timeframe.[26] It is unlikely, however, that the City's current resources dedicated to processes such as background checks, medical clearances, and academy instruction could accommodate a large influx of applicants, which PDP's targeted recruitment strategy should yield. The City should plan ahead as it implements this Court's August 16, 2024 Order, to ensure that it avoids any potential bottlenecks that might delay start dates of new personnel.*

6. Establish continuous-fill civil service hiring lists during the staffing crisis.

   *The City reported that it implemented back-to-back civil service hiring lists in response to this recommendation. Despite the back-to-back lists, the City's application portal was not configured to receive applications continuously and some applicants were instead directed to reapply at later dates.*

   *On August 16, 2024, this Court ordered the City to maintain an internal portal, which must remain open and continuously available at all times, to accept applications for employment with PDP.[27]*

7. Assess the impact of Philadelphia's employee residency requirements on PDP's hiring outcomes and consider whether permanent exemptions or modifications are appropriate.

   *The June 12, 2024, Arbitration Award ordered that the City residency requirement for PDP employees be eliminated until PDP reaches 80 percent of its staffing complement.[28] However, the temporary residency requirement waiver only applies to applicants who*

---

[24] Order, *supra* note 8, at 2.

[25] *Id.* at 1.

[26] Monitor's Fourth Report, *supra* note 12, at 17.

[27] Order, *supra* note 8, at 1.

[28] In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 4 (decision date, June 12, 2024), Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia.

20

*reside within the Commonwealth of Pennsylvania. The residency requirement waiver does not apply to applicants in neighboring states.*

*On August 16, 2024, this Court ordered the City to expand the category of eligible applicants receiving the residency requirement waiver to all qualified individuals who reside outside the Commonwealth of Pennsylvania.[29]*

8. PDP should implement strategies for employee retention and a robust employee wellness program.

*The Commissioner reports that he conducts regular facility tours to maintain visibility and consistently meets with facility staff, among other initiatives, to attend to employee wellness and morale. During site visits in April and June 2024, facility staff appeared more optimistic and those interviewed reported fewer complaints than previous site visits. Most cited pay increases, the 12-hour work shift, and less mandatory overtime as improving morale. All staff interviewed continue to report needing additional staff to feel safe.*

*PDP reports that it hired an employee wellness manager who did not remain in the position through this reporting period. PDP also reports it hired an Employee Assistance Program (EAP) coordinator to facilitate access to mental health and other support services offered through the City's EAP program. Finally, PDP reports it anticipates reopening a dedicated space for employee wellness programs, which will host a gym and other wellness activities, in the next reporting period.*

*On August 16, 2024, this Court ordered PDP to appoint a new employee wellness coordinator by November 14, 2024.[30] By January 13, 2025, the City must fund an adequate Employee Wellness Program. These requirements are designed and anticipated to offer PDP staff much needed, long-awaited support and improve employee retention.*

9. The City should implement a return-to-work strategy that is tailored to the needs of PDP employees who are out on long-term leave or work-related illness.

*The City has implemented this recommendation. In November 2023, PDP reported that there were 40 employees on long-term leave and that the City's Department of Risk Management and Human Services was working with them on a return-to-work process. As of June 30, 2024, PDP reports that only 12 employees remained on long-term leave. The City is currently employing meaningful return-to-work strategies, and is encouraged to sustain progress in this area.*

10. Retain an expert to build internal capacity to manage systems, coding, and budgetary processes associated with staffing allocations. The expert should assist PDP in identifying and retaining only the most useful database reports and discontinuing the use of non-essential or inaccurate reports.

*As previously reported, this recommendation has been implemented.[31]*

---

[29] Order, *supra* note 8, at 3.
[30] *Id.* at 2.
[31] Monitor's Fourth Report, *supra* note 12, at 18.

**Additional recommendations for immediate action:[32]**

11. Immediately authorize additional double-time pay each day of the week as necessary to staff all vacant shifts.

     *The City did not accept this recommendation.*

     *The Act 195 Interest Arbitration Supplemental Award issued January 27, 2023, requires the City to offer double-time pay to staff who work on certain regularly scheduled days off.[33] Consistent with the arbitration order and the twelve-hour shift schedule, double-time pay is routinely being offered on Thursdays and Sundays, but not on Fridays and Saturdays. An unintended consequence of this otherwise effective initiative is higher post vacancy rates on Fridays and Saturdays, which has resulted in unattended or locked-down housing units.*

     *As the double-time pay initiative demonstrates, it is impossible to predict with certainty which initiatives will be most effective in maximizing staff attendance. Increasing overtime opportunities also poses risks associated with exhaustion and staff burnout. However, given PDP's unprecedented personnel vacancies, the City and PDP must remain flexible, pilot various options, and use all available management tools until the staffing crisis is resolved. Having successfully implemented Recommendation 11 above, the Commissioner reports that he intends to use available data to make informed executive decisions about how best to allocate resources, incentivize attendance, and offer Class Members a more reliable out-of-cell schedule.*

     *On August 16, 2024, this Court ordered the City to authorize PDP to offer double-time pay on any day of the week as necessary to staff all vacant shifts.[34]*

12. The City should establish a well-resourced team to assist with recruitment, application processing, onboarding, and supporting new staff. The team should conduct meaningful exit interviews of staff leaving PDP to determine what is needed to improve retention.

     *The City has partially implemented this recommendation. PDP hired a Recruitment Coordinator who started on July 1, 2024. PDP has been encouraged to track and report on outcomes of this new position.*

**Substantive Provision 2—Out-of-Cell Time**

*Sub-provision 2.1--Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than*

---

[32] Original Additional Recommendations 12 and 13, as discussed in the Monitor's Fourth Report, regarding facility sanitation and maintenance have been moved and are now discussed *infra* under Substantive Provision 17—Sanitation, Additional Recommendations 7, 8, 9, and 10.

[33] In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2-3 (decision date, Jan. 27, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia.

[34] Order, *supra* note 8, at 2.

*May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than*
*August 1, 2022, no less than five hours of out-of-cell time each day.*

**Compliance Rating:  Partial Compliance**

Insufficient staffing remains the primary reason for PDP's failure to comply with this substantive
provision.  Most PDP housing units are staffed by only one officer.  This requires Class
Members to recreate in smaller groups thereby limiting each group's out-of-cell opportunities.
For various operational and safety reasons, some housing units are able to offer more out-of-cell
time than others.  Multiple units are offering more than five hours of-of-cell time daily, and some
are offering eight or more.  Systemwide, PDP facilities are not consistently offering five hours
daily as required.

Out-of-cell tables for 2024 depicted below reflect additional timeframes for tracking out-of-cell
compliance and now include ranges for 0 to .9 hours, 1 to 2.9 hours, 3 to 5.9 hours, 6 to 7.9
hours, and 8 or more hours out of cell.  Previously reported issues with tracking and data
accuracy persist and reported times can only be verified via CCTV review.[35]  Currently, the
Monitoring Team is aggregating and documenting PDP's reported out-of-cell data for the
Monitor's reports.  The Monitoring Team is hopeful that PDP's new data analysis team will
assume responsibility for this task in the future.

---

[35] Monitor's Fourth Report, *supra* note 12, at 19.

The following tables depict average out-of-cell time that select CFCF general population recreation groups received daily for one week of each month, July through December 2023 and January through June 2024:

**Table 11: General Population Average Out-of-Cell Time Per Day Reported for CFCF, Six One-Week Periods***

July – December 2023

| Hours** | Monthly Average | |
| --- | --- | --- |
| | Groups | Percent (%) |
| 0 to .9 | 13 | 17% |
| 1 to 4.9 | 58 | 74% |
| ≥ 5, < 6 | 7 | 9% |
| Total CFCF Groups | 78 | 100% |

*Weeks reviewed include: July 10-16, 2023, August 7-13, 2023, September 4-10, 2023, October 9-15, 2023, November 13-19, 2023, and December 18-24, 2023. From July through December 2023, not all CFCF housing units completed out-of-cell trackers, so sampled housing units include A1, A2, B1, B2, C1, C2, D1, and D2 – Pod 1 only.

**When PDP fails to log recreation time for a group, zero out-of-cell time is assumed.

**Table 12: General Population Average Out-of-Cell Time Per Day Reported for CFCF, Six One-Week Periods***

January – June 2024

| Hours*** | Jan-March 2024 | | April-June 2024 | | Monthly Average | |
| --- | --- | --- | --- | --- | --- | --- |
| | Groups | % | Groups | % | Groups | % |
| 0 to .9** | 201 | 30% | 183 | 27% | 64 | 29% |
| 1 to 2.9 | 53 | 8% | 80 | 12% | 22 | 10% |
| 3 to 5.9 | 408 | 62% | 413 | 61% | 137 | 61% |
| 6 to 7.9 | 0 | 0% | 0 | 0% | 0 | 0% |
| ≥ 8 | 0 | 0% | 0 | 0% | 0 | 0% |
| Total CFCF Groups | 662 | 100% | 676 | 100% | 223 | 100% |

*Weeks reviewed include: January 8-14, 2024; February 12-18, 2024; March 4-10, 2024, April 1-7, 2024, April 29-May 5, 2024, and June 3-9, 2024. Sampled housing units include: A1P1 (January 2024 only), A1P1-4; B1P1-4; C1P1-4; D1P1-4.

**For Q1 2024, only 1 of the 201 groups for the range of 0 to .9 was more than 0.

***When PDP fails to log recreation time for a group, zero out-of-cell time is assumed.

None of CFCF's housing units reviewed reported offering an average of six or more hours out-of-cell time daily. PDP reports due to staffing shortages, most CFCF general population housing units must follow a schedule that offers each tier either three or four hours out of cell per day on a regular rotation. In this reporting period, a higher average percentage of CFCF recreation groups received less than one hour out-of-cell time daily than in the previous reporting period. Trackers reviewed reflect that from June through December 2023, an average of 17 percent of recreation groups received less than an average of one hour out-of-cell daily. That average percentage increased to 29 percent in this reporting period. Of groups receiving between 0 to .9

hours out of cell in this reporting period, trackers reviewed most frequently suggest that zero out-of-cell time was offered to those groups in weeks reviewed.[36]

The following tables depict average out-of-cell time that select PICC general population recreation groups received daily for one week of each month, July through December 2023 and January through June 2024:

**Table 13: General Population Average Out-of-Cell Time Per Day Reported for PICC, Six One-Week Periods\***
July – December 2023

| Hours\*\* | Monthly Average | |
|---|---|---|
| | Groups | Percent (%) |
| 0 to .9 | 13 | 10% |
| 1 to 4.9 | 66 | 51% |
| ≥ 5, < 6 | 50 | 39% |
| Total PICC Groups | 129 | 100% |

\*Weeks reviewed include: July 10-16, 2023, August 7-13, 2023, September 4-10, 2023, October 9-15, 2023, November 13-19, 2023, and December 18-24, 2023. Lockdown days were not included for the following: week of 10/9 unit G2 (2 days); week of 11/13, unit F2 (2 days); week of 12/18, for K (3 days) and H2 (2 days).
\*\*When PDP fails to log recreation time for a group, zero out-of-cell time is assumed.

**Table 14: General Population Average Out-of-Cell Time Per Day Reported for PICC, Six One-Week Periods\***
January – June 2024

| Hours\*\* | Jan-March 2024 | | April-June 2024 | | Monthly Average | |
|---|---|---|---|---|---|---|
| | Groups | % | Groups | % | Groups | % |
| 0 to .9 | 29 | 9% | 26 | 6% | 9 | 8% |
| 1 to 2.9 | 70 | 23% | 88 | 21% | 26 | 22% |
| 3 to 5.9 | 167 | 55% | 213 | 51% | 63 | 52% |
| 6 to 7.9 | 18 | 6% | 51 | 12% | 12 | 10% |
| ≥ 8 | 22 | 7% | 40 | 10% | 10 | 9% |
| Total PICC Groups | 306 | 100% | 418 | 100% | 120 | 100% |

\*Weeks reviewed include: January 8-14, 2024; February 12-18, 2024; March 4-10, 2024, April 1-7, 2024, April 29-May 5, 2024, and June 3-9, 2024.
\*\*When PDP fails to log recreation time for a group, zero out-of-cell time is assumed.

PICC demonstrated progress in this reporting period, increasing average monthly out-of-cell time for weeks reviewed and reducing slightly the average percentage of groups that received less than one hour out-of-cell time. Trackers reviewed in the previous reporting period showed that PICC was unable to provide any of the recreation groups with more than six hours out-of-cell time on any day for weeks reviewed. In this reporting period, however, PICC documented providing an average of 10 percent of the general population groups an average of six to eight hours out-of-cell time daily and an additional nine percent of groups more than eight hours out-

---

[36] This will be discussed further in Substantive Provision 3—Out-of-Cell/Segregation.

of-cell time each day, on average, for weeks reviewed. The percentage of groups receiving less than one-hour out-of-cell time daily also reduced slightly from an average of 10 percent to an average of 8 percent for weeks reviewed. PDP reports that these improvements are largely attributable to slight staffing increases at PICC, which is permitting upper and lower tiers to recreate together in some housing units. These improvements further demonstrate PDP leadership's ability to make the most of small decreases in daily post vacancies and emphasize the need for similar improvements in all PDP facilities.

As previously reported, housing units that combine Class Members who require varying security classifications offer less out-of-cell time to Class Members than units with fewer security classification groupings.[37] Combining security classifications is common with women who represent smaller populations in mixed-gender jail and prison facilities and is the case for those living in PICC's E and C Units. E Unit houses general and restricted populations together, including administratively and punitively segregated Class Members, as well as pregnant Class Members. C Unit houses the women's Transition Unit (TU) and general population Class Members.

Officers in both units provide out-of-cell time in compatible groups or individually if a Class Member is unable to safely recreate with others. PDP's current out-of-cell time trackers do not distinguish between various security classifications or housing statuses (such as PDP "orientation" or "Transition Unit") that might reduce out-of-cell time allowances. For this reason, the Monitoring Team is unable to calculate average out-of-cell percentages for this and other mixed-classification units with any confidence. Interviews of staff and Class Members on both units during site visits suggest that Class Members in restricted housing may generally be offered daily out of cell time, but often less than one hour. Staff and Class Members have reported that those in E Unit whose security classifications fall within the general population category may receive an average of three to six hours out-of-cell time daily, but that cannot be verified with available data.

PDP reports that its data team is beginning to monitor and refine PDP's out-of-cell tracking system. The Monitoring Team has recommended that refinements ultimately include documentation of security classification and housing status, among other details.[38] Additional detail will be critical for the data team's tracking of out-of-cell time and will inform any analysis or recommendations it makes.

---

[37] Monitor's Third Report, *supra* note 12, at 19.
[38] Monitor's Fourth Report, *supra* note 12, at 24.

The following tables depict average out-of-cell time that RCF general population recreation groups received daily for one week of each month, July through December 2023 and January through June 2024:

**Table 15: General Population Average Out-of-Cell Time Per Day Reported for RCF, Six One-Week Periods***

July – December 2023

| Hours** | Monthly Average | |
| --- | --- | --- |
| | Groups | Percent (%) |
| 0 to .9 | 9 | 9% |
| 1 to 4.9 | 36 | 38% |
| ≥ 5, < 6 | 51 | 53% |
| **Total RCF Groups** | **96** | **100%** |

*Weeks reviewed include: July 10-16, 2023, August 7-13, 2023, September 4-10, 2023, October 9-15, 2023, November 13-19, 2023, and December 18-24, 2023.
**When PDP fails to log recreation time for a group, zero out-of-cell time is assumed.

**Table 16: General Population Average Out-of-Cell Time Per Day Reported for RCF, Six One-Week Periods***

January – June 2024

| Hours** | Jan-March 2024 | | April-June 2024 | | Monthly Average | |
| --- | --- | --- | --- | --- | --- | --- |
| | Groups | % | Groups | % | Groups | % |
| 0 to .9 | 57 | 17% | 8 | 2% | 11 | 9% |
| 1 to 2.9 | 78 | 23% | 86 | 24% | 27 | 23% |
| 3 to 5.9 | 152 | 46% | 186 | 51% | 56 | 48% |
| 6 to 7.9 | 17 | 5% | 16 | 4% | 6 | 5% |
| ≥ 8 | 30 | 9% | 70 | 19% | 17 | 15% |
| **Total RCF Groups** | **334** | **100%** | **366** | **100%** | **117** | **100%** |

*Weeks reviewed include: January 8-14, 2024; February 12-18, 2024; March 4-10, 2024, April 1-7, 2024, April 29-May 5, 2024, and June 3-9, 2024.
**When PDP fails to log recreation time for a group, zero out-of-cell time is assumed.

Data suggests RCF also demonstrated some progress in this reporting period. Groups that received less than one hour out-of-cell time per day remained at an average of 9 percent from one reporting period to the next for weeks reviewed. However, RCF was able to offer an average of 20 percent of groups more than 6 hours out-of-cell time daily, on average, for weeks reviewed. RCF's improvements are partially explained by reduced staffing requirements on some units, such as worker units or those with lower security classifications, where both tiers may recreate together under the supervision of a single officer.

As anticipated, PDP continues to struggle with the accurate tracking of out-of-cell time. PDP has procured a Radio Frequency Identification (RFID) system, which will improve accuracy of out-of-cell tracking and other facility movement. The implementation of an RFID tracking system will likely require a year to finalize, and will need refinement before reliable, detailed reports can be generated. PICC and RCF should be commended for efforts to improve out-of-cell time. CFCF is, by far, the most complex facility operationally and its ongoing challenges in

improving out-of-cell opportunities, though disappointing, are not surprising. Until PDP has more staff or fewer Class Members, none of PDP's facilities will achieve substantial compliance with this substantive provision.

*Sub-provision 2.2--The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases in out-of-cell time should continue to be made beyond the August 1, 2022, standard, with a presumptive expected increase to six hours by October 15, 2022. The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, infra, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis. See also para. 4, infra.*

**Compliance Rating: Non-Compliance**

This is the first reporting period during which PDP data suggests that some Class Members are receiving eight or more hours out-of-cell per day for weeks reviewed. PDP recognizes that it is far from substantial compliance with out-of-cell requirements and that conditions for Class Members remain unacceptable. PDP should, however, be acknowledged for these and other reported improvements, which demonstrate the capabilities of facility leadership and staff, as well as PDP's commitment to improving conditions.

**Substantive Provision 3—Out-of-Cell/Segregation**

*Sub-provision 3.1--Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day.*

**Compliance Rating: Non-Compliance**

Tracking of out-of-cell time in segregation units remains problematic. For example, in this reporting period, Class Members housed in segregation at PICC were temporarily moved to DC for repairs from March 2024 to May 2024. During this time, PDP failed to track out-of-cell time for those Class Members, as reflected in the analysis below.

28

The following table reflects the average total populations of Class Members on all segregation units and the average percentage of Class Members who were offered one hour of out-of-cell time for six one-week periods from January through June 2024:

**Table 17: Daily Out-of-Cell Opportunities for Class Members on All Segregation Units**
January – June 2024*

| Date | January** | February | March | April*** | May*** | June*** |
|---|---|---|---|---|---|---|
| CFCF (%) | 81%** | 18% | 15% | 36% | 35% | 28% |
| PICC (%) | 51% | 17% | 36% | N/A | N/A | N/A |
| RCF (%) | 12% | 35% | 39% | 24% | 33% | 38% |
| **Average Total Stable Population**** | 156 | 207 | 190 | 149 | 143 | 142 |
| **Average Class Members Out-of-Cell** | **74** | **41** | **49** | **46** | **50** | **46** |
| **Average Percent Out-of-Cell** | **47%** | **20%** | **26%** | **31%** | **35%** | **32%** |

*Weeks reviewed include: January 8-14, 2024, February 12-18, 2024, March 4-10, 2024, April 13-19, 2024, May 13-19, 2024, and June 3-9, 2024. For one-week, RCF evaluated April 29-May 5, 2024, instead of May 13-19, 2024.
**A1P2 not reported this month so totals are incomplete and do not reflect all segregation housing units.
***PICC segregation not included in totals for these months because PDP failed to log daily out-of-cell opportunities for those Class Members.
****"Stable Population" refers to the average total class members who resided in all segregation units for the entire week.

PDP continues to remain non-compliant with this sub-provision. In this reporting period, the average monthly percentage of Class Members who were offered one hour of out-of-cell time ranged from 20 percent to 47 percent. Thirty-five percent or fewer Class Members, on average, received one hour out-of-cell time on any given day in five of the six months in this reporting period. As previously reported, PDP generally offers recreation time for Class Members in segregation only when three officers are present.[39] When fewer than three officers are present, out-of-cell time is limited or not offered. Based on documented entries in the out-of-cell trackers, issues with providing daily out-of-cell opportunities may also be impacted by maintenance on housing units and lack of staffing stemming from off-site medical transports.

Comparing out-of-cell data in general population to out-of-cell data in segregation, it appears PDP is beginning to make some decisions about allocation of staffing resources in efforts to improve out-of-cell time in some units. For example, CFCF's daily out-of-cell opportunities in segregation housing units appeared to improve in this reporting period. This is reportedly because personnel were redirected from general population units to provide short durations of out-of-cell time in segregation units, as recommended.[40] Also as recommended, CFCF began providing limited out-of-cell time on segregation units with only two officers present.[41] This was not the case at PICC and RCF, which may explain why daily out-of-cell opportunities in those facilities' segregation units decreased while out-of-cell opportunities for general population Class Members increased.

---

[39] Monitor's Second Report, *supra* note 12, at 20.
[40] *Ibid*.
[41] *Id*. at 20.

29

In an attempt to compare previous reporting periods, the following table reflects the average total populations of Class Members on all segregation units and the average total Class Members who were offered one hour of out-of-cell time for sampled one-week periods in June 2023, November and December 2023, January and February 2024, and May and June 2024:

**Table 18: Daily Out-of-Cell Opportunities for Class Members on All Segregation Units**
June 2023 – June 2024*

| Date | June 2023 | Nov-Dec 2023 | Jan-Feb 2024*** | May-June 2024**** |
|---|---|---|---|---|
| **Average Total Stable Population**** | 192 | 230 | 182 | 143 |
| **Average Class Members Out-of-Cell** | 73 | 75 | 58 | 48 |
| **Average Percent Out-of-Cell** | 38% | 33% | 32% | 34% |
| **Average Percent Not Out-of-Cell** | 62% | 67% | 68% | 66% |

*Weeks reviewed include: June 5-11, 2023, November 13-19, 2023, December 18-24, 2023, January 8-14, 2024, February 12-18, 2024, May 13-19, 2024, and June 3-9, 2024.
**"Stable Population" refers to average total Class Members who resided in all segregation units for the entire week.
***A1P2 not reported this month so totals are incomplete and do not reflect all segregation housing units.
****PICC segregation not included in totals for this review period because PDP failed to log daily out-of-cell opportunities for those Class Members.

The average percentage of Class Members in segregation units who reportedly received no daily out-of-cell time for weeks reviewed increased from 67 percent in November through December 2023 to 68 percent in January through February 2024. As with previously reporting periods, it was not uncommon for Class Members in segregation units to remain confined in their cells multiple days in a row in this reporting period.[42]

Due to PICC's missing data, April through June 2024 data is not useful for comparison purposes. Over the previous two reporting periods, there has been little systemwide change; however, some changes at the facility level include:

- CFCF appears to have increased out-of-cell opportunities for units A1P3 and A1P4 in this reporting period. In Unit A1P3, the average percentage of the population offered out-of-cell time reportedly increased from 27 percent in November through December 2023 to 35 percent in January through June 2024. Similarly, on Unit A1P4, the average percentage of the population offered out-of-cell time reportedly increased from 28 percent in November through December 2023 to 34 percent in January through June 2024.
- PICC appears to have reduced out-of-cell opportunities in this reporting period. The average percentage of the population offered out-of-cell time decreased from an average of 39 percent in November and December 2023 to an average of 35 percent in January through March 2024.

---

[42] *Ibid.*

30

- RCF also appears to have reduced out-of-cell opportunities in this reporting period. The average percentage of the population reportedly offered out-of-cell time decreased from an average of 42 percent in November through December 2023 to an average of 30 percent in January through June 2024.

*Sub-provision 3.2--Defendants further agree that they will continue their normal practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units.*

**Compliance Rating: Partial Compliance**

As previously reported, PDP's segregation documentation does not identify a lack of housing space or insufficient staffing as rationales for placement or retention of Class Members in administrative segregation.[43]  Also previously reported and discussed below under Substantive Provision 6—Behavioral Health in Segregation, PDP continues to house too many Class Members with mental illness in segregation because it lacks sufficient staff and space for appropriate alternatives.

The Monitoring Team previously reported that PDP redirected staff to hold more frequent hearings for retention on administrative segregation.[44]  As a result, Class Members not receiving retention hearings within the 30-day policy requirement steadily decreased in each reporting period.[45]  These and other efforts also appeared to reduce lengths of stay in administrative segregation and total placements in administrative segregation over three consecutive reporting periods.[46]  PDP sustained improvements to timeframes for retention hearings in this reporting period, however, total placements in both administrative and punitive segregation have increased.

In this reporting period, PDP was able to improve its tracking of durations Class Members spend in both punitive and administrative segregation.  In the first four reporting periods, PDP's administrative segregation totals only reflected days spent for each new administrative segregation term and excluded some Class Members' temporary changes to punitive segregation status.  Consistent with the Monitoring Team's recommendation, in April 2024, PDP also began tracking the total time each Class Member spends in any restricted housing environment, including any status changes between administrative and punitive segregation.[47]  This measure is far more meaningful in assessing potential harm to Class Members who spend extended periods in isolation and in identifying overreliance on either form of restricted housing.

---

[43] Monitor's Fourth Report, *supra* note 12, at 24; Monitor's Second Report, *supra* note 12, at 21.

[44] Monitor's Fourth Report, *supra* note 12, at 25.

[45] *Id.* at 25-26.

[46] Average total administrative segregation placements reduced from 196 during July through December 2022, then to 126 during January through June 2023, the, again, to 107 during July through December 2023.  Monitor's Fourth Report, *supra* note 12, at 25-26; Monitor's Third Report, *supra* note 12, at 24; Monitor's Second Report, *supra* note 12, at 21.

[47] For example, it is common for administrative segregation Class Members to be disciplined.  When this occurs, and if they are found guilty, Class Members return to punitive segregation status for the duration of their sentence.  Following the time spent in punitive segregation, Class Members are frequently then moved to administrative segregation status again.

31

The following table depicts average total Class Members in administrative segregation and retention reviews exceeding 30- and 60-day timeframes for sample dates in four periods, July through December 2022, January through June 2023, July through December 2023, and January through June 2024:

**Table 19: Reviews for Retention on Administrative Segregation**
**Exceeding 30 and 60 Days**
July 2022 – June 2024

| | CFCF | | | | PICC | | | | RCF | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total Ad-Seg | > 30 Days | > 60 Days | % > 60 Days | Total Ad-Seg | > 30 Days | > 60 Days | % > 60 Days | Total Ad-Seg | Total Ad-Seg |
| July-Dec 2022 | 95 | 10 | 12 | 26% | 78 | 2 | 2 | 6% | 21 | 193 |
| Jan-June 2023 | 67 | 10 | 3 | 3% | 44 | 2 | 0 | 0% | 14 | 126 |
| July-Dec 2023 | 74 | 2 | 0 | 0% | 16 | 0 | 0 | 0% | 17 | 107 |
| Jan-June 2024 | 95 | 4 | 1 | 1% | 12 | 1 | 0 | 0% | 22 | 133 |

The following table depicts average total Class Members in administrative segregation, retention reviews exceeding 30- and 60-day timeframes, and average lengths of stay in administrative and punitive segregation (restricted housing) for the period January through June 2024:

**Table 20: Reviews for Retention on Administrative Segregation**
**Exceeding 30 and 60 Days and Average Lengths of Stay in Restricted Housing**
January – June 2024

| | CFCF | | | | | PICC* | | RCF | | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Ad-Seg | > 30 Days | > 60 Days | % > 60 Days | Average Days in Restricted Housing | Total Ad-Seg | Average Days in Restricted Housing | Total Ad-Seg | > 30 Days | Average Days in Restricted Housing | Total Ad-Seg | Average Days in Restricted Housing |
| 1-12-24 | 72 | 3 | 0 | 0% | N/A | 19 | N/A | 23 | 7 | N/A | 114 | N/A |
| 2-16-24 | 72 | 9 | 0 | 0% | N/A | 18 | N/A | 19 | 0 | N/A | 109 | N/A |
| 3-15-24 | 86 | 0 | 0 | 0% | N/A | 23 | N/A | 17 | 0 | N/A | 126 | N/A |
| 4-12-24 | 106 | 0 | 0 | 0% | 86 | 1 | 66 | 17 | 0 | 89 | 145 | 85 |
| 5-15-24 | 106 | 9 | 1 | 1% | 57 | 1 | 71 | 40 | 0 | 89 | 147 | 66 |
| 6-14-24 | 125 | 2 | 2 | 2% | 74 | 12 | 59 | 18 | 3 | 80 | 155 | 69 |
| Average | 95 | 4 | 1 | 1% | 72 | 12 | 65 | 22 | 2 | 86 | 133 | 73 |

*PICC reviews were all completed within policy according to documentation reviewed with the exception of one incident in March 2024 with a four-day delay.

Overall, the average number of Class Members in administrative segregation increased by 24 percent in this reporting period, from 107 during July through December 2023 to 133 during

January through June 2024.[48]  The average total of 133 Class Members in administrative segregation this reporting period also represents a 6 percent increase over the past calendar year, which averaged 126 from January through June 2023.[49]

Accounting for population differences between reporting periods, there is an increase in the overall proportion of the total PDP population housed in administrative segregation.  Class Members in administrative segregation represented an estimated 2.2 percent of the ADP from July through December 2023[50] versus 2.9 percent from January through June 2024, an approximate 32 percent increase in this reporting period.[51]

RCF and CFCF did not meet 30-day retention hearing requirements for some cases.  CFCF also failed to complete hearings within 60 days in three incidents.  CFCF's missed retention hearing deadlines increased from an average of two cases in the period July through December 2023 to an average of four cases in January through June 2024.  However, an average of four hearings in this reporting period represents a 60 percent reduction in missed deadlines over the last calendar year.  As previously reported, CFCF averaged 10 hearings beyond the 30-day time requirement from January through June 2023.[52]

PDP continues to demonstrate a commitment to timely hearings.  Outcomes are difficult to monitor, however, because documentation is not centralized (it is maintained both electronically and in paper format in housing units) and does not always support continued placement in administrative segregation.  PDP's new, more sophisticated Jail Management System (ATIMS) will provide for real-time monitoring of segregation placements, notify PDP of pending hearing requirements and exceeded timeframes, and facilitate more thorough and efficient documentation regarding rationales for retention or release from administrative segregation.  ATIMS will also assist with internal and external monitoring.  PDP's data team will reportedly initiate review of PDP's current segregation data tracking in the next reporting period with the eventual goal of assuming responsibility for internal compliance monitoring.

As previously reported, PDP has permanently discontinued the automatic placement of state sentenced Class Members into administrative segregation based solely on their state commitments.[53]  PDP also significantly reduced the number of Class Members confined in

---

[48] Monitor's Fourth Report, *supra* note 12, at 26.

[49] Monitor's Third Report, *supra* note 12, at 24.

[50] Percentages were calculated based on the average daily population for the period July-December 2023, as reported in the Philadelphia Prison Population Reports.  *See* Philadelphia Prison Population Report | July 2015 – December 2023, MacArthur Safety and Justice Challenge (Jan. 5, 2024), https://www.phila.gov/media/20240105120028/December-2023-Full-Report.pdf.

[51] Percentages were calculated based on the average daily population for the period January-June 2024, as reported in the Philadelphia Prison Population Reports.  *See* Philadelphia Prison Population Report | July 2015 – June 2024, MacArthur Safety and Justice Challenge (July 16, 2024), https://www.phila.gov/media/20240716150642/June-2024-Full-Public-Report.pdf.

[52] Monitor's Third Report, *supra* note 12, at 24.

[53] PDP continues to periodically segregate a small number of state sentenced Class Members for short periods while they await movement to their designated housing unit.  On June 3, 2022, administrative segregation reports listed 36 state sentenced Class Members in administrative segregation.  Subsequent reviews on January 5, 2024, and June 28, 2024 confirmed there were zero Class Members in administrative segregation exclusively due to pending state prison transfers.

segregation solely due to high bail.  PDP continues to house some high-profile Class Members in segregation, as well as those facing life without possibility of parole or the death penalty.  As staffing increases, PDP will consider options for high security non-segregation housing for these Class Members.

On June 28, 2024, 25 Class Members remained in administrative segregation beyond 90 days, 12 of whom exceeded 90 days in administrative segregation following a punitive segregation term.  Three of the 12 Class Members had reportedly received subsequent punitive segregation terms for compounding infractions, though the infractions may have occurred following their initial 90-day terms.[54]  Two of the three Class Members were involved in serious incidents or presented significant security risks in the general population that may have warranted extended segregation terms.  Finally, one Class Member on the Behavioral Health caseload remained in segregation for approximately 7 months reportedly originating from an altercation with injuries.  However, the rationale for this Class Member's ongoing retention in segregation was documented as the Class Member having a "bad attitude" and refusing to receive treatment for anger management.  The request for approval of this Class Member's extension beyond 90 days included no documentation regarding an interdisciplinary plan to support the patient's reintegration to general population or consideration of this patient for referral to another level of care.

In this reporting period, the subject matter experts reviewed five additional placements of Class Members on the Behavioral Health caseload who had been in segregation beyond 90 days.  PDP records suggest all five patients received periodic social work and psychiatric appointments but limited group treatment, also discussed below under Substantive Provision 6—Behavioral Health in Segregation, *Requirement 4*.  It does not appear that these patients were being followed by an interdisciplinary committee that considers treatment goals or plans for the removal of these patients to a more appropriate environment.

---

[54] Whether the discipline occurred before or after 90-days could not be determined based on PDP's documentation.

The following tables depict total punitive segregation placements and average lengths of stay in punitive segregation for four review periods, July through December 2022, January through June 2023, July through December 2023, and January through June 2024:

**Table 21: Total Placements and Average Lengths of Stay in Punitive Segregation**
July 2022 – June 2024

| | CFCF | | PICC | | RCF | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Total Average Punitive Segregation | Average Days in Punitive Segregation | Total Average Punitive Segregation | Average Days in Punitive Segregation | Total Average Punitive Segregation | Average Days in Punitive Segregation | Total Average Punitive Segregation | Average Days in Punitive Segregation |
| July-Dec 2022 | 61 | 63 | 49 | 65 | 45 | 37 | 154 | 55 |
| Jan-June 2023 | 64 | 21 | 50 | 23 | 26 | 14 | 139 | 19 |
| July-Dec 2023 | 70 | 26 | 42 | 22 | 37 | 15 | 148 | 21 |
| Jan-June 2024 | 90 | 30 | 37 | 25 | 36 | 26 | 162 | 27 |

**Table 22: Total Placements and Average Lengths of Stay in Punitive Segregation**
January – June 2024

| | CFCF | | PICC | | RCF | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation |
| 1-12-24 | 88 | 22 | 48 | 24 | 31 | 28 | 167 | 25 |
| 2-16-24 | 127 | 29 | 52 | 25 | 35 | 30 | 214 | 28 |
| 3-15-24 | 109 | 32 | 38 | 21 | 33 | 26 | 180 | 26 |
| 4-12-24 | 36 | 48 | 42 | 41 | 6 | 33 | 84 | 41 |
| 5-15-24 | 103 | 27 | 9 | 17 | 62 | 25 | 174 | 23 |
| 6-14-24 | 75 | 23 | 30 | 20 | 48 | 14 | 153 | 19 |
| **Average** | **90** | **30** | **37** | **25** | **36** | **26** | **162** | **27** |
| **Difference, July-Dec 2023 and Jan-June 2024** | **+29%** | **+15%** | **-12%** | **+14%** | **-3%** | **+73%** | **+9%** | **+29%** |

The year-to-year average days Class Members spent in punitive segregation increased by 42 percent, from 19 days for the period January through June 2023 to 27 days for January through June 2024. The average number of Class Members in punitive segregation also increased by 17 percent, from 139 for January through June 2023 to 162 for January through June 2024. The punitive segregation population represented an estimated 3.1 percent of the ADP for January

35

through June 2023[55] and increased to approximately 3.4 percent of the ADP for January through June 2024.[56]

Previously, PDP's efforts to decrease its segregated population resulted in significant progress over the previous two reporting periods.[57]  In this reporting period, PDP regressed and has seen an unfortunate increase in its reliance on administrative and punitive segregation.  As anticipated, PDP is clearly struggling to sustain improvements with persisting staff vacancies.  PDP has agreed to assess the reasons for the increases and attempt course correction.  PDP recognizes this is particularly important given PDP's inability to provide adequate programming, out-of-cell time, and services on these units.

**Status of Recommendations, Sub-Provision 3.2—Out-of-Cell/Segregation, from the Monitor's Fourth Report:**

1. Provide daily out-of-cell time for all Class Members, even if Agreement requirements cannot be met.  PDP should reevaluate the current requirement that three officers must be present to provide out-of-cell time.
   *PDP remains unable to provide daily out-of-cell time to all Class Members.  CFCF has intermittently provided reduced out-of-cell opportunities when only two officers are present, but this has not been consistent or operationalized.*
2. Ensure that current out-of-cell schedules are feasible for personnel to implement, that Class Members receive schedules in advance, and that schedules are consistently adhered to.
   *This recommendation has not been implemented.*
3. Use currently available information, such as reports from staff, supervisors, and Class Members to identify and attend to housing units that are struggling to offer out-of-cell time.
   *This recommendation has not been implemented.*
4. Document the reasons for any failures to offer out-of-cell time.
   *PDP security staff continue to improve in documenting reasons for failures to offer out-of-cell time though improvements are not consistent.  Thus far, out-of-cell documentation has not been monitored internally, however, the data analysis team is reportedly focusing on improving out-of-cell tracking and documentation.*

The Monitoring Team has made the following recommendations over the course of implementation monitoring to assist PDP in reducing its reliance on punitive segregation:

---

[55] Percentages were calculated based on the average daily population for the period January-June 2023, as reported in the Philadelphia Prison Population Reports.  *See* Philadelphia Prison Population Report | July 2015 – June 2023, MacArthur Safety and Justice Challenge (July 19, 2023), https://www.phila.gov/media/20230719111504/June-2023-Public-Piktochart-Report.pdf.

[56] Percentages were calculated based on the average daily population for the period January-June 2024, as reported in the Philadelphia Prison Population Reports.  *See* Philadelphia Prison Population Report | July 2015 – June 2024, MacArthur Safety and Justice Challenge (July 16, 2024), https://www.phila.gov/media/20240716150642/June-2024-Full-Public-Report.pdf.

[57] Monitor's Fourth Report, *supra* note 12, at 24-28; Monitor's Third Report, *supra* note 12, at 23-26.

5. Increase educational, therapeutic, and other positive programming in general population units.
   *This recommendation has not been implemented.*
6. Utilize sanctions that do not require isolation, such as creating loss of privilege tiers where Class Members receive out-of-cell time but access to commissary, tablets, and phones is limited or restricted.
   *This recommendation is being piloted as part of the PICC disciplinary pilot discussed below under Substantive Provision 6—Behavioral Health in Segregation and Substantive Provision 8—Discipline.*
7. Expand Therapeutic Housing Units, discussed below under Substantive Provision 6—Behavioral Health in Segregation, and develop accompanying disciplinary policies that limit the placement of patients in isolation.
   *This recommendation has not been implemented. See discussion under Substantive Provision 6—Behavioral Health in Segregation.*
8. Improve systems for behavioral health input in the disciplinary process, discussed below under sub-provision 8.1.
   *This recommendation is being piloted as part of the PICC disciplinary pilot discussed below under Substantive Provision 6—Behavioral Health in Segregation and Substantive Provision 8—Discipline.*
9. Establish an interdisciplinary committee to create behavior management plans for Class Members who cycle in and out of segregation.
   *This recommendation has not been implemented.*
10. Develop programming for Class Members in segregation units to address behavior and assist with the transition back to general population.
    *This recommendation has not been implemented.*
11. Direct the new data analysis unit to analyze punitive segregation practices and trends.
    *The data analysis team has not listed segregation practices and trends as a focus for 2024. However, the data analysis team is focusing on contraband interdiction data, which is an important project to analyze factors that lead to violence, misconduct, and segregation placements.*
12. Revise classification policies and procedures to ensure they are designed to maximize programming and reserve segregation for those with the most serious behavioral issues for the shortest possible durations.
    *This recommendation has not been implemented.*

**Substantive Provision 4—Resume Normal Operations**

*By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services). During the period that precedes a return to normal operations, if the Monitor determines that the Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor. The parties and the Monitor shall then engage in discussions to resolve the issues in dispute. If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon*

37

*good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions.*

**Compliance Rating: Non-compliance**

**Restorative and Transitional Services**

If PDP is expected to return to normal operations, it must ensure that the broad categories of services and programs provided by its Restorative and Transitional Services Division (RTS) are being offered consistent with PDP policy. In the previous reporting period, PDP reported that it reclassified some RTS positions to better align with current staffing needs. PDP reports additional position reclassifications occurred in this reporting period. Position changes and RTS vacancies from January to June 2024 are depicted in the following table:

**Table 23: Restorative and Transitional Services Division Staffing**
January 2024 and June 2024

| Position Category | Allocated Positions Jan 2024 | Filled Positions Jan 2024 | Vacancy Rate Jan 2024 | Allocated Positions June 2024 | Filled Positions June 2024 | Vacancy Rate June 2024 |
|---|---|---|---|---|---|---|
| Instructor | 4 | 1 | 75% | 4 | 2 | 50% |
| Volunteer Services Director | 1 | 1 | 0% | 1 | 0 | 100% |
| Psychologist | 6 | 4 | 33% | 5 | 4 | 20% |
| Prison Psychologist Supervisor | 1 | 1 | 0% | 1 | 1 | 0% |
| Social Work Services Trainee | 0 | 4 | 0% | 5 | 4 | 20% |
| Social Work Services Manager I | 1 | 0 | 100% | 1 | 0 | 100% |
| Social Work Services Manager 2 | 44 | 33 | 25% | 39 | 36 | 8% |
| Social Work Supervisor | 14 | 11 | 21% | 14 | 10 | 29% |
| Human Services Program Administrator | 2 | 2 | 0% | 3 | 3 | 0% |
| Social Services/Housing Program Analyst | 2 | 0 | 100% | 2 | 1 | 50% |
| Prison Close Circuit TV Specialist | 2 | 1 | 50% | 2 | 1 | 50% |
| Inmate Computer-Based Education Instructor | 7 | 4 | 43% | 7 | 6 | 14% |
| Inmate Computer-Based Education Supervisor | 1 | 1 | 0% | 1 | 1 | 0% |
| Correctional Industries Assistant Director | 1 | 1 | 0% | 1 | 1 | 0% |
| Correctional Industries Director | 1 | 0 | 100% | 1 | 0 | 100% |
| Industries Shop Supervisor | 16 | 14 | 13% | 16 | 14 | 13% |
| Education Director | 1 | 1 | 0% | 1 | 1 | 0% |
| **Total** | **104** | **79** | **24%** | **104** | **85** | **18%** |

In this reporting period, RTS filled six positions, decreasing its total vacancy rate from 24 percent in January 2024 to 18 percent in June 2024. PDP lacks performance metrics and has not completed a staffing analysis for RTS, so it remains unclear whether RTS' current staffing and

38

positions are sufficient to offer all required services and programs. It appears the only data currently available is total allocated positions and vacancies as depicted in Table 23 above.

As previously reported, PDP established a behavior modification unit led by RTS and security personnel. [58] The unit's goal is to offer individual behavior modification plans and programming for a small subset of patients who exhibit extreme maladaptive behaviors. These patients often spend extended periods in segregation, are frequently hospitalized, and require substantial security and clinical resources. The behavior modification unit was piloted at PICC and reported initial success in working with several Class Members by using incentives to reduce the frequency of maladaptive behaviors. The Monitoring Team observed the program during two site visits in January 2024 and were encouraged by its progress. The unit was closed in March 2024 and reopened in August 2024 in a new location. These services were not available during the program's closure.

By June 2024, PDP reported that it had identified security personnel whose expertise is well suited to the program and the unique challenges its participants face. The officers completed additional Crisis Intervention and Mental Health First Aid training and were sent to tour the Pennsylvania Department of Corrections' behavioral modification unit. PDP designated permanent space to house the program in PHSW, Unit 112, and established regular interdisciplinary meetings to evaluate referrals to the program and patient progress.

During the June and July 2024 site visits, however, the unit was empty and several Class Members who were either previous participants or otherwise appropriate for the program were instead being held in administrative segregation at CFCF. CFCF personnel reported to the Monitoring Team that they had requested assistance from RTS and Behavioral Health in managing, or possibly moving, some of these patients to more suitable housing. As of August 29, 2024, none of the Class Members had been moved to the behavior modification unit and all remained in segregation housing, except one patient who was transferred to Norristown State Hospital.

Behaviors displayed by some Class Members who may benefit from the behavior modification program include inserting or swallowing sharp or toxic objects, inappropriate or violent sexual behaviors, smearing or ingesting feces, and unprovoked attacks on other Class Members or staff. Dr. Belavich indicates that the segregation environment is inappropriate for this population because their needs far exceed the capacity of most segregation unit staff and the limited programming offered. Their behaviors may exacerbate the instability of PDP's segregation environments and the isolation of the environments may exacerbate the patients' symptoms. Because the behaviors and motivations of this small population of Class Members are so complex, they require individualized treatment in a highly controlled, therapeutic setting. Without it, they are unlikely to improve and will likely continue to engage in maladaptive behaviors with the potential for critical incidents or other serious negative outcomes.

It is clear to the Monitoring Team that previously reported failures to communicate and poor interdisciplinary coordination among RTS, security, and healthcare divisions continue to prevent

---

[58] Monitor's Fourth Report, *supra* note 12, at 32.

these and other Class Members from receiving the care they need. These are precisely the types of issues that the Access to Care Committee was recommended to address.[59]

On August 16, 2024, this Court ordered the City to fund a nine-person Access to Care team to facilitate the provision of physical and behavioral healthcare to PDP's Class Members.[60] The team must be fully operational by February 12, 2025.

The behavior management unit also requires significant behavioral health staffing. It is unclear whether additional RTS positions should be allocated or the current staff can absorb the additional workload. As previously reported, the Monitoring Team recommended that PDP evaluate job descriptions and staffing allocations for all programs and services provided by RTS, including the behavior management unit.[61] PDP has taken no action to implement this recommendation.

On August 16, 2024, this Court ordered the City to retain an independent consultant to complete an evaluation of the RTS unit's functions and effectiveness.[62] The evaluation must include comparisons to programs and services offered in other jurisdictions and recommendations for performance metrics. The City must submit a list of potential consultants to this Court for approval by October 15, 2024, and finalize a contract with the approved vendor within 60 days following the Court's approval.

**Substantive Provision 5—Healthcare**

*The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons. The Defendants agree to institute the programs and measures (referred to as "the Backlog Plan") set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022 to address the existing backlog. The "Backlog Plan" is a new, three-month effort to see backlogged patients as soon as possible. The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs. Four agencies are contracted to provide staff towards this end. Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort. Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures. Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog.*

**Compliance Rating: Partial Compliance**

---

[59] Monitor's First Report, *supra* note 12, at 20.

[60] Order, *supra* note 8, at 4.

[61] Monitor's Fourth Report, *supra* note 12, at 31; Monitor's Third Report, *supra* note 12, at 28.

[62] Order, *supra* note 8, at 5.

Since February 2024, PDP has maintained a weekly average of fewer than 550 backlogged on-site medical appointments, which is an improvement from previous reporting periods. The table below compares on-site appointment backlogs for two four-week periods in November/December 2023 and June 2024:

**Table 24: On-Site Appointment Backlogs for General Medical and Behavioral Healthcare
Weekly Averages, Four-week Comparison**
November/December 2023 and June 2024

| Backlog Report Four-week Period | Weekly Average Backlogged Appointments** | | Change | Percent Change (+/-) |
| | Nov-Dec 2023 | June 2024 | | |
|---|---|---|---|---|
| BH Initial Psychiatric Eval. | 82 | 62 | -20 | -24% |
| BH Medication Evaluation | 73 | 65 | -8 | -11% |
| BH Social Work Sick Call | 25 | 35 | +10 | * |
| BH SW SCTR | 0 | 4 | +4 | * |
| Chronic Care Follow-up | 268 | 75 | -193 | -72% |
| Chronic Care Initial | 121 | 31 | -90 | -74% |
| MAT | 129 | 119 | -10 | -8% |
| MAT Follow-up | 0 | 0 | 0 | * |
| Provider Sick Call | 204 | 62 | -142 | -70% |
| RN Sick Call | 42 | 2 | -40 | * |
| Re-Entry Planning | 46 | 10 | -36 | * |
| **Total Backlog** | **989** | **465** | **-524** | **-53%** |

*Average percent change not calculated for average appointments <50.
**Weeks reviewed include: 11/29/23 to 12/21/23 and 6/5/24 to 6/26/24.

As predicted in the previous reporting period, PDP's recent efforts to improve access to care have resulted in a 53 percent reduction in its on-site appointment backlog since 2023. In addition to increases in PDP's healthcare staffing, discussed in more detail below, PDP leadership has instituted operational changes that help offset barriers to care caused by the security staffing shortage. Some changes include:

- Permitting patients to receive medical care during institutional count times;
- Permitting patients housed on different tiers to receive care at the same time;
- Offering some types of care inside housing units rather than requiring security escorts to medical clinics; and
- Additional healthcare "blitzes" during which healthcare and security staff work overtime to complete healthcare appointments.

PDP also implemented a tablet-based sick-call pilot program at CFCF in April 2024. Patient feedback has been positive and PDP Healthcare reports it has streamlined the sick-call process.

41

RCF's tablet sick-call requests became operational in July 2024 and at PICC in August 2024. PDP estimates DC tablet sick-call requests will be operational in October 2024. PDP agrees that paper sick-call requests must remain available in all PDP facilities, consistent with the Monitoring Team's recommendation.

Finally, PDP has assigned PICC's Health Services Administrator as a "care coordinator" to liaise between providers, patients, and security personnel. PDP credits this improvement with much of the reduction in backlogged appointments at PICC. The Monitoring Team has recommended expansion of the care coordinator initiative to every PDP facility. However, Health Services Administrator is the highest management-level healthcare position in each PDP facility, so the Care Coordinator initiative may be more sustainable if assigned to lower-level healthcare team members. With Court-ordered healthcare staffing increases discussed below, PDP should be able to expand the initiative soon. The Monitoring Team thanks and congratulates PDP's Healthcare Division for its ingenuity and commitment to improving patient care.

**On-Site Specialty Care**

PDP healthcare continues to struggle to provide timely on-site specialty care, particularly for podiatry and optometry services. In this reporting period, on-site specialty care appointments represent 23 percent of the overall appointment backlog.[63] The on-site specialty backlog increased by 76 percent, from 141 appointments in December 2023 to 248 in June 2024. The increase is driven largely by a backlog of 159 on-site optometry appointments, which comprise 64 percent of the overall on-site specialty backlog. Podiatry appointments also remain an issue with a consistent backlog of approximately 50 appointments per month since August 2023. In June 2024, the podiatry backlog reached 65 appointments or 26 percent of the total on-site specialty backlog.

PDP reports success in reducing backlogs for some types of on-site specialty care by having providers travel between facilities and see patients on-site rather than requiring transport to the main clinic at DC/PHSW. The change was finalized in this reporting period and PDP reports it has eliminated backlogs in most areas apart from optometry, podiatry, and x-ray. As a result, PDP has purchased mobile optometry equipment that will allow the specialists to see patients at multiple facilities and reduce the need for security escorts. PDP also plans to expand podiatry services from one day per week to two. Finally, X-ray services are currently provided at each facility except PICC. PDP reports that the backlog in X-ray services is, in part, the result of insufficient security staff to transport patients from PICC to other facilities to receive X-rays during the busy day shift. PDP reports it is attempting to correct this problem by extending hours of service for X-ray patients.

---

[63] PDP offers on-site specialty services in obstetrics, gynecology, optometry, pap testing, podiatry, physical therapy, ultrasound, and x-ray. For on-site specialty appointments, specialty providers come to PDP and treat patients on-site. The on-site specialty backlog is sensitive to minor staffing changes or provider absences.

**Off-Site Specialty Care**

The backlog in off-site specialty care appointments remains a serious concern in this reporting period.  In December 2022, PDP's backlog of off-site appointments awaiting scheduling was 172 total appointments.  In June 2023, the backlog had increased slightly to 187 total appointments awaiting scheduling.  By December 2023, the total backlog (scheduled appointments and those awaiting scheduling) reached 375 total appointments and then reduced slightly in the fourth reporting period to 358 in June 2024.  The graph below depicts appointments completed for off-site specialty appointments from January 2023 through June 2024.  PDP has shown a downward trend in successfully completed off-site specialty appointments over this 18-month period.



The consistent reduction in completed off-site specialty appointments is the greatest contributing factor to the significant backlog.  From January 2023 through June 2023, PDP completed 1,273 off-site specialty appointments.  From July 2023 through December 2023, PDP's completed appointments reduced by 26 percent to 938 completed appointments.  From January through June 2024, they reduced another 9 percent to 851 completed off-site specialty appointments, reflecting a 33 percent decrease in completed appointments for the same period one year earlier.

The following table depicts off-site specialty appointments scheduled and attended from January through June 2024:

**Table 25: Off-Site Specialty Appointment Summary**
January – June 2024

| Month | Jan | Feb | Mar | Apr | May | Jun | Total |
|---|---|---|---|---|---|---|---|
| **# Scheduled** | **464** | **395** | **458** | **525** | **460** | **407** | **2709** |
| Out of Custody | 32 | 20 | 33 | 59 | 29 | 28 | 201 |
| Out of Jurisdiction/Open Ward | 5 | 1 | 5 | 8 | 2 | 4 | 25 |
| Cancel Prior to Transport | 16 | 15 | 16 | 21 | 17 | 21 | 106 |
| COVID-19 Isolation | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| *Total Ineligible* | *54* | *36* | *54* | *88* | *48* | *53* | *333* |
| **# Eligible to Attend Appointment** | **410** | **359** | **404** | **437** | **412** | **354** | **2376** |
| Refused[64] | 45 | 39 | 32 | 34 | 42 | 31 | 223 |
| C/O Shortage | 219 | 116 | 221 | 214 | 205 | 189 | 1164 |
| Cancelled at Office | 4 | 4 | 0 | 1 | 0 | 2 | 11 |
| Scheduling Error | 1 | 5 | 6 | 3 | 5 | 6 | 26 |
| Court | 4 | 6 | 2 | 8 | 6 | 3 | 29 |
| Late to Appointment | 2 | 5 | 1 | 6 | 0 | 3 | 17 |
| Other | 12 | 12 | 10 | 8 | 10 | 3 | 55 |
| *Total NOT Seen* | *287* | *187* | *272* | *274* | *268* | *237* | *1525* |
| **Total Seen** | **123** | **172** | **132** | **163** | **144** | **117** | **851** |
| **% of Eligible Patients Seen** | **30%** | **48%** | **33%** | **37%** | **35%** | **33%** | **36%** |

The greatest contributing factor to the reduction in completed off-site specialty appointments remains lack of security staff to transport patients. Staff shortages reportedly account for 76 percent of appointments missed in this reporting period. PDP has continued to see a decrease in the percentage of eligible patients who attend off-site specialty appointments. Eligible patient attendance decreased from 62 percent in the first half of 2023 to 43 percent in the second half of the year.[65] This downward trend continued in this reporting period, with data indicating only 36 percent of eligible patients attended their scheduled appointments.

Patients regularly report they must wait many months to receive specialty care appointments with providers in the community, and that appointments are most frequently cancelled and rescheduled multiple times before they are seen. PDP has resorted to a process that requires the Healthcare Division's Medical Director to evaluate patient charts and prioritize which patients "must go" for their scheduled appointments. That is, PDP security notifies the Medical Director how many patients may be transported in a given week based on availability of transport staff, and the Medical Director must then determine which patients need care the most. Patients on the must-go list are prioritized for specialty appointments but, even then, may not make them when security post vacancy rates are higher than anticipated. It is inappropriate to require a physician

---

[64] PDP does not currently track reasons for refusals. As previously reported, patients have consistently reported to the Monitoring Team that excessive wait times in holding cells for transportation to appointments is among primary reasons for their refusals. *See* Monitor's Third Report, *supra* note 12, at 31-32.

[65] Monitor's Fourth Report, *supra* note 12, at 35.

to prioritize patient care based on security staff availability rather than medical necessity. In June 2024, PDP began requiring notifications to executive management when patients on the "must go" list are unable to be transported, which PDP anticipates will improve appointment attendance for those patients.

Throughout the first two years of settlement implementation, PDP has attempted to reduce its off-site specialty backlog in various ways by: (1) adjusting appointment times for greater uniformity in scheduling; (2) batching patients together to reduce the frequency of medical transports; (3) seeking providers who offer evening appointments; (4) offering outside providers reimbursement for travel to PDP facilities to treat specialty patients on site; (5) guaranteeing payment for all scheduled appointments, whether patients attend or not; and (6) reimbursing off-site specialty care providers at higher rates to provide care on site rather than in their community offices. Reportedly, none of these efforts were successful.

In this reporting period, PDP finalized the establishment of a nine-bed secure inpatient unit at Frankford Hospital, which began accepting patients on July 22, 2024. As previously reported, the secure inpatient unit is expected to decrease the number of security officers who are redirected for medical guarding and instead allow them to remain in their PDP facility posts.[66]

**Intake Screenings**

PDP remains unable to meet policy guidelines for completing patient intake screenings within four hours of arrival at PDP. The following table depicts PDP's reported compliance with four-hour timeframes for each month in the first half of 2024:

**Table 26: Percentage of Intake Screenings Within Four Hours**
January – June 2024

| Month | Percentage (%) |
|---|---|
| January | 37% |
| February | 33% |
| March | 35% |
| April | 40% |
| May | 33% |
| June | 51% |
| Average | 38% |

PDP continues to report that its intake area is staffed with sufficient healthcare personnel to meet the four-hour policy requirement. PDP acknowledges, however, that security staffing, especially during the overnight hours, is insufficient to meet the four-hour policy requirement and causes intake backlogs. PDP reports that it will begin to evaluate intake timeframes more closely to identify the extent of policy non-compliance, average intake durations, and areas to target for improvement.

---

[66] *Id.* at 15.

45

**Mortality Information**

Three Class Member's died while in PDP custody in the first six months of 2024.  One death was ruled a homicide, one was due to natural causes, and one cause of death is pending.

**Behavioral Healthcare**

PDP remains out of compliance with required timeframes for behavioral health referrals.[67]  In this reporting period, the behavioral health appointment backlogs reduced by 24 percent for initial psychiatric evaluations and 11 percent for medication evaluations.  Behavioral health appointments comprise 36 percent of the entire on-site, non-specialist appointment backlog.[68]

The following tables depict PDP's compliance with policy timeframes for behavioral health referrals, social worker sick calls, and 14-day patient evaluations for January through June 2024:

**Table 27: Percent Compliance with Behavioral Health Referral Timeframes**
January – June 2024

| Month | Total Completed Referrals | Total Referrals Completed within Timeframes (%) | Emergency Referrals Completed within 4 hours (%) | Emergency Referrals Completed within 24 hours (%) | Urgent Referrals Completed within 24 hours (%) | Urgent Referrals Completed within 48 hours (%) | Routine Referrals Completed within 5 days (%) |
|---|---|---|---|---|---|---|---|
| January | 609 | 58% | 75% | 100% | 19% | 29% | 41% |
| February | 762 | 51% | 72% | 100% | 16% | 31% | 29% |
| March | 708 | 57% | 71% | 100% | 26% | 36% | 50% |
| April | 718 | 61% | 78% | 100% | 22% | 39% | 59% |
| May | 772 | 55% | 73% | 100% | 23% | 36% | 51% |
| June | 761 | 53% | 79% | 100% | 16% | 30% | 33% |
| Average | 4330 | 56% | 75% | 100% | 20% | 34% | 44% |

*Expectation: emergent within 4 hours, urgent within 24 hours, routine within 5 days.

---

[67] PDP behavioral healthcare policy prescribes the following timeframes for responding to behavioral health patient referrals:  emergency referrals, within four hours; urgent referrals, within 24-hours; and routine referrals, within five days.
[68] Refer to Table 24, page 41.

**Table 28: Social Worker Sick Calls**
January – June 2024

| Month | Number Completed | Completed within 24 hours (%) |
|---|---|---|
| January | 483 | 72% |
| February | 369 | 72% |
| March | 372 | 69% |
| April | 334 | 60% |
| May | 337 | 64% |
| June | 436 | 48% |
| **Total** | **2331** | **64%** |

**Table 29: Compliance with 14-Day Patient Evaluations**
January – June 2024

| Month | Number Completed | Completed within 14 Days (%) |
|---|---|---|
| January | 704 | 46% |
| February | 659 | 79% |
| March | 740 | 68% |
| April | 756 | 87% |
| May | 802 | 89% |
| June | 714 | 52% |
| **Total** | **4375** | **70%** |

In this reporting period, behavioral health staff referrals were completed within required timeframes 56 percent of the time. Compliance with four-hour emergency referral timeframes ranged from 71 percent to 79 percent in the first half of 2024, similar to the 62 to 78 percent compliance range in the second half of 2023.[69]

Compliance rates with urgent and routine referrals remain low in this reporting period. Responses to urgent referrals were completed within 24 hours no more than 26 percent of the time for each month, January through June 2024. Routine referrals were completed within required timeframes less than 60 percent of the time each month. Creative operational solutions have assisted in reducing some types of backlogged appointments, however, behavioral health appointment timeframes are unlikely to be met without additional behavioral health providers. Social work sick call requests are patient initiated and require face-to-face triaging of patients within 24 hours of receipt. Data for this reporting period shows PDP met this goal an average of 64 percent of the time, similar to previous reporting periods.

PDP's compliance with 14-day behavioral health evaluations also decreased in this reporting period. All Class Members entering PDP are referred for a 14-day evaluation by behavioral health staff. In the third and fourth reporting periods, PDP maintained a monthly average

---

[69] Monitor's Fourth Report, *supra* note 12, at 39.

compliance rate greater than 90 percent.[70]  This rate reduced to an average of 70 percent compliance in this reporting period with the lowest compliance rate, an average of 46 percent, occurring in January.  As with other Behavioral Health markers, compliance with required timeframes is unlikely without the addition of Behavioral Health providers.

Despite ongoing challenges in providing timely and consistent behavioral healthcare, PDP has continued to make progress in the treatment of opioid use disorder (OUD), another critical component of effective correctional care.  In the past, patients who deviated from their treatment plans or abused orally-administered OUD medications were removed from PDP's Medication Assisted Treatment (MAT) program.  PDP reports it has now received a grant of $600,000 to purchase long-acting medication, administered via injection.[71]  The grant will permit PDP to offer patients another chance in the MAT program and reduce the risk of overdose or death while in custody and following release.  PDP is also beginning to administer OUD medications at intake to assist with withdrawal symptoms and has begun to house OUD medication recipients together at RCF.  PDP reports these improvements have reduced incidence of medication abuse by 30 percent and allows providers to offer cognitive-behavioral therapy treatment groups to these patients.

**Healthcare Staffing**

Healthcare staffing efforts continued in this reporting period with additional full-time positions filled and a reported functional vacancy rate of less than 5 percent each month from January through June 2024.  Correctional healthcare staff vacancy rates are analyzed based on the number of vacant and filled positions for a "staff vacancy" rate.  A "functional vacancy" rate includes shifts that are filled by overtime and temporary agency hires and accounts for permanent staff who are out on leave and not reporting for duty.

In December 2023, PDP reported a healthcare staff vacancy rate of 20 percent and a functional vacancy rate of 5 percent.  In June 2024, having filled approximately 10 positions, the staff vacancy rate reportedly reduced to 17 percent.  The functional vacancy rate reportedly reduced to 4 percent, which Dr. Belavich opines is excellent.

---

[70] *Id.* at 38; Monitor's Third Report, *supra* note 12, at 34.
[71] Eligible patients will receive extended-release buprenorphine.  When administered via injection, risk of abuse or noncompliance associated with oral administration are significantly reduced.

The following tables depict healthcare new hires and separations for each classification in this reporting period, January through June 2024, and total healthcare vacancies for December 2023 and June 2024:

**Table 30: Healthcare Personnel New Hires and Separations by Job Classification**
January – June 2024

| Job Classification | New Hires | Separations | Net (+/-) |
|---|---|---|---|
| Administration | 4 | 2 | +2 |
| Behavioral Health Aide | .4 | .4 | 0 |
| Behavioral Health Clinician | 2 | 1 | +1 |
| Behavioral Health Prescriber | 5 | 1 | +4 |
| Behavioral Health Professional | 1.4 | 0 | +1.4 |
| Certified Nursing Assistant | .4 | 1.8 | -1.4 |
| Dialysis RN and Technician | 0 | 0 | 0 |
| Infectious Disease Physician | 0 | 0 | 0 |
| Licensed Practical Nurse | 14.4 | 10.8 | +3.6 |
| Medical Assistant | 2 | 2.8 | -.8 |
| Medical Records | 1.8 | 4 | -2.2 |
| OB/GYM Physician | 0 | .8 | -.8 |
| Physical Health Clinician | 1 | 1 | 0 |
| Physical Therapist and Assistant | 0 | 0 | 0 |
| Telehealth Coordinator | 0 | 0 | 0 |
| Radiology Technician | 0 | 0 | 0 |
| Registered Nurse | 11.2 | 8.6 | 2.6 |
| **Total** | **43.6** | **34.2** | **+9.4** |

49

**Table 31: Healthcare Vacancy Report**[72]
December 2023 and June 2024

| Position Category | Allocated Positions Dec 2023 | Unfilled Positions Dec 2023 | Vacancy Rate Dec 2023 | Allocated Positions June 2024 | Unfilled Positions June 2024 | Vacancy Rate June 2024 | Functional Vacancy Rate |
|---|---|---|---|---|---|---|---|
| Administration | 49.0 | -1.0 | -2% | 59.5 | -3.0 | -5% | 8% |
| Behavioral Health Aide | 8.4 | 1.4 | 17% | 12.2 | 1.4 | 11% | 32% |
| Behavioral Health Clinicians: Social Worker/Psychologist | 24.0 | 14.6 | 61% | 18.4 | 13.6 | 74% | 24% |
| Behavioral Health Prescribers: Psychiatrist, NP | 15.4 | 6.5 | 42% | 15.2 | 2.5 | 16% | 19% |
| Behavioral Health Professionals: BH Coun./Activity Th. | 15.0 | 0.0 | 0% | 15.0 | -1.4 | -9% | 16% |
| Certified Nursing Assistant | 2.8 | 1.4 | 50% | 2.8 | 2.8 | 100% | 94% |
| Dialysis RN and Dialysis Technician | 1.6 | 0.8 | 50% | 1.5 | 0.8 | 53% | 0% |
| Infectious Disease Physician | 2.0 | 1.0 | 50% | 2.0 | 1.0 | 50% | 59% |
| License Practical Nurse: All LPNs | 68.2 | 11.2 | 16% | 74.2 | 7.6 | 10% | 3% |
| Medical Assistant | 17.0 | 4.2 | 25% | 15.0 | 5.0 | 33% | -17% |
| Medical Records Clerk | 14.8 | 0.0 | 0% | 13.8 | 2.2 | 16% | 10% |
| OB/GYN Physician | 0.8 | 0.0 | 0% | 0.8 | 0.8 | 100% | 56% |
| Physical Health Clinicians: Physician, NP, PA | 18.0 | 1.6 | 9% | 19.8 | 1.6 | 8% | -11% |
| Physical Therapist/Therapist Assistant | 3.0 | 0.0 | 0% | 3.0 | 0.0 | 0% | 11% |
| Telehealth Coordinators | 3.0 | 2.0 | 67% | 3.0 | 2.0 | 67% | 67% |
| Radiology Technician | 2.4 | 0.4 | 17% | 2.4 | 0.4 | 17% | 17% |
| Registered Nurse: All RNs | 68.8 | 18.7 | 27% | 63.1 | 16.1 | 26% | -17% |
| **Total** | **314.2** | **62.8** | **20%** | **321.7** | **53.4** | **17%** | **4%** |

As previously reported, PDP offered an average 13 percent pay increase for most healthcare positions.[73]  Increases took effect in mid-2023 and healthcare staffing largely improved as a result.  Unfortunately, increases did not improve hiring across behavioral health classifications

---

[72] In this reporting period, PDP identified inaccuracies in its healthcare staffing reports, which resulted in erroneous underreporting of unfilled positions and the vacancy rate for December 2023 in the Monitor's Fourth Report.  *See* Monitor's Fourth Report, *supra* note 12, at 41.  PDP reports it has corrected the errors and reported corrections are reflected here.  Additionally, PDP had previously assigned staff to work in some functions which were not specifically allocated.  PDP reports it has now allocated those positions for a total of 7.5 additional positions, increasing the total positions allocated from 314.2 positions in December 2023 to 321.7 in June 2024.

[73] Monitor's Fourth Report, *supra* note 12, at 38-39.

(i.e., prescribers and clinicians).  PDP reports that it has evaluated pay raises for behavioral health positions and determined that PDP's compensation package is competitive with similar positions in the community.  PDP reports it has attempted to correct high vacancies in these job classifications by converting them to positions that are easier to recruit but which would not limit any services available to patients, such as converting social worker positions to clinical psychologist positions.

The vacancy rate for behavioral health clinicians increased from 61 percent in December 2023 to 74 percent in June 2024.  The functional vacancy rate, however, reduced from 45 percent to 24 percent in the same periods, reportedly with the use of additional overtime and registry staff.  Reported percentages are also influenced by the conversion of positions described above.  The vacancy rate for Behavioral Health Prescribers was greatly reduced from 42 percent in December 2023 to 16 percent in June 2024 with the hiring of additional behavioral health nurse practitioners.

On August 16, 2024, this Court ordered the City to increase PDP's Healthcare Division budget to include additional healthcare personnel to serve as healthcare liaisons and to provide additional rounding to monitor patients more closely due to current conditions to ensure compliance with Substantive Provisions 4—Resume Normal Operations, 5—Healthcare, and 6—Behavioral Health in Segregation.[74]

**Status of Recommendations, Substantive Provision 5—Healthcare, from the Monitor's Fourth Report:**

1. Defendants should engage an independent salary survey to assist PDP in identifying salaries and benefits that are sufficiently competitive to attract and retain full-time healthcare staff.

   *PDP has instituted 13 percent raises, on average, for almost all healthcare classifications, which has improved recruitment and retention in several classifications.  PDP reports it has evaluated salary ranges for behavioral health classifications with higher vacancy rates and has determined that current salaries and benefits are competitive.  PDP reports difficulty recruiting social workers in the Philadelphia area and has decided to convert several vacant positions to licensed psychologists and psychiatric nurse practitioners to reduce overall vacancy rates and increase clinical staff.  These conversions are reflected in Table 31 above.*

2. Continue to explore options to provide both on and off-site appointment services via telehealth.

   *On August 16, 2024, this Court ordered the City to take all reasonable and necessary steps to engage telehealth service providers to improve patient access to healthcare and reduce the number of correctional officers who are redirected for transport duties.[75]*

---

[74] Order, *supra* note 8, at 3-4.

[75] *Id.* at 4.

3. Create an internal interdisciplinary workgroup to evaluate reasons for missed off-site appointments and develop procedures to increase efficiency in arranging and ensuring scheduled appointments occur.

> *PDP reports barriers to off-site care for those on the "must-go" lists described above are addressed during weekly executive meetings of security and healthcare leadership. Security staffing transportation issues remain the greatest barrier to off-site specialty care.*

4. PDP should evaluate reimbursement rates for both on-site and off-site specialty services and make increases sufficient to attract necessary providers.

> *PDP reports that the Chief Medical Officer approached seven specialty providers to discuss increased reimbursement rates and incentives for providing on-site specialty care or telehealth. This offer was reportedly declined with the exception of urology and ENT service providers who agreed to provide some services via telehealth.*

5. PDP should increase incentives for providers to offer specialty care on-site rather than transporting patients to off-site facilities. Some incentives may include: (1) offering outside providers reimbursement for travel time to PDP facilities; (2) guaranteed reimbursement for all scheduled appointments, whether patients attend or not; and (3) reimbursement of off-site specialty care providers at higher rates to provide care on site.

> *As discussed above, PDP reports efforts thus far have been unsuccessful.*

6. The City should explore contracting with outside law enforcement or private security agencies to establish a team dedicated to off-site transport details.

> *See discussion of this Court's Order to engage a secure transportation and medical guarding contractor above under recommendation 3.*

**Substantive Provision 6—Behavioral Health in Segregation**

*By September 30, 2022, the PDP and Corizon shall re-establish a mental health program for persons who are in segregation status.*

**Compliance Rating: Partial Compliance**

To achieve substantial compliance with this substantive provision, PDP must, at a minimum: (1) resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status; (2) ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on segregation status; (3) resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating serious mental illness (SMI); (4) resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation status; (5) establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units; (6) safely discontinue the use of segregation for Class Member patients due to lack of sufficient TU housing; and (7) significantly reduce the use of segregation for Class Member patients who require placement on the Behavioral Health caseload.

52

*Requirements 1 and 3: Resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status and resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating SMI.*

Data from PDP's biannual audit of segregation rounds for physical and behavioral healthcare from May 2024 reflects a decline in the frequency of physical health rounding. In October 2023, data showed 94 percent compliance with required daily physical health rounds systemwide, and at least 90 percent compliance at each PDP facility. Data from a randomly selected two-week period in May 2024 reflects a sharp reduction to 65 percent compliance with required daily medical/physical healthcare rounds systemwide.

None of the facilities achieved 90 percent compliance in this reporting period for daily physical health rounds, and compliance at PICC and DC reduced to 32 percent in this reporting period. PDP explains the decline in care as resulting from a communication failure regarding the patients' movement. As discussed in more detail above under Substantive Provision 3—Out-of-Cell/Segregation, and below under Substantive Provision 17—Sanitation, the men's segregation unit at PICC was closed for renovations in this reporting period. Behavioral Health patients were among those moved to DC while renovations were completed. PDP Healthcare Division reports it was unaware of the moves and, as a result, failed to complete rounding on those patients from March 27, 2024 through May 11, 2024. The Monitoring Team is unable to verify precisely why this serious lapse in patient care occurred, however, this appears to be another example of poor interdisciplinary communication and further illustrates the need for additional care coordinators and an effective Access to Care team.

The May 2024 audit suggested improved compliance with weekly behavioral health rounds for Class Member patients on segregation status. Data reviewed by the Monitoring Team revealed a 96 percent compliance rate for weekly behavioral health rounds systemwide.

As previously reported, a primary goal of frequent rounding is to identify patients who show signs of decline or poor coping in segregation housing, and to make timely referrals for additional services or recommend removal from segregation.[76] Since compliance monitoring began in 2022, the Monitoring Team has observed patients in segregation whose symptoms strongly suggest they required a higher level of care. These observations are consistent with those reported by independent oversight and other advocates, including the Pennsylvania Prison Society, *Remick* class counsel, Defender Association of Philadelphia (Defender Association), and counsel from the private bar.

The Monitoring Team has communicated to PDP that compliance with Substantive Provisions 5—Healthcare, and Substantive Provision 6—Behavioral Health in Segregation require the provision of *quality* care in addition to meeting standards for the *frequency* of clinical contacts. As previously reported, clinical staff report they may request further evaluation from clinical supervisors if they believe a patient requires enhanced care or advocacy.[77] However, PDP does

---

[76] Monitor's Fourth Report, *supra* note 12, at 43.

[77] *Ibid.*

not track when supervisors are requested or when clinicians request removal of patients from segregation, and the Monitoring Team's strong impression is that such requests are rare. The Monitoring Team has consistently recommended that PDP begin to track this information both for quality improvement and compliance purposes, but PDP reports these data remain unavailable.

In this reporting period, the Monitoring Team reviewed rounding notes in PDP's electronic medical record. Clinical notes for weekly behavioral health rounding should be individualized, reflect a clinician's interaction with each patient, and note any concerns observed by the clinician or communicated by the patient. Notes should also include any observations about, for example, cell conditions and any requests for follow-up care. PDP's clinical rounding notes are not individualized or unique to each patient and are, instead, completed in batches that simply denote whether rounding occurred. Notes reviewed suggest that Behavioral Health's current rounding documentation is of little use in identifying patients' needs.

*Requirement 2: Ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on segregation status.*

Healthcare clearances are required for all Class Members being considered for placement on segregation status. This requires a face-to-face evaluation by a physical healthcare provider and, for those in Behavioral Health programs, a behavioral health clinician. Patients designated SMI are required to have a behavioral health clearance performed within four hours of placement in segregation. Patients who are on the Behavioral Health caseload but not identified as SMI are to receive a behavioral health clearance within 24-hours of placement.

As previously reported, Dr. Belavich has been assessing samples of behavioral health clearance forms for quality and consistency and has identified issues in each reporting period.[78] Based on a review of 50 physical and behavioral healthcare clearance forms (PDP 86-733) from January through March 2024, Dr. Belavich notes improvement in the identification of Class Members who are SMI or on the Behavioral Health caseload. In previous reporting periods, multiple patients on the Behavioral Health caseload, some of whom were also SMI, were not designated as such and, therefore, did not receive required clearance evaluations consistent with policy. In this reporting period, PDP improved its procedure to reliably identify these Class Members. Cases reviewed in this reporting period reflect those with SMI or assigned to the Behavioral Health caseload are now being accurately identified and their behavioral health clearances are being completed. Physical health sections of the clearances are still being completed consistently, as previously reported.[79]

PDP also developed a pilot project to improve the quality of mental health clinical input in disciplinary hearings and dispositions, the accurate identification of the SMI populations, and to ensure that staff assistant support for disciplinary hearings is offered and documented. The pilot,

---

[78] *Id.* at 44; Monitor's Third Report, *supra* note 12, at 38-39; Monitor's Second Report, *supra* note 12, at 34-35; Monitor's First Report, *supra* note 12, at 21.
[79] Monitor's Fourth Report, *supra* note 12, at 44.

also discussed below under Substantive Provision 8—Discipline, was implemented at PICC in May 2024.

Dr. Belavich reviewed all nine Rules Violation Mental Health Review forms (PDP 363-C) submitted in this reporting period for Behavioral Health or SMI patients at PICC.  Although forms reviewed were generally complete, the quality of behavioral health documentation varied.  In some instances, for example, clinicians noted "unknown" or "not applicable" to questions that required responses.  It remains early in the pilot and PDP reports Behavioral Health managers are working with staff to improve quality and thoroughness.  In the next reporting period, PDP plans to expand the pilot to RCF, which has a larger SMI and Behavioral Health patient population.  PDP reports that Behavioral Health managers will be providing additional training and monitoring the quality of documentation on clearance forms.

Despite reported progress, the Monitoring Team remains concerned about high behavioral thresholds for recommending mitigation in disciplinary determinations and for diverting patients from segregation who may be at risk in isolation.  As with previous reporting periods, the Monitoring Team identified several Class Members during the June 2024 site visits who were clearly decompensating in segregation.  In most instances, patient electronic medical records reflect that these patients were being followed and had recently been seen by clinicians.  If so, these patients should have been identified for removal from segregation to another level of care.  Previously, the only available alternative to segregation was inpatient hospitalization, and many patients did not meet inpatient criteria.  PDP has included in its pilot program described above the option to divert patients from segregation to TUs and to a new PHSW step-down unit, which gives clinicians additional options.  PDP will need to begin tracking instances of diversion and mitigation both as a quality improvement measure and to prove compliance with this requirement.

Generally, it appears that some Behavioral Health clinicians are either failing to recognize the mental health needs of some highly symptomatic patients in their care or are failing to advocate for their needs appropriately.  In this reporting period, disciplinary hearing officers reported to the Monitoring Team that they could not recall in recent years a single instance in which a clinician recommended mitigation for patients facing discipline.  If true, it is further evidence that PDP must reevaluate its mitigation and diversion thresholds and train clinicians accordingly.

Clinical staff experience the same harmful consequences as security and other personnel working in PDP's poor conditions.  Behavioral health providers have limited placement alternatives and too few clinical tools to adequately support their patients.  At times, efforts to advocate for patients are thwarted by long-standing issues with poor interdisciplinary communication.  These barriers are exacerbated by the security staffing crisis, which may breed exhaustion and a degree of complacency, even among the most dedicated staff.

It has also become increasingly apparent that some of PDP's issues with patient advocacy are rooted in a cultural dynamic within its Behavioral Health division.  Some of the Monitoring Team's efforts over the last two years to address various clinical care and referral and placement thresholds have been met with resistance.  As a result, some of PDP's initiatives to improve care for Behavioral Health patients have been delayed and opportunities to help individual patients

55

have been missed.  There has been little observable progress in clinical recommendations for mitigation of disciplinary sanctions or removal of mentally ill patients from segregation.  The clinical culture in the Behavioral Health division, and PDP culture as a whole, continues to tolerate inappropriately high thresholds for providing some types of care or prohibiting some types of punishment, and patients are exposed to harm as a result.

*Requirement 4:  Resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation status.*

PDP continues to struggle to deliver the "Positive Change/Positive Outcomes" (PC/PO) behavioral health group treatment program for patients in segregation due largely to security vacancies.  The program is designed to deliver group treatment for two hours, five days per week, for a total of 10 possible treatment hours each week for every program participant.  PDP tracks the number of treatment hours possible based on the number of staff hired to provide this treatment ("treatment hours possible"), the number of hours offered based on personnel absences, vacations, and redirections ("treatment hours offered"), and number of treatment hours provided based on both healthcare and security staff availability ("treatment hours provided").

The following table reflects total PC/PO group treatment hours possible, offered, and provided on segregated units from January through June 2024:

**Table 32: PC/PO Structured Group Treatment Hours in Segregation**
January – June 2024

| Month | Treatment Hours Possible | Treatment Hours Offered | Treatment Hours Provided | Percent (%) Provided | Percent of Required Hours Provided |
|---|---|---|---|---|---|
| January | N/A | 194 | 57 | 29% | N/A |
| February | 310 | 176 | 67 | 38% | 4% |
| March | 534 | 450 | 59 | 13% | 3% |
| April | 568 | 434 | 49 | 11% | 3% |
| May | 654 | 504 | 113 | 22% | 6% |
| June | 558 | 426 | 107 | 25% | 7% |
| **Average** | **525\*** | **364** | **75** | **23%** | **8%\*** |

*Averages do not reflect treatment hours possible and percent of required hours provided from January.

PDP also developed a metric in this reporting period that denotes compliance percentages with weekly treatment requirements, or "percent of required hours provided."  In May 2024, for example, 113 hours of group treatment was provided.  Accounting for group size, this only reflects six percent of the goal of 10 treatment hours per week for all eligible segregation patients.

PDP reports all segregation Class Members are eligible to attend PC/PO and participants may opt in and out of groups.  Security classification issues currently limit which Class Members may

56

attend groups together, but if additional groups are offered, more Class Members of all security classifications should receive additional access to groups. PDP will remain unlikely to make significant progress in this area without additional security personnel.

*Requirement 5: Establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units.*

PDP has met this requirement. Previously reported discrepancies between security and Healthcare tracking that were leaving some patients on segregation status without sufficient healthcare rounding were resolved in January 2024. The Monitoring Team confirmed the data's accuracy each week for four weeks and monthly thereafter throughout this reporting period. Until PDP implements ATIMS, PDP's segregation and other data must be tracked and reconciled manually. PDP reports data has remained consistent since the solution was implemented, and it will continue monthly audits to ensure segregation patients are properly tracked.

*Requirement 6: Safely discontinue the use of segregation for Class Member patients due to lack of sufficient Transition Unit housing.*

Dr. Belavich maintains that PDP should reduce its dependence on segregation for all Class Members, especially those on the Behavioral Health caseload, and discontinue its use altogether for SMI patients unless no alternatives exist.[80] PDP's TU housing provides an alternative to segregation housing in a more therapeutic setting for the mentally ill. Pre-COVID-19, PDP reserved 128 TU beds for women and 200 for men. During the COVID-19 lockdown, PDP reduced its available TU beds and, by August 2022, 134 beds remained, including 22 for women and 112 for men.

The women's TU is now housed in PICC C-unit. C Unit has a 128-bed capacity, 34 of which are reserved for TU patients. Women with various security classifications are also housed in the unit, which significantly limits out-of-cell time and therapeutic programming for TU patients. There has been no observable change in the women's TU in this reporting period. In December 2023, 19 patients were enrolled in the 34-patient program. In June 2024, that number reduced to 16 patients. During June site visits, patients reported some positive benefits but limited therapeutic programming and recreational opportunities on the unit. PDP reports one group per day is provided on the unit and the security staff report making efforts to increase out-of-cell opportunities for the patients. PDP has acknowledged that the current space is inappropriate for this program and committed to opening a 100-bed TU for women by March 2024. As of this filing, the expansion has not occurred.

In October 2023, PDP moved the Men's TU from a 128-bed unit to a smaller 64-bed unit. PDP reports the unit is consistently full and often has a waitlist of less than one week. PDP reports it has established an interdisciplinary team that meets weekly to evaluate referrals to and from the unit. PDP Healthcare also reports they are developing a uniform referral template. Although treatment offered on the unit remains limited, TU participants consistently report that they are benefiting from participation. Security personnel on the unit are clearly engaged and committed.

---

[80] *Id.* at 46; Monitor's Third Report, *supra* note 12, at 40.

During June site visits, for example, the officer on duty knew each patient by name and each patient's unique mental health needs. TU participants have reported to the Monitoring Team they feel as though officers on the unit care about them and treat them fairly. They report that TU officers are making consistent efforts to provide additional recreation time whenever possible. TU officers and clinicians work collaboratively, and interdisciplinary communication is effective. For example, officers prepare a daily list of patients who refuse medications or showers so that they may be monitored by clinicians for signs of decompensation.

PDP executives recognize that TU programming must expand. PDP's Behavioral Health caseload continues to maintain more than 1,600 patients and more than 300 patients with SMI. Sixty-four total TU beds is inadequate for a population this size, and the Monitoring Team continues to recommend expansion as soon as possible. PDP confirms its goal is to improve care for the mentally ill by diverting as many patients as possible from segregation to TUs and to offer at least 10 hours of PC/PO group treatment for all patients in segregation. As with the previous reporting period, there is no definitive plan in the near term to expand TUs or to increase PC/PO group hours absent additional security staff or a substantial reduction in PDP's population.

*Requirement 7: Significantly reduce the use of segregation for Class Member patients who require placement on the behavioral health caseload.*

Behavioral Health patients have been consistently overrepresented in segregation since December 2022 when the Monitoring Team first began collecting this data. Over twelve months, from June 2023 to June 2024, the number of Behavioral Health patients in segregation has consistently increased and they remain overrepresented in segregation status. However, the Behavioral Health patient population that is also designated SMI has consistently reduced and they have remained slightly underrepresented on segregation status for 12 months from June 2023 to June 2024.

58

The following table depicts SMI and Behavioral Health patients in segregation housing on specific dates in June 2023, January 2024, and June 2024:

**Table 33: SMI and Behavioral Health Class Members in Segregation**
June 2023 – June 2024

| | June 9, 2023 | | January 12, 2024 | | June 30, 2024 | |
|---|---|---|---|---|---|---|
| | Count | Percent of PDP Population | Count | Percent of PDP Population | Count | Percent of PDP Population |
| **PDP Census** | 4565 | 100% | 4455 | 100% | 4574 | 100% |
| **Number of SMI** | 439 | 10% | 342 | 8% | 329 | 7% |
| **Number on BH Caseload** | 1653 | 36% | 1633 | 37% | 1672 | 37% |
| **Number in Segregation** | 268 | 6% | 280 | 6% | 290 | 6% |
| | | Percent of Segregation Population | | Percent of Segregation Population | | Percent of Segregation Population |
| **Number of SMI in Segregation** | 21 | 8% | 15 | 5% | 14 | 5% |
| **Number of BH in Segregation** | 102 | 38% | 113 | 40% | 133 | 46% |

Segregation data from select dates in June 2023, January 2024, and June 2024 shows that patients on the Behavioral Health caseload totaled between 36 and 37 percent of PDP's overall population. Behavioral Health patients represented 38 percent of the segregation population in June 2023, 40 percent in January of 2024, and 46 percent in June 2024.[81] SMI patients, however, have continued to reduce from 10 percent of PDP's total population in June 2023 to 7 percent in June 2024. SMI patients are not overrepresented in segregation and PDP has successfully reduced their proportion of the total segregation population in each reporting period, from eight percent in June 2023 to five percent in June 2024.

In this reporting period, Dr. Belavich initiated a qualitative review of medical records for approximately 30 patients in segregation to determine whether applications and removals of SMI designations were appropriate. Behavioral Health providers report they are making efforts to be more discerning when designating patients SMI. For example, some providers previously had a practice of designating patients SMI based solely on the patients' self-reporting without attempting to confirm symptoms or community history. This is an inappropriate practice and may result in unintended negative consequences for these patients. For charts reviewed, Dr. Belavich determined that SMI designations were appropriate.

Dr. Belavich also determined based on charts reviewed, that removals of patients from SMI designations were appropriate. PDP's psychiatric providers are the only clinicians who may

---

[81] Monitor's Fourth Report, *supra* note 12, at 47; Monitor's Third Report, *supra* note 12, at 41; Monitor's Second Report, *supra* note 12, at 37.

apply or remove a SMI designation, which Dr. Belavich indicates is sound practice. However, rationales for the removal of patients from SMI designations were not consistently documented in charts reviewed. Consequently, assessing clinical decisions to remove these patients' SMI designations required time-consuming review of extensive notes for each patient. Insufficient documentation limits internal quality control, so PDP has agreed to train providers in thorough documentation practices, which Dr. Belavich will assess via additional chart review in a future reporting period.

**Status of Recommendations, Substantive Provision 6—Behavioral Health in Segregation, from the Monitor's Second Report:**

1. PDP should reexamine its behavioral health policies and practices for segregation clearances and rounding, with particular focus on thresholds for diversion or removal from segregation based on patient acuity.
   *PDP preliminarily reports the piloting of this procedure at PICC has been positive. There are relatively few SMI Class Members at PICC, so the pilot will be expanded to RCF in the next reporting period where the new procedure can be tested more thoroughly.*
2. PDP should make additional progress in identifying security personnel to staff Positive Change, Positive Outcome treatment groups and fill Transition Units with only Transition Unit patients or others who can safely program in common spaces with them.
   *PDP reports it is unable to implement this recommendation without additional security staff or fewer Class Members.*

**Substantive Provision 7—Law Library Access**

*PDP will continue to provide law library access for all incarcerated individuals. The Monitor and the parties will discuss access and scheduling matters and the Monitor shall make any recommendations on these matters by August 1, 2022.*

**Compliance Rating: Partial Compliance**

PDP remains unable to offer Class Members consistent access to law libraries. Insufficient security staff to provide out-of-cell time and escorts to law libraries have presented barriers to law library access since compliance monitoring began, and access has not improved in this reporting period.

In April 2023, the Monitoring Team worked with PDP to implement a law library sign-up and tracking system.[82] Law library tracking has been inconsistent and has prevented reliable compliance monitoring of this substantive provision. In efforts to improve Class Members' access to legal research, PDP plans to install kiosks inside PDP housing units. PDP made progress in this reporting period and initiated the procurement of kiosks with plans to implement a pilot program in the next reporting period.

---

[82] Monitor's Third Report, *supra* note 12, at 43.

PDP recognizes that kiosks do not permit printing or copying of documents, and that it must develop a plan to provide these services upon request, in a timely manner. PDP has also committed to continuing to provide law library access whenever possible so that Class Members may use research, printing, and copying services themselves. Finally, PDP reports personnel will be trained with the understanding that kiosks supplement, but do not replace, law libraries and law library access, and that Class Members may not be instructed otherwise. The implementation of the RFID system discussed above under Substantive Provision 2—Out-of-Cell Time, will assist with tracking law library access. PDP is unlikely to achieve compliance with this substantive provision without additional security personnel or fewer Class Members.

PDP continues to track maintenance of law library printers and computers via monthly audits. A review of monthly audits for the period of January through June 2024 reflects equipment was operational on the days reviewed.

On August 16, 2024, this Court ordered PDP to install legal research terminals in every housing unit in every PDP facility by August 18, 2025.[83]

**Substantive Provision 8—Discipline**

*Sub-provision 8.1--All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding. See Wolff v. McDonnell, 418 U.S. 539, 563–66 (1974); Kanu v. Lindsey, 739 F. App'x 111, 116 (3d Cir. 2018); Stevenson v. Carroll, 495 F.3d 62, 70–71 (3d Cir. 2007).*

      **Compliance Rating: Partial Compliance**

---

[83] Order, *supra* note 8, at 5.

The following tables depict PDP's disciplinary hearing data in four six-month periods, July through December 2022, January through June 2023, July through December 2023, and January through June 2024, and for each month, January through June 2024.  The tables include totals for disciplinary sanctions issued, "not guilty" findings, dismissals, and discipline imposed despite Class Members' absence without waiver:

**Table 34: PDP Disciplinary Hearings**
July 2022 – June 2024

| Six-month Total | Total Discipline Issued | Total Not Guilty | | Dismissed | | SMI | | Guilty without a hearing - excludes refusals | |
|---|---|---|---|---|---|---|---|---|---|
| | n | n | % | n | % | n | % | n | % |
| July-Dec 2022 | 268 | 19 | 7% | 30 | 11% | 24 | 9% | 6 | 2% |
| Jan-June 2023 | 303 | 23 | 8% | 34 | 11% | 30 | 10% | 0 | 0% |
| July-Dec 2023 | 322 | 23 | 7% | 30 | 9% | 24 | 7% | 0 | 0% |
| Jan-June 2024 | 359 | 32 | 9% | 32 | 9% | 22 | 6% | 0 | 0% |

**Table 35: PDP Disciplinary Hearings**
January – June 2024

| Month | Total Discipline Issued | Total Not Guilty | | Dismissed | | SMI | | Guilty without a hearing - excludes refusals | |
|---|---|---|---|---|---|---|---|---|---|
| | n | n | % | n | % | n | % | n | % |
| January | 336 | 25 | 7% | 36 | 11% | 23 | 7% | 0 | 0% |
| February | 382 | 36 | 9% | 40 | 10% | 21 | 5% | 0 | 0% |
| March | 371 | 31 | 8% | 24 | 6% | 29 | 8% | 0 | 0% |
| April | 381 | 35 | 9% | 41 | 11% | 18 | 5% | 0 | 0% |
| May | 357 | 40 | 11% | 38 | 11% | 21 | 6% | 0 | 0% |
| June | 324 | 24 | 7% | 15 | 5% | 22 | 7% | 0 | 0% |
| **Average/Average %** | **359** | **32** | **9%** | **32** | **9%** | **22** | **6%** | **0** | **0%** |

In this reporting period, PDP remains compliant with the requirement to allow Class Members to be present at their disciplinary hearings.

However, from approximately February through May 2024, CFCF engaged in an inappropriate practice of group punishment by denying all Class Members in administrative segregation at CFCF access to commissary.  In March 2024, the Monitoring Team learned that security personnel on segregation units at CFCF had reportedly been assaulted on multiple occasions with urine or feces, possibly in violation of § 2701 of the Pennsylvania Criminal Code, or with other

62

liquids.  At times, assaults were reportedly committed with containers or items purchased from commissary.  In response, PDP withheld commissary privileges from all administrative segregation Class Members in all four segregation units at CFCF for several months.  After significant delay, PDP returned commissary access to eligible Class Members in impacted housing units.

The decision to deny commissary to all administrative segregation Class Members at CFCF rather than limiting perpetrators' access only, was reportedly based on concerns for the safety of personnel.  Assault with bodily or unknown fluids is traumatic by any measure.  Some victims experience post-traumatic stress or other mental health symptoms, and some require disability leave.  Staff on housing units where these assaults occur can become inclined to maintain greater distance from incarcerated persons, thereby reducing vigilance during security checks and further limiting access to required services.

SME McDonald agrees that suspending or reducing access to commissary or other items may be appropriate for limited periods of time while investigations are pending and any population moves are made.  This should have occurred at CFCF and required hours or days, not months, to complete.  She also notes that most group misconduct is rooted in systemic operational failures that must be identified and addressed.  PDP acknowledges, in this instance, Class Members in CFCF segregation housing were likely lashing out against PDP's long-standing failures to provide out-of-cell time and other well-documented poor conditions.  PDP's fear for the safety of its staff was appropriate but, based on PDP policy and generally accepted disciplinary protocols in detention facilities, its response was not.  This systemic failure further highlights the profound deprivation some Class Members experience, the safety risks personnel face, and the questionable decisions operating an overcrowded jail with half the necessary staff may breed.

The percentage of disciplinary reports involving SMI-designated persons continued to reduce in this reporting period.  From July 2022 through June 2023, an average of approximately 10 percent of disciplinary hearings involved Class Members with SMI.  From July 2023 to June 2024, disciplinary hearings involving Class Members with SMI reduced to an average of approximately 7 percent.

The percentage of not guilty and dismissed hearings remains at an average of approximately 18 percent in this reporting period.  The presence of not guilty findings and dismissals is positive and suggests that disciplinary hearing officers are effectively identifying errors or poor disciplinary decisions made by other security staff and supervisors at the times the alleged violations occurred.

In the second reporting period, the Monitoring Team recommended that PDP revise its disciplinary policies, hearing documentation, and training materials to comport with due process and Agreement requirements.[84]  PDP has the infrastructure to implement a revised disciplinary protocol consistent with established due process rights and has initiated revisions.  Change has been slow, however, and will require additional time and effort to implement effectively.

---

[84] Monitor's Second Report, *supra* note 12, at 39-40.

As reported above under Substantive Provision 6—Behavioral Health in Segregation, PDP initiated a pilot disciplinary process at PICC in May 2024. Disciplinary hearing officers must consider mental health evaluations and recommendations in making disciplinary determinations and imposing sanctions for those with SMI or who are otherwise identified as having difficulty understanding the disciplinary process. Clinicians must assess each of these patients and document any behavioral health contraindication to placement in segregation. They must also assess and document whether a patient is able to participate in the hearing process and present a defense. Finally, clinicians must denote whether a Class Member's mental illness should be considered a mitigating factor in any discipline imposed. As discussed above, clinicians will receive additional training in providing sound clinical input.

Hearing officers also require additional training to ensure they have considered, and documented any consideration of, clinical input. With the exception of the PICC pilot, hearing officers are not consistently requiring the completion of mental health assessment forms prior to hearings, nor are they consistently documenting whether they have considered clinical factors in their deliberations. Class Members' rights cannot be adequately protected until clinical factors are properly documented and considered during disciplinary hearings. The subject matter experts will continue to offer PDP additional technical support in the next reporting period to ensure proper implementation of the PICC pilot and this requirement.

*Sub-provision 8.2--The PDP shall expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date [April 12, 2022]. . .*

> **Compliance Rating: Substantial Compliance (March 3, 2023, monitoring discontinued)**

*Sub-provision 8.3--[PDP shall] release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are [on April 12, 2022] still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing. . .*

> **Compliance Rating: Substantial Compliance (October 12, 2023, monitoring discontinued)**

*Sub-provision 8.4--[PDP shall] cancel sanctions [imposed in hearing held between March 2020 and April 12, 2022] that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms. Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation. Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline. Defendants shall provide to counsel for plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022.*

64

**Compliance Rating: Substantial Compliance (March 3, 2023, monitoring discontinued)**

**Substantive Provision 9—Tablets**

*Sub-provision 9.1--PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational capabilities and housing designs. The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets; and, at RCF, expanding from six (6) to eight (8) tablets on the [first floor] (4 housing units) and expanding from eight (8) to twelve (12) tablets on the [2nd and 3rd floors] of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF. This expansion process will be completed by May 1, 2022.[85]*

**Compliance Rating: Partial Compliance**

PDP reports that it continues to maintain an inventory of tablets consistent with this sub-provision. The following table reflects current tablet totals at each PDP facility based on documentation provided:

**Table 36: Tablet Availability at Each PDP Facility**
January 2024 and June 2024

| Facility/Housing Unit | Total Tablets Jan 2024 | Total Tablets June 2024 | Difference |
|---|---|---|---|
| ASD Total | 0 | 0 | 0 |
| MOD 3 Total | 12 | 10 | -2 |
| CFCF Total | 188 | 192 | +4 |
| DC Total | 52 | 92 | +40 |
| PICC Total | 61 | 53 | -8 |
| RCF Total | 79 | 78 | -1 |
| **Total** | **392** | **425** | **+33** |

---

[85] The Agreement, as written, requires the expansion of tablets at RCF *"from six (6) to eight (8) tablets on the 2nd and 3rd floor (4 housing units) and expanding from eight (8) to twelve (12) tablets on the 1st floor of RCF (4 larger units) . . .".* In fact, RCF's larger units are located on the 2nd and 3rd floors and the smaller units are located on the 1st floor, suggesting that the numbers of tablets required were inadvertently reversed. To correct this small oversight in the Agreement's drafting, PDP must instead increase tablets from eight to twelve on the second and third floor housing units and from six to eight on the first-floor housing units in order to achieve substantial compliance with this aspect of the substantive provision.

65

PDP's inventory for January 2024 reflects 392 tablets were issued to housing units and an additional 113 tablets for educational purposes. The inventory as of June 21, 2024 reflects 425 tablets issued to housing units and 114 tablets maintained for educational purposes. This reflects an additional 33 housing unit tablets and 1 education tablet in this reporting period.

PDP is issuing tablets, but it is clear from internal audits, staff interviews, Class Member grievances, review of available video, and on-site observations that housing units are not consistently issuing the required number of tablets when dayrooms are open. As previously reported, some reasons for this likely include failures to replace broken tablets or to keep operational tablets charged, or hoarding of tablets by some Class Members.[86] In this reporting period, PDP logged the receipt of 29 tablet-related grievances.

PDP reports that it continues to reiterate expectations regarding tablets and monitors compliance internally. PDP also recognizes that the most appropriate solution is to make tablets available to all eligible Class Members. This is addressed in more detail below under sub-provision 9.2. PDP is unlikely to achieve substantial compliance with this substantive provision without more staff and/or issuing tablets to all eligible Class Members.

*Sub-provision 9.2--The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices.*

**Compliance Rating: Partial Compliance**

PDP reports additional progress in the City's lengthy process for procuring tablets for all Class Members. In this reporting period, the City reportedly received responses to a request for proposals issued in the fourth reporting period and is on target to select a vendor by October 2024. Once a vendor is selected, the City must initiate contract negotiations, meet any applicable labor requirements, and ensure all infrastructure upgrades are in place. Assuming progress is not hindered by additional unanticipated delays, the City reports that tablets will be issued by October 2025. In the meantime, the Monitoring Team is working with PDP on upgrading associated policies and developing staff training. As with each of PDP's technology upgrades, implementation must be done thoughtfully to ensure consistent and equitable access to tablets for all Class Members, including those in restricted housing.

---

[86] Monitor's Fourth Report, *supra* note 12, at 54.

The following table depicts total monthly and average grievances for the two largest categories of complaints and "others" submitted via tablet for the period September through December 2023:

**Table 37: Monthly Tablet Grievances**
September – December 2023

| Month | September | October | November | December | Average |
|---|---|---|---|---|---|
| Commissary | 426 | 420 | 632 | 449 | 482 |
| Food Vendor | 63 | 100 | 124 | 185 | 118 |
| Other[87] | 234 | 192 | 302 | 75 | 201 |
| **Total** | **723** | **712** | **1058** | **709** | **801** |

Tablet grievance categories require refinement and PDP's tracking of paper and tablet grievances require improvements.  PDP's tracking of paper grievances includes additional categories of complaints.  The following table depicts total monthly and average grievances submitted via paper grievance for the period January through May 2024:

**Table 38: Monthly Paper Grievances**
January – May 2024

| Month | January | February | March | April | May | Average |
|---|---|---|---|---|---|---|
| Commissary Items | 184 | 122 | 113 | 53 | 65 | 107 |
| Law Library Access | 0 | 5 | 6 | 0 | 12 | 5 |
| Out-of-Cell | 1 | 8 | 1 | 4 | 3 | 3 |
| Sanitation/Clothing | 0 | 1 | 2 | 1 | 0 | 1 |
| Discipline | 0 | 0 | 0 | 1 | 0 | 0 |
| Religious Access | 2 | 0 | 1 | 0 | 0 | 1 |
| Medical Access | 23 | 34 | 14 | 4 | 11 | 17 |
| Medication | 4 | 15 | 8 | 3 | 14 | 9 |
| MAT/Suboxone | 16 | 11 | 6 | 5 | 8 | 9 |
| Staff Complaint | 6 | 6 | 4 | 7 | 8 | 6 |
| Mail | 0 | 0 | 3 | 1 | 1 | 1 |
| Grievance Process | 0 | 0 | 1 | 1 | 0 | 0 |
| Housing/Classification | 0 | 3 | 1 | 4 | 0 | 2 |
| Misc. | 1 | 3 | 2 | 1 | 6 | 3 |
| **Total** | **237** | **208** | **162** | **85** | **128** | **164** |

---

[87] Currently, tablet grievances categorized as "other" include both complaints and requests for services.  Because service requests are not grievances, reported totals for grievances in this category as reflected in the table are inflated.  Further categorial breakdown of PDP's tablet grievances is prohibitively time consuming.

PDP reports that improvements to PDP's grievance tracking and data have been included among several projects for PDP's new data management team. Because the team is only beginning to familiarize itself with PDP's data systems, including those for use of force, out-of-cell time, staffing, medical transportation, and contraband interdiction, the team will not likely turn its attention to grievance systems until 2025.

As previously reported, when submitting electronic grievances, PDP will need to ensure Class Members are able to obtain copies of filed grievances, appeals, and any responses.[88] PDP should also permit Class Members to have access to paper grievance forms at all times, so that Class Members may choose the methods by which grievances are submitted.

In the interim, and prior to PDP issuing tablets to every Class Member, PDP should: (1) dedicate civilian resources to improving the tablet grievance process by adding an option for Class Members to "request" services in addition to filing a complaint/grievance; and (2) improve tracking to separate service requests from grievances; (3) improve tracking to identify non-grievable issues and duplicate grievances; and (4) document when grievances are processed.

**Substantive Provision 10—Phone Calls**

*Sub-provision 10.1--PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices.*

**Compliance Rating: Partial Compliance**

Interviews with Class Members, call logs, and the Monitoring Team's observations during site visits support PDP's assertion that Class Members are being offered free fifteen-minute phone calls. Because out-of-cell time is so restricted, and access to phones is limited, Class Members are unable to benefit from this requirement as PDP intended. PDP will be unable to achieve substantial compliance with this substantive provision without additional personnel—or fewer Class Members—to improve access to phones, or without providing every eligible Class Member a tablet programmed to offer free fifteen-minute call opportunities daily.

*Sub-provision 10.2--Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls.*

**Compliance Rating: Non-compliance**

As reported above under Substantive Provision 4—Return to Normal Operations, PDP does not have a plan for the return to normal operations and, therefore, remains in non-compliance with this sub-provision.

---

[88] Monitor's Fourth Report, *supra* note 12, at 55.

**Substantive Provision 11—PICC Emergency Call Systems**

*The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to tablets and/or phones and determine whether any policies and practices are necessary to address these matters considering all relevant factors, including operational feasibility and physical capacity.*

**Compliance Rating: Partial Compliance**

The Monitoring Team continues to recommend against the expansion of a call button system at PICC and instead continues to recommend significant improvements to security check protocols. PDP reports that it does not anticipate additional improvements to security check protocols and monitoring until the RFID system is implemented. RFID will require correctional officers to document security checks by scanning electronic tags for each Class Member, which will allow managers to monitor timeliness of the checks. PDP reports the current goal is to complete infrastructure modifications and test the RFID system at CFCF by December 2024. The Monitoring Team continues to recommend that PDP consider PICC for the second phase of RFID rollout if appropriate.

While RFID will permit PDP to monitor the frequency of safety checks, assessing the quality of the checks will continue to require CCTV sampling and review.[89] The City reports that it is continuing with its plans to replace existing cameras with an integrated camera system. The Monitoring Team is not hopeful that upgrades will be finalized until at least 2026. The City has also agreed to pilot a body-worn camera initiative at CFCF in 2025. The City reports that it has an existing body-worn camera contract that can be expanded to include resources necessary for the pilot. If so, the City's may be able to meet its predicted pilot timeframe of 2025.

As previously reported, physical plant limitations prevent PICC from installing additional phones and tablet docking stations.[90] The Monitoring Team reiterates its recommendation that PDP prioritize PICC in issuing tablets to every Class Member assuming it does not interfere with other aspects of the implementation timeline.[91]

In April 2024, the City provided to the Monitoring Team the confidential security analysis prepared by the Pennsylvania Department of Corrections (DOC Report) following the escapes from PICC nearly one year earlier.[92] Many of the contributing factors to the escapes have been reported publicly and further demonstrate the consequences of the City's failure to resolve PDP's staffing crisis. The DOC Report did not conflict with any Agreement provisions, this Court's orders, or Monitoring Team recommendations. PDP is in the process of implementing recommended security upgrades pursuant to the DOC Report's findings. PDP reports that some

---

[89] It was previously reported that this qualitative assessment of security checks is time consuming and hampered by the lack of an integrated camera system and the staffing crisis. Monitor's Fourth Report, *supra* note 12, at 56. Further exploration of the viability of conducting a video assessment will be explored following the implementation of the RFID system at PICC.

[90] Monitor's Second Report, *supra* note 12, at 48.

[91] Monitor's Fourth Report, *supra* note 12, at 56.

[92] PDP reportedly received the report in December 2023.

of the upgrades must be prioritized over some of its other reform efforts, though projects are being managed in tandem and are not expected to cause additional delay.

**Substantive Provision 12—Locks**

*Sub-provision 12.1--PDP initiated the lock replacement program for PICC. . . which will be completed by June 30, 2022.*

> **Compliance Rating:  Substantial Compliance (March 29, 2024, monitoring discontinued)**

*Sub-provision 12.2--PDP initiated the lock replacement program for. . .RCF, which will be completed by June 30, 2022.*

> **Compliance Rating:  Substantial Compliance (March 29, 2024, monitoring discontinued)**

*Sub-provision 12.3--For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022.*

> **Compliance Rating:  Substantial Compliance (March 3, 2023, monitoring discontinued)**

*Sub-provision 12.4--Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner.*

> **Compliance Rating:  Partial Compliance**

PDP provided copies of 14 call-button work orders completed at CFCF and RCF from January through June 2024.  This represents a significant reduction from the 37 work orders submitted for the period July through December 2023.  The 63 percent reduction is likely associated with new tamper-proof safety plates installed over call buttons at CFCF.  As previously reported, the installation of tamper-proof safety plates excluded the four-person "multipurpose room" cells which do not accommodate safety plates.[93]  Of the 14 call-button work orders submitted in this reporting period, half involved damaged call buttons in multipurpose rooms.  PDP reports it is exploring other potential options for upgrading the call buttons in those areas.

Four of the 14 work orders were documented as completed within one working day.  The number of work orders submitted in this reporting period reduced, which should have resulted in more timely repairs.  However, repairs completed within 24 hours reduced from 29 percent in the previous reporting period to 8 percent in this reporting period.  In this reporting period, call button repairs required an average of 10 calendar days, 5 days longer than average repairs in the

---

[93] Monitor's Fourth Report, *supra* note 12, at 58.

previous reporting period. PDP anticipates that call button repair timeframes will improve in the next reporting period.

PDP documented one grievance regarding broken call buttons and one grievance regarding the failure to respond to a call button. Previously reported concerns about access to paper grievances, collection of paper grievances, and access to tablets persist in this reporting period, so grievance data may be unreliable and/or underreported.

*Sub-provision 12.5--PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system.*

> **Compliance Rating: Substantial Compliance (March 3, 2023, monitoring discontinued)**

### Substantive Provision 13—Visiting

*Sub-provision 13.1--As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members. PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule. At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots.*

> **Compliance Rating: Substantial Compliance (March 3, 2023, monitoring discontinued)**

*Sub-provision 13.2--Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues.*

> **Compliance Rating: Partial Compliance**

PDP reports it has not made meaningful changes to its visiting program due to critical vacancies and competing priorities. As previously reported, PDP has agreed to implement a visiting improvement plan based on feedback from surveys and focus groups.[94] The plan has not been finalized and PDP reports it cannot yet set deadlines by which substantive improvements may be completed. Initial feedback reported in the Monitor's Third Report and PDP's responses thus far include:

- PDP's website should include all visiting policies and procedures.
  *This information is now available on PDP's website.*
- When the visiting website is down for "scheduled maintenance," visitors are unable to schedule visits, and the durations of scheduled maintenance are not clearly communicated to users.

---

[94] Monitor's Third Report, *supra* note 12, at 55.

> *PDP reports it has communicated this issue to the vendor and the issue will be addressed with the procurement of new tablets.*

- Visitors report that the visiting website's technical support phone line has excessive wait times.

  > *PDP reports it has communicated this issue to the vendor and the issue will be addressed with the procurement of new tablets.*

- Visitors report that they are not notified when scheduled visits are cancelled. This is frequently true when a Class Member is in punitive segregation at the time of scheduling or is placed in punitive segregation after a visit is scheduled.

  > *PDP reports that ATIMS is being programmed to notify visitors quickly when scheduled visits are cancelled due to movement of Class Members.*

- Class Members and staff request that Class Members receive the ability to approve or deny visits. Currently, Class Members are unable to manage visits and do not know who is visiting until the day of a scheduled visit. Class Members report that they may want to refuse some visits or prioritize some visitors over others. Staff report that it would be more efficient for them, and helpful in avoiding potential conflict in the visiting area, if Class Members were able to accept or deny scheduled visits.

  > *PDP reports that new tablets will permit Class Members to view, accept, and reject visitation requests. [95]*

- Class Members request more support from PDP in visiting with their children. For example, they have requested that PDP personnel liaise with caregivers and facilitate visits.

  > *PDP reports it has not taken action on this request.*

- Visitors and Class Members request that PDP allow visitors to resume taking photographs during visits.

  > *PDP reports it has not taken action on this request.*

- Class Members request additional access to tablet visits generally, and specifically on weekends. They also report that existing tablets are often unavailable and request greater consistency with current tablet visiting. Finally, visitors and Class Members request expanded visiting hours to include evenings for visitors who work and children who attend school during the day.

  > *PDP reports that new tablets will allow for expanded tablet visiting hours.*

The Monitoring Team made additional recommendations in previous reporting periods that PDP has agreed to include in its visiting improvement plan.[96] These include:

- Analyzing filled versus unfilled in-person visiting timeslots and making any necessary scheduling adjustments (consistent with the evening visiting request above)

  > *The current visiting scheduling system lacks a mechanism to track frequently requested timeslots and does not have a waitlist capability. PDP maintains that it*

---

[95] Class Members reported that it is not uncommon for a visitor to sign up for the allotted visits and then not show up for the visit.

[96] Monitor's Second Report, *supra* note 12, at 51-52; Monitor's First Report, *supra* note 12, at 29-30.

*does not have sufficient staff at this time to expand visiting hours, but it should consider adjusting existing visiting hours to more desirable timeslots to support working families and children.*

- Ensuring that family visiting spaces in all facilities are regularly sanitized.
  *There were no grievances filed concerning the overall condition of the visiting rooms and rooms are generally clean during announced and unannounced site visits. Several areas require maintenance to repair broken tiles, chipped paint, and aging plumbing.*

- Ensuring family visiting areas are stocked with age and culturally appropriate activities for youth.
  *PDP has some age-appropriate activities for children in visiting areas, which should be maintained and expanded while PDP is working on a visiting improvement plan.*

Given PDP's staffing crisis, PDP's decision not to prioritize visiting over other substantive provisions, such as out-of-cell time and access to medical and behavioral health care, may be appropriate. Regarding complaints about PDP's scheduling vendor, however, PDP should be persistent and require definitive responses to requests and timely solutions to issues identified. The vendor should be required to correct deficiencies immediately and provide documentation of any improvements. PDP and the City should ensure that subsequent vendor contracts contain express provisions to address deficiencies identified via surveys, focus groups, and by Class Members and PDP staff.

*Sub-provision 13.3--PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated.*

   **Compliance Rating: Substantial Compliance (October 12, 2023, monitoring discontinued)**

**Substantive Provision 14—Attorney Visiting**

*Sub-provision 14.1--PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit.*

   **Compliance Rating: Partial Compliance**

As previously reported, PDP does not log individual official visits.[97] As a result, the Monitoring Team has generally relied on reports from PDP, Class Members, Defender Association, members of the private bar, and *Remick* class counsel in assessing areas for improvement and progress.

High-traffic morning hours remained PDP's greatest hurdle regarding in-person official visits at CFCF. As previously reported, PDP worked directly with the Defender Association to strategize solutions to official visiting delays.[98] PDP promulgated numerous pilot programs and short-term

---

[97] Monitor's Fourth Report, *supra* note 12, at 59.
[98] *Ibid.*

73

policies in efforts to compensate for staffing deficiencies and space limitations. At CFCF, PDP began utilizing additional visiting rooms, modified institutional count times, and amended tablet visiting schedules, among other initiatives.[99]

Counsel continues to report issues as they arise, but it seems delays have significantly reduced over the last calendar year. As with other operational challenges reported here, PDP used creative problem-solving and trial-and-error to improve operations. As previously reported, substantial compliance will require policy changes, staff training, and perhaps additional space allocation, all of which PDP reports will occur once more urgent priorities have been met.[100] In the future, PDP reports it will evaluate whether it is operationally feasible to expand visiting areas/rooms at CFCF to: 1) increase the number of visiting booths for attorneys and social workers; and 2) resume virtual visits during high-traffic morning hours.

In the next reporting period, the Monitoring Team will continue to track improvements, and findings will eventually be incorporated into formal policy recommendations. Due to PDP's limited data tracking, compliance with this provision will ultimately be measured based on compliance with PDP's revised official visiting policies.

*Sub-provision 14.2--For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment.*

**Compliance Rating: Partial Compliance**

PDP reports ongoing challenges in meeting the 15-minute requirement for remote legal visits, due primarily to staffing shortages. This is consistent with delays tracked by the Monitoring Team, as well as reports from the Defender Association and private bar, which reflect inconsistent attendance rates in this reporting period. As previously reported, PDP tracks delays for completed calls but does not track calls that are scheduled but not completed, which will pose methodological challenges once PDP is ready for a compliance audit.[101] For now, the Monitoring Team will continue to use its own tablet visiting data to assess progress.

From January 1, 2024, through June 30, 2024, 61 of 91 or 67 percent of the Deputy Monitor's scheduled tablet visits were attended by Class Members. This reflects a 15 percent decrease from the previous reporting period. 30 of the 91 visits were no-shows and another 12 were delayed beyond the 15-minute compliance window, suggesting a 54 percent compliance rate for sub-provision 14.2 in this reporting period. Overall, this is a four percent decrease from the last reporting period, highlighting the frustrating lack of consistency with tablet meetings.

PDP has made progress implementing additional time slots for tablet meetings, as recommended. In April 2024, PDP began offering both 25-minute and 55-minute slots, which creates additional

---

[99] An exhaustive list of changes was outlined in the Monitor's Fourth Report. *See Id.* at 59-60.
[100] *Ibid.*
[101] Monitor's Fourth Report, *supra* note 12, at 60.

flexibility for counsel when scheduling remote visits. Counsel no longer have to wait an hour between visits when scheduling back-to-back tablet meetings with Class Members. Delays and problems persist, but this improvement marks progress.

*Sub-provision 14.3--For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay.*

**Compliance Rating: Non-compliance**

As predicted in the Monitor's Fourth Report, PDP has not made meaningful progress toward compliance with this sub-provision. PDP's current policy does not require notification to attorneys when visits are delayed or canceled, and PDP has not issued an interim directive regarding this requirement. Personnel have been instructed to notify attorneys of delays, cancelations, or refusals; however, they may not be held accountable for failures to comply until policies and post orders have been revised and personnel have been trained. PDP will be unable to comply with this provision until staffing levels improve or the population reduces and policy revisions are complete.

**Substantive Provision 15—COVID-19 Testing**

*The PDP shall continue the present policy regarding testing of persons who are scheduled for court. Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID-19. They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results. Those housed on a "yellow block" may have been exposed to a COVID-19-positive individual, and they will be rapid-tested twice, the night before court and the morning of court. They will be transported to court if both tests are negative. Those housed on a "red block" are COVID-19 positive and will be isolated for ten days and not brought to court during that time frame. These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia Department of Public Health. Provided, however, that the Defendants shall not unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols.*

**Compliance Rating: Substantial Compliance (October 12, 2023, monitoring discontinued)**

**Substantive Provision 16—Quarantine**

*If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19. Under current policy, see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021, for persons who are vaccinated and are exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative.*

75

**Compliance Rating:  Substantial Compliance (October 12, 2023, monitoring discontinued)**

**Substantive Provision 17—Sanitation**

*Sub-provision 17.1--Defendants agree to continue conducting the weekly General Inspection ("GI") cleaning days with supplies provided by officers to clean cells and housing areas.*

**Compliance Rating:  Partial Compliance**

PDP facilities continued to make efforts to improve sanitation, and facility leadership remained responsive when issues were brought to their attention in this reporting period.  The maintenance contractor is also continuing to make progress.  However, staffing vacancies render the system too strained to maintain progress over entire reporting periods, and the quality of facility sanitation continues to vary among housing units.

Examples of some improvements in this reporting period include plans reported by the CFCF Warden to assign a crew of security personnel to supervise the deep cleaning of housing unit showers.  This is a positive step to address one of the facility's persistent issues.  The Warden notes, however, the security crew will be staffed with overtime personnel, so maintaining a consistent cleaning schedule will be challenging.  Dorms at DC were noticeably cleaner during the June 2024 site visits and lighting and plumbing upgrades were also noted.  Despite these improvements, most sanitation issues identified in previous reporting periods are still present to varying degrees, and some have worsened.  For example, with the exception of one unit at PHSW, PDP's clinical units do not meet accepted standards for clinical care environments and MOD 3 is not an appropriate environment for PDP's youth Class Members.[102]

PDP continues to complete weekly internal sanitation inspections.  Inspectors' findings are shared with facility leadership and the Monitoring Team and generally mirror the issues reported here and complaints the Monitoring Team receives from Class Members.  Examples include:

- At CFCF, inspectors consistently noted graffiti, poorly cleaned and maintained showers, rodents, and frequent Class Member complaints.[103]  The population intermittently complains about inconsistent distribution of clean clothing and bed linens.[104]  CFCF Unit A1P4 reported three inoperable showers for two consecutive inspections completed two weeks apart.[105]  Unit D1P4 is noted as maintaining higher cleanliness standards, consistent with Class Member reports that they receive more regular access to cleaning supplies, soap, and toilet paper.
- At DC, the auditor notes noncompliance with vector control, deteriorating and nonoperational showers, missing windows covered with plastic, chipping paint, graffiti,

---

[102] Beds in the unit have open slats and should be replaced with suicide resistant beds.
[103] PDP Audit CFCF – January 9, 12, 30, 31, 2024; March 8, 2024; April 5, 10, 22, 2024; June 6, 2024.
[104] PDP Audit CFCF – January 9, 12, 31, 2024; April 10, 22, 2024; June 6, 2024.
[105] PDP Audit CFCF – March 8, 2024 and April 5, 2024.

and inoperable phones, drinking fountains, and televisions.[106]  The population generally reported access to cleaning supplies, soap, and toilet paper.  Inconsistent clothing and bed linen exchange were documented as an ongoing issue.

- At MOD 3, youth reported access to laundry, cleaning supplies, and linen.  The unit was determined to be in satisfactory condition.[107]
- At PHSW, the auditor notes month after month that cells remain inoperable due to exposed wires, leaking ceilings, and broken locks, glass, and plumbing.  Showers in unit 207 are noted to be inoperable and contain broken tiles.[108]  The population consistently reported insufficient access to clean clothing, bedding, cleaning supplies, soap, and toilet paper.
- At PICC, the showers are routinely noted on every sanitation audit to have a buildup of soap scum.  Approximately 20 to 30 percent of the population continues to report that they are not receiving two sets of outer clothing and/or clean clothing or bed linens on a weekly basis.  No evidence of vector control issues were noted.[109]  As noted above, PICC closed F Unit during this reporting period for painting and renovation, including the application of chalkboard paint on cell walls to reduce graffiti.  J Unit was also closed in this reporting period for renovations.  There were unaddressed maintenance issues noted during multiple inspections, such as a recreation yard window in H Unit that was covered with a wooden board and exposed electrical wires in a closet in H2.[110]  The population generally reported access to cleaning supplies, soap, and toilet paper.
- At RCF, Class Members generally reported access to clean clothing and bed linens, cleaning supplies, and toilet paper.  Issues observed during sanitation inspections requiring correction were related to graffiti, visual obstructions due to hanging clothing/sheets, soap buildup in showers, and broken vents.[111]

The Monitoring Team met with an inspector in this reporting period to better understand PDP's review methods and how corrective action is monitored when issues recur over more than one inspection period.  The PDP auditing team was receptive to suggestions and plans to implement improvements in the next reporting period.

At PICC, access to feminine hygiene products has continued to improve and Class Members are now generally reporting during site visits that they consistently receive two rolls of toilet paper, eight sanitary pads, four tampons, and one bar of soap three times per week.  As previously reported, Class Members also have direct access to tampons free of charge via dispensers installed in all female housing units.[112]

---

[106] PDP Audit DC – January 17, 2024; February 14, 2024; March 13, 20, 2024: April 22, 2024; May 6, 2024; June 6, 11, 2024.

[107] PDP Audit RCF MOD 3 – January 31, 2024; February 28, 2024; March 28, 2024; April 25, 2024.  MOD 3 is an old unit and the housing environment and program offerings do not meet current youth confinement standards.

[108] PDP Audit PHSW – February 5, 2024; March 1, 27, 2024; April 24, 2024; May 24, 2024; June 19, 2024.

[109] Class Members at PICC reported to the Monitoring Team that ants and garden snakes were becoming an issue.

[110] Examples PDP Audit RCF – February 10, 2024; March 13, 2024; May 22, 2024; June 19, 2024.

[111] PDP Audit RCF Main – January 9, 18, 26, 2024; February 6, 14, 29, 2024; March 5, 13, 22, 2024; April 11, 24, 29, 2024; May 5, 13, 17, 2024; June 2, 10, 20, 2024.

[112] Monitor's Fourth Report, *supra* note 12, at 63.

PICC renovations and improvements at CFCF continued in this reporting period following the expansion of PDP's maintenance contract with US Facilities, Inc. At PICC, entire housing units are being renovated and common areas and hallways are receiving lighting upgrades and fresh paint. CFCF closed some housing units for renovations and corridors have been repainted.

MOD 3, where youth are currently housed, requires updated lighting, fresh paint and shower, flooring, and window repair in every housing unit. At DC, the Monitoring Team observed Class Members accessing the yard for the first time since compliance monitoring began in 2022, reportedly delayed by lengthy, outstanding maintenance projects. Poor vector control and inconsistent maintenance at DC continue to require immediate intervention that City maintenance cannot provide with current staff. Neither MOD 3 nor DC/PHSW are covered under the expanded maintenance contract and neither facility meets acceptable standards for youth or adult confinement or clinical care. City maintenance vacancies continue to cause unacceptable maintenance delays, which directly impact Class Members in both facilities.

*Sub-provision 17.2--[Defendants agree] to provide regular laundry services under current PDP policies.*

**Compliance Rating: Partial Compliance**

Previously reported issues with inadequate clothing exchange persisted in this reporting period. The Monitoring Team has alerted PDP executives to this unacceptable condition following every site visit since 2022. Class Members have continued to report that they did not receive two sets of clean outerwear at intake, that they cannot rely on the weekly laundry exchange in facilities that do not permit in-unit laundering, and that they lack clean clothing, bed linens, and underclothing. As with previous site visits, the Monitoring Team observed dingy, dirty, or stained bed linens and many cells clearly continue to lack second sets of clean clothing.

PDP has proven it is capable of implementing effective solutions to long-standing failures to distribute supplies to Class Members. For more than a year, women at PICC complained about inadequate access to feminine hygiene products. PICC leadership implemented an initial solution with some positive results, but complaints continued. When leadership revisited the issue, they pivoted to a more durable strategy and have continued to monitor its effectiveness. As stated above, the feminine hygiene issue now appears to have been resolved.

PDP should apply the same creativity to correct its long-standing failures to provide clean clothing, bed linens, undergarments, and cleaning supplies. Over two years, SME McDonald has recommended multiple potential approaches to correct these operational deficiencies, including modifying distribution schedules, internal auditing, increasing the number of Class Member workers, procuring more clothing and bed linens, ensuring laundry equipment is operational, and holding managers accountable for required access to these items. Unlike most other aspects of the Agreement, PDP's staffing crisis does not preclude compliance with this substantive provision. Ultimately, SME McDonald recommended in this reporting period that executives find any way possible to "flood" housing units with clothing, linens, and cleaning supplies. In

78

August 2024, the new Commissioner committed to more intent focus in this area. Effective solutions should be forthcoming.

**Status of Recommendations, Substantive Provision 17—Sanitation, from the Monitor's Third Report:**

1. PDP should modify schedules to increase the frequency of deep cleaning rounds.

   *There has been no notable improvement in deep cleaning due primarily to lack of staffing to oversee the process and workers to facilitate cleaning. PDP did, however, purchase pressure washers in this reporting period to assist with shower and cell sanitation.*

2. PDP should provide Class Members with secure, rodent-proof containers for their belongings.

   *PDP reports it has procured secure, rodent-proof containers in this reporting period. The containers are institutional grade, soft-sided boxes for the storage of commissary and edible items in cells and dormitories. PDP reports containers should be issued in the next reporting period. This improvement marks progress.*

3. PDP should expedite procurement of sufficient undergarments to meet the needs of all Class Members.

   *During site visits in June 2024, it was evident that undergarments were not being routinely issued. Following the site visits, PDP reported that Class Members in women's units are now issued three pairs of underwear and two brassieres, and males are issued two sets of boxers and t-shirts. In the next reporting period, the Monitoring Team will confirm this policy is being implemented as reported.*

4. PDP jail managers should conduct thorough assessments in every facility to identify specific deficiencies in the areas of general sanitation and vector control, clothing and linen exchange, and issuance of hygiene supplies.

   *PDP continues to complete regular internal sanitation audits. Audits are completed by sergeants who are not assigned to facilities being audited and findings are shared with institutional staff and the Monitoring Team.*

5. PDP should revise its post orders to reflect operational nuances at each facility. Post orders should account for the needs of unique populations, such as women, youth, and those navigating mental illness or other disabilities.

   *PDP reports it is in the process of revising post orders but has not had sufficient bandwidth to finalize updates in this reporting period. The Monitoring Team has recommended that PDP continue to prioritize reform based on available resources with emphasis on improving conditions for Class Members.*

6. PDP executives and facility leadership should develop plans to increase guidance for unit personnel in meeting expectations for general sanitation and vector control, clothing and linen exchange, and the issuance of cleaning and hygiene supplies. Plans should include effective monitoring via audits or other modes of verification.

   *PDP has implemented improvements, as noted above, however, supervisor vacancies impede progress in developing recommended plans. As also noted, PDP must*

*identify some way of ensuring Class Members have clean clothing, linens, and cleaning supplies. Any solutions the Commissioner and his executive team identify should be implemented immediately.*

**Additional recommendations for immediate action:**

7. The City should authorize the emergency procurement of outside contractors to deep clean housing units on a regular schedule, similar to its approach in medical and mental health housing units, which have shown improvement as a result. The contract should include entire housing units, showers, and all biohazardous cells prior to re-occupancy.

    *PDP reports it cannot implement this recommendation because any outside cleaning crew would require security escorts, which staffing vacancies would not support. If so, PDP must identify an effective alternative to ensure housing units are sanitized.*

8. The City should authorize PDP to immediately implement an effective vector control program at DC/PHSW and MOD 3.

    *PDP reports that it entered into a new contract for vector control services at DC/PHSW and MOD 3. The Monitoring Team will evaluate any progress in the next reporting period.*

9. PDP should prioritize capital projects that pose health and safety risks in populated housing units.

    *PDP has not prepared a comprehensive, prioritized capital projects plan. As previously reported, PDP's aging facilities require significant renovation and repair. Projects will be complex and costly to operationalize.[113] Significant capital projects have been underway since monitoring began, such as air conditioning installation at DC and lock replacements in all facilities, among others. However, the City has not dedicated sufficient resources to develop a systemwide plan for renovations and repairs with completion timeframes for each project.*

    *RCF and CFCF visually appear to be in sound repair. It is unclear, however, whether aspects of the infrastructure require replacement and whether some areas, such as showers and flooring at CFCF, are in acceptable condition. Each of PICC, MOD 3 and DC/PHSW have critical repair and major capital projects needs. An acceptable project plan should include repairs and renovations of deficiencies that are observable throughout facilities and housing units as well as hidden or larger infrastructure needs, such as roofs, HVAC, plumbing, and electrical. The plan should include a full-scale assessment to assist PDP with prioritizing projects based on projected population needs, and fire, life, and safety protocols.*

    *On August 16, 2024, this Court ordered the City to analyze physical plant and long-term capital needs at every PDP facility housing Class Members, and to identify deficits that impact conditions of confinement.[114] The analysis must be submitted by May 13, 2025.*

---

[113] *Id.* at 16-18.
[114] Order, *supra* note 8, at 6.

10. Expand existing contracts to correct maintenance vacancies that severely impact conditions of confinement at ASD-CU and MOD 3, DC, and PICC.

> *PDP reports that the City has further expanded PDP's maintenance contract to include all maintenance services at PICC, in addition to emergency repairs. US Facilities, Inc. is now responsible for all maintenance at CFCF, RCF and PICC, including vector control.*
>
> *City maintenance employees are responsible for facilities maintenance and vector control at DC/PHSW and MOD 3. PDP continues to report a maintenance employee vacancy rate exceeding 40 percent.[115] Even with reduced responsibilities, City maintenance is currently unable to meet physical plant needs at DC/PHSW and MOD 3.*
>
> *On August 16, 2024, this Court ordered the City to authorize further expansion of PDP's maintenance contract to include all necessary maintenance at all PDP facilities, and to initiate outreach to labor unions as appropriate.[116]*

**Substantive Provision 18—Use-of-Force**

*PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands. The parties agree that correctional officers should follow de-escalation measures provided in PDP policies. The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors. In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states: "Force is only used when necessary and only to the degree required to control the inmate(s) or restore order…The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated….Staff will not use pepper spray as a means of punishment, personal abuse, or harassment."*

**Compliance Rating: Partial Compliance**

PDP continues to maintain a small Use of Force Review Team (UFRT) comprised of two lieutenants and a captain. The UFRT reviews all video of reported uses of force as soon as possible following each incident to identify or exclude any use-of-force policy violations or employee misconduct. The UFRT also continues to complete more comprehensive reviews of a small number of use-of-force packages. The team continues to refine its expertise in identifying factors that contribute to force incidents, the quality force responses and post-incident care, and systemic approaches to reducing reliance on force.

---

[115] Refer to Table 1, page 13.
[116] Order, *supra* note 8, at 5-6.

Meaningful systemic change will require supervisors and managers to take a far more concerted approach to use-of-force reviews. That remains unlikely due to critical security staff vacancies, which continue to result in months-long delays in facility-level use-of-force reviews.[117]

In this reporting period, SME McDonald completed a comprehensive review of five use-of-force packages from each of RCF, CFCF, and PICC to assess any improvement in the quality of reviews at the facility and UFRT levels. Facilities were notified in advance which packets would be reviewed and were encouraged to give them particular focus at the facility-level review. The system showed improvement in addressing contributing factors to force incidents and analyzing use-of-force responses. The UFRT and facility personnel identified a broad range of concerns that included unnecessary/excessive force, policy violations, and training issues. Reviews in this reporting period also included confirmation that some non-compliance issues were addressed. This marks progress.

Incidents reviewed were selected specifically because they each include multiple, complex issues and serve as effective case-studies. Examples below do not reflect typical use-of-force incidents and are not representative of incidents systemwide. Some findings include:

- Five use of force incidents were identified by PDP as involving unnecessary or excessive force, resulting in employee discipline or pending misconduct investigations;
- Pre-force issues were identified in three incidents that were non-emergent and should have involved support from mental health. Packets contained documentation confirming that personnel were retrained in the controlled situation policy; and
- Seven use-of-force incidents were identified as requiring a range of areas for improvement in tactical responses, de-contamination, report writing, isolation, containment, and equipment requirements.

SME McDonald provided feedback on cases and discussed with reviewers any areas for improvement or consideration that were not documented. None of the cases involved excessive use of force that was not identified by PDP. This marks important progress. PDP has remained receptive to feedback during the review processes and is demonstrating more rigorous internal monitoring.

Force incidents reviewed in this reporting period also demonstrate that staff remain ill prepared to manage larger disturbances. Cases included repeated failures to isolate and contain situations, and uninvolved Class Members can be seen on CCTV remaining in close proximity to fights or other disturbances. SME McDonald notes that correcting issues with disturbance control requires intensive training and internal monitoring and mentorship. They are perishable skills that require initial and annual training to maintain, which staff vacancies prevent PDP from providing. However, PDP reports it will conduct disturbance-control drills in the next reporting period. The drills will temporarily impact program offerings but are critical for safety and security. Incidents also demonstrate that staff continue to use unnecessary force and continue to use force after situations are controlled. These issues remain unacceptable but were documented more consistently in this reporting period.

---

[117] Monitor's Fourth Report, *supra* note 12, at 66.

Other areas of progress in this reporting period include:

- On June 27, 2024, following the identification of incidents that should have been recorded and involve mental health clinical support, PDP executives issued a reminder to all staff concerning requirements for pre-planned or controlled force situations.
- PDP worked with the National Institute of Corrections to provide Crisis Intervention training to 26 employees in April 2024. This is reportedly the first in a series of courses designed to build de-escalation skills and skills in effective engagement with those navigating mental illness.
- PDP lacks sufficient supplies of handcuffs to issue systemwide, so temporary restraints have been purchased for training and distribution in the next reporting period.[118]
- PDP anticipates its new jail management tracking system, referred to in corrections only as ATIMS, will be online in the next reporting period. It will reportedly have the ability to enhance use-of-force reporting, reviews, and tracking as well as serve as an early warning system for potentially problematic personnel. ATIMS implementation has been a multi-year effort and will likely require refinement, but PDP is certain to benefit from anticipated improvements.
- PDP reports the new data analysis team is preparing to assist the UFRT in analyzing and reporting on force trends in the next reporting period.

On August 16, 2024, this Court ordered the City to implement the following security measures designed to increase facility safety and reduce reliance on security officers for some tasks:[119]

1. PDP must confer with the Philadelphia Police Department to implement a system to remotely report criminal offenses that occur at PDP facilities, to include a video capability that would allow police personnel to interview complainants and witnesses remotely. PDP must report the outcome of these discussions by October 15, 2024.
2. The City must fund PDP's K9 detection program. Funding for the program must be at a level sufficient to conduct routine and consistent sweeps for contraband at each institution and to ensure adequate facilities to house K9s and all necessary equipment.
3. The City must complete the purchase of technology that allows for prompt and efficient scanning, without violating any attorney-client privilege, of incoming legal mail for contraband. The technology must be purchased by October 15, 2024.

The Monitoring Team is confident that PDP's momentum will continue and anticipates additional progress in some areas. Progress will be slow and incremental, however, due to critical staffing shortages and an increasing Class Member population. PDP must still revise its policies on use of force, use-of-force review, and force training. None of these tasks will likely be completed until staff vacancies or the Class Member population are reduced. Other critical projects such as group incident training, utilization of body worn cameras and an integrated

---

[118] PDP has not been issuing handcuffs to all staff, which has caused delays in restraining combative Class Members and poses risk to those involved. Temporary restraints are consistent with the Monitoring Team's recommendation to ensure all staff have restraints.

[119] Order, *supra* note 8, at 6.

camera system, and use of personal alarm devices will also surely take considerable time, funding, and effort to operationalize.